# EXHIBIT H

# OPERATING AGREEMENT

# PEAK SERVICING, LLC

### a Limited Liability Company of the Big Valley Band of Pomo Indians

Peak Servicing, LLC (the "*Company*") is wholly owned by the Big Valley Band of Pomo Indians of the Big Valley Rancheria, a federally recognized Indian tribe ("*Tribe*"), and formed under the Big Valley Band of Pomo Indians of the Big Valley Rancheria Business Ordinance ("*Ordinance*"), with Articles of Organization ("*Articles*") authorized and approved by the Tribe as the Company's sole member, pursuant to Resolution No. 05-28-2020-05 on May 28, 2020 ("*Resolution*"). Pursuant to Section 6.1 of the Articles of Organization, the Board of Managers of Company has authorized and approved this Operating Agreement ("*Agreement*"), effective as of May 29, 2020.

## ARTICLE 1
## FORMATION

    1.1    <u>Name</u>. The name of the Company is "Peak Servicing, LLC."

    1.2    <u>Articles of Organization</u>. Articles of Organization were filed on May 29, 2020, and approved by the Member by the aforementioned Resolution.

    1.3    <u>Purpose.</u> The Company is formed for the following purposes: (1) to serve the social, economic, educational and health needs of the Tribe; (2) to provide Tribal revenues and enhance the Tribe's economic self-sufficiency and efforts related to self-determination; (3) to provide positive, long-term social, environmental and economic benefits to Tribal members by enhancing the Tribe's business undertakings and prospects; (4) to engage in all business activities allowable pursuant to applicable law, including but not limited to consumer finance and loan servicing; (5) to provide employment opportunities for Tribal members, including opening a call center, if feasible; (6) to provide employment training through the Pathways Pilot Program; and (7) to generate revenues for the Company to utilize in furtherance of the purposes of the Company for the ultimate benefit of the Tribe and its members. To effectuate these purposes, the Company has the power to engage, participate and provide and operate a consumer financial services business that will provide full service internet-based, consumer loan management, servicing, and collections (the "*Company Purpose*"), and to engage in such business activity to generate additional revenues, enhance self-sufficiency and self-determination of the Tribe. Without in any way limiting the scope and generality of the foregoing, the Company shall have and may exercise powers up to the limits of its Articles of Organization and the Ordinance as deemed desirable to give effect to the Company Purpose. Notwithstanding anything to the contrary herein or in the Articles of Organization, without the consent of a Supermajority of the Board, the Company shall not engage in, participate in or provide, directly or through wholly owned subsidiary business entities, any business or activity other than to effectuate the Company Purpose.

    1.4    <u>Duration</u>. The Company shall exist perpetually, unless dissolved as provided herein and pursuant to the Ordinance.

72755189.18

1.5     Principal Place of Business. The Company shall be a resident of and maintain its corporate headquarters on the Tribe's Reservation, but may conduct its business activities any place in or outside the United States. The principal office of the Company shall initially be 2726 Mission Rancheria Rd., Lakeport, CA 95453. The Company may have such other offices, either within or outside of the Reservation as the business of the Company may require from time to time and as shall be approved by the Board of Managers.

1.6     Registered Agent. The Company's initial registered agent shall be Ben G. Ray III, whose address shall be 2726 Mission Rancheria Rd., Lakeport, CA 95453.

1.7     Title to Property. Title to the Property will be held in the name of the Company. No Member has any ownership interest or rights in the Property, except indirectly by virtue of such Member's ownership of equity interests in the Company.

1.8     Bank Accounts. All funds of the Company will be deposited in a separate bank, money market or similar account or accounts approved by the Board and in the Company's name. Withdrawals therefrom may be made only by such persons as are authorized by the Board.

## ARTICLE 2
## MEMBER, MANAGEMENT, AND INTERESTS

2.1     Member. The sole Member of the Company is the Tribe. No Member shall have the power to withdraw from the Company without the consent of the Board. The assignee of a Member's interest may become a Member only if the other Members unanimously consent and if approved by the Board of Managers.

2.2     Manager-Managed. The Company shall be manager-managed and the business and affairs of the Company shall be managed by a board of managers (the "***Board***") consisting of eight (8) members of which four (4) shall be appointed by Kraken (each, a "***Kraken Representative***") and four (4) shall be appointed by the Business Committee of the Tribe (each, a "***Tribal Representative***"); provided, that, after the Earnout Period and so long as there is no Event of Default under the Closing Consideration Note or under the Earnout Agreement or default in the payment of the Post-Closing Cash Consideration required under the Merger Agreement and after all Earnout amounts required to be paid under the Earnout Agreement have been paid, then the Tribe may, but is not required to, replace the Kraken Representatives. The Tribal Representatives must have the following qualifications to serve on the Board: (a) at least one (1) Tribal Representative will be the sitting Business Committee Chairperson; (b) at least (1) other Tribal Representative shall be a member of the Tribe; and (c) the remaining Tribal Representatives may be whomever the Business Committee appoints. Kraken will designate in writing the names of the initial Kraken Representatives it is appointing to the Board and the effective date and time upon which they will become members of the Board. Until the effective date and time for the appointment of the initial Kraken Representatives the Board will have four members composed only of the Tribal Representatives and the presence of all four members shall constitute a quorum, all actions of the Board will require only the consent of a majority of the Board, and no Supermajority vote on matters described in Section 4.3(4) shall be necessary on any matter until the appointment of the Kraken Representatives. After the appointment of the Kraken Representatives the Board will consist of eight (8) members as set forth above.

2.3     Resignation; Removal. Any member of the Board may resign at any time, such resignation shall be made in writing to the Company and to Kraken, with respect to the Kraken Representatives, and shall take effect immediately upon receipt, unless the notice specifies a later date in which case such later date shall be the effective date of resignation. Each of Kraken and the Business Committee of the Tribe shall have the right to remove and replace any of its appointees at any time and to fill a vacancy left by the resignation, removal or death of any of its appointees by delivering written notice thereof to the Company.

2.4     Liability. No Member, Manager, officer or management executive of the Company shall be personally liable for the expenses, debts, obligations or liabilities of the Company or for claims made against it, provided however, that such liability is limited by the actions set forth in Section 6.1 of this Agreement.

ARTICLE 3
MEETINGS

3.1     Member Meetings. An annual meeting of the Member and Board shall be held in the month of June each year. The annual meeting shall be held at the principal office of the Company or at such other location as the Board shall specify. Notice of the annual meeting shall be required as defined in Section 3.3 below.

3.2     Board Meetings. Regular meetings of the Board will be held every quarter, and may be held without notice at such times and places as will from time to time be fixed in advance by resolution adopted by the Board. Any business may be transacted at a regular meeting. Special meetings of the Board may be called at any time by any two Managers. The place of each special meeting will be at the principal office of the Company, or at such other place as may be unanimously agreed upon by the Board. The Managers may participate in any meeting by means of remote communication, including conference telephone or similar communication equipment, whereby all of the Managers participating in the meeting can hear each other, and participation in a meeting in this manner will constitute presence in person at the meeting.

3.3     Notice of Meeting. Except as set forth in Section 3.2 with respect to regular meetings of the Board, written notice of the date, time, and place, and for each special meeting the purpose, of each meeting shall be given to each attendee not earlier than thirty (30) days nor less than five (5) days before the meeting date and for each special meeting not less than two (2) days before the meeting date. Written notice may be delivered personally, given by facsimile or other form of wire communication, or e-mail, or by United States mail or by reputable private overnight courier service, to each attendee's address maintained as such attendee's notice address in the records of the Company. Written notice shall be effective at the earliest of the following: (a) when received, (b) when sent by facsimile or other form of wire or electronic communication (receipt confirmed), or (c) three (3) business days after being deposited in the United States mail or with a reputable private overnight courier service. Whenever any notice is required to be given to the Member or any Manager under any law or this Agreement, a written waiver thereof, signed by the Member or Manager entitled to such notice, whether before or after the time stated therein, will be deemed equivalent to notice. Attendance by the Member or a Manager at a meeting will constitute a waiver of notice of such meeting, except when the Member or Manager

72755189.18

attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in any written waiver of notice.

       3.4     <u>Action without Meeting.</u> Any action required to be taken at a meeting of the Board or any other action which may be taken at a meeting of the Board may be taken without a meeting if a consent in writing setting forth the action so taken is signed by all the Managers. Any such consent signed by all of the Managers shall be filed with the minutes of the proceedings of the Board. Any such consent signed by all of the Managers will have the same effect as a unanimous vote and may be stated as such in any document describing the action taken by the Board.

       3.5     <u>Meetings by Electronic Communication.</u> Meetings of the Board may be held by conference telephone or by any other means of communication by which all participants can hear each other simultaneously during the meeting, and participation in a meeting in such manner shall constitute presence in person at the meeting.

       3.6     <u>Voting</u>. Each Manager will have one vote on all matters to be voted upon or consented to by the Board. At all meetings of the Board, both a majority of the Tribal Representatives and a majority of the Kraken Representatives will, unless a greater number as to any particular matter is required by this Agreement, constitute a quorum for the transaction of business. Except as may be otherwise provided in this Agreement, all actions by the Board shall require consent of at least five (5) members; <u>provided</u>, <u>that</u>, to the extent allowed by applicable law, at any meeting of the Board, Managers may vote by proxy for other Managers provided that the proxy is in writing and filed with the chairman of any meeting prior to the taking of the applicable vote (for the avoidance of doubt, each proxy will be counted for purposes of determining whether a quorum exists, but any action taken by written consent may not be consented to by proxy). If a quorum is not present at any meeting of the Board, the Managers present may adjourn the meeting successively until a quorum is present, and no notice of adjournment will be required other than announcement at the meeting.

       3.7     <u>Compensation</u>. Unless otherwise determined by the Board, no Manager will be entitled to any compensation for serving in such capacity. Notwithstanding the preceding sentence, the Board, in its discretion, may make payments to any Manager(s) as compensation for such Manager(s) work for the Company in a capacity other than as Manager.

ARTICLE 4
AUTHORITY OF THE BOARD

       4.1     <u>Approvals and Day to Day Business</u>. As provided in the Articles of Organization, the Company shall be managed by the Board, who shall appoint one or more officers to manage the day-to-day operations of the Company.

       4.2     <u>General Authority</u>. Subject to restrictions set forth in this Article 4 or elsewhere in this Agreement, the Board will have the right, power, and authority from time to time to make such decisions and take such actions for and on behalf of the Company, or delegate the same to

72755189.18

the appropriate officers or employees of the Company, as the Board deems necessary or appropriate to equip, staff, and operate the business of the Company. All actions specified in Chapter 3, Section 4.7.2 of the Ordinance will require only an affirmative vote of the Board of Managers in accordance with the provisions of this Agreement.

4.3  <u>Specific Actions Requiring Approval of a Supermajority of the Board</u>. Subject to the provisions of Section 2.2, the approval of a Supermajority of the Board shall be required prior to the Company taking any of the following actions:

1) Sell, lease, exchange, mortgage, pledge, or other transfer or disposition of all or substantially all the assets of the Company other than in the ordinary course of business;

2) Merge the Company with another entity;

3) Amend the Articles of Organization;

4) Incur indebtedness by the Company other than in the ordinary course of business;

5) Convert the Company to a corporation or other entity;

6) Change the nature of the business of the Company from that of the Company Purpose; or

7) Any investment by the Company outside the ordinary course of business.

4.4  <u>Officers</u>.

(a)  <u>Officers</u>. The Company shall appoint a Chief Executive Officer ("***CEO***"), and a Chief Financial Officer ("***CFO***"), and may appoint one or more Chief Operating Officers, Chief Information Officers, Vice Presidents, Secretary, Assistant Secretaries, and/or other officers as determined by the Board. Any number of offices may be held by the same person, unless this Agreement otherwise provides. The Company may also appoint a Chairman of the Board ("***Chairman***") whose sole responsibility will be to preside over all meetings of the Board. The Chairman shall be a Tribal Representative who is a member of the Tribe.

(b)  <u>Election of Officers</u>. The Board may elect, appoint, and remove the officers from such positions from time to time.

(c)  <u>Compensation of Officers and Employees</u>. The salaries and compensation of all officers shall be fixed by the Board from time to time through an employment agreement with the officer.

(d)  <u>Duties of CEO</u>. The CEO shall be the chief executive officer of the Company and shall be in charge of all of the day to day operations of the Company and have all duties normally associated with such position, subject to the discretion of the Board, and shall preside at all meetings of the Board if no Chairman is appointed or if the

72755189.18

Chairman is unavailable to preside. The CEO is authorized to take all actions necessary to cause the Company to comply with contracts entered into by the Company, and may perform other duties as prescribed by the Board from time to time

(e) <u>Duties of CFO</u>. The CFO shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall be responsible for preparing all financial statements. The CFO shall perform such other duties as may be prescribed by the Board or the CEO.

(f) <u>Duties of Vice President</u>. Unless otherwise determined by the Board, if appointed, in the absence of the CEO or in the event of the CEO's inability or refusal to act, the Vice President, if any, shall perform the duties of the CEO, and when so acting, shall have all the powers of and be subject to all the restrictions upon the CEO. The Vice President shall perform such other duties and have such other powers as may be prescribed by the Board or the CEO.

(g) <u>Duties of Secretary</u>. Unless otherwise determined by the Board, if appointed, the Secretary shall attend all meetings of the Board and record all the proceedings of the meetings of the Board in a book to be kept for that purpose. The Secretary shall perform such other duties as may be prescribed by the Board or the CEO.

4.5 <u>Resignation.</u> Any officers appointed by the Board may resign at any time by delivering written notice to the Board. The resignation is effective upon receipt by the Board, unless the notice specifies a later effective date, subject to the Board's consent of any later date, not to be unreasonably withheld. Once delivered, a notice of resignation is irrevocable unless revocation is permitted by an affirmative vote of the Board.

4.6 <u>Insurance</u>. The Company shall procure and maintain at all times, at its expense, directors and officers insurance covering members of the Board with coverage in an amount to be determined by the Board or as required by any contract.

4.7 <u>Management of Subsidiaries</u>. Any Subsidiary of the Company that is a limited liability company will be member-managed and any Subsidiary of the Company that is a corporation shall have a board of directors identical in all material respects to the Board.

4.8 <u>Annual Audits</u>. The Company shall appoint, by vote of a Supermajority of the Board, an independent, regionally recognized accounting firm selected by the Board (the "***Accountant***"), to perform audits of the Company and the Company Subsidiaries and provide the reports required under the Articles of Organization and under any agreement.

4.9 <u>Competing with the Company.</u> The Member and the Board acknowledge and agree that any Manager and its affiliates and any officer of the Company: (a) will deal with the Company without any restrictions imposed on the ability to compete with the Company, notwithstanding any access a Manager or officer may have to confidential information of the Company or any position a Manager or officer may have with respect to trust and confidence in relation to the Company and its Member, provided that the Manager or officer will not use Company Confidential Information in the competitive venture; (b) is permitted to, and may presently or in the future, have investments or other business relationships, ventures, agreements

72755189.18

or arrangements with entities engaged in the business of the Company, other than through the Company and the subsidiaries of the Company; and (c) is permitted to, and may presently or in the future, have or develop strategic relationships with businesses that are or may be competitive with the Company and the subsidiaries of the Company. Accordingly, no Manager or officer is required to refrain from competing with the Company in the conduct of the Company's business, and the Managers and officers may engage in or possess an interest in other business ventures of every kind and description, independently or with others. Neither the Company nor the Member will have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement or any law. No Manager or officer shall be obligated to present any particular investment or business opportunity to the Company even if such opportunity is of a character which, if presented to the Company, could be taken by the Company, and each Manager and officer shall have the right to take for its own account and with others or to recommend to others any such opportunity.

4.10     Consent Regarding Kraken Representatives. Notwithstanding anything to the contrary in the Ordinance, the Articles or this Agreement, the Member and the other Managers acknowledge and agree that the Kraken Representatives may have a financial or personal interest in all matters relating to the Merger Agreement and the Transaction Documents as defined therein, and that the Company plans to assume the obligations under the Merger Agreement and the Transaction Documents, including but not limited to the Closing Consideration Note and the Earnout Agreement (collectively, the "*Assumed Merger Agreements*"). The Member and the other Managers acknowledge and agree that each Kraken Representative shall be entitled, in his or her discretion, to consider the best interests of Kraken, as a creditor of the Company in the discharge of the duties of the position of Manager and in making decisions that affect the enforcement of the Assumed Merger Agreements and the Kraken Representatives will not be required to withdraw from discussion or voting on any matter relating to the Assumed Merger Agreements. The Member and Managers hereby acknowledge and agree that (i) certain of the Kraken Representatives may be affiliated with Kraken and may receive profits (whether directly or indirectly) in connection with the Earnout Agreement and the Closing Consideration Note and the Post-Closing Cash Consideration, and (ii) no Kraken Representative will be required to account to the Company for any such profits or hold any such profits as trustee for the Company.

ARTICLE 5
ACCOUNTING AND RECORDS

5.1     Books of Account. The Company shall maintain its books and records at its principal place of business or at its registered office. Such books and records shall include financial statements, tax returns, a register showing the names and address of each Manager on the Board and executive staff, copies of all meetings of the Board and a copy of this Agreement, including all amendments hereto. Both the Board and Member shall have access to the books and records at all reasonable times.

5.2     Fiscal year. The Company shall have a fiscal year based on the calendar, [June 1][1] through [May 31]. Such fiscal year shall end on the last day of any one calendar year, and shall begin the first day of the next succeeding calendar year.

5.3     Accounting Reports. The Company shall cause the Accountant to provide copies of the audited financial statements to the Board within one hundred twenty (120) days after the close of each fiscal year.

ARTICLE 6
LIMITATION OF LIABILITY/INDEMNIFICATION

6.1     Limitation on Liability. To the maximum extent permitted by law, no Member, Manager or officer shall be liable, responsible or accountable in damages or otherwise to any other Member, Manager or officer, or to the Company, for any acts performed or failure to act by the Member, Manager or officer reasonably believed to be within the scope of authority granted to it by this Agreement and in the best interests of the Company, provided that such action or omission does not constitute bad faith, fraud, gross negligence, or willful misconduct. Each Member, Manager, and officer will be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any person as to matters such Member, Manager, or officer reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, income, losses, or any other facts pertinent to the existence and amount of assets.

6.2     Indemnification.

(a)     The Company shall indemnify and hold harmless the Member, each Manager and each officer to the fullest extent possible, and will indemnify and hold harmless any person who is or was serving at the request of the Company as an executive, manager, director, officer, partner, trustee, employee, or agent of another limited liability company, corporation, partnership, joint venture, trust, benefit plan, or other enterprise against all liability, loss and costs (including reasonable attorney's fees) incurred or suffered by such person by reason of or arising from the fact that such person is Member, a Manager or an officer of the Company or is or was serving at the request of the Company as an executive, manager, director, officer, partner, trustee, employee, or agent of another limited liability company, corporation, partnership, joint venture, trust, benefit plan, or other enterprise. The indemnification provided in this Section shall not be exclusive of any other rights to which any person may be entitled under any statute, bylaw, agreement, resolution of the Board or Member, contract, or otherwise.

(b)     A Member, Manager or officer ("Indemnified Person") shall have the right to require the Company to pay, prior to the final disposition of any claim by final adjudication to which there are no further rights of appeal, any and all reasonable costs and expenses actually paid or incurred by such Indemnified Person ("Expenses") in connection with any claim for which the Indemnified Person is required to be indemnified pursuant to Section 6.2(a) ("Indemnifiable Event"). Without limiting the generality or effect of the foregoing, within

---

[1] **Polsinelli Note:** Fiscal year to begin on the Closing Date of the merger transaction.

72755189.18

thirty (30) days after any written request by an Indemnified Person, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of the Indemnified Person, or (b) reimburse the Indemnified Person for such Expenses. In connection with any request for the payment of Expenses, the Indemnified Person shall (i) not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege and (ii) execute and deliver to the Company an undertaking (which shall be accepted without reference to the Indemnified Person's ability to repay the Expenses) to repay any amounts paid or reimbursed by the Company for such Expenses to the extent that it is ultimately determined, following the final disposition of such claim, that the Indemnified Person is not entitled to indemnification hereunder. For purposes of this Agreement a "claim" shall mean: (a) any threatened, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, whether civil, criminal, administrative, arbitrative, investigative or other, and whether made pursuant to tribal, federal, state or other law; or (b) any inquiry, hearing or investigation that the Indemnified Person determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

No Indemnified Person shall settle any claim that requires the payment by the Indemnified Person of any amount, without the prior consent of the Company which shall not be unreasonably withheld.

6.3    Company's Limitation of Liability. Where a person otherwise entitled to indemnification under Section 6.2 acts recklessly or with gross negligence or with intent to defraud any person or for any fraudulent purpose in carrying out the business of the Company, he or she will be personally liable and not subject to the protections of this Article. The Company shall not indemnify any person otherwise entitled to indemnification under Section 6.2 against liability which by law attaches to him or her in respect of any fraud, gross negligence, or breach of trust of which he or she is found guilty. The Company shall indemnify a Member, Manager, officer, employee or agent against any liability, civil or criminal, where judgment is given in his or her favor subsequent to any proceedings against him or her.

ARTICLE 7
MISCELLANEOUS

7.1    Amendment, Modifications and Dissolution. The Articles of Organization and this Agreement may be amended or restated, and, notwithstanding the provisions of Chapter 3, Section 3.1.1 or Section 3.2.1 of the Ordinance, the Company may be dissolved, solely pursuant to a resolution of the Company's Board of Managers duly adopted by a Supermajority of the Board. An event of dissociation of a Member shall not cause the dissolution of the Company.

7.2    Third Party Beneficiaries. The parties do not confer any rights or remedies upon any Person other than the parties to this Agreement and their respective successors and permitted assigns.

7.3    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one agreement

72755189.18

that is binding upon all of the parties hereto, notwithstanding that all parties are not signatories to the same counterpart. This Agreement may be delivered by facsimile transmission or by scanned e-mail transmission. This Agreement shall be considered to have been executed by a party if there exists a photocopy, facsimile copy, or a photocopy of a facsimile copy of an original hereof or of a counterpart hereof which has been signed by such party. Any photocopy, facsimile copy, or photocopy of facsimile copy of this Agreement or a counterpart hereof shall be admissible into evidence in any proceeding as though the same were an original.

7.4     Suit by Member. Notwithstanding the provisions of Chapter 3, Section 4.4.2.1 of the Ordinance, the Member may not bring suit on behalf of the Company without the consent of a Supermajority of the Board.

## ARTICLE 8
## DEFINITIONS

8.1     Terms Defined Herein. As used herein, the following terms shall have the following meanings, unless the context otherwise specifies:

"**Articles of Organization**" means the Articles of Organization of the Company filed with the Tribe, as amended from time to time.

"**Closing Consideration Note**" means the promissory note of Peak Acquisition and Surviving Entities, and their assignees including the Company and its Subsidiaries, in the face principal amount of $200,000,000 delivered to Kraken pursuant to the Merger Agreement.

"**Contract Year**" has the meaning set forth in the Earnout Agreement.

"**Earnout Agreement**" means that certain Earnout Agreement to be entered into by and among Kraken, the Target Companies, Peak Acquisition, and the MergerSubs and their assignees.

"**Earnout Period**" has the meaning set forth in the Earnout Agreement.

"**Kraken**" means Kraken Holdings LLC, a Minnesota limited liability company.

"**Merger Agreement**" means that certain Merger Agreement to be entered into by and among Kraken, the Target Companies, Peak Acquisition, and the MergerSubs.

"**MergerSubs**" means, collectively, Pinnacle Acquisitions, LLC, a limited liability company formed under the laws of the Tribe, Crown Acquisitions, LLC, a limited liability company formed under the laws of the Tribe, Crest Acquisitions, LLC, a limited liability company formed under the laws of the Tribe, Horizon Acquisitions, LLC, a limited liability company formed under the laws of the Tribe, and Granite Acquisitions, LLC, a limited liability company formed under the laws of the Tribe.

"**Peak Acquisition**" means Peak Acquisition, LLC, a limited liability company formed under the laws of the Tribe.

72755189.18

"***Person***" means an individual, corporation, partnership, association, limited liability company, joint-stock company, trust, unincorporated organization, joint venture or other entity or any governmental authority.

"***Post Closing Cash Consideration***" means the Cash Consideration less the Closing Date Cash Consideration.

"***Property***" means all assets that the Company may own or otherwise have an interest in from time to time.

"***Subsidiary***" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of the total voting power of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"***Supermajority of the Board***" means, until such time as the Tribe may replace the Kraken Representatives pursuant to Section 2.2, not less than six members of the Board, three Tribal Representatives and three Kraken Representatives.

"***Target Companies***" means, collectively, Soaren Management, LLC, a Delaware limited liability company, Kraken Investments LLC, a Minnesota limited liability company, Cortex Systems, LLC, a Wyoming limited liability company, Lendrev, LLC, a Minnesota limited liability company, Zenresolve, LLC, a Wyoming limited liability company.

**[Remainder of Page Intentionally Left Blank]**

72755189.18

## CERTIFICATION

The undersigned sole Member and Managers of Company, constituting all of the initial members of the Board of Managers, do hereby certify that the foregoing Agreement was approved and adopted on the 28th day of May, 2020 as reflected by Resolution No. 05-28-2020-01

**MEMBER:**

BIG VALLEY BAND OF POMO INDIANS
OF THE BIG VALLEY RANCHERIA

By: _____
Ben G. Ray III

72755189.18

**INITIAL BOARD OF MANAGERS:**

DocuSigned by:
_____
7EA02AC406B288...
Ben G. Ray III, Manager

DocuSigned by:
_____
FA24A74650AD4AB...
Brent McFarland, Manager

DocuSigned by:
_____
230C37FD92634C4...
Philip Gomez, Manager

DocuSigned by:
_____
A0871639ADD453...
Aleah Lerma, Manager

72755189.18