# EXHIBIT K

## OPERATING AGREEMENT

of

## GRANITE ACQUISITIONS, LLC

THIS OPERATING AGREEMENT (this "Agreement") is made this 29th day of May, 2020, by and between Peak Acquisition, LLC (the "Member"), a limited liability company wholly owned by the Big Valley Band of Pomo Indians of the Big Valley Rancheria, a federally recognized Indian tribe ("Tribe"), and Granite Acquisitions, LLC (the "Company"), a Peak Acquisition, LLC subsidiary formed pursuant to the Tribe's Business Ordinance ("Business Ordinance"), with Articles of Organization authorized and approved by Member, as sole member.

## ARTICLE 1
## FORMATION

1.1   Name. The name of the Company is "Granite Acquisitions, LLC".

1.2   Articles of Organization. The Articles of Organization were filed and effective on May 29, 2020.

1.3   Purpose. The Company is formed for the following purposes: (1) to serve the social, economic, educational and health needs of the Tribe; (2) to provide Tribal revenues and enhance the Tribe's economic self-sufficiency and efforts related to self-determination; (3) to provide positive, long-term social, environmental and economic benefits to Tribal members by enhancing the Tribe's business undertakings and prospects; (4) to engage in all business activities allowable pursuant to applicable law, including but not limited to consumer finance and loan servicing; and (5) to generate revenues for the Company to utilize in furtherance of the purposes of the Company for the ultimate benefit of the Tribe and its members. To effectuate these purposes, the Company has the power to engage, participate and provide and operate a consumer financial services business that will provide full service internet-based, consumer loan management, servicing, and collections (the "**Company Purpose**"), and to engage in such business activity to generate additional revenues, enhance self-sufficiency and self-determination of the Tribe. Without in any way limiting the scope and generality of the foregoing, the Company shall have and may exercise powers up to the limits of its Articles of Organization and the Ordinance as deemed desirable to give effect to the Company Purpose.

1.4   Duration. The Company shall exist perpetually, unless dissolved as provided herein and pursuant to the Business Ordinance and the Articles of Organization.

1.5   Principal Place of Business. The Company shall be a resident of and maintain its corporate headquarters on the Tribe's Rancheria, but may conduct its business activities any place in or outside the United States. The principal office of the Company shall initially be 2726 Mission Rancheria Rd., Lakeport, CA 95453. The

1

Company may have such other offices, either within or outside of the Rancheria as the business of the Company may require from time to time.

1.6   Registered Agent. The Company's registered agent shall be Ben G. Ray, III, whose address shall be 2726 Mission Rancheria, P.O. Box 102, Finley, CA 95435.

1.7   Definitions. Whenever used in this Agreement, the following terms have the following meanings:

(a)   "Agreement" means this written Operating Agreement. No other document or oral agreement shall be treated as part of or superseding this Agreement unless it is reduced in writing and it has been signed by the Member.

(b)   "Articles" means the Articles of Organization filed for the Company, and as such Articles of Organization may be amended from time to time.

(c)   "Capital Accounts" means the record of the Member's Capital Contributions.

(d)   "Capital Contribution" means an amount of money or assets given to the Company by the Member.

(e)   "Company" means the limited liability company formed pursuant to the Articles and governed by this Agreement.

(f)   "Losses" means, for each fiscal year, the losses and deductions of the Company determined in accordance with the accounting principles consistently applied from year to year plus any expenditures described in the Internal Revenue Code of 1986, as amended.

(g)   "Member" means Peak Acquisition, LLC.

(h)   "Profits" means, for each fiscal year, the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes plus any income described in the Internal Revenue Code of 1986, as amended.

(i)   "Person" means any individual or any legal entity and his, her, or its respective heirs, executors, administrators, legal representatives, successors, and assigns.

(j)   "Tribe" means the Big Valley Band of Pomo Indians of the Big Valley Rancheria.

(k) "Tribal Business Committee" means the Big Valley Band of Pomo Indians of the Big Valley Rancheria Tribal Business Committee, the governing body of the Tribe as defined by and described in the Tribe's Constitution and pursuant to Tribal law.

## ARTICLE 2
## MEMBER; CAPITALIZATION OF COMPANY

2.1 Member. The sole Member of the Company is Peak Acquisition, LLC.

2.2 Capital Contribution. The Member has made contribution of funds in-kind on behalf of or to the Company. These contributions shall be considered as equity contributions to the Company in exchange for the Member's 100% ownership of the Company.

2.3 Additional Capital Contributions.

(a) The Member, in its sole discretion, may provide additional Capital Contributions to the capital of the Company based on the Company's needs and obligations.

(b) Prior to the adoption of this Agreement, the Member has expended certain funds which may have been expended on behalf of the Company. This may include, but is not exclusive to, attorneys' fees, consultant fees and other regular expenses of the Company. The Member shall review past funding of the Member to determine whether these amounts shall also be attributable to the Company as Company expenses. To the extent past funding are Company expenses, they shall be treated as a Capital Contribution of the Company.

2.4 Use of Capital Contributions. All Capital Contributions shall be expended only in furtherance of the business purpose and intent of the Company as set forth in this Agreement and the Articles.

2.5 Unauthorized Withdrawals of Capital Contributions. The Member shall not have the right to withdraw or distribute Capital Contributions except as specifically provided in this Agreement.

2.6 Creditor Rights. Nothing contained in this Agreement is intended or will be deemed to benefit any creditor of the Company except as may be specifically set forth in this Agreement, nor will any creditor of the Company be entitled to solicit or demand Capital Contributions from the Member. The Company shall not assign the Member's obligation to make Capital Contributions to the Company, if any, to creditors of the Company without the consent of the Member.

2.7 Capital Obtained From Private Investor. The Company may obtain capital from a private investor for the operation of its business, so long as the Company reviews

the following information and approves of the private investor based on such information:

(a) if the private investor is not a natural person, the documents creating the private investor, and, if applicable, any certificates of good standing or similar document from the jurisdiction in which the private investor is registered;

(b) if the private investor is not a natural person, a list of all owners that own more than ten-percent (10%) of the private investor; and

(c) a list and description of any prior or pending regulatory, criminal, or civil investigations or lawsuits against the private investor and, if applicable, any of its owners with at least a ten-percent (10%) ownership interest.

2.8 Rights of Private Investors. Capital the Company obtains from private investors shall be evidenced in writing, and such writing shall control the rights of the private investor.

ARTICLE 3
MEETINGS OF MEMBER

3.1 Meetings. An annual meeting of the Member shall be held in the month of June each year. The annual meeting shall be held at the principal office of the Company or at such other location as the Member shall specify. Notice of the annual meeting shall be required as defined in Section 3.3 below.

3.2 Special Meetings. A special meeting of the Member shall be held if the Member signs, dates, and delivers to attendees a notice of meeting that satisfies the requirements of Section 3.3 below.

3.3 Notice of Meeting. Notice of the date, time, and place of each meeting shall be given to each attendee not earlier than thirty (30) days nor less than ten (10) days before the meeting date. Written notice may be delivered personally, given by facsimile or other form of wire communication, or e-mail, or by mail or private carrier, to each attendee's business or home address. Written notice shall be effective at the earliest of following: (a) when received, (b) when sent by facsimile or other form of wire or electronic communication, or (c) two (2) business days after being mailed or sent by private carrier.

3.4 Action without Meeting. Any action required or permitted to be taken by the Member at a meeting may be taken without a meeting if a consent in writing, describing the action taken, is signed by the Member and is included in the minutes of the Company's records of meetings.

3.5 Meetings by Telephone. Meetings of the Member may be held by conference telephone or by any other means of communication by which all participants can hear each other simultaneously during the meeting, and such participation shall constitute presence in person at the meeting.

## ARTICLE 4
## MANAGEMENT

4.1    <u>Member Managed</u>.  Management of the Company shall be vested in the Member. The Member shall have the power and authority to do and perform all actions as may be necessary or appropriate to conduct the Company's business.

4.2    <u>Day to Day Business</u>.  The Member or its designees (including authorized officers) shall have authority to negotiate on behalf of and otherwise represent the interests of the Company, execute documents relating to the business activities and/or contractual obligations of the Company.

4.3    <u>Authority</u>.  The Member and its designees (including authorized officers) shall be the authorized representative of the Company with authority to bind the Company in the ordinary course of its business.  No individual, except the Member or its designee (acting with the approval of the Member), shall have any authority to act for or bind the Company. Further, no management executive shall have the authority to bind the Company as to the following matters without first obtaining written approval of the Member:

(a)    Sell, lease, exchange, mortgage, pledge, or other transfer or disposition of all or substantially all the assets of the Company other than in the ordinary course of business;

(b)    Merger, consolidation, or conversion of the Company with another entity where the Company is not the surviving entity;

(c)    Amendment of the Articles of Organization or this Agreement;

(d)    Incurrence by the Company of indebtedness for borrowed money secured by the assets of the Company;

(e)    Change in the nature of the business of the Company or the Specific Purpose;

(f)    Dissolution of the Company; or

(g)    Cease operations or file an entry of an order for relief against the Company under the United States Bankruptcy Code or the insolvency of the Company under any state insolvency act or any similar provisions of the Tribe's laws.

## ARTICLE 5
## FINANCIAL ACCOUNTS; BOOKS AND RECORDS; ACCOUNTING

5.1    <u>Financial Accounts.</u>

5

(a) The Company shall have the authority to open and close financial institution accounts and disburse Company funds.

(b) A financial institution shall be able to rely upon a resolution duly adopted and approved by the Member, specifically authorizing the opening, closing, or transacting of business for that specific account or activity.

5.2 Books and Records. The Member shall keep, or cause to be kept, at the Company's principal place of business or at its registered office, for a period of not less than three (3) years, the following records:

(a) Financial statements kept using a method of accounting as determined by the Member;

(b) tax returns, if applicable;

(c) contracts, correspondence and other transaction documents relating to all vendors of the Company;

(d) any and all audits prepared by or on behalf of the Company;

(e) any and all enforcement activities pertaining to the Company by a government agency with jurisdiction over Company;

(f) written customer complaints and their disposition;

(g) a register showing the name and address of the Member and executive staff;

(h) copies of all meeting minutes of the Member; and

(i) a copy of this Agreement, including all amendments hereto and previous versions no longer in effect, and copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property, or services to the Company.

5.3 Confidentiality. The Company's books and records are confidential and may not be disclosed to any Person except the Member as sole member of the Company and any other Person authorized by the Member or by Tribal or applicable federal law or contract to have access to such books and records.

5.4 Accounting Reports. The Company shall prepare and deliver to the Member such accounting reports as are set forth in the Articles.

## ARTICLE 6
## LIMITATION OF LIABILITY/INDEMNIFICATION

6.1 <u>Limitation on Liability</u>. To the maximum extent permitted by law, no Member, Manager or officer shall be liable, responsible or accountable in damages or otherwise to any other Member, Manager or officer, or to the Company, for any acts performed or failure to act by the Member, Manager or officer reasonably believed to be within the scope of authority granted to it by this Agreement and in the best interests of the Company, provided that such action or omission does not constitute bad faith, fraud, gross negligence, or willful misconduct. Each Member, Manager, and officer will be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any person as to matters such Member, Manager, or officer reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, income, losses, or any other facts pertinent to the existence and amount of assets.

6.2 <u>Indemnification</u>. (a) The Company shall indemnify and hold harmless the Member, each Manager and each officer to the fullest extent possible, and will indemnify and hold harmless any person who is or was serving at the request of the Company as an executive, manager, director, officer, partner, trustee, employee, or agent of another limited liability company, corporation, partnership, joint venture, trust, benefit plan, or other enterprise against all liability, loss and costs (including reasonable attorney's fees) incurred or suffered by such person by reason of or arising from the fact that such person is Member, a Manager or an officer of the Company or is or was serving at the request of the Company as an executive, manager, director, officer, partner, trustee, employee, or agent of another limited liability company, corporation, partnership, joint venture, trust, benefit plan, or other enterprise. The indemnification provided in this Section shall not be exclusive of any other rights to which any person may be entitled under any statute, bylaw, agreement, resolution of the Board or Member, contract, or otherwise.

(b) A Member, Manager or officer ("Indemnified Person") shall have the right to require the Company to pay, prior to the final disposition of any claim by final adjudication to which there are no further rights of appeal, any and all reasonable costs and expenses actually paid or incurred by such Indemnified Person ("Expenses") in connection with any claim for which the Indemnified Person is required to be indemnified pursuant to Section 6.2(a) ("Indemnifiable Event"). Without limiting the generality or effect of the foregoing, within thirty (30) days after any written request by an Indemnified Person, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of the Indemnified Person, or (b) reimburse the Indemnified Person for such Expenses. In connection with any request for the payment of Expenses, the Indemnified Person shall (i) not be required to provide any documentation or information to the extent that the

7

provision thereof would undermine or otherwise jeopardize attorney-client privilege and (ii) execute and deliver to the Company an undertaking (which shall be accepted without reference to the Indemnified Person's ability to repay the Expenses) to repay any amounts paid or reimbursed by the Company for such Expenses to the extent that it is ultimately determined, following the final disposition of such claim, that the Indemnified Person is not entitled to indemnification hereunder. For purposes of this Agreement a "claim" shall mean: (a) any threatened, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, whether civil, criminal, administrative, arbitrative, investigative or other, and whether made pursuant to tribal, federal, state or other law; or (b) any inquiry, hearing or investigation that the Indemnified Person determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

No Indemnified Person shall settle any claim that requires the payment by the Indemnified Person of any amount, without the prior consent of the Company which shall not be unreasonably withheld.

## ARTICLE 7
## PROFITS, LOSSES; DISTRIBUTIONS

7.1   Allocation of Profits and Losses. All profits and losses of the Company will be allocated to the Member.

7.2   Distributions. The Company may distribute to the Member the amount, if any, of cash on hand or in bank, money market or similar accounts of the Company at any given time which the Member determines, in its absolute discretion, is available for distribution to the Member after taking into account all obligations of the Company and any amount required or appropriate to be maintained as a reasonable amount of reserves.

7.2   Loans to Company. Nothing in this Agreement shall prevent the Member from making secured or unsecured loans to the Company by agreement with the Company.

## ARTICLE 8
## ADDITIONAL MEMBERS

8.1   No additional Members shall be permitted but nothing shall prevent the transfer by the Member of its membership interest to another Person.

## ARTICLE 9
## DISSOLUTION

9.1   Dissolution. The Company shall be dissolved upon the occurrence of any of the following events:

8

      (a)    The passage of any resolution dissolving the Company by the Member; or

      (b)    The issuance of an order of dissolution by a tribunal of competent jurisdiction.

9.2    Effect of Dissolution. Upon the dissolution of the Company, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until Articles of Dissolution have been filed with the Secretary of the Tribe which shall occur within five (5) days of the occurrence of an event described in Article 9.1.

9.3    Winding Up and Dissolution of Assets.

      (a)    Upon the dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Member shall immediately proceed to wind up the affairs of the Company.

      (b)    If the Company is dissolved and its affairs are to be wound up, the Member shall (1) sell or otherwise dispose all of the Company's assets as promptly as practicable unless the Member determines to distribute assets in kind, (2) allocate any profits or losses resulting from such sales to the Member's Capital Accounts, (3) discharge all liabilities of the Company, other than to Member, including all costs relating to the dissolution, (4) establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Member, the amounts of such reserves shall be deemed to be an expense of the Company), (5) discharge any liabilities of the Company to the Member other than on account of the Member's interests in Company capital or profits, and (6) distribute the remaining assets in the following order:

          (1) If any assets are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by appraisal or by agreement of the Member. Such assets shall be deemed to have been sold as of the date of dissolution to their fair market value.

          (2) The positive balance of the Member's Capital Account as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs shall be distributed to the Member, either in cash or in kind, with any assets distributed in kind being valued for this purpose at their fair market value.

(c)  Notwithstanding anything to the contrary in this Agreement, upon a liquidation, if any Member has a negative deficit Capital Account balance, such Member shall have no obligation to make any contribution to the capital of the Company, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever.

## ARTICLE 10
## LICENSING

10.1 License.  The Company shall obtain any licenses as may be required under the Business Ordinance and Tribal law.

## ARTICLE 11
## MISCELLANOUS PROVISIONS

11.1 Application of Law.  This Agreement and its application and interpretation shall be governed exclusively by Tribal law, where applicable.

11.2 Amendments.  The Member may amend this Agreement from time to time.

11.3 Execution.  The Member on behalf of the Company hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any applicable law, rules, or regulations for the purpose of carrying out the business of the Company.

11.4 Severability.  If a court of competent jurisdiction holds any provision of this Agreement or the application thereof to any person to be invalid, the court may sever the provision and the Agreement shall remain in force.

*[Remainder of Page Intentionally Left Blank]*

PEAK ACQUISITION, LLC, sole Member

By: _____
As Its Authorized Representative
Name: Ben G. Ray III
Title: Manager
Date: May 29, 2020

Granite Acquisitions, LLC, as Company
By: Peak Acquisition, LLC as its sole Member

By: _____
Name: Ben G. Ray III
Title: Manager
Date: May 29, 2020

11