**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| LORI FITZGERALD, *et al.*, *individually and on behalf of others similarly situated*, | |
| Plaintiffs, | Case No. 3:20-cv-00044 (GEC) |
| v. | |
| JOSEPH WILDCAT SR., TRIBAL PRESIDENT OF THE LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, *in his official and individual capacities*; *et al.*, | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION OF PLAINTIFF KEVIN WILLIAMS' CLAIMS, MOTION TO DISMISS THE PLAINTIFFS' CLAIMS OR, ALTERNATIVELY, TO STRIKE THE CLASS ACTION ALLEGATIONS**

Plaintiffs, by counsel, respectfully submit this Opposition to the Motion to Compel Arbitration of Kevin Williams' Claims, Motion to Dismiss the Plaintiffs' Claims or, Alternatively, to Strike the Class Action Allegations (Dkt. 15) filed by Defendants Joseph Wildcat, Sr., Jessi Phillips Lorenzo, and Nicole Chapman Reynolds (hereafter "Defendants").

## **INTRODUCTION**

Most states have usury laws that limit the amount of interest that a lender can charge on a loan. To evade these laws, payday lenders originated their high-interest loans in the name of national banks, who were exempt from state interest-rate caps under the National Bank Act. *See* 12 U.S.C. § 85. Under these arrangements, the bank served as a conduit for the loans in exchange for a fee, but the payday lender funded, serviced, and collected the loans—a tactic known as "rent-a-bank." When federal regulators began cracking down on these rent-a-bank arrangements, the

1

payday lenders developed a solution—they adapted the structure to use Native American tribal entities as the conduit to ostensibly cloak the loans in tribal sovereign immunity.[1] Hence, this lending model is often referred to as "rent-a-tribe".

This case concerns online loans made to borrowers in Virginia and Georgia through the tribal lending business model. These loans impose triple-digit interest rates, exponentially higher than the 12-16% interest rate cap mandated the laws of Virginia and Georgia. By way of example, one of Mr. Williams' loans charged an interest rate of 600%, requiring him to pay $2,019.24 in finance charges on a $1,000 loan over a period of 5 months. These unlawfully high interest rates violate federal law, as well as the usury laws of almost every state, which "[f]rom times immemorial," have sought to "protect desperately poor people from the consequences of their own desperation." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

This case has been filed against three individuals, who oversee and control significant aspects of the lending businesses created by the Lac du Flambeau Band of Lake Superior Chippewa Indians ("Tribe"). Even though the tribal lending businesses *may* be entitled to immunity as arms of the Tribe, the Supreme Court has held that "tribal immunity does not bar" a "suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). Tribal sovereign immunity is also "simply not in play" when a person seeks recovery from a tribal employee in his or her individual capacity—even when the wrongful conduct was within the scope of tribal employment. *Lewis v. Clarke*, 137

---

[1] *See, e.g.*, Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 785 (2012) (providing background on payday loans and describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance").

S. Ct. 1285, 1291 (2017). These are two of the "panoply of tools" recognized by the Supreme Court to "shutter, quickly and permanently" unlawful conduct involving tribes. *Bay Mills*, 572 U.S. at 796.

Consistent with these principles, the Complaint seeks the following relief: (1) prospective relief against Chairman Wildcat in *his official capacity*; and (2) monetary damages against Chairman Wildcat, Jessi Philips Lorenzo, and Nicole Chapman Reynolds *in their individual capacities*. Because Plaintiffs have pled this case consistent with *Bay Mills* and *Lewis*, the Tribe's immunity does not protect these individuals from this lawsuit; and it certainly does not legalize their conduct. As the Supreme Court has held and consistently reaffirmed: "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973) (citing *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398 (1968)).  In other words, tribal immunity does not provide individuals a free pass to "operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

## SUMMARY OF THE ARGUMENT

In the present motion, Defendants seek to dismiss this case on four grounds—none of which are novel. *First*, Defendants seek to compel arbitration of Mr. Williams' claims. *Four times*, however, the Fourth Circuit has labeled these tribal arbitration contracts a "farce," designed specifically "to avoid state and federal law," and deployed "to game the entire system." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 674-76 (4th Cir. 2016); *see also Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. July 21, 2020); *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. July 21, 2020); *Dillon v. BMO Harris Bank*, 856 F.3d 330 (4ᵗʰ Cir. 2017). Other courts of

appeals have uniformly refused to enforce them multiple times. *See Gingras*, 922 F.3d at 127; *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 232 (3d Cir. 2018); *Williams v. Medley Opportunity Fund II, LP*, 2020 WL 3968078, at \*1 (3d Cir. July 14, 2020). This unanimous view is no surprise, given that the same set of law firms crafted these tribal arbitration contracts in a "brazen" attempt to avoid federal and state laws. *Hayes*, 811 F.3d at 676.

Mr. Williams' contracts in this case are no different. Although members of a different enterprise now seek their enforcement, the contracts' terms are materially indistinguishable from the ones that have been repeatedly struck down. For example, the both the contracts and the tribal law governing the contracts expressly provided that any dispute is considered to be "a petition for redress submitted to a sovereign government, without waiver of sovereign immunity or exclusive jurisdiction, *and does not create any binding procedural or substantive rights for a complainant*." *See, e.g.*, Ex. 1 at LDF0060 (emphasis added). In addition, the tribal law governing the arbitration agreement is virtually identical to the tribal law considered by the Fourth Circuit in *Haynes* and *Sequoia*, which held the arbitration agreement unenforceable because the tribe's law did "not permit" a borrower "to effectively vindicate the federal protections and remedies they seek." *Haynes*, 967 F.3d at 343.

*Second*, Defendants contend that Plaintiffs failed to state a claim for a variety of different reasons—most of which amount to conclusory challenges with little explanation. Suffice to say, all their arguments have been rejected by "[c]ourts across the country" that have "confronted transparent attempts to deploy tribal sovereign immunity to skirt state and federal consumer protections laws." *Gingras*, 922 F.3d at 126; *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 838 (E.D. Va. 2020) (denying a Rule 12(b)(6) motion to dismiss filed by a tribe's officials and non-tribal business partners); *Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955 (N.D. Cal. 2019)

(denying motion to dismiss for failure to state a claim in case involving tribal loans); *Gibbs v. Stinson*, 421 F. Supp. 3d 267 (E.D. Va. 2019) (same); *Commonwealth of Pennsylvania v. Think Fin., Inc.*, 2016 WL 183289, at *18 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss RICO claim in case involving tribal loans).

*Third*, Defendants further argue that sovereign immunity bars this lawsuit because "the Tribe is the real party in interest." Dkt. 16 at 44. This test often arises "in the context of lawsuits against state and federal employees," *Lewis v. Clarke*, 137 S. Ct. 1285, 1290 (2017), and seeks to prevent efforts to circumvent sovereign immunity where the relief sought is "nominally against an officer" and truly against the sovereign. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). As explained above, however, Plaintiffs have followed bedrock principles established by the Supreme Court precedent with respect to sovereign immunity by *only*: (1) seeking prospective relief against Joseph Wildcat in his official capacity; and (2) seeking monetary damages against Defendants in their individual capacities.

*Fourth*, the Defendants contend that the Tribe and lending entities are necessary and indispensable parties because their contractual and business interests are at stake. ECF at 16 at 47 of 52. But the presence of Chairman Wildcat, in his official capacity, satisfies the requirements of Rule 19. *See Hengle v. Asner*, 433 F. Supp. 3d 825, 869 (E.D. Va. 2020) (holding tribal entities were not "necessary" parties in analogous case); *Gingras v. Rosette*, Case No. 5:15-CV-101, 2016 WL 2932163, at *20 (D. Vt. May 18, 2016) (same), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019). Were it otherwise, it would "effectively gut the *Ex Parte Young* doctrine," which permits "actions for prospective non-monetary relief… *without the presence of the immune State or tribe*." *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1181 (9th Cir. 2012) (emphasis added).

## ARGUMENT

I.   **Mr. Williams' arbitration agreement is unenforceable.**

   **A. Courts may not enforce an arbitration agreement that prospectively waives federal rights and remedies.**

Over thirty years ago, the Supreme Court first observed that an arbitration agreement could not be enforced if it "prospective[ly] waive[d]" a "party's right to pursue statutory remedies." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (warning that "we would have little hesitation in condemning" such an agreement). This oft-repeated lesson boils down to the following: An arbitration agreement that "forbid[s] the assertion of certain statutory rights" cannot be enforced under the FAA. *American Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (the FAA's "effective vindication" exception to the enforceability of arbitration agreements "would certainly cover" this type of arbitration agreement); *see also 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009) ("[A] substantive waiver of federally protected civil rights will not be upheld."); *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 289 (4th Cir. 2007) ("While statutory claims are arbitrable unless Congress has specifically provided otherwise, agreements to arbitrate statutory claims may nonetheless be unenforceable if the terms of the agreement prevent the plaintiff from effectively vindicating his statutory rights.").

Here, Defendants' effort to compel arbitration of Mr. Williams' claims fails for a simple reason: By its terms, the dispute resolution procedure and arbitration agreement attempt to prospectively waive all rights and remedies available to consumers. This is a hallmark feature of tribal lending agreements that has been rejected by the Fourth Circuit *in four cases*. In each case, the Fourth Circuit applied the prospective waiver doctrine to invalidate arbitration provisions that have the same effect of the agreement here— "mak[ing] unavailable to the borrowers the effective

vindication of federal statutory protections and remedies." *Haynes*, 967 F.3d at 344; *see also Sequoia*, 966 F.3d at 293; *Dillon*, 856 F.3d at 337; *Hayes*, 811 F.3d at 673.

In the first of these cases, *Hayes*, the Fourth Circuit refused to enforce an arbitration agreement that expressly stated that no federal law or regulation would apply to the agreement. *Hayes*, 811 F.3d at 669. The Fourth Circuit reasoned that "a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of federal statutes to which it is and must remain subject." *Id.* at 675. A little over a year later, the Fourth Circuit expanded on this principal in *Dillon*, holding that a loan agreement that even "implicitly accomplishes" what the agreement in *Hayes* expressly stated was likewise unenforceable. *Dillon*, 856 F.3d at 336.

The Fourth Circuit went even further in *Haynes* and *Sequoia Captial* and looked at the tribal law to support its holding that an arbitration agreement prospectively waived federal rights and remedies. Even though the arbitration agreements did not "explicitly disclaim the applicability of federal law," they still operated as a prospective waiver because the tribal law itself "prevent[ed] claimants from vindicating a RICO claim for treble damages against entities and individuals" such as the non-tribal participants in the scheme. *See Sequoia*, 966 F.3d at 293 (describing and applying the analysis in *Haynes*). These recent decisions in *Haynes* and *Sequoia* completely foreclose any attempt by Defendants to enforce the arbitration provisions in this case because the tribal codes in both cases are materially indistinguishable.

Four years ago, the Fourth Circuit labeled these tribal "arbitration" schemes as a "farce" designed specifically "to avoid state and federal law," and deployed "to game the entire system." *Hayes*, 811 F.3d at 674-76. In so holding, the court surmised that its decision might prompt "future companies" to "craft [their] arbitration agreements on the up-and-up and avoid the kind of mess"

confronting the defendants in that case. *Id*. at 676. Not here—as discussed more fully in the next

section, Defendants have continued to use a dubious dispute resolution and arbitration scheme that

cannot be enforced.

        **B.**      **The loan contract and tribal law work in tandem to prospectively waive all rights, remedies, and any due process.**

Under the Fourth Circuit's reasoning in *Haynes* and *Sequoia*, the arbitration agreements

are unenforeable in their entirety because the "relevant tribal codes would not permit" a borrower

"to effectively vindicate the federal protections and remedies they seek." *Haynes*, 967 F.3d at 343.

In particular, the Fourth Circuit took issue with three sections of the tribe's code—all of which

mirror the "Tribal Consumer Financial Services Regulatory Ordinance" ("Tribal Code") enacted

by the Lac du Flambeau Band of Lake Superior Chippewa Indians.

*First*, the Fourth Circuit observed that "although § 5.1 of the Otoe-Missouria Tribal

Consumer Financial Services Ordinance" provided that lenders shall comply with "federal laws as

applicable," that the Racketeer Influence and Corrupt Organizations Act was "noticeably absent

from the list of federal consumer protection statutes with which a lender must apply." *Id*. at 343

(citing *Otoe-Missouria Tribal Consumer Fin. Servs. Ord*. §§ 5.2(a) (2018)).[2] "And even for the

laws listed," the Fourth Circuit noted that the "Ordinance makes clear that a lender's compliance

does not constitute 'consent . . . related to the applicability of federal laws[.]" *Id*. (citing § 5.2(a)).

Since both tribes appear to have been represented by the same law firm, it is no surprise that § 7.2

of this Tribe's Tribal Code is *identical* in this respect. *Compare* Ex. 1 at LDF0047 (providing that

a licensee "shall conduct business in a manner consistent with the principles of federal consumer

protection law" and omitting any reference to RICO in the list of statutes); *with* Ex. 2 at pg. 12.

---

[2] For the convenience of the Court, attached hereto as Exhibit 2 is the Otoe-Missouria's Tribal Consumer Financial Services Regulatory Ordinance.

*Second*, although tribal law allowed for a claim against the lending entity, the Fourth Circuit further found a prospective waiver occurred because tribal law did not allow for claims against individuals or non-tribal entities. In particular, the Fourth Circuit explained:  "[A] borrower's ability to assert a federal statutory claim under tribal law against an individual or entity (such as the Haynes Defendants) related to a lender remains even more elusive: although the Ordinance governs 'licensed lenders' and mandates their compliance with tribal and applicable federal law, it says nothing about non-tribal entities or individuals associated with the lenders who may have violated RICO." *Id.* Once again, the Tribal Code at issue in this case is identical in this respect. *See* Ex. 1 at LDF0047.[3]

*Third*, "even if the borrowers could assert a RICO claim against the Haynes Defendants under tribal law," the Fourth Circuit concluded that "the rest of the Ordinance fail[ed] to clarify how any consumer could meaningfully pursue any claims under it." *Id.* at 344. Stated differently, "[a]lthough the Ordinance contain[ed] a consumer complaint procedure," the tribal code "does not provide for or establish a private right of action for violations of any provisions, let alone any federal laws." *Id.* (citing §§ 8.1-8.4). The same is true here—the Tribal Code only allows for the imposition of fines against the lender. *See* Ex. 1 at LDF0058 (establishing the enforcement power of the Commission). Worst yet, just as in this case, the Fourth Circuit found it problematic that the "tribal commission overseeing such a claim" was permitted to "grant or deny any relief as the Commission deems appropriate," thereby making it "clear that a claimant would be unable to assert

---

[3] The contract also reinforces this point. For example, the contract deceptively claims that "WE," *i.e.*, the tribal lender and its "DIRECTORS, OFFICERS, AND EMPLOYEES ACTING WITHIN THE SCOPE OF THEIR AUTHORITY, ARE NOT SUBJECT TO SUIT IN ANY COURT IN ANY JURISDICTION, OR ANY OTHER FORUM, ABSENT A WAIVER OF SOVEREIGN IMMUNITY." Dkt. 16-1 at pg. 86 (caps in original). This statement is not only inaccurate, but is direct evidence of the Tribe's view that consumers cannot possibly have any rights and remedies against their directors, officers, and employees, such as the Defendants in this case.

a RICO claim against entities associated with a tribal lender." *Id.* The same is true here—just as in *Haynes*, § 10.3 of the Tribal Code provides that the "Authority may grant or deny a Consumer complaint and grant or deny such relief, if any, as the Authority determines in its sovereign discretion." Ex. 1 at LDF0060.

These provisions are further troubling in light of the ordinance's stated purpose of benefiting the Tribe and its members, as well as the express proclamation that the ordinance "shall be liberally construed" to effectuate this purpose. Ex. 1 at LDF0029. And if there were any doubt about its intention to strip all rights and remedies, the Tribal Code expressly provides that its permitted dispute resolution process is considered to be "a petition for redress submitted to a sovereign government, without waiver of sovereign immunity or exclusive jurisdiction, *and does not create any binding procedural or substantive rights for a complainant*." Ex. 1 at LDF0060 (emphasis added). This means precisely what it says—a borrower has no "procedural or substantive rights" under tribal law.

The loan contract reinforces this fundamental aspect of tribal law. More specifically, in the section entitled "Dispute Resolution Procedure and Arbitration Provision," the contract states that the Tribe has established a "Dispute Resolution Procedure" as an "accommodation to consumers" in order to "receive, review, and consider any and all types of complaints made by or on behalf of our consumers." *See, e.g.*, Dkt. 16-1 at pg. 60. The contract further explains that a consumer's dispute "shall be considered in nature to a petition for redress submitted to a sovereign government" and "does not create any binding procedural or substantive rights." *Id.* "If *this dispute* is not resolved" to the consumer's "satisfaction," then the parties "shall arbitrate *that dispute* in accordance with the terms of the Arbitration Provision, described below." *Id.* at pg. 60-61. When read together, these provisions make clear that the consumer: (1) has no substantive or procedural

rights under the first instance (*i.e.*, the Tribal Dispute Resolution Procedure); and (2) any subsequent arbitration would be of the same "dispute" where the consumer had no rights to begin with.

***

Although easier to identify, an express waiver of federal law *in a loan contract* is not the only way to violate the prospective waiver doctrine. There is a myriad of ways in which creative legal minds can implicitly achieve the same result. One such one way is to create a "dispute resolution procedure" that "does not create any binding procedural or substantive rights." *Id*. at pg. 60-61. Another way is to craft *a governing law* that prospectively waives federal rights and ensures that there is no private right of action or available remedy. Just as in *Haynes*, the Tribal Code in this case do not allow borrowers "to effectively vindicate the federal protections and remedies they seek." *Haynes*, 967 F.3d at 343. Because of this, the arbitration agreement is unenforceable.

### C. Because the effect of the prospective waiver is certain, the Court may determine it in the first instance even though there is a delegation clause in the contract.

The presence of a delegation clause—a provision designed to allow an arbitrator to decide certain threshold questions concerning the contract's enforceability—does not change the foregoing. In particular, Defendants argue that this Court should let the arbitrator resolve any dispute regarding the validity or enforceability of the arbitration agreement because the contract requires arbitration of "[a]ll claims," including those related to the "validity and scope" of the arbitration provision. Dkt. 16 at pgs. 25-26. But a contract that contains an FAA-prohibited prospective waiver is unenforceable in its entirety, delegation clause included. "In practical terms, enforcing the delegation provision would place an arbitrator in the impossible position of deciding the enforceability of the agreement *without* authority to apply any applicable federal or state law." *Smith v. Western Sky Fin., LLC*, 168 F. Supp. 3d 778, 781 (E.D. Pa. 2016) (emphasis in original).

11

As a result, any delegation clauses in the contracts are unenforceable "for virtually the same reason" that the rest of the contracts are unenforceable. *MacDonald*, 2017 WL 1536427, at *4; *Parm*, 835 F.3d at 1338 (invalidating *both* the delegation clause *and* the underlying arbitration contract); *Parnell*, 664 Fed. App'x at 843–44 (same); *Hayes*, 811 F.3d at 671 n.1 (same).

The Fourth Circuit's recent decision in *Haynes* confirms this settled rule. There, the defendants argued that the "district court ignored the arbitration agreements' delegation provisions requiring an arbitrator to resolve all threshold issues of arbitrability, including whether the choice-of-law clauses amounted to a prospective waiver." *Haynes*, 967 F.3d at 336. The Fourth Circuit firmly rejected this claim and explained: "When there is uncertainty whether the foreign choice of law would preclude an otherwise applicable federal substantive statutory remedies, the arbitrator should determine in the first instance whether the choice of law provision would deprive a party of those remedies." *Id*. However, the Fourth Court added: "where there is no uncertainty about the effect of the choice-of-law provisions, the court may properly conclude the delegation provision—and thus the arbitration agreement—is unenforceable." *Id*. Although the "the language of the agreements" did not "*expressly* forbid the application of federal law," the Fourth Circuit held that the delegation provision and arbitration agreement was unenforceable because there no uncertainty that "the relevant tribal codes would not permit them to effectively vindicate the federal protections and remedies they seek." *Id*. at 343 (emphasis in original).

In short, because the Tribal Code unmistakably attempts to prospectively waive all federal rights and remedies, it invalidates *both* the delegation provision and the arbitration agreement.

## II.   Plaintiffs sufficiently allege violations of RICO.

"The enactment of RICO was a result of twenty years of intense scrutiny of organized crime by Congress, the Department of Justice, and the public." Pamela Bucy Pierson, Rico,

*Corruption & White-Collar Crime*, 85 TEMP. L. REV. 523, 535 (2013); *see also Callanan v. United States*, 364 U.S. 587, 593 (1961). The statutory scheme reflects Congress's recognition that groups—rather than individuals—working together present "a greater potential threat to the public than individual delicts." *Id*. Indeed, when enacting the statute, Congress declared that its purpose was to seek the eradication of organized crime in the United States," including loan sharking. Pub. L. 91–452, § 1; *see also United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986) ("The elimination of loansharking was one of Congress' principal aims in enacting the statute.").

To accomplish Congress's goal to prevent loan sharking, RICO generally prohibits four activities associated with "unlawful debt," which is defined as debt that "is *unenforceable under State* or Federal law in whole or in part as to principal or interest because of laws relating to usury," where "the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6) (emphasis added). Against this backdrop, RICO prohibits: (1) § 1962(a) prohibits a person who has received income from the collection of an unlawful debt from investing any of that income in the enterprise; (2) § 1962(b) prohibits a person to acquire or maintain control over an enterprise engaged in the unlawful collection of debt; (3) § 1962(c) prohibits a person from conducting or participating in the affairs of an enterprise engaged in the collection of an unlawful debt; and (4) § 1962(d) prohibits any person from conspiring to commit any of the provisions in §§ 1962(a)-(c). 18 U.S.C. § 1962(a)-(d). In other words, RICO "makes it unlawful for '*any person*'—not just mobsters—" to be part of an organized scheme to collect unlawful debt. *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 839 (4th Cir. 1990).

**A.  Plaintiffs Adequately Allege That Elevate Violated § 1962(c) of RICO.**

Section 1962(c) makes it unlawful for a person "to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs." 18 U.S.C. § 1962(c). In order to establish a §

1962(c) violation, Plaintiffs must prove that: (1) the Defendants are persons; (2) associated with an enterprise engaged in interstate commerce; (3) who conducted or participated in the enterprise's affairs; and (4) through the collection of unlawful debt. *See, e.g., D'Addario v. Geller*, 264 F. Supp. 2d 367, 396 (E.D. Va. 2003). The Complaint sufficiently alleges each one of these elements.

<b>i.      The Complaint plausibly alleges an association in fact enterprise.</b>

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1691(4) (emphasis added). The Supreme Court's decision in *Boyle v. United States*, recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009). Put differently, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

The *Boyle* decision noted that "the very concept of an association in fact is expansive" and that the terms of RICO are "to be 'liberally construed to effectuate its remedial purposes.'" *Id.* (quoting Pub.L. 91–452, § 904(a), 84 Stat. 947). To that end, the Supreme Court has held that an association-in-fact enterprise merely requires three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle*, 556 U.S. at 946. The Complaint adequately alleges each one of these elements.

*First*, the purpose requirement merely requires that the enterprise include a common interest or purpose. *See Boyle*, 556 U.S. at 946. Evidence that "association-in-fact members

14

actively associate with one another and work cooperatively and illegally to achieve a goal" is sufficient. *See Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 653 (S.D. Tex. 2016). It is also sufficient when a complaint alleges that the participants "associated with each other and nonparties for the common purpose of exploiting the sovereignty of the Tribe to engage in the practice of issuing usurious loans." *Solomon*, 2019 WL 1320790 at *7. Like *Solomon*, the purpose of the association-in-fact enterprise in this case was to engage in predatory lending and ostensibly exploit sovereign immunity. *See, e.g.*, Compl. at ¶ 3 ("LDF Holdings and its multiple subsidiaries are organized under the laws of the Band to ostensibly avoid state and federal laws and shield non-tribal participants in the enterprise from liability."); *id*. at ¶ 42 ("In order to protect non-tribal outsiders that are realizing the vast majority of the profits from the illegal lending enterprise, the Band adopted various ordinances and laws to be used by the illegal lending enterprise to support LDF Holdings and its subsidiaries' claims of sovereign immunity."). These allegations are sufficient to satisfy the purpose requirement.

*Second*, the Complaint adequately alleges sufficient relationships among those associated with the enterprise. To do so, there must be evidence of the relationships that connect the members of the enterprise, and it is not enough that several individuals "independently and without coordination, engaged in a pattern of crimes listed as RICO predicates." *See id*. at 958 n.4. But there is no requirement that the enterprise "ha[s] a hierarchical structure or a 'chain of command'" and "decisions may be made on an ad hoc basis and by any number of methods." *Id*. at 948. Additionally, "[m]embers of the group need not have fixed roles; different members may perform different roles at different times," and "[t]he group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id*.

Here, the Complaint adequately alleges the relationships between the members of the enterprise, especially with respect to each of the Defendants. As alleged, Tribal Council established LDF Holdings to be the parent company for subsidiaries that make the illegal loans. Compl. at ¶ 3; *see also* Compl. at ¶ 40. Within this framework, Defendant Wildcat is the President of the Tribe, head of its Executive Council, and Ex-Officio Board Member of the LDF Business Development Corp., *i.e.*, LDF Holding's parent company. *Id*. at ¶ 12. In these capacities, the Complaint alleges that Chairman Wildcat "exercises high-level supervision" over the illegal lending scheme. *Id*. The Complaint further alleges that Chairman Wildcat has "signed the articles of incorporation for several of the lending businesses," and he "has authority to direct the affairs" of the illegal lending scheme "even if non-tribal third parties are permitted to exert significant control over the lending business." *Id*. at ¶ ¶ 59, 61.

The Complaint similarly details the role of Defendants Jessi Phillips Lorenzo and Nicole Chapman Reynolds. For example, the Complaint alleges that Defendant Lorenzo "holds herself out as both the President of LDF Holdings and the Vice President of Lending at LDF Holdings." Compl. at ¶ 14. In other words, Defendant Lorenzo is the highest-ranking executive of LDF Holdings and, thus, she is responsible for making major corporate decisions and managing the overall operations of the illegal lending businesses. This includes approval of the creation of the subsidiaries engaged in the making and collection of the unlawful debt, as well as direction and control of their affairs. *Id*. at ¶¶ 63-66. The same is true for Defendant Reynolds, who was the Board President for LDF Business Development Corporation. *Id*. at ¶¶ 13, 67-69, 71. In short, the Defendants, LDF Business Development Corporation, LDF Holdings and its subsidiaries, and others did not act "independently and without coordination," *Boyle*, 556 U.S. at 958 n. 4, but rather

coordinated their efforts for the ultimate purpose of facilitating the usurious lending scheme. These facts sufficiently establish the relationships among those associated with the enterprise.[4]

*Third*, the evidence easily establishes the required longevity of the enterprise. The enterprise "must have some longevity, since the offense proscribed by that provision demands proof that the enterprise had 'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through" the predicate act. *Id.* at 946. Further, "[w]hile the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." *Id.* at 948. Here, the length of the operations of the enterprise, which commenced in 2012 (Compl. at ¶ 41), more than satisfies this minimal requirement.

### ii.   Plaintiffs sufficiently allege the collection of unlawful debt.

To establish liability pursuant to § 1962(c), a plaintiff must also establish the required predicate act or acts—either "a pattern of racketeering activity" or "collection of unlawful debt." 18 U.S.C. § 1962(c). In their motion, the Defendants summarily contend that "the Complaint does not include sufficient facts to support a claim that the Defendants engaged in the 'collection of

---

[4] Ignoring these allegations, Defendants contend that the Complaint is an impermissible shotgun pleading because it "is a quintessential shotgun pleading." Dkt. 16 at 31. This argument is premised primarily on their misunderstanding of the requirements of RICO, which do not require Plaintiffs to allege how "each Tribal Defendant participated in the collection of the Plaintiff's debts." Dkt. 16 at pg. 31. As explained below, RICO prohibits "to conduct or participate, directly or indirectly, *in the conduct of the enterprise's affairs*[.]" 18 U.S.C. § 1962(c). In other words, RICO is not a statute targeted at debt collectors, such as the Fair Debt Collection Practices Act. In rejecting this same argument, one court has explained: "each Defendant is alleged to have been involved in and/or profited from a scheme to circumvent Pennsylvania and federal laws through marketing, funding, underwriting and collecting loans, and providing various other services specified in the FAC. The individual Defendants are aware of what services they provide; this puts them on notice of what services they are alleged to have illegally undertaken to advance this scheme." *Commonwealth of Pennsylvania v. Think Fin., Inc.*, 2016 WL 183289, at *12 (E.D. Pa. Jan. 14, 2016) (internal citations omitted).

unlawful debt' under RICO." Dkt. 16 at 38. This argument disregards the allegations in the Complaint, which sufficiently allege the predicate act of the collection of unlawful debt, as well as the Defendants' role in directing and inducing its collection.

As explained at the beginning of this section, RICO targets groups involved in the creation, collection, and receipt of "unlawful debt," which is defined as debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). Against this backdrop, § 1962(c) "encompasses efforts to collect on a usurious loan" such as the predatory loans made to Plaintiffs in this case. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148 (3d Cir. 2016). Unlike the "pattern of racketeering activity" that is also prohibited by § 1962(c), "*a single act* which would *tend to induce another to repay* on an unlawful debt incurred in the business of lending money" is sufficient for the predicate act, and there need not be "[a]n actual exchange of cash." *United States v. Eufrasio,* 935 F.2d 553, 576 (3d Cir. 1991) (emphasis added); *United States v. Weiner*, 3 F.3d 17, 24 (1st Cir. 1993) (explaining that "there is no counterpart definition of a '*pattern* of collection of unlawful debt," as one would expect if such a pattern were an element of one of RICO's core provisions. Instead, section 1961 simply lists 'unlawful debt'").

The Complaint sufficiently alleges that unlawful debt was collected. For example, the Complaint alleges that each of the small dollar loans issued to Mr. Fitzgerald had an "interest rate ranging from 319% to 711%." Compl. at ¶ 88. This means that Mr. Fitzgerald's loans imposed an interest rate at least 25 times greater than the 12% interest rate cap in Virginia. Va. Code § 6.2-303(A). The Complaint further alleges that Mr. Fitzgerald repaid at least $4,860.87. Compl. at ¶ 89. By way of another example, the Complaint alleges that Mr. Williams' loans carried interest

rates in excess of 300%. Compl. at ¶ 98.[5] This means that Mr. Williams' loans imposed interest rates far greater than the 16% permitted by Georgia law. *See* Ga. Code § 7-4-2. The Complaint further alleges that Mr. Williams repaid at least $10,892.30. Compl. at ¶ 99. These allegations—establishing the interest rate imposed and payments made by Plaintiffs—sufficiently allege the collection of unlawful debt.

Contrary to the Defendants' suggestion,[6] Plaintiffs are not required to plead that each defendant *personally* collected the debt. Put differently, "RICO does not criminalize engaging in a pattern of racketeering or collecting unlawful debt, but rather criminalizes participation in the affairs of an enterprise through those means." *United States v. Pepe*, 747 F.2d 632, 661 n.48 (11th Cir. 1984); *see also Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 984-985 (N.D. Cal. 2019) (rejecting a defendant's argument that "the failure to allege that they personally collected an illegal debt means that this claim cannot be asserted against them."). Instead, so long as there is an unlawful debt, what matters is whether a defendant conducted or participated in an enterprise's affairs. As explained below, the Complaint sufficiently alleges that the Defendants conducted and participated in the affairs of the enterprise.

### iii.    Plaintiffs sufficiently allege that the Defendants participated in the operation of the enterprise.

Rather than requiring direct collection of the debt, § 1962(c) makes it unlawful for a person "to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs."[18]

---

[5] Mr. Williams did not possess copies of his loan contract at the time of filing, but the Defendants' filing confirms that the interest rates were 600%, 576.77%, 600.69%, 313.86%, 388.19%. *See* Dkt. 16-1 at pgs. 6, 28, 50, 72, 99.

[6] *See, e.g.*, Dkt. 16 at pg. 33 (asserting that the " 'conduct' alleged here is the collection of unlawful debt and, thus, Plaintiffs' RICO claims ultimately hinge on whether Defendants collected an unlawful debt.").

U.S.C. § 1962(c). In *Reves v. Ernst & Young*, the Supreme Court held that "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." 507 U.S. 170, 185 (1993). The *Reves* decision also "held that 'the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise.'" *United States v. Posada-Rios*, 158 F.3d 832, 856 (5th Cir. 1998) (quoting *Reves*, 507 U.S. at 856). Thus, the operation or management test does not limit liability to "upper management" because "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* (quoting *Reves*, 507 U.S. at 184). "An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it." *Reves*, 507 U.S. at 184.

The purpose of the "operation or management test" assures that § 1962(c) claims "do not reach complete 'outsiders'" who act in an "advisory professional capacity," such as an auditor that merely prepared the enterprise's financial statements. *Reves*, 507 U.S. at 185; *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 633 F. Supp. 2d 214, 230 (E.D. Va. 2008); *In re American Honda Motor Co. Inc. Dealerships Relations Litigation*, 941 F. Supp. 528, 560 (D. Md. 1996). However, spreading the scheme over a number of entities that purport to merely provide "services" will not insulate those actors from liability. In addition, an individual does not need to be personally involved in the collections in order to be liable for a violation of § 1962(c).

A recent decision from the United States District Court for the Eastern District of Virginia in comparable litigation illustrates this point. *Gibbs v. Haynes Investments, LLC*, 368 F. Supp. 3d 901, 908 (E.D. Va. 2019), *aff'd on other grounds*, 967 F.3d 332 (4th Cir. 2020). In that case, the

defendants argued that they could not be held liable because "the Complaint contain[ed] no allegation that the Haynes Defendants *collected* the allegedly unlawful debt." *Id*. at 930, n. 53 (emphasis in original). Observing that "[e]xisting case law suggests otherwise," *id*., the court rejected this argument and, instead, focused on whether the complaint alleged that the defendants "conducted the affairs of the unlawful Tribal lending operation." *Id*. at 933. Against this backdrop, the court found that the plaintiffs sufficiently alleged a violation of § 1962(c) through allegations that the defendants: (1) "helped design and implement the Tribal lending business," (2) helped fund the businesses; (3) secured the "method, via the ACH network, to collect the loans," and (4) met with "multiple banks and identifying various potential partners over the course of a year beginning in 2013." 368 F. 3d 901, 933 (E.D. Va.). The court further found that the defendant "engaged" in these acts "as part of its association with the alleged unlawful operation," and the allegations "amply support Plaintiffs' claim that" those defendants "conducted the affairs of the unlawful Tribal lending business." *Id*.

Similarly, in another comparable case, a court found that the plaintiffs sufficiently alleged a violation of § 1962(c) through overarching allegations that "the enterprise would not exist but for Think Finance's instrumental role, which Plaintiffs plausibly attribute to Defendants." *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 312 (E.D. Va. 2019). In addition, the court found that the plaintiffs sufficiently alleged a violation of § 1962(c) through allegations that the defendants: (1) held business meetings in order to determine how to restructure Think Finance's business model; (2) attend board meetings whereby they directed they "directed, reviewed, and approved key business decisions of Think Finance, including decisions related to the origination, marketing, underwriting, servicing, and collection of the loans." *Id*.

Other courts have reached similar conclusions that the operation and management test was satisfied where "defendants were instrumental in setting up, and knowingly set up, an enterprise whose sole purpose was to collect illegal debts, thereby causing those acts to occur and reaping the benefits therefrom." *Brice*, 372 F. Supp. 3d at 985 (citing *Bunnett & Co., Inc. v. Gearheart*, 2018 WL 1070298, at *7 (N.D. Cal. Feb. 27, 2018) (where defendants "are alleged to have been instrumental in setting up the" scheme and "convincing [others] to engage with it," the averments "in combination with Plaintiffs' allegations regarding their roles in the enterprise described above, are sufficient at this stage to plead that each defendant participated in the operation of the enterprise such that they played some part in directing its affairs."); *Solomon v. Am. Web Loan*, 2019 WL 1320790, at *10 (E.D. Va. Mar. 22, 2019) (finding allegations "went beyond the normal incidents of a borrower-lender relationship" and sufficiently alleged that "day-to-day involvement in management and operations of the borrower."); *Hengle*, 433 F. Supp. 3d at 897 (finding that the complaint sufficiently alleged a violation of § 1962(c) because it alleged that the defendants "established several Tribal Lending Entities," and "possessed significant authority and influence over the alleged enterprise"); *Gingras v. Rosette*, 2016 WL 2932163, at *31 (D. Vt. May 18, 2016) (finding that the complaint sufficiently alleged a violation of § 1962(c) because it alleged the defendants assisted with the adoption of the tribe's finance code and "provided everything that the enterprise that the enterprise needed to operated); *see also Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 674 (5th Cir. 2015) (explaining that a jury was "presented with sufficient evidence to conclude" that the defendants "were actively involved," including evidence of sharing of a building, staff switching between entities, loaning money, and solicitation of patients).

Similar to the above cases, the Complaint establishes that Defendants were significant, active and independent participants in the misconduct, not merely retained professional advisors

22

to the enterprise. Put differently, the Complaint does not allege a claim against a passive member of the Tribe, such as its director of human resources. Instead, the Complaint named the Defendants because they are the individuals who were responsible for the creation of and instrumental in furthering the illegal lending business, which could not exist without their oversight and participation. *See, e.g.*, Compl. at ¶¶ 12-14, 38-73.

## B.   Plaintiffs Adequately Allege That Elevate Violated § 1962(d) of RICO.

The Complaint also sufficiently alleges a conspiracy claim, which "does not require that a defendant have a role in directing an enterprise." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012); *see also Smithfield Foods*, 633 F. Supp. 2d at 231 ("To state a claim for conspiracy to violate Section 1962(c), it is not necessary for every defendant to personally qualify as an operator or manager of the RICO enterprise.").[7] Rather, in the Fourth Circuit, "simply agreeing to advance a RICO undertaking is sufficient." *Id.* "Once it has been shown that a conspiracy exists, the evidence need only establish *a slight connection* between the defendant and the conspiracy" to support a violation of § 1962(d). *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992) (emphasis added). A "slight connection" is satisfied by showing "knowledge of the essential nature of the plan." *United States v. Morrow*, 914 F.2d 608, 612 (4th Cir. 1990).

The Complaint shows far more than a slight connection between the enterprise and the Defendants, who as the executives with oversight and responsibly over the businesses, unquestionably had knowledge of and facilitated the conspiracy. In sum, the Complaint sufficiently alleges that the Defendants have been instrumental in aiding, abetting, and facilitating the unlawful collection of the debt because they are the executives of the Tribe who are responsible

---

[7] *United States v. Wilson*, 605 F.3d 985, 1019 (D.C. Cir. 2010) (explaining that after the Supreme Court's decision in *Salinas*, "every court of appeals to consider the question has held that the *Reves* operation or management test does not apply to conspiracy under § 1962(d)").

for the creation of and major decisions with respect to tribal entities involved. Put differently, "the crux of a RICO claim" based on the collection of unlawful debt is the "scheme itself." *Robinson v. Fountainhead Title Grp. Corp.*, 257 F.R.D. 92, 94 (D. Md. 2009). Because the Defendants oversee and control key aspects of the illegal lending scheme as alleged in the Complaint, they can be held liable as conspirators.

### C. Response to Defendants' additional arguments regarding the RICO claims.

Having established that the Complaint sufficiently alleges each element of their claims, Plaintiffs now address the arguments made by the Defendants.

### i. Plaintiffs allege an enterprise that is distinct from the Defendants.

Unlike the other sections of RICO, § 1962(c) "limits the 'persons who may be charged to those who are 'employed by or associated with [the] enterprise. By comparison, any person may be charged with violations of §§ 1962(a), (b) or (d)." Pamela Bucy Pierson, *Rico, Corruption & White-Collar Crime*, 85 Temp. L. Rev. 523, 548-60 (2013). "Because of this difference in statutory language, the courts have held that the 'person' charged with violating § 1962(c) must be separate and distinct from the 'enterprise' through which the defendant" acted. *Id.* (citing *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 30 (1st Cir. 1986) (gathering cases and finding that the plain language of § 1962(a) does not require involvement of two separate entities for liability)). Hence, the "reason for § 1962(c)'s distinctness requirement is simple: one cannot be 'employed by or associated with' oneself." *Id.* (citing *Haroco, Inc. v. Am. Nat'l Bank & Trust Co.*, 747 F.2d 384, 400 (7th Cir. 1984)).

To satisfy the distinctness requirement, "[t]here must be a 'person,' alleged to have violated Section 1962(c) . . . who is separate and distinct from the 'enterprise,' or tool, through which the RICO violation occurred." *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 588 (D. Md.

24

2014); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). In other words, a corporate entity may not be both the entirety of the RICO enterprise and the person liable under the statute. *E.g.*, *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994). "The basic idea is that while one basketball player does not constitute a team, an association of five players does, without each losing his identity as a distinct person." *Chambers*, 43 F. Supp. 3d at 589–90 (citing *In re Lupron Mktg. & Sales Practices Litig.*, 295 F.Supp.2d 148, 173 (D. Mass. 2003)).

In moving to dismiss the RICO claims, Defendants summarily argue that Plaintiffs fail to allege an enterprise distinct from Defendants because an enterprise "comprised of subsidiaries, agents, or employees of the corporation acting in concert, they are not indistinct for the purposes of a civil RICO claim." Dkt. 16 at 39. This argument directly contradicts the Supreme Court's decision in *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 163 (2001). In that case, the petitioner sued boxing promoter, Don King, the president and sole shareholder of Don King Productions, a corporation, alleging King conducted the affairs of his corporation in violation of RICO. *Id.* at 160. The district court dismissed the case and the Second Circuit affirmed the decision based on its view that § 1962(c) applies "only where a plaintiff shows the existence of two separate entities, a 'person' and a distinct "enterprise," the affairs of which that 'person' improperly conducts." *Id.* at 161. The Second Circuit reasoned that "King, in a legal sense, was part of, not separate from, the corporation," and thus, "[t]here was no 'person,' distinct from the 'enterprise,' who improperly conducted the 'enterprises affairs.'" *Id.*

In a unanimous decision, the Supreme Court reversed the Second Circuit and explained that a "corporate/owner employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we

can find nothing in the statute that requires more 'separateness' than that." *Id*. at 163. To that end, the Supreme Court explained that an employee and a corporation are "different 'persons,' even where the employee is the corporation's sole owner." *Id*. Accordingly, the Supreme Court held "that the need for two distinct entities is satisfied; hence, the RICO provision before us applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." *Id*. at 166.

Following these principles, courts have routinely rejected distinction challenges, especially in cases where a defendant is an individual. As one court succinctly explained: "*individual defendants are always distinct from corporate enterprises* because they are legally distinct entities, even when those individuals own the corporations or act only on their behalf." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013) (emphasis added); *see also United States v. Najjar*, 300 F.3d 466, 485 (4th Cir. 2002) ("[W]here a corporate employee 'acting within the scope of his authority . . . conducts the corporation's affairs in a RICO-forbidden way,' the only 'separateness' required is that the corporate owner/employee be a natural person and so legally distinct from the corporation itself."); Pierson, *supra* at 560 ("Assessing whether such distinctness exists is not difficult when the defendant alleged is an individual and the enterprise alleged consists of that individual plus other individuals.").[8]

Here, there are no distinction problems because Plaintiffs do not allege that a corporate entity is both the person and the enterprise. In cases where a plaintiff alleges the defendant is

---

[8] *See also G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521 (S.D.N.Y. 2002) (finding that named partners and members of law firm were distinct from the law firm); *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 268 (3d Cir. 1995) (holding that conduct by officers and employees who operate or manage a corporate enterprise are distinct).

both—often in single defendant cases— the distinctness requirement is implicated due to the need to distinguish the person responsible under the statute from the enterprise or tool through which the violation occurred. As one court has explained: "A party cannot claim that Corporation X is the enterprise in a Civil RICO claim, and also name Corporation X as a defendant, *but* a party can name Corporation X's officers as the defendants in that action." *Compound Prop. Mgmt., LLC v. Build Realty, Inc.*, 462 F. Supp. 3d 839, 857 (S.D. Ohio 2020) (emphasis in original).

ii.    **Plaintiffs sufficiently allege injury of the form of repayment of usurious amounts on their loans.**

Defendants further contend that the Complaint fails to allege damages because it does "not allege how much" of principal was repaid on the loans and, so the argument goes, it is unclear whether Plaintiffs suffered "any loss." Dkt. 16 at 40. In other words, Defendants contend that Plaintiffs have not suffered any damages unless they allege that they repaid more than the principal amount on their loans. This argument fails for multiple reasons.

*First*, there is no potential right to offset in this case because Plaintiffs' loans are void and unenforceable, including as to principal.[9] For example, Virginia law provides that a "loan contract shall be void if any act has been done in the making or collection thereof" that violates the Virginia Consumer Finance Act. Va. Code § 6.2-1541(A). If a loan violates this section, it is unlawful to "collect, receive, or retain any principal, interest, or charges whatsoever with respect to the loan,

---

[9] Typically, defendants in comparable cases have moved to dismiss on the basis of the choice-of-law provision in the loan contract. *See, e.g., Hengle*, 433 F.Supp. at 864 (finding that enforcement of the tribal choice-of-law provision violates Virginia's public policy); *Gibbs*, 368 F. Supp. at 929 (holding "[b]ecause the choice of law provisions throughout the Loan Contracts are unenforceable, the Haynes Defendants cannot rely on them for their state-law related arguments, either."); *Brice*, 372 F. Supp. 3d at 982 (same). The Defendants have decided not to present this issue for this motion. Dkt. 16 at pg. 11, n. 2 ("The Tribal Defendants assert that the loans at issue are governed by and issued in accordance with Tribal law and applicable federal law and dispute that the loans are subject to state law, however, *the instant Motion does not require resolution of that issue*.") (emphasis added). For the purpose of this motion, thus, it is presumed that state law applies.

and any principal or interest paid on the loan shall be recoverable by the person by or from whom payment was made." Va. Code § 6.2-1541(B). Georgia law similarly provides that any person who violates its lending laws "shall be barred from the collection of any indebtedness created by said loan transaction and said transaction shall be void ab initio[.]" Ga. Code Ann. § 16-17-3. Because both states' law renders the loans void ab initio including as to principal, there is no conceivable defense of setoff.

*Second*, Defendants' argument is "belied by the structure" of the "loan agreements, which requires repayment of a fixed schedule of payments, with a portion of each payment directed to interest, and a portion directed to principal." *MacDonald*, 333 F.R.D. at 350. Like a standard mortgage, there is "an interest portion in every single payment under the loan" and each of Plaintiffs' payments "carried usurious interest." *Id*. Accordingly, by alleging that they repaid thousands of dollars on their loans (which had interest rates ranging from 300-700%), Plaintiffs sufficiently alleged the repayment of usurious interest.

*Third*, even if setoff was permitted (which it is not), it is "an affirmative defense which must be pled and proven by the party asserting it." *McGinity v. USAA Fed. Sav. Bank*, 2020 WL 1867386, at *2 (E.D.N.C. Apr. 14, 2020) (quoting *Durham v. SMI Indus. Corp.*, 882 F.2d 881, 883 (4th Cir. 1989)); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 891 (E.D. Va. 2020) ("courts generally do not reach the merits of affirmative defenses at the motion-to-dismiss stage"). Any entitlement to setoff, therefore, is an issue for another day. And if the Court disagrees, Plaintiffs request leave to amend so that they can provide details regarding the total amount of principal and interest repaid on their loans.[10]

---

[10] By way of example, Plaintiff Williams would allege that he received five loans in the cumulative amount of $5,400, and he repaid no less than $10,892.30 on these loans.

### iii.   The intra-corporate conspiracy doctrine does not require dismissal.

Defendants further argue that the § 1962(d) claim "fails as a matter of law" because all "alleged acts" occurred within their employment and, thus, the "intracorporate conspiracy doctrine prohibits Plaintiffs' claims." Dkt. 16 at 41. Under the doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). Here, there are multiple problems with this argument, but Plaintiffs focus on the most apparent.

*First*, even assuming the Defendants are agents of the same legal entity for purposes of the intra-corporate conspiracy doctrine, the Complaint alleges that they are part of a broader conspiracy with non-tribal members. For example, the Complaint alleges that Defendants "have joined one or more association in fact enterprises with individuals outside of the tribe and non-tribal investors to collect usurious loans throughout the country." Compl. at ¶ 50. The Complaint further alleges that LDF Holdings and Defendants have created no less than 20 different entities— the purpose of which is "to facilitate the illegal lending enterprises and the distribution of profits from illegal loans to the various nontribal outsiders who are involved." *Id*. at ¶¶ 52-53.[11] The Complaint further alleges that two non-tribal companies, Triax Management and Dater Portfolio, "are members of the association in fact enterprise" and assist with the creation and facilitation of the illegal lending businesses. *Id*. at ¶¶ 70-72; *see also id*. at ¶ 75 (alleging that "the subsidiaries

---

[11] As alleged in the Complaint, the tribal lending entities do business under the following names: Ningodwaaswi, LLC d/b/a/ Sky Trail Cash; Ishwaaswi, LLC d/b/a RadiantCash; Makwa, LLC d/b/a Makwa Finance; Niizhwaaswi, LLC d/b/a Loan at Last; Niizh, LLC d/b/a Bright Star Cash; Niiwin, LLC, d/b/a Lendgreen; Anong, LLC d/b/a Availblue.com; Niibin, LLC, d/b/a Cash Aisle; Midaaswi, LLC d/b/a/ National Small Loan; Naanan, LLC d/b/a Bear Claw Finance; Mitig, LLC d/b/a MitigCapital and Cashcity; Zagime, LLC d/b/a Blue River Lending; Bridge Lending Solutions; Opichi, LLC d/b/a Evergreen Services; Giizis, LLC d/b/a Lakeshore Loans; Waawaatesi LLC, d/b/a Quickhelp Loans; Naanan, LLC d/b/a Stone Lake Lending; Nigig, LLC d/b/a Ubicash; Ziibi, LLC d/b/a zFunds; and Zhaangaswi, LLC d/b/a Nine Torches.

of LDF Holdings are not really wholly controlled by the Tribe. Upon information and belief, it is nontribal outsiders—not the Tribe—that handles and controls the underwriting, risk assessment, compliance, accounting, lead generation, collections, and website management for the business."). Because the Complaint alleges a conspiracy involving non-tribal members, the intra-corporate conspiracy doctrine does not require dismissal of the § 1962(d) claim.

*Second*, following the Supreme Court's decision in *Cedric Kushner*, it is doubtful that the intra-corporate conspiracy doctrine applies to § 1962(d) claims. In that case, the Supreme Court explained: "The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." 533 U.S. at 163. Relying in part on this language, at least one circuit has held that the intracorporate conspiracy doctrine does not bar § 1962(d) claims. *Kirwin v. Price Communications Corp.*, 391 F.3d 1323, 1327 (11th Cir. 2004). Although the Fourth Circuit has yet to address this issue, it would make little sense for the corporation and individual to be "legally different" for a claim under § 1962(c), but the same for a claim under § 1962(d) claim. What's more, even ignoring the significant involvement of the non-tribal outsiders, the conspiracy involves multiple entities created by the Tribe—LDF Business Corp., LDF Holdings, and the tribal lending entities—which are legally different entities capable of conspiring with each other. Accordingly, the intra-corporate conspiracy doctrine is inapplicable in this case.

## III. Plaintiffs stated a viable claim for declaratory relief.

The Supreme Court has repeatedly recognized that the Declaratory Judgment Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)). In determining whether to entertain a request for

a declaratory judgment, the Fourth Circuit has instructed that district courts should consider whether the request " 'will serve a useful purpose in clarifying and settling the legal relations in issue,' and 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.' " *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004).

It is well established that a party may seek a declaratory judgment to determine their rights with respect to a contract. For example, the Supreme Court has found that there was a sufficient case and controversy where a party sought a declaratory judgment that a patent licensing agreement was "invalid, unenforceable, or not infringed." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 137 (2007). By way of another example, the Fourth Circuit has acknowledged that an actual controversy existed when "a plaintiff seeks declaratory relief in order to avoid the accrual of potential damages for past actions," such as the breach of a dealership agreement. *Volvo Const.*, 386 F.3d at 593; *see also United Capital Ins. Co. v. Kapiloff*, 155 F.3d 488, 494 (4th Cir. 1998) ("It is well established that a declaration of parties' rights under an insurance policy is an appropriate use of the declaratory judgment mechanism."). District courts have also routinely considered declaratory judgments where there was a controversy over rights and obligations contemplated by the parties' contract. *Kersey v. PHH Mortg. Corp.*, 682 F. Supp. 2d 588, 595 (E.D. Va. 2010) ("The parties' contract gives rise to the Plaintiff's claim, and the Declaratory Judgment Act provides an avenue through which the Court can hear the Plaintiff's controversy related to the rights and obligations contemplated by the parties' contract."), *vacated on other grounds*, 2010 WL 3222262 (E.D. Va. Aug. 13, 2010); *Harleysville Ins. Co. v. Holding Funeral Home, Inc.*, 2016 WL 4703755, at *4 (W.D. Va. Sept. 8, 2016) (finding complaint stated a claim for declaratory judgment to clarify obligations under insurance contract).

Here, Plaintiffs seek a declaratory judgment that their contracts are void and unenforceable under state law. Absent declaratory relief, Plaintiffs will be subject to ongoing collection of the illegal loans, which have unlawful interest rates as high as 600%. As the Complaint alleges, Mr. Williams has been the subject of attempted debt collection as recently as November 11, 2019, claiming that he owed a balance of $1,512.57. In just one year of nonpayment, the interest rate on this loan, a minimum of 300%, would balloon the balance to over $6,000. It would be the same for the following year; and over $25,000 after five years. Such a debt—arising from an illegal loan—could easily subject a low-income borrower to a lifetime of ongoing collection and other negative consequences, such as derogatory credit reporting. Until the amounts are repaid or a court orders otherwise, the tribal lending entities will continue to impose their finance charges and attempt to collect the illegal amounts, which they believe are lawful. *See* Dkt. 16 at 11, n. 2 (suggesting the loans are valid and enforceable). These facts not only apply to Plaintiffs, but likely thousands of borrowers in Virginia and Georgia, as wells as tens of thousands of consumers across the country.[12]

Further, Plaintiffs have adequately alleged a case and controversy by: (1) providing the interest rates charged on their loans; and (2) alleging that each of them have an outstanding balance. *See* Compl. at ¶ 18 (alleging that the Fitzgerald's received loans with triple digit interest rates as high as 750%); *id.* at ¶ 19 (alleging Williams received loans with interest rates exceeding 300%); *id.* at ¶ 102 (detailing the attempted collection of an outstanding balance of $1,512); *id.* at

---

[12] Plaintiffs do not presently know the number of loans originated by the tribal lenders. Plaintiffs' counsel, however, have been involved in several comparable cases, including one that had over a million class members. *Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-495 (E.D. Va.), Dec. 13, 2019 Order at Dkt. 141 (granting final approval of the class settlement); *see also* David Rees, *Historic settlement sees online lenders wiping out $380 million in debt. Virginians led the way*, The Virginian Pilot, available at https://www.pilotonline.com/business/consumer/dp-nw-online-lender-settlement-20191212-n7khtxn7tbbsbauzirehwmpgly-story.html.

¶ 145 (defining the declaratory judgment class as only those individuals "who have any outstanding balance on their loan," and alleging that "Plaintiffs are members of the Declaratory Judgment Class."). And for the reasons explained below, Plaintiffs have properly asserted this claim as to Chairman Wildcat, in his official capacity.

## IV.   The Complaint conforms with Supreme Court precedent regarding sovereign immunity and the real party in interest test.

In their brief, the Defendants further argue that sovereign immunity bars this lawsuit because "the Tribe is the real party in interest." Dkt. 16 at 44. This test often arises "in the context of lawsuits against state and federal employees," *Lewis v. Clarke*, 137 S. Ct. 1285, 1290 (2017), and seeks to prevent efforts to circumvent sovereign immunity where the relief sought is "nominally against an officer" and truly against the sovereign. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). Typically, this occurs when a plaintiff seeks monetary damages against a government employee in their official capacity, which would be paid by the state's treasury. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself."). Because an official-capacity suit for damages would be paid by the government, the "real party in interest is the government entity, not the named official," and sovereign immunity applies. *Lewis*, 137 S. Ct. at 1291. The real party in interest rule, in essence, ensures that sovereign immunity does not become a matter of form over substance.

In this case, Plaintiffs have faithfully followed the Supreme Court's sovereign immunity decisions with respect to the "real party in interest" test by *only*: (1) seeking prospective relief against Joseph Wildcat in his official capacity; and (2) seeking monetary damages against the Defendants in their individual capacities.

**A.  An official capacity suit for prospective relief is permissible.**

The Supreme Court has expressly "recognized an important exception" to sovereign immunity, which allows official-capacity suits against government officials so long as they only request injunctive or declaratory relief. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984); *see also Kroll v. Bd. of Trustees of Univ. of Illinois*, 934 F.2d 904, 908 (7th Cir. 1991) ("Under an exception to the general rule, however, official-capacity actions may not be barred by the eleventh amendment insofar as they request prospective relief—i.e., an injunction or a declaratory judgment[.]"). This exception was created by "the holding in *Ex parte Young*," where the Supreme Court established that sovereign immunity "did not prohibit issuance" of an injunction to prevent a state official's violation of federal law. *Pennhurst*, 465 U.S. at 102 (citing *Ex parte Young*, 209 U.S. 123). And since it was first created, it has been repeatedly applied[13] and expanded "far beyond its original office in order 'to vindicate the federal interest in assuring the supremacy of federal law[.]'" *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)).

Most recently, the Supreme Court reaffirmed these principles in *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). In that case, the State of Michigan brought an action to enjoin the Bay Mills Indian Community from operating a casino on land located in Michigan. 572 U.S. at 785. The question before the Supreme Court was simple: "whether tribal sovereign

---

[13] *See, e.g., Graham v. Richardson*, 403 U.S. 365, 370 (1971) (enjoining the Arizona's commissioner of its Department of Public Welfare from enforcement of state welfare laws that violated the Fourteenth Amendment); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (enjoining the New York City's commissioner of Social Services from enforcement of state law terminating welfare benefits without a hearing); *Edelman v. Jordan*, 415 U.S. 651, 667 (1974) (enjoining the Director of Illinois's Department of Public Aid from following state regulations that did not comply with federal time limits).

immunity" barred "Michigan's suit against Bay Mills for opening a casino outside Indian lands." *Id*. Declining to revisit its prior decisions, the Supreme Court held that "immunity protects Bay Mills" even though the gaming occurred off tribal lands. *Id*. In doing so, the Supreme Court rejected Michigan's argument that its holding left it without recourse, explaining that "tribal immunity does not bar such a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Id*. (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978)).

The Supreme Court not only expressly stated that "tribal immunity does not bar such a suit for injunctive relief against individuals," but it provided examples of the "panoply of tools" available to Michigan "to enforce its laws on its own lands." *Id*. One of those tools was denying "a license to Bay Mills for an off-reservation casino." *Id*. (citing Mich. Comp. Laws Ann. §§ 432.206–432.206a (West 2001)). And if the tribe "went ahead anyway," the Supreme Court said that Michigan "could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gaming without a license" in violation of Michigan's gaming laws. *Id*. (citing Mich. Comp. Laws Ann. § 432.220).

Here, with respect to the declaratory judgment claim against Chairman Wildcat, the Complaint seeks nothing other than prospective relief, thereby satisfying the straightforward requirement of *Ex Parte Young*. *See, e.g.*, Compl. at ¶ 6 (asserting that Plaintiffs seek "declaratory relief against Defendant Joseph Wildcat, Sr., in his official capacity as Tribal President of the Band."); *id*. at Count III (indicating that claim is asserted against Chairman Wildcat is his official capacity as tribal president).

**B. The individual is the real party in interest in an individual capacity suit for monetary damages.**

In addition to an official-capacity suit for prospective relief, the Supreme Court has held that government employees may be sued in their individual capacities for monetary damages even when acting within the scope of their employment. *Lewis*, 137 S. Ct. at 1289 (holding that "in a suit brought against a tribal employee in his individual capacity, the employee, not the tribe, is the real party in interest and the tribe's sovereign immunity is not implicated."). In doing so, the Supreme Court explained "[t]hat the employee was acting within the scope of his employment at the time the tort was committed is not, on its own, sufficient to bar a suit against that employee on the basis of tribal sovereign immunity." *Id*. Instead, the Supreme Court instructed courts to "look to whether ***the sovereign is the real party in interest*** to determine whether sovereign immunity bars the suit." *Id*. at 1290 (emphasis added).

In determining "whether the sovereign is the real party in interest," the Supreme Court further explained that "[t]he distinction between individual-and official-capacity suits is paramount." *Id*. at 1291. As to the former, "the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself." *Id*. "Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." *Id*. (quoting *Hafer v. Melo*, 502 U.S. 21, 27 (1991)). Because the *Lewis* lawsuit sought to impose individual liability upon the tribal employee, albeit for actions taken while acting within the scope of his employment, the Supreme Court concluded that the tribal employee was the "real party in interest" because it was "simply a suit against [the employee] to recover for his personal actions, which 'will not require action by the sovereign or disturb the sovereign's property.'" *Id*. (quoting *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 687 (1949)).

In further explaining its decision, the Supreme Court stated it was "cognizant of the

Supreme Court of Connecticut's concern that plaintiffs not circumvent tribal sovereign immunity," but in an action against a tribal employee in his individual capacity, "that immunity is simply not in play." *Id*. at 1291. To hold otherwise, the Supreme Court further explained, would "extend sovereign immunity for tribal employees beyond what common-law sovereign immunity principles would recognize for either state or federal employees." *Id*. at 1292 (citing *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985)). Because the "protections offered by tribal sovereign immunity" should be "no broader than the protection offered by state or federal sovereign immunity," the Supreme Court denied the tribal employee's plea for sovereign immunity. *Id*.

The Supreme Court's decision in *Lewis* is consistent with its jurisprudence governing the availability of sovereign immunity for state and federal employees. Most notably, in *Hafer v. Melo*, the Supreme Court rejected the argument that a state official could not be sued in his personal capacity in federal court for actions taken in an "official capacity." 502 U.S. 21, 29 (1991). The Court acknowledged that "imposing personal liability on state officers may hamper their performance of public duties." *Id*. at 31. However, "such concerns" were "properly addressed within the framework of [the Court's] personal immunity jurisprudence." *Id.* Accordingly, the Court concluded that, to the extent the plaintiffs sought "damages against [the state official] personally," Eleventh Amendment sovereign immunity did "not restrict [the plaintiffs'] ability to sue in federal court." *Id.*

Here, the  Defendants' argument is foreclosed by a straightforward application of the Supreme Court's decision in *Lewis*. The Complaint makes clear that Plaintiffs seek monetary damages against the Defendants—in their *individual capacities*. *See* Compl. at ¶ 119 ("Defendants Joseph Wildcat, Sr., Nicole Chapman-Reynolds, Jessi Phillips Lorenzo, and ZenResolve, LLC are each being sued in their individual capacities for their own conduct violating RICO[.]"); *id*. at ¶

130 ("Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c)."); *see also id.* ¶¶ 138, 143. The Prayer for Relief in the Complaint further seeks an "Order awarding monetary damages against Defendants in their individual capacities, including but not limited to any compensatory, incidental, or consequential damages." *Id.* at pg. 34. If the Plaintiffs are successful on these claims, the Tribe and the tribal entities will not have to pay anything or do anything because Plaintiffs' sole recourse will be attempted collection from the *personal assets* of the Defendants.

> ### C.     The Defendants' real party in interest argument is premised on a mischaracterization of the Complaint.

The Defendants ignore all of the express references to their individual capacities and mischaracterize the Complaint by isolating a paragraph out of context. In particular, Defendants assert that "Plaintiffs seek 'actual damages, which would include any interest, fees, or other sums collected *by the enterprise*.'" Dkt. 16 at 43 (quoting Compl. at ¶ 142) (emphasis added by Defendants). The Complaint actually states, however, that "Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise." Compl. at ¶ 142. Against this backdrop, the Complaint then further asserts that "Defendants are *jointly and severally liable in their individual capacities* to Plaintiffs and the RICO Class for actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c)." Compl. at ¶ 143 (emphasis added).

The Complaint's reference to the "sums collected by the enterprise," is nothing more than a description of the alleged damages, not a statement about the party whom collections will be sought against. Plaintiffs used this description because "[e]very circuit in the country that has

addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations." *States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) (citing *Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 775 (9th Cir. 2002) ("[h]olding RICO conspirators jointly and severally liable for the acts of their co-conspirators reflects the notion that the damage wrought by the conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole")).

Because Plaintiffs have sued the Defendants in their individual capacities for monetary damages, the Defendants are the real party in interest because "[a]ny damages will come from their own pockets, not the tribal treasury." *Maxwell v. County of San Diego*, 708 F.3d 1075, 1089 (9th Cir. 2013) (citing *Alden v. Maine*, 527 U.S. 706, 757 (1999)).

**D.  Indirect impacts on the Tribe's treasury does not make it the real party in interest.**

In addition to mischaracterizing the remedy sought by the Complaint, the Defendants further argue that the Tribe is the real party in interest because it may be indirectly impacted by a judgment against its employees. *See generally* Dkt. 16 at 44. This argument is also foreclosed by *Lewis*, where the tribal employee further argued that the tribe was "the real party in interest" because tribal law required the tribe to indemnify him for any adverse judgment. 137 S. Ct. at 1292. In rejecting this argument, the Supreme Court explained that the real party test turns "on where the potential legal liability lay, not from whence the money to pay the damages award ultimately came." *Id*. The Supreme Court further added that "the critical inquiry is who may be legally bound by the court's adverse judgment, not who will ultimately pick up the tab." *Id*. Here, the potential legal liability lies: (1) against all of the Defendants in their individual capacity for

monetary damages; and (2) against the Tribal President in his official capacity for prospective relief. This is exactly what is permitted by *Ex Parte Young*, *Bay Mills*, and *Lewis*.

The Defendants further argue that the Tribe is the real party in interest because Plaintiffs will "have to ascertain the size of the proposed class through discovery," and, so their argument goes, "Plaintiffs will without a doubt seek to compel the Tribe" to "provide information about the class." Dkt. 16 at 45-46. This argument does not require dismissal of this case for several reasons. *First*, even if this case does not ultimately proceed as a class action, Plaintiffs have sufficiently alleged claims against the Defendants, and they already possess the necessary evidence to support those claims. *Second*, even assuming that the tribal entity is entitled to immunity, the "the doctrine of sovereign immunity is inapplicable" to a third-party subpoena. *Arista Records LLC v. Does 1-14*, No. 7:08CV00205, 2008 WL 5350246, at *3 (W.D. Va. Dec. 22, 2008) (overruling a state university's objection to a subpoena despite the court's assumption that it was "an arm of the state for Eleventh Amendment purposes.");[14] *see also United States v. Juvenile Male 1*, 431 F. Supp. 2d 1012, 1016 (D. Ariz. 2006) ("The service of a federal subpoena on an employee of an entity of a tribe is neither a suit, nor one against a tribe.").

*Third*, even if this Court were to determine that the doctrine of sovereign immunity applied to a third-party subpoena, there is no derivative sovereign immunity for third parties that possess

---

[14] Courts routinely hold that state must respond to discovery requests, including subpoenas, issued by federal courts. *In re Mo. Dep't of Natural Res.*, 105 F.3d 434, 436 (8th Cir. 1997) ("There is simply no authority for the position that the Eleventh Amendment shields government entities from discovery in federal court."); *Allen v. Woodford*, 544 F.Supp.2d 1074, 1078–79 (E.D. Cal. 2008) (concluding that "issuance and required compliance with a third-party subpoena by State custodians of records in an action in which the State is not a party" does not constitute "any suit in law or equity" within the meaning of the Eleventh Amendment, and thus that "the Eleventh Amendment does not apply to preclude discovery from a State agency"); *United States v. University of Mass., Worcester*, 167 F.Supp.3d 221 (D. Mass. 2016) (same).

tribal documents. *Miccosukee Tribe of Indians of Florida v. United* States, 698 F.3d 1326, 1330 (11th Cir. 2012) ("The Tribe voluntarily disclosed its confidential financial information to third-party financial institutions before these summonses were issued. After disclosure, that information became the property of the third parties."); *accord EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 203-55 (2d Cir. 2012) (finding Argentina's sovereign immunity not infringed by subpoenas to third-party banks seeking information regarding Argentina's assets). Plaintiffs, thus, could obtain information about the class members' loan histories from third parties, such as credit reporting agencies or loan management companies.

***

As explained above, Plaintiffs have faithfully followed the Supreme Court's sovereign immunity decisions with respect to the "real party in interest" test by *only*: (1) seeking prospective relief against Joseph Wildcat in his official capacity; and (2) seeking monetary damages against the Defendants in their individual capacities.

## V.     Neither the Tribe nor the lending entities are not necessary or indispensable.

Defendants further seek to expand tribal sovereign immunity through Rule 19 of the Federal Rules of Civil Procedure. "Rule 19 requires a two-step inquiry, namely: (1) whether the party is 'necessary' to the action under Rule 19(a); and, (2) whether the party is 'indispensable' under Rule 19(b). *Hengle*, 433 F. Supp. 3d at 869. If the Court determines the party is "necessary," under Rule 19(a)(1), "the court must order that the person be made a party." Fed. R. Civ. Proc. 19(a)(2). And if the necessary person "cannot be joined," the "court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed" because the absent party is indispensable. Fed. R. Civ. P. 19(b).

Here, Defendants have failed satisfy their burden of "show[ing] that the person who was not joined is needed for a just adjudication." *Hengle*, 433 F. Supp. 3d at 869 (quoting *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005)); *see also id.* ("Courts are loathe to dismiss cases based on nonjoinder of a party, so dismissal will be ordered only when the resulting defect cannot be remedied and prejudice or inefficiency will certainly result." (quoting *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 441 (4th Cir. 1999)).

### A. The Tribe and tribal lenders are not necessary parties in an official capacity suit.

It is well established that "a tribe is not a required party under Rule 19 in suits naming a tribal official in his official capacity." *Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 930 (D.C. Cir. 2012) (Kavanaugh, J.) (citing *In Salt River Project Agricultural Improvement and Power District v. Lee*, 672 F.3d 1176, 1180 (9th Cir. 2012); *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001)). A tribe is not a necessary party because "[a]s a practical matter" the tribe and the executive "in his official capacity are one and the same in an *Ex parte Young* suit for declaratory and injunctive relief." *Id*. Because they "are one and the same," the official "can adequately represent" the tribe in the suit, rendering the tribe "itself not a required party for purposes of Rule 19." *Id*. Were it otherwise, "official-action suits against government officials would have to be routinely dismissed, at least absent some statutory exception to Rule 19, because the government entity in question would be a required party yet would be immune from suit and so could not be joined." *Id*.

The Ninth and Tenth Circuits have reached similar conclusions. For example, in *Salt River Project*, two entities brought an action "to enjoin Navajo Nation tribal officials from applying tribal law to them in tribal courts." 672 F.3d at 1178. In reversing the district court, the Ninth Circuit held "that the tribe is not a necessary party because the tribal officials can be expected to

adequately represent the tribe's interests in this action and because complete relief can be accorded among the existing parties without the tribe." *Id*. The court further explained that "a contrary holding would effectively gut the *Ex parte Young* doctrine," which "permits actions for prospective non-monetary relief against state or tribal officials… without the presence of the immune State or tribe." *Id*. at 1181. In *Kansas*, the Tenth Circuit reached a similar conclusion, explaining that "the potential for prejudice to the Miami Tribe is largely nonexistent due to the presence" of other defendants with substantially similar interests, including "the tribal officials." 249 F.3d at 1228.

For the same reason, the tribal entities are also not necessary parties under Rule 19(a)(1)(b). "As with *Salt River Project*, the Tribal Officials here can adequately represent the interests of the Tribe and the Tribal Lending Entities that the Tribe effectively control." *Hengle*, 433 F. Supp. 3d at 871. Accordingly, other federal district courts, including in the Eastern District of Virginia, have concluded in similar cases that the tribal lending entities were not necessary parties. *Hengle*, 433 F. Supp. 3d at 871; *Gingras*, 2016 WL 2932163, at *20.  This is unsurprising given that, "[i]f successful on the merits of their claims, Plaintiffs will enjoin the Tribal Officials who, by virtue of their positions on the Tribe's Executive Council, control the Tribal Lending Entities, rendering the Tribal Lending Entities unnecessary to accord complete relief." *Hengle*, 433 F. Supp. 3d at 871.

### B.    The Tribe and tribal lending entities are not necessary parties in an individual capacity lawsuit against tribal employees for monetary damages.

Further, to the extent Plaintiffs seek monetary damages against the Defendants, they do so only in their individual capacity for their violations of RICO. A party is necessary and must be joined if "in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. Proc. 19(a)(1)(A) (emphasis added). Thus, the complete relief inquiry is limited to persons who are already parties—"not as between a party and the absent person whose joinder is

sought." *United States v. Cnty. of Arlington*, 669 F.2d 925, 929 (4th Cir.1982) (quoting 3A Moore's Federal Practice P 19.07-1(1) at 9-128 (2d ed. 1979)). Relief is considered "complete" if it 'will effectively and completely adjudicate the dispute.'" *Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 518 (M.D.N.C. 2008) (quoting 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1604 (3d ed. 2001)).

It is well established that Rule 19 is not applicable when a party seeks monetary damages from a joint tortfeasor. *S. Co. Energy Mktg., L.P.*, 190 F.R.D. 182, 186 (E.D. Va. 1999) ("Rule 19(a)(1) is inapplicable because complete relief will be afforded among those already parties. Specifically, the damages and rights at issue relate exclusively to the relationship between Southern and VEPCO; Southern does not seek relief from a nonparty in this action, nor would PCA's claims against VEPCO affect Southern's claims against VEPCO.").[15]  Additionally, to the extent Plaintiffs may be able to seek other relief from other nonparties for different claims, it is irrelevant as the inquiry under Rule 19(a)(1) looks only to the Court's ability to provide "complete relief among *existing parties*." Fed. R. Civ. Proc. 19(a) (emphasis added). Here, with respect to

---

[15] *See also Herpich v. Wallace,* 430 F.2d 792, 817 (5th Cir.1970) ("Rule 19 . . . was not meant to unsettle the well-established authority to the effect that joint tortfeasors or coconspirators are not persons whose absence from a case will result in dismissal for non joinder."); *Beckham v. Grand Affair of N.C., Inc.*, 671 F. Supp. 415, 420–21 (W.D.N.C. 1987) ("Clearly, the first step must be to examine the relief claimed. Plaintiff prays for an award of actual and punitive damages. . . . There is no reason that the Court would be unable to award to Plaintiff any and all of the damages to which Plaintiff is entitled from Defendant, thereby according complete relief among the parties . . . ."); *James v. Valvoline, Inc.*, 159 F. Supp. 2d 544, 551 (S.D.Tex.2001) ("Indisputably, in this suit for money damages, whatever amount, if any, that is awarded will be complete as between Plaintiff and [the defendant]."); *Broad. Music, Inc. v. Armstrong*, 2013 WL 3874082, at *5 (W.D. Tex. July 24, 2013) ("With regard to damages, complete relief is possible if the full amount of damages sought can be collected from a defendant. The absence of a joint and several tortfeasor generally does not affect the completeness of monetary relief because a defendant is jointly and severally liable for the full amount of the damages sought." (internal citations omitted)).

the RICO claims, the Court can afford complete relief among the parties because Plaintiffs merely seek monetary damages for the alleged violations of federal law by Defendants.

Accordingly, Plaintiffs request the Court to find that the Tribal Officials have not established that the Tribe and Tribal Lending Entities are necessary parties under Rule 19(a)(1)(A) or Rule 19(a)(1)(B)(ii). "Because the Tribal Lending Entities do not constitute necessary parties under Rule 19(a), the Court need not consider whether those Entities prove indispensable to Plaintiffs' claims." *Hengle*, 433 F. Supp. 3d at 871.

### C.    Defendants cases are easily distinguishable.

Undeterred by the cases cited above, the Defendants cite to the Fourth Circuit's decision in *Yashenko v. Harrah's NC Casino Co., LLC,* 446 F.3d 541, 552 (4th Cir. 2006), which is easily distinguishable because it did not involve a suit against a tribe or its official. Instead, the plaintiff sued Harrah's Casino—a non-tribal entity—alleging that the casino's "tribal preference policy violated his rights under 42 U.S.C.A. § 1981, which prohibits discrimination in employment on the basis of race." *Id.* at 551-552. Because the casino's tribal preference policy was a contractual agreement between the casino and the tribe, the Fourth Circuit found that the plaintiff could not obtain complete relief because "a judgment in the plaintiff's favor would only bind him and the private employer and would not prevent the tribe from continuing to enforce its tribal preference policy on its own property." *Id.* (citing *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150 (9th Cir. 2002)).

Of course, this case presents a different situation then *Yashenko*, which relied heavily on the Ninth Circuit's decision in *Dawavendewa* in support of its conclusion. *Id.* at 551-552. "Indeed, in *Salt River Project*, the Ninth Circuit expressly noted that '[in *Dawavendewa*] — unlike here — the tribal officials were not parties to the action and thus could not represent the absent tribe's

interests.'" *Hengle*, 433 F. Supp. 3d at 870 (explaining why a case similar to this one was distinguishable from *Yashenko*) (quoting *Salt River Project*, 672 F.3d at 1181). In direct contrast, this case "includes claims for injunctive relief against the tribal official defendants in their official capacities." *See id.* To hold that the Tribe or tribal lenders are necessary parties "'would effectively gut the *Ex parte Young* doctrine,' which 'permits actions for prospective non-monetary relief against state or tribal officials in their official capacity to enjoin them from violating federal law, without the presence of the immune State or tribe.'" *Id.* (quoting *Salt River Project*, 672 F.3d at 1181).

## VI.   Defendants' Request to Strike Should Be Denied.

### A.  Legal Standard Pertaining to Motion to Strike Class Allegations.

Rule 12(f) allows a court to strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). In general, "Rule 12(f) motions are generally viewed with disfavor 'because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic.'" *Flame S.A. v. Indus. Carriers, Inc.*, 2014 WL 2871432, at *1 (E.D. Va. June 24, 2014) (quoting *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001)). A Rule 12(f) motion "imposes a sizable burden on the movant[.]" *Lopez v. Asmar's Mediterranean Food, Inc.*, 2011 WL 98573, at *1 (E.D. Va. Jan.10, 2011) (internal quotations omitted).

"A motion to strike class allegations is even more disfavored because it requires a reviewing court to preemptively terminate aspects of… litigation, solely on the basis of what is alleged in the complaint and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Mayfield*, 2015 WL 1501100 at *6; *see also Smith v. Washington Post Co.*, 962 F. Supp. 2d 79, 90 (D.D.C. 2013)

("This Court is hesitant to delve deep into the merits of the plaintiff's class allegations. There has been no discovery whatsoever in this matter. The Court should not litigate prematurely the sufficiency of the complaint and the appropriateness of class certification.") (internal quotations and citation omitted).

In order to grant a motion to strike class allegations at a Rule 12 posture, the Defendants must "demonstrate from the face of the Complaint that *it would be impossible* to certify the alleged class regardless of the facts Plaintiffs may be able to obtain during discovery." *Mayfield*, 2015 WL 1501100 at *6 (emphasis added) (citing *Bryant v. Food Lion, Inc.*, 774 F.Supp. 1484, 1495 (D.S.C.1991)); *see also McPeak v. S–L Distribution Co., Inc.*, 2014 WL 4388562 at *4 (D.N.J. Sept. 5, 2014) ("It is only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23, that a motion to strike class allegations should be granted."); *Smith*, 962 F. Supp. 2d at 84 ("Thus, absent a strong reason for so doing, courts will generally not tamper with pleadings.").

## B.      Defendants' request to strike is premature and substantively erroneous.

In the final section of their brief, the Defendants contend that the Court to strike the class allegations in the Complaint. This argument is both premature and substantively erroneous. In support of their request to strike the class allegations, the Defendants assert several broad and conclusory arguments. First, the Defendants claim that the "classes do not, as a matter of law satisfy the commonality and superiority requirements" of Rule 23 because "the Court would have to look to state law to determine if the debt is void." Dkt. 16 at 50. This argument ignores the well-established rule that the "application of multiple states' laws does not in and of itself preclude class certification." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 140–41 (2d Cir. 2015); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998)

("Courts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit."). For this reason alone, the Court should deny the Defendants' request, which wrongly suggests that it is impossible to certify a multi-state class action.

The Defendants also gloss over the obvious difference between this case and other multi-state class actions: two of the three counts arise from a unitary federal cause of action, *i.e.*, violations of RICO. State law differences, thus, only conceivably matter if they impact one of the elements needed to prove the violation of the federal statute. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, *with the elements of the underlying cause of action*.") (emphasis added). In other words, it is not enough to simply point out potential differences between class members—the party opposing certification must connect those differences to "elements of the underlying cause[s] of action." *Erica P. John Fund*, 563 U.S. at 809.

Here, state law is not entirely irrelevant with respect to RICO claims because the statute defines "unlawful debt" as debt that "is *unenforceable under State* or Federal law in whole or in part as to principal or interest because of laws relating to usury," where "*the usurious rate is at least twice the enforceable rate*." 18 U.S.C. § 1961(6) (emphasis added). This "difference," however, is inconsequential because it simply requires a determination of the interest rates in each state.[16] For example, a borrower in Virginia would only have a RICO claim if the annual interest rate exceeded 24%, *i.e.*, more than two times the 12% interest rate cap established by Virginia Code § 6.2-303. The same would be true for borrowers in Connecticut, Massachusetts, and

---

[16] Plaintiffs' counsel has already completed a 50-state survey of the applicable interest rates.

Wisconsin because each of these states also have a 12% interest rate cap. *See* Conn. Gen. Stat. Ann. § 37-4; Mass. Gen. Laws ch. 140, § 96; Wis. Stat. § 138.05.   A borrower in California, on the other hand, only has a claim if the annual interest rate exceeded 20%, *i.e.*, more than two times the 10% interest rate cap in California. Cal. Civ. Code § 1916–2. These minor differences between state law interest rates do not create individualized issues that will predominate. *See, e.g.*, *Purdie v. Ace Cash Express*, 2003 WL 22976611, at *3 (N.D. Tex. Dec. 11, 2003) ("Here, the members of the putative class share a common factual circumstances of having obtained payday loans that were originated, serviced and collected in a uniform manner according to policies and procedures implemented by Defendants on a nationwide basis.").

Further, even assuming that this Court finds that state interest rate differences create unmanageable problems, a simple change to the class definition will alleviate all risk with respect to *some* consumers, *i.e.*, Virginia and Georgia classes. In other words, if Plaintiffs amend their class definition to include only consumers located in Virginia and Georgia when they received their loans, then there are no variances whatsoever. Indeed, courts have routinely certified cases involving alleged violations of a state's usury laws, as well as RICO's prohibition against the collection of unlawful debt.[17]

The Defendants' second basis for striking the class allegations fares no better. According to the Defendants, "[p]roof sufficient to substantiate actual damages would necessitate

---

[17] *See, e.g.*, *MacDonald v. Cashcall, Inc.*, 333 F.R.D. 331, 353 (D.N.J. 2019) (granting a contested motion for class certification and certifying both usury and RICO claims in a comparable tribal lending case); *Upshaw v. Georgia (GA) Catalog Sales, Inc.*, 206 F.R.D. 694, 699 (M.D. Ga. 2002) (finding "numerous common issues," including, among others, "[w]hether the interest charged on the loans violates the Georgia usury laws" and "[w]hether the loans and interest are unlawful debts, the collection of which violates RICO."); *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 155 (S.D.N.Y. 2017) (finding commonality in a case alleging violations of New York's usury laws based on the "common injury" of "the attempted collection of interest at a usurious rate").

adjudication of highly individualized issues, which would vastly outweigh the common questions applicable to actual damages." Dkt. 16 at 51. Other than making this summary statement, however, the Defendants offer no explanation *why* the theory of damages creates an individualized issue, let alone one that predominates. The Defendants' conclusory assertion is insufficient to satisfy their burden. Further, their blanket statement ignores the well-established rule that the "possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003).

For damages, Plaintiffs are seeking the usurious amounts repaid in connection with their loans. This amount can be easily calculated on a classwide basis as it is an objective amount. In other words, this is not a case where the determination of damages awarded will largely depend on individualized testimony, such as in a case where the consumer is seeking emotional distress or damages for physical injuries. *See MacDonald*, 333 F.R.D. at 349 (explaining "questions of law and fact common to the class will predominate, such as whether each contract was an absolute obligation to repay a usurious loan and whether the compensation of each loan amounted to usury. Damages may then be calculated on a purely individual basis."). Instead, damages will simply be calculated by determining the amount that each individual paid in excess of their respective states interest rate—an objective task that has been routinely performed in other class cases.[18]

---

[18] Plaintiffs' counsel have been appointed nationwide class counsel in five nation settlements relating to usurious tribal loans. *See generally Turner v. ZestFinance, Inc.*, Case No. 3:19-cv-00293 (E.D. Va.), Feb. 25, 2020 Preliminary Approval Order at Dkt. 94 (preliminarily approving settlement providing $18.5 million in cash and $170 million in debt relief to borrowers); *Galloway v. Williams*, No. 3:19-cv-470 (E.D. Va.), Dec. 20, 2019 Preliminary Approval Order at Dkt. 65 (preliminarily approving settlement providing $8.7 million in cash and over $100 million dollars in debt relief for over 300,000 consumers); *Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-495 (E.D. Va.), Dec. 13, 2019 Order at Dkt. 141 (granting final approval of $60 million settlement and more than $380 million dollars in debt relief to consumers); *Gibbs v. TCV, V, LLP*, Case No. 3:19-

## CONCLUSION

For the reasons explained above, Plaintiffs request the Court to deny Defendants' motion in its entirety. Alternatively, Plaintiffs request leave to file an amended complaint to address any deficiencies in their claims, especially in light of the multitude of issues raised by Defendants' motion. And to the extent the Court grants the motion to compel arbitration of Mr. Williams' claims, he respectfully requests the Court to dismiss this case, rather than stay the proceeding.

Respectfully submitted,
**PLAINTIFFS**

By: _____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
*Counsel for Plaintiffs*

---

cv-00789 (E.D. Va.), Dec. 9, 2020 Preliminary Approval Order at Dkt. 43 (granting preliminary approval of a $50.5 million dollar fund and $380 million dollars in debt relief); *Gibbs v. Rees*, 3:20-cv-717 (E.D. Va.), Dec. 9, 2020 Preliminary Approval Order at Dkt. 28 (granting preliminary approval of a class settlement for more than $ 9 million). In each of these cases, class members received payments based on unlawful amounts paid under the respective state's usury laws. A settlement administrator performed the calculations for each of these settlements using loan data and payment histories.

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of December, 2020, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

                             _____/s/_____

                             Kristi C. Kelly, Esq. VSB # 72791
                             KELLY GUZZO, PLC
                             3925 Chain Bridge Road, Suite 202
                             Fairfax, Virginia 22030
                             Telephone: (703) 424-7570
                             Facsimile:  (703) 591-0167
                             E-mail:  kkelly@kellyguzzo.com
                             *Counsel for Plaintiffs*