```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF VIRGINIA
 2                        Charlottesville Division

 3     - - - - - - - - - - - - - - - - - -
 4                                        )
          LORI FITZGERALD, et al,         )
 5                                        )
                      Plaintiffs,         )   CIVIL ACTION NO.
 6                                        )   3:20cv44
       v.                                 )
 7                                        )
       JOSEPH WILDCAT, SR., et al,        )
 8                                        )
                      Defendants.         )
 9     - - - - - - - - - - - - - - - - - -

10
                         TRANSCRIPT OF PROCEEDINGS
11
                     (VIDEOCONFERENCE MOTIONS HEARING)
12
                         Charlottesville, Virginia
13
                           September 21, 2022
14

15
       BEFORE:  THE HONORABLE NORMAN K. MOON
16              Senior United States District Judge

17
       APPEARANCES:
18
           FOR THE PLAINTIFFS:
19
                   ANDREW JOSEPH GUZZO
20                 KRISTI CAHOON KELLY
                   Kelly Guzzo, PLC
21                 3925 Chain Bridge Road, Suite 202
                   Fairfax, VA  22030
22                 703.424.7576

23
           FOR THE DEFENDANTS:
24
                   PATRICK MCANDREWS
25                 Spencer Fane, LLP
                   13815 FNB Parkway, Suite 200
```

```
 1              Omaha, NE  68154
                402.965.8600
 2
                ANDREW ADAMS, III
 3              Hogan Adams PLLC
                1935 County Road B2 W, Suite 460
 4              St. Paul, MN  55113
                651.842.9100
 5
                JOHN EDWARD KOMISIN
 6              Troutman Pepper Hamilton Sanders LLP
                1001 Haxall Point, Suite 1500
 7              Richmond, VA  23219
                804.697.1872
 8
 9                           * * * * *

10

11              (Proceedings commenced at 2:00 p.m.)

12              THE COURT:  All right.  Are all the parties on the

13      call?

14              THE CLERK:  Yes, Judge.

15              THE COURT:  All right.  You may call the case.

16              THE CLERK:  Lori Fitzgerald and others v. Joseph

17      Wildcat, Sr., and others, case number 3:20cv44.

18              THE COURT:  Are the plaintiffs ready?

19              MR. GUZZO:  Yes, Your Honor.

20              THE COURT:  Are the defendants ready?

21              MR. MCANDREWS:  Yes, Your Honor.

22              THE COURT:  Okay.  We're here on the defendants'

23      motion, so, counsel, whoever is going to be first, may

24      proceed.

25              MR. MCANDREWS:  Your Honor, this is Patrick
```

```
 1    McAndrews from Spencer Fane, and I'm going to be talking on

 2    behalf of all the defendants in this case.

 3              THE COURT:  Good afternoon.

 4              MR. MCANDREWS:  Good afternoon.  We're here, again,

 5    on defendants' Motion to Dismiss, Motion to Compel

 6    arbitration, and to strike class claims.

 7              Defendants are three individuals associated with the

 8    Lac du Flambeau Band of the Lake Superior Chippewa Indians.

 9    The tribe is a federally-recognized Indian tribe, and it has

10    a reservation in a remote section of northern Wisconsin.

11              With that remoteness comes limited resources and job

12    opportunities.  So in order to rectify that, the tribe

13    started the LDF or the Lac du Flambeau Business Development

14    Corp.  I'll refer to that as the LDF Bs. Corp. throughout

15    this hearing.

16              What LDF Bs. Corp. does is they act as the holding

17    company for all the tribes non-gaming businesses.  This

18    includes a construction company, a campgrounds, the tribe or

19    the reservation's only grocery store, the tribe's vocational

20    school, and finally, the tribe's lending business known as

21    LDF Holdings.

22              Now, LDF Holdings was established by the tribe, and

23    it holds about 20 different lending subsidiary tribal

24    companies, and those tribal entities provide online short

25    term loans for customers.  LDF Holdings employs roughly 50
```

1    people on the reservation.

2         The plaintiffs are Virginia and Georgia residents

3    who entered loan agreements and took out loans with one of

4    LDF Holding's tribal lending subsidiary companies.

5         Now, at this point you're probably wondering why the

6    tribe or the company that actually loaned the money to

7    plaintiffs are not named in this lawsuit.  Plaintiffs, in an

8    attempt to avoid the argument of tribal sovereign immunity,

9    have essentially plucked three individuals who were either

10   associated with the tribe, the tribal council, or the lending

11   business and has brought RICO claims against these

12   individuals.  That, Your Honor, is the fundamental and fatal

13   problem with the plaintiffs' lawsuit.

14        Now, the three defendants in this case, and the only

15   defendants in this case, are individuals.  The first

16   individual defendant is Joseph Wildcat.  Mr. Wildcat was the

17   former president of the tribal council, which is the

18   governing body of the tribe.  He's being sued in both his

19   official and individual capacity.

20        The second defendant is Nicole Reynolds-Chapman, and

21   she's the former president of the board of the LDF Business

22   Development, Corp., which is, again, the holding company for

23   all of the tribe's non-lending businesses, and she's being

24   sued in her individual capacity.

25        The final defendant is Jessi Lorenzo, and she is the

1  former president of LDF Holdings, which is one of the

2  subsidiaries under the LDF Business Development, Corp., and

3  she is being sued in her individual capacity.

4        Now, as I stated earlier, plaintiffs have brought a

5  RICO cause of action alleging that defendants Wildcat,

6  Reynolds, and Lorenzo individually conspired to collect

7  unlawful debt under 18 USC 1964.

8        They also allege that these individual defendants

9  conspired to operate an enterprise to issue and collect loans

10  in violation of state lending laws.  Plaintiffs have also

11  brought a declaratory judgment action asking the Court to

12  find all of the loans issued by the LDF tribal lending

13  subsidiaries to be void as a matter of law.

14        Finally, this is styled as a class complaint in that

15  plaintiffs are seeking to certify a nationwide class of

16  borrowers who took out loans with one of the 20 LDF Holding

17  tribal lending subsidiaries, and they're seeking the return

18  of all monies paid to all these LDF Holding subsidiaries.

19        This leads us to the first basis for dismissal, Your

20  Honor.  Plaintiffs have fundamentally failed to state a claim

21  for relief.  Again, plaintiffs' claims are that these

22  individual defendants conspired to violate state lending and

23  usury laws.

24        Now, in order to state a plausible RICO claim, as

25  the Court knows, you must allege a conduct, number two, of

1  enterprise through a pattern of racketeering, in this case

2  it's the collection of unlawful debt, and there must be an

3  injury to plaintiff by reason of the RICO enterprise.

4         The first issue, or the first problem with the way

5  the RICO causes of action were pled is that plaintiffs have

6  not sufficiently pled the existence of an actual enterprise.

7         Now, an enterprise, of course, is an association or

8  group of people associated together for a common purpose;

9  however, under the Intracorporate Conspiracy Doctrine a

10  corporation acting in concert in an ordinary course of

11  business with its agents and employees is not a RICO

12  enterprise, and that's what we have here, Your Honor.

13         Plaintiffs are alleging that these individual

14  defendants worked with either the companies they were

15  employed by, in Ms. Lorenzo's case, or which they sat on the

16  board of, which is Ms. Reynolds' case, or the tribe, and that

17  they conspired together into one enterprise conspiracy.

18         The second problem with this RICO cause of action is

19  plaintiffs have not alleged an actual pattern of

20  racketeering.  Again, here the racketeering activity is the

21  collection of the unlawful loans.

22         Noticeably absent from plaintiffs' complaint is any

23  actual allegations about the loans these plaintiffs took out.

24  It does not state the actual tribal lending company which the

25  loan was provided by.

```
1              It does not provide the date the loans were

2    provided, how much principal was given, how much was paid

3    back, and what interest was paid back.  None of those

4    allegations are in the complaint, so there hasn't been a

5    pattern of racketeering that has been sufficiently pled.

6              Just as an example of the conclusory nature of the

7    allegation pled --

8              THE COURT:  Let me ask you, do you need the pattern

9    when you're alleging the loan?

10             MR. MCANDREWS:  So, Your Honor, for the pattern you

11   actually need to allege what these individual defendants or

12   how these individual defendants collected on the loan, and

13   since there is no allegations of how they collected on it,

14   right, they haven't alleged that they paid back principal or

15   interest or really anything on the loan, so you do need to

16   allege what these individual defendants did to collect on the

17   quote/unquote "unlawful loan" to prove the pattern.  But,

18   again, there is no allegation specifically about this loan.

19             THE COURT:  What do you mean what they did to

20   collect it when just if it was an illegal loan, no matter how

21   they collected, it would still be an illegal loan, wouldn't

22   it?

23             MR. MCANDREWS:  Well, but they haven't even

24   explained how these individual defendants actually issued the

25   loans.
```

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/2022   8

```
 1              If you remember, Your Honor, the tribal lending
 2    subsidiary -- I believe in Mr. Williams' case Niizhwaaswi LLC
 3    was actually the lender of that, so they have not alleged how
 4    these individual defendants got Niizhwaaswi to collect on the
 5    loan and issue illegal loans, and that's the problem.
 6              There is not this connection, because you've got to
 7    remember none of the actual tribal entities have been named
 8    in this lawsuit.  These are only individuals who had
 9    shoestring ties to these organizations.
10              Now, again -- sorry, Your Honor.
11              THE COURT:  Go ahead.
12              MR. MCANDREWS:  So just as an example of some of the
13    conclusory allegations in this complaint, I point the Court
14    to paragraph 58, and that is for -- this is directed at
15    defendant Joseph Wildcat, and it's almost verbatim for all
16    the defendants.  It's kind of restated.
17              I quote, "Upon information and belief, defendant
18    Joseph Wildcat, Sr. was instrumental in furthering the
19    illegal lending business and agreed to the collection of
20    unlawful debt."
21              But, again, they don't explain it.  There are no
22    further allegations regarding those, specifically what
23    Mr. Wildcat did or what Ms. Lorenzo did or what Ms. Reynolds
24    did, and that's the fundamental flaw with --
25              THE COURT:  Well, he knows that he's accused of
```

Cynthia L. Bragg, Official Court Reporter

1    collecting an unlawful debt.  I mean, that puts him on

2    sufficient notice of what he's got to defend, doesn't it?  He

3    knows these people, Reynolds and whatever their name is, they

4    borrowed the money.

5              MR. MCANDREWS:  Well, Your Honor, for Joseph

6    Wildcat, he was the president of the tribal council, so he

7    wasn't even involved in the day-to-day operations of this.

8    You know, he was on -- he oversaw LDF Business Development

9    Corporation which had a bunch of different businesses, and

10   one of them was the lending subsidiary.

11             So, again, the allegations lack any tying up to

12   these individual defendants because what the plaintiffs do is

13   they essentially make allegations against the tribe and the

14   tribal lending company and just say, oh, all these individual

15   defendants were somehow involved, but they don't actually

16   explain it, and that's the problem.  They aren't really

17   alleging a tie.

18             THE COURT:  The purpose of the pleading is to let

19   them know what they're accused of so they can defend it.  And

20   it looks to me that it's pretty -- either he would know

21   whether he's involved in any loans to these people or not.

22             MR. MCANDREWS:  They haven't actually alleged that

23   he was personally involved in the loans.  They've said that

24   the tribal lending company was and that's what tied it to

25   him, but because we're dealing with RICO cause of actions,

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202210

1    there is a heightened pleading standard more than just your

2    normal causes of action.

3            I think what would be really instructive for the

4    Court is to point the Court to the *Manago v. Cane Bay*

5    *Partners* case.  That was a case that was just decided two

6    weeks ago, and it was in the District Court of Maryland.

7            In that case it's almost identical to this case,

8    Your Honor.  It's the same structure where you allege the

9    tribal lending entities and these individuals conspired to

10   violate state lending laws.

11           In that case -- Your Honor, the complaint in *Manago*

12   and the complaint here is almost identical.  I mean, word for

13   word.  We can get into it, but most of the alleged factual

14   allegations are pretty much word for word identical.

15           In that case, the Court dismissed on a Motion to

16   Dismiss the entire complaint, including the RICO cause of

17   actions, finding that, one, the plaintiffs' group pleading

18   incorrectly lumps defendants together without specifying

19   allegations attributable to each individual defendant.

20           Two, that the allegations establishing the agreement

21   to participate in the enterprise were conclusory rather than

22   factual.  And, three, that the complaint was devoid of any

23   actual facts about the structure and organization of the

24   alleged RICO enterprise.

25           The same is true here.  There have been no facts

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202211

1  that have been alleged that specifically explain the

2  structure and organization or how each individual defendant

3  actually participated in the enterprise or agreed to

4  participate in the enterprise.

5         Now, the third problem with the lawsuit, Your Honor,

6  is that plaintiffs have not alleged that they were in fact

7  injured because they have not explained that they took out a

8  loan, how much they took out a loan for, or that they've paid

9  back either principal or interest on that loan.  They

10  actually haven't even alleged that there was an injury, that

11  the conspiracy to issue and collect illegal loans has injured

12  them, because they haven't alleged what was collected on any

13  of these loans.

14         THE COURT:  I understand that some of these things,

15  you know, may be deficiencies, but what have you gained if

16  these are readily cured by filing an amended complaint?

17         MR. MCANDREWS:  Your Honor, it would greatly assist

18  us in discovery and actually finding out what exactly they're

19  alleging each -- you know, the actual enterprise and what was

20  agreed to because right now --

21         THE COURT:  But if they file an amended complaint, I

22  mean, what I'm asking is, why couldn't they ask to file an

23  amended complaint and correct most of these things, these

24  issues?  I don't --

25         MR. MCANDREWS:  They could have.  In fact, in the

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202212

```
 1    Manago case I cited earlier, the Court gave the plaintiffs an

 2    opportunity to amend, but the Court in Manago said that,

 3    Look, because there is such a shoestring to these individual

 4    defendants, even how it was repled was still deficient.

 5         But, again, in the Manago case the plaintiffs did

 6    amend, and the complaint was still dismissed for failure to

 7    state a RICO cause of action.

 8         THE COURT:  All right.

 9         MR. MCANDREWS:  As far as the declaratory judgement

10    action, again, the plaintiffs are asking that the Court find

11    that the loans should be void as they violate state law.

12    But, again, just like the RICO claim, they haven't alleged

13    anything about their loans.  They haven't explained the

14    loans, who they took out the loans from, the amount.  So you

15    can't support also the dec action as well.

16         Now, the second basis for dismissal, and this kind

17    of goes back to what we were talking about earlier at the

18    beginning, is that plaintiffs failed to join necessary and

19    indispensable parties in this case.

20         When you read this complaint, you can tell it is

21    pointed at the tribe, LDF Holdings, and its lending

22    subsidiaries that issued the plaintiffs' loans, right?

23    That's really the parties that are directed in this lawsuit.

24         So the fact that they haven't been named, nor can

25    they be named because of sovereign immunity, makes this
```

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202213

```
 1    complaint deficient from the get-go.

 2         The individual defendants cannot get just

 3    adjudication without the tribe's or the TLE's involvement,

 4    and they can't be named because presumably, and maybe by

 5    admission of plaintiffs, they are shielded in a cloak of

 6    tribal sovereign immunity.

 7         THE COURT:  What about injunctive relief?

 8         MR. MCANDREWS:  I believe you're referring to the

 9    ex parte case.  In that, Your Honor, they can seek injunctive

10    relief if they actually named an individual that has the

11    authority to stop the conduct.

12         Again, in Ex Parte Young, that was regarding whether

13    or not a tribe could set up an off-reservation casino, and

14    they named the individual in the tribe that actually was

15    doing that, was actually setting up the non-gaming casino.

16         Here, again, they haven't alleged facts that any of

17    these defendants have direct control.  In fact, as I

18    mentioned earlier, Ms. Reynolds and Ms. Lorenzo are no longer

19    even at the tribe, and Mr. Wildcat is no longer president of

20    the tribal council.

21         Now, the second kind of big component of our motion

22    is the Motion to Compel arbitration, but, again, you don't

23    even need to get there if you find that the complaint was

24    insufficiently pled or that they're indispensable parties.

25         Nevertheless, the arbitration agreement is at issue,
```

```
1    and it's specifically at issue for one of the three
2    plaintiffs, and that's Mr. Williams.  He's the Georgia
3    borrower.
4          Mr. Williams signed a loan agreement that contained
5    an arbitration provision.  He's the only one of the three
6    plaintiffs that signed an arbitration agreement.  So what
7    we're asking is his individual claims be sent over to
8    arbitration.
9          Now, in plaintiffs' response to our Motion to Compel
10   Arbitration they fundamentally misunderstand and misstate the
11   loan agreement and the arbitration provision, so I want to
12   set the record straight on what's actually said in the
13   agreements and how they work.
14         So the loan agreement has a governing law provision
15   which states that the tribal law and applicable federal law
16   apply to the loan.  In a separate section called the Dispute
17   Resolution Provision, there is an informal procedure for if a
18   borrower wants to go to LDF before any formal proceedings and
19   try to resolve the dispute.
20         If they don't feel that they got adequate resolution
21   in that alternative dispute, informal alternative distribute
22   procedure, what the agreement says is that doesn't create an
23   independent cause of action, meaning that the borrower cannot
24   say that LDF Holdings or its TLEs violated the loan agreement
25   by not giving adequate informal resolution to their claims.
```

```
 1    So that's a separate provision.

 2          Separate from that is then a whole new provision

 3    called the arbitration provision.  In the arbitration

 4    provision LDF Holdings and its tribal lending subsidiary

 5    state that they offer a limited waiver of their sovereign

 6    immunity to allow claims and disputes of borrowers, including

 7    Mr. Williams, to be brought through arbitration with AAA.

 8          Now, the disputes that Mr. Williams or any borrowers

 9    can bring against LDF Holdings or the tribal lending

10    subsidiary is all U.S. federal and state law claims,

11    disputes, and controversies; all common law claims based on

12    contract, tort, fraud, or other torts; and all claims based

13    on violation of any state or federal Constitution statute or

14    regulation.

15          So a borrower can bring those claims through

16    arbitration.  That is agreed to in the agreement, and that is

17    part of the limited waiver.

18          Now, the arbitration agreement also applies to

19    claims that a borrower has against the tribe officials and

20    employees.  So the claims against these individual defendants

21    would be within the scope of the arbitration agreement.

22          Now, the arbitration agreement also provides that

23    the arbitration shall take place in the plaintiff's county of

24    residence and that LDF Holdings and its tribal lending

25    subsidiaries will pay for all arbitration costs.
```

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202216

1              The arbitration provision notably provides that the
2      arbitrator shall apply applicable substantive law consistent
3      with the governing law set forth above, that's tribal law and
4      federal law, and apply the Federal Arbitration Act and
5      applicable statute of limitations and shall honor claims of
6      privilege of recognized law.
7              Finally, the arbitration provision allows for any
8      arbitration decision to be filed in any court having
9      competent jurisdiction.  So, presumably, if Mr. Williams or
10     any borrowers get an award, they can actually move to enforce
11     that award in any state or federal court.
12             Finally, the arbitration agreement does provide a
13     delegation clause that provides that the scope, validity, and
14     enforcement is delegated to the arbitrator.
15             Now, plaintiffs principally argue that the
16     arbitration agreement is unconscionable, it violates public
17     policy, and it perspectively waives federal law.  That's
18     clearly not the case here.
19             Borrowers are allowed to bring all their claims in
20     arbitration.  The arbitrator is free to apply applicable
21     federal law, and if that applicable federal law points them
22     to apply state law, the arbitrator has the ability to do
23     that.  It also allows that any arbitration award can be filed
24     in state or federal court.
25             Now, plaintiffs cite to a host of tribal lending

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202217

```
 1    cases where the court did not enforce arbitration provisions
 2    in the loan agreements and found that the arbitration
 3    agreements were procedurally and subsequently unconscionable.
 4         However, none of those cases, not one of the cases
 5    cited by plaintiff is relevant to Mr. Williams' loan
 6    agreement and arbitration provision at issue here in this
 7    case.  Those cases are completely different than the
 8    agreement Mr. Williams signed.
 9         For example, in Hayes v. Delbert, a case cited by
10    plaintiffs and is a Fourth Circuit case, in that case the
11    loan agreement contained a governing law section in the loan
12    agreement that stated that no United States state or federal
13    law applies to this agreement.
14         In Dillon v. BMO Harris, also a case cited by
15    plaintiffs and is a Fourth Circuit Case, in that case the
16    loan agreement stated, and I quote, "No other state or
17    federal law or regulation shall apply to this agreement."
18    That's why the Court found it was unconscionable.
19         In Gibbs v. Haynes and in Gibbs v. Sequoia Capital,
20    both cases cited by plaintiff, the choice of law provision in
21    that loan agreement provided that the loan agreement shall be
22    governed by tribal law and that the arbitrator shall only
23    apply tribal law and that the arbitrator's decision must be
24    consistent with tribal law.  That's not what we have here in
25    this case.
```

Cynthia L. Bragg, Official Court Reporter

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202218

1              Another case cited by the plaintiff that's kind of

2      interesting is the *Dunn v. Global Trust Management* case.   Why

3      this one is interesting is because the Court did find that

4      this was unconscionable and against public policy, but there

5      the arbitration provision again said only tribal law applies.

6              In the *Dunn* case the borrower -- the loan agreement,

7      or the arbitration provision said that any arbitration award

8      could not be filed in court, meaning that the borrower

9      essentially would get an arbitration award that isn't

10     enforceable, and that's why it was unconscionable and against

11     public policy.

12             That's not what we have in our case.   Again, any

13     award Mr. Williams gets can be filed and enforced in state

14     and federal court.

15             Now, in an attempt to try to manufacture this idea

16     that the loan agreement perspectively waives federal law,

17     plaintiffs cite to or try to bring up LDF Holdings Consumer

18     Financial Service Regulations Ordinance saying that it bars

19     application of federal law, and that's just not the case.

20     It's kind of a misunderstanding of the loan agreement.

21             So as we stated earlier, the loan agreement has a

22     separate informal dispute resolution provision and then a

23     separate arbitration provision.   The ordinance applies to the

24     dispute resolution provision.

25             It basically says that at that stage the tribe is

1    looking at whether or not to resolve it informally.  They

2    haven't waived any of their immunity.

3         Immunity isn't waived until the arbitration is

4    actually brought and they've said yes, we've waived our

5    sovereign immunity, and federal law does apply.  So it's a

6    little nuanced, but it's basically a red herring argument.

7         THE COURT:  May I ask you a question?

8         MR. MCANDREWS:  Yes.

9         THE COURT:  If in the arbitration the arbitrator

10   decides that an interest rate in excess of what Virginia's

11   usury rate is should apply and that the plaintiffs owe the

12   usury rate of interest plus principal, what would happen with

13   such an award as that?

14        MR. MCANDREWS:  Yeah, so that's kind of a good

15   point, Your Honor.  So how the arbitrator -- again, it kind

16   of brings up a broader issue is we're talking in speculation

17   here of what the arbitrator will and won't do, so a lot of

18   the arguments advanced by plaintiff really are arguments that

19   would be advanced if they tried to enter or move to, you

20   know, an arbitration award, at that point saying, you know,

21   if they tried to actually enforce the arbitration award,

22   these arguments would be valid.

23        But to answer your question, what the arbitrator can

24   do is they can look to federal law, and if the federal law

25   points them to apply state law; for example, in the RICO

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202220

```
 1    cause of action it does that.  It states that an unlawful
 2    debt under RICO is a debt that's illegal under state or
 3    federal law.
 4          So it allows the arbitrator to look at state law,
 5    and if he says, "Yeah, that is a violation of federal law,"
 6    then you have violated the RICO statute.  The arbitrator can
 7    issue an award, and Mr. Williams can go and file that in any
 8    state or federal court to be enforced.
 9          THE COURT:  Okay.  But my question is:  Where the
10    arbitrator decides that an interest rate above the legal rate
11    is applicable, can -- I mean, what happens with that, that
12    award that's not in favor of the plaintiff?  Does he file
13    that, or what does he do?  How does he overturn that?
14          MR. MCANDREWS:  So he would file that in any state
15    or federal court having competent jurisdiction, and he would
16    argue that the arbitrator misapplied the law in that there
17    was an error at the arbitrator's level, and that's why the
18    arbitration award should be invalidated.
19          Again, then all these arguments plaintiff advanced
20    would be ripe, but at this stage we're kind of speculating on
21    how the arbitrator is going to --
22          THE COURT:  It's hypothetical.  I'm sure at some
23    point in history an arbitrator has gotten it wrong.  I'm just
24    curious.  That's not -- I just wanted to know.
25          MR. MCANDREWS:  I appreciate it.  So a simple
```

1   reading of the arbitration provision, Your Honor, clearly

2   shows that there is no prospective waiver of federal law.

3   The arbitrator can apply federal law.

4           The arbitration agreement is fair, valid, and

5   conscionable.  The claims Mr. Williams brings are within the

6   scope of the arbitration agreement, and his claim should be

7   compelled to arbitration.

8           Now, the final argument we advance in our motion,

9   and I won't spend too much time on this, is the Motion to

10  Strike the class allegations.

11          Again, that goes back to the fact that plaintiffs

12  have failed to state a cause of action and failed to add the

13  necessary parties in this case because the class definition

14  asks for LDF Holdings and tribal lending subsidiaries to

15  return monies paid.  And, again, they're not in this lawsuit.

16  So plaintiffs have failed to allege an ascertainable class,

17  and those claims should be stricken.

18          So in summary, Your Honor, the RICO claims haven't

19  been properly pled, and the claims should be dismissed.  And

20  because we're dealing with RICO, they need to be more

21  specific on the enterprise.

22          The indispensable parties have not been added to

23  this lawsuit, nor can they, so this case cannot proceed.

24  Even if you do find that it was adequately pled and the

25  indispensable parties aren't needed, Mr. Williams' claim

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202222

1    should be compelled to arbitration and the class claims

2    should be stricken.

3              Thank you, Your Honor.

4              THE COURT:  Thank you.  For the plaintiff.

5              MR. GUZZO:  Good afternoon, Your Honor, Andrew Guzzo

6    on behalf of the plaintiffs.  Thank you for the opportunity

7    to address the Court.

8              I want to start today with really two big picture

9    points from our perspective.  The first point is this motion

10   really begins and ends with the Fourth Circuit's decision in

11   *Hengle*.

12             Defendants move to stay this case pending the Fourth

13   Circuit's decision in *Hengle*.  In doing so, they argued that

14   this case had overlapping core issues between the two cases.

15   The Court granted this motion finding that it did.

16             The Fourth Circuit's decision was a major loss for

17   the industry in general and for these defendants

18   specifically.

19             In affirming Judge Novak's opinion, the Fourth

20   Circuit expressly held that substantive state law applies to

21   off-reservation conduct, and although the tribe itself could

22   not be sued for its commercial activities, its members and

23   officers can be.

24             That's the direct holding from *Hengle*, and that's

25   exactly what we've done here.  We've sued its members and its

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202223

1   officers.  The tribe cannot shroud those people with immunity
2   under *Hengle*.
3           It also held that enforcement of the tribal choice
4   of law provision would violate Virginia's compelling public
5   policy against usurious lending.
6           Following that ruling, *Hengle* has now settled.  The
7   tribal officials in that case agreed to cancel over
8   $450 million of debt, and their business partners are paying
9   $39 million in cash back to consumers.
10           Judge Novak preliminarily approved that settlement
11   in May of 2022, and it's scheduled for final approval in
12   October of 2022.  Our final approval brief is actually due
13   today.  It's our case.
14           This case parallels *Hengle*.  It's on all fours with
15   it.  We didn't try to reinvent the wheel here.  The
16   allegations and the theories are exactly the same.  The
17   complaints are the same.
18           We survived robust motions to dismiss in *Hengle*.
19   Judge Novak wrote an 108-page opinion in that case that
20   touches on pretty much every issue raised in this motion.
21           We tailored our complaint, which was filed six
22   months after Judge Novak's decision, to follow the blueprint
23   in that case, which we were largely successful on in the
24   district court and completely successful on in the Fourth
25   Circuit.

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202224

```
 1              Just as in Hengle, at a high level, we allege that
 2    the president of the tribe oversees and controls the lending
 3    business by virtue of his executive position as the
 4    president.  This is the same allegation and the same theory
 5    as Hengle.
 6              In turn, we alleged that the president has
 7    authorized the creation of the lending businesses and
 8    oversees and supervises them, although he has delegated the
 9    day-to-day management to the co-defendants Chapman-Reynolds
10    and Lorenzo.  These are the same allegations and theories as
11    Hengle.
12              In sum, we allege that they are the upper level
13    management of a purely unlawful business that makes illegal
14    loans in Virginia, Georgia, and elsewhere throughout the
15    country.
16              What I'm trying to say, in other words, is this
17    isn't a case that involves a lawful business, such as a real
18    estate brokerage firm, that happens to have a secret side
19    scheme involving a few rogue employees.  The people that are
20    overseeing this are overseeing a business that makes unlawful
21    loans and nothing else.
22              As a Northern District of California judge put it in
23    another case involving my firm, Judge Orrick in the Brice
24    matter, "Defendants were instrumental in setting up and
25    knowingly setting up an enterprise whose sole purpose was to
```

1    collect illegal debts thereby causing the acts to occur and
2    reaping the benefits therefrom."
3           That's our position in this case.  These are the
4    high level executives.  This is what they do, and without
5    them, it wouldn't be possible.
6           Before I wrap up this point about *Hengle*, I want to
7    note that it's not novel.  There are multiple opinions from
8    Judge Locke in the *Gibbs* case supporting our position.  That
9    case involved the same allegations and same theories.
10          There were three settlements in that case totalling
11   more than $780 million of debt cancellation and over $150
12   million of repayments to consumers.
13          Judge Locke wrote 11 different opinions in that case
14   including multiple motions to dismiss from various different
15   players involved in that enterprise who did a lot less than
16   those involved in this case.
17          There are also multiple opinions from Judge Payne in
18   the *Williams* and *Galloway* litigation.  That litigation
19   involves the same allegations and theories, except in that
20   case we sued the actual tribal entity in *Williams*.
21          Judge Payne found that the entity did not have
22   immunity, but the Fourth Circuit reversed.  That is why
23   *Hengle* was filed the way it was is because it came after
24   Williams in the Fourth Circuit's decision in that case.
25          Rather than suing the four entities involved in

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202226

1   *Hengle*, we sued the officials, and the Fourth Circuit post

2   Williams said that was completely okay and that they could be

3   sued.

4           There is also a decision from Judge Morgan in

5   *Solomon* on these issues.  That case settled for $86 million

6   in cash and $100 million in debt cancellation.

7           Beyond Virginia there are decisions in

8   Massachusetts, Oregon, Vermont, and the Commonwealth of

9   Pennsylvania all supporting our position.  So, of course all

10  of these other district court decisions are persuasive

11  authority; however, the overwhelming authority is on our side

12  in support of our position.

13          The second high level point I want to make, Your

14  Honor, is now that *Hengle* is controlling on most of these

15  issues, the biggest divide between the parties really boils

16  down to the pleading standard.

17          They say the Court cannot accept our allegations

18  because they are based on information and belief; thus, in

19  their brief at page 35 they ask the Court to disregard

20  allegations 3, 41, 43, 44, 49 through 50, 53 through 60, 62

21  through 65, 67, 69, 70, and multiple other allegations.  This

22  is where we outline that these defendants oversee and have

23  control and are involved in this business.

24          As Your Honor has explained in another case,

25  pleading upon information and belief is appropriate when

```
1    factual basis supporting a pleading is only available to the

2    defendant at the time of the pleading.

3           This is from Your Honor's opinion in McClain v.

4    Carucci, 2011 Westlaw 1706810 at 4.

5           Here it is completely acceptable to use upon

6    information and belief because plaintiffs don't have access

7    to this information.

8           Indeed these companies intentionally try to hide the

9    information related to their operation.  There is nothing on

10   the tribe's website, even though they advertise and provide

11   information related to other businesses.

12          And this is intentional, Your Honor.  Multiple

13   people have been convicted of felonies for their involvement

14   in these schemes.  Scott Tucker, who was one of the pioneers

15   of the tribal lending model, was convicted and sentenced to

16   16 years in prison in 2018.  His conviction was upheld by the

17   Second Circuit.

18          Charles Hallinan, another pioneer of this lending

19   scheme, was convicted and sentenced to 14 years in prison in

20   the Eastern District of Pennsylvania.  His sentence and

21   conviction was upheld by the Third Circuit.

22          They intentionally try to conceal as much

23   information as possible because of government enforcement

24   actions, class actions, and criminal proceedings.  Because of

25   this, we think that upon the information and belief
```

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202228

1   allegations can be properly considered by the Court.

2          Now turning to more specifically the defendants'

3   arguments, I'm going to begin on the *Manago* decision, which

4   is really an outlier, but since it was highlighted

5   significantly by the defendants, I'll start there.

6          In that case, the Maryland court agreed to dismiss

7   the RICO claims as to tribal officials because it only sought

8   injunctive relief.  Here our RICO claims do not seek

9   injunctive relief.  We have a declaratory judgement claim

10  solely against the president of the tribe, but we seek

11  monetary relief against the individuals involved.

12         This is permissible under the Supreme Court's

13  decision in *Lewis v. Clark*.  Our brief thoroughly addresses

14  this point that we can go after the individuals for their

15  involvement for monetary relief.

16         As to the non-tribal defendants in the *Manago*

17  decision, the Court found that the plaintiffs failed to

18  adequately allege an enterprise.  That's it.  That was the

19  sole basis that the Court dismissed the RICO claim.

20         There are three problems with the defendants'

21  reliance on this point.  First, the defendants never moved to

22  dismiss on this ground.  Instead they complained that it

23  failed on several other grounds; namely, that we did not

24  plead a distinct enterprise because all their actions were

25  taken within their roles as individuals and employees of the

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202229

1    various entities, but they never moved to dismiss in their

2    original pleading citing the same argument was cited in

3    *Manago*.

4           I think the Court should hold them to their

5    pleadings raised in their Motion to Dismiss, and it's unfair

6    to let them now piggyback off a decision years later from

7    when the briefing was completed.

8           Second, the Maryland court found that the plaintiffs

9    in that case failed to allege what roles and responsibilities

10   the defendants had in maintaining the enterprise.  Here we

11   have done this.

12          As I said before, we alleged the president

13   supervises and oversees the tribe's lending business, and we

14   further alleged that Reynolds and Lorenzo handled the

15   day-to-day operations.

16          Rule 8 does not require us to detail every action

17   taken by them, and there is no heightened pleading standard

18   under a RICO case for unlawful debt collection.

19          Multiple courts have decided this.  It's a Rule 8

20   pleading.  There is no heightened pleading standard.  This

21   isn't a fraud case, and we don't have to comply with Rule 9

22   here.

23          The third point I would make regarding the *Manago*

24   decision is that it wrongly applied binding precedent from

25   the Supreme Court.  In particular, the Maryland decision

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202230

```
 1    found that the plaintiffs failed to show, and I'm quoting,
 2    "the specific nature of the structure of the enterprise and
 3    what roles and responsibilities each defendant had."  Again,
 4    the specific nature of the structure and what roles and
 5    responsibilities.
 6          But in Boyle the Supreme Court expressly noted that
 7    there was no requirement that an enterprise have a hierarchal
 8    structure or a chain of command and that decisions may be
 9    made on an ad hoc basis and by any number of methods.
10          The Supreme Court further added in that case that
11    members of the group need not have fixed roles.  Different
12    members may perform different roles and at different times,
13    and the group need not have a regular name, regular meetings,
14    dues, established rules and regulations.
15          So when the Maryland court found that the specific
16    nature of the structure and what roles and responsibilities
17    were lacking, I would submit that that is contrary directly
18    to the Supreme Court's decision in Boyle that there needs to
19    be no hierarchal structure or chain of command.  There only
20    needs to be alleged relationships between the parties, and
21    here we allege the relationships.
22          They're the president of the entities or the
23    executives.  Essentially, you know, it's a government entity,
24    but one is considered the owner and others are the chief
25    executive officer making all the decisions.
```

Cynthia L. Bragg, Official Court Reporter

1              So for those reasons, we don't think *Manago* is

2    persuasive, and we certainly think the overwhelming majority

3    of the decisions in the other cases are certainly more

4    persuasive.

5              With respect to the Motion to Dismiss -- now getting

6    to the four overarching grounds for dismissal raised by the

7    defendants.  I'm going to start with the 12(b)(6) Motion to

8    Dismiss.

9              Counsel stated in his argument that we have no

10   allegations that our clients made any payments.  That is just

11   contrary to the allegations in the complaint.  At paragraph

12   89 of the complaint we allege that Mr. Aaron Fitzgerald --

13   that the defendants received no less than $4,860.87 from

14   Mr. Fitzgerald.  That's at paragraph 89.

15             At paragraph 94 we allege that the defendants,

16   together with the others in the lending enterprise, received

17   no less than $104.88 from Ms. Fitzgerald.  And at paragraph

18   99 we allege that defendants, together with other members of

19   the enterprise, received no less than $10,892.

20             All of this money is illegal debt under RICO which

21   defines unlawful debt as debt that's unenforceable under

22   state or federal law as to principal or interest due to laws

23   relating to usury.

24             Now, Virginia and Georgia, as we have explained in

25   our papers, make both the principal and the interest illegal

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202232

```
 1    and unenforceable, and, therefore, all payments made by our

 2    plaintiffs are sufficient to allege an injury.

 3           On top of that, the defendants' argument is belied

 4    by the structure of the loan agreements themselves.  These

 5    agreements work like a loan, as we've pointed out in our

 6    papers, like a mortgage.

 7           Every payment that is made by a consumer goes in

 8    part to principal and in large part to interest.  So by

 9    alleging that they made payments on these loans, including

10    $10,000 of payments, it can be reasonably inferred that the

11    plaintiffs repaid both usurious principal and interest, and

12    we allege that they also still owe outstanding money on the

13    loans.

14           One other point to make in response to counsel's

15    argument.  This isn't a racketeering case.  The statute

16    creates two predicate acts.  One is the pattern of

17    racketeering, and the other one is the collection of unlawful

18    debt which contains no pattern requirement.

19           It's not a racketeering case which has a very

20    specific definition under the statute as opposed to

21    collection of unlawful debt which requires, as court after

22    court has explained, no direct collection effort by the

23    defendant but participation in the operation or management of

24    the affairs of the enterprise.

25           A few other points to make with respect to the
```

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/2022       33

```
 1   12(b)(6).  They've argued that it's a shotgun pleading
 2   because we failed to articulate what each one of them did.
 3   We've explained that they are the high level executives, and
 4   RICO is a group theory of liability.
 5          The pleading isn't a group pleading or a shotgun
 6   pleading.  We explain how they've conducted the affairs of
 7   the enterprise, and there is a sufficient nexus between the
 8   defendants and the enterprise that they can be held
 9   responsibile for the ACH collection of the entity.
10          As the Dugan Court explained in addressing this same
11   argument, the Massachusetts court said, "A sufficient nexus
12   or relationships exists between the predicate act and the
13   enterprise if the defendant was able to commit the predicate
14   act by means or by consequence by reason of agency of his
15   association with the enterprise."
16          RICO doesn't prohibit collection of the unlawful
17   debt.  It's not a statute like the Fair Debt Collection
18   Practices Act that holds a single debt collector
19   responsibile.  It's a statute that holds groups responsibile
20   and recognition that groups are more dangerous than
21   individuals, and anyone who is involved in this enterprise
22   that's collecting the debt can be as long as they are
23   managing the affairs or participating in the enterprise.
24          With respect to defendants' arguments that we failed
25   to allege when, who, how much the interest was that was paid,
```

1    and who it was paid to, we allege Mr. Fitzgerald received

2    five loans from the subsidiaries, that Ms. Fitzgerald

3    received one, and that Mr. Williams received at least five.

4    That's in paragraph 86, paragraph 90, and paragraph 95.

5         We allege that the interest rates in these were all

6    triple digits, which is 20 to 50 times Virginia and Georgia

7    law, and that's the critical component that makes these debts

8    unlawful debts under RICO.

9         We don't need to allege when or -- there's no

10   pleading requirement as to that.  And the defendants attached

11   the loan contracts in this case, at least with respect to

12   Mr. Williams, to their pleadings.  It was within the four

13   years that would be within the statute of limitations for

14   RICO.

15        So I don't think it really should be necessary for

16   us to go back and have to say he took out this loan in 2017

17   or whenever it was.  I mean, they know the information.  It

18   just seems like kind of a waste of time to have us go back

19   and do that.

20        With respect to their argument that the president of

21   the tribe has now switched since the complaint was filed,

22   it's just appropriate to substitute him in.  This isn't the

23   first case where there has been an official capacity suit

24   against the president or head of an agency, and courts,

25   including the Second Circuit in the *Gingras* matter, said that

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/2022 35

1    the defendant can't just moot the case by switching the

2    individual involved.  It runs with the position.

3           So if we need to just substitute whoever the new

4    president is, that's an easy way to do it.  We did it in

5    *Hengle*.  On multiple occasions throughout that case different

6    members of their tribal council had turned over, so we

7    substituted three of them at various times in the litigation.

8    That's the appropriate course of action for that argument.

9           With respect to -- one of the central arguments in

10   their brief on the Motion to Dismiss is that we have failed

11   to allege a distinct enterprise as opposed to the individuals

12   running it.

13          That argument is directly contrary to the Supreme

14   Court's decision in *Cedric Kushner*.  We've briefed that at

15   length, and I just wanted to highlight that for the Court.

16          With respect to the declaratory judgement count, the

17   Declaratory Judgement Act allows a federal court in a case or

18   actual controversy to declare the right and legal relations

19   of any interested party seeking a declaration whether or not

20   it is entitled to further relief that could be sought.

21          This Court has said the test for that is whether the

22   complaint alleges an actual controversy.  The Court possesses

23   an independent basis for jurisdiction, and the Court does not

24   abuse its discretion.  That's the test.

25          Unquestionably we meet all of these requirements.

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202236

1    There is an actual controversy as evidenced by the papers.
2    We think the loan is void.  They think it's perfectly
3    legitimate and enforceable, and they continue to accrue
4    interest on the loan.  Determining parties' rights with
5    respect to a contract is the classic example of -- one of the
6    classic examples of when the party can use the Declaratory
7    Judgement Act.
8         The Court possesses an independent basis for
9    jurisdiction under RICO, and if necessary, we could plead
10   that the Court would have an independent basis under the
11   Class Action Fairness Act because the plaintiffs and the
12   defendants are from different states, and the amount in
13   controversy is over $5 million.
14        That, admittedly, is not in our complaint, Your
15   Honor, but if we needed to go back and do that for an
16   independent basis for jurisdiction, we certainly could.
17        In addition, we could allege in an amended complaint
18   that the loans violated Virginia usury laws and Georgia laws
19   which entitles the plaintiffs to injunctive and declaratory
20   relief as was found by Judge Novak in *Hengle*.  Judge Novak
21   also allowed us to proceed on count 6 in *Hengle* on a pure
22   declaratory judgement claim.
23        With respect to their argument that -- really
24   briefly, Your Honor, as to the necessary parties argument,
25   this is foreclosed by *Hengle*.  The Court there said

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/2022 37

1    substantive state law applies to off-reservation conduct, and
2    the tribe's members can be sued.
3         Judge Novak dealt with this argument at length in
4    the district court opinion, and necessary parties aren't
5    subject to an appeal as a matter of right.  So that was
6    not -- it did not go up to the Fourth Circuit on the
7    interlocutory appeal.
8         I think one of the implicit results of the Fourth
9    Circuit's decision is that members and officers can be sued
10   in federal court for violations of state and federal law, and
11   that's also implicit from the Supreme Court's decision in *Bay*
12   *Mills*, which was heavily relied on by the Fourth Circuit in
13   reaching its decision in *Hengle*.
14        Now turning to the arbitration issue, Your Honor.  I
15   want to begin by answering from my perspective your question
16   that you asked to counsel about what if the arbitrator wants
17   to apply state law in the arbitration.  The answer to that is
18   the arbitrator, he or she, can't.
19        Arbitration is a matter of contract.  They're not
20   judges.  They don't get to, like judges, look to the rules
21   and apply and use the authority that is given to them under
22   the Constitution and the federal rules.  They are bound by
23   what the contract allows them to do.
24        So here the contract would not allow an arbitrator
25   to apply state laws or to consider an argument that

1    Virginia's public policy against usurious lending renders the

2    contract unenforceable and violates the Prospective Waiver

3    Doctrine.

4           A few more points on the arbitration clause, Your

5    Honor.  There has been five case from the Fourth Circuit on

6    this issue, *Hayes, Dillon, Gibbs, Gibbs, and Hengle*.  Four

7    out of the five of those my firm was heavily involved in.

8    Four out of the five of them dealt with different contracts,

9    but the Fourth Circuit found them materially

10   indistinguishable.

11          There is a myriad of different ways that someone can

12   violate the Prospective Waiver Doctrine.  Here they really

13   did in three independent ways that we think suffice, any one

14   of which to render it unenforceable.

15          First, there is an express waiver in the contract.

16   The dispute procedure itself says it's considered to be a

17   petition for redress submitted to a sovereign government, and

18   it does not create any binding procedural or substantive

19   rights.  If a consumer is unhappy with the tribe's

20   adjudication of that dispute, it's only subject to

21   arbitration of that dispute.

22          We repeatedly cite this as the problem in our

23   briefing.  In response, in their rebuttal brief defendants

24   said nothing.  The argument they have today is new, and I'm

25   going to address that in just a second.

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202239

```
1          But after the briefing concluded in this case, Judge
2    Payne in Williams said that this provision, even though there
3    was a choice of law clause that said applicable federal law
4    was one of the reasons why that contract was a prospective
5    waiver of borrower's rights.
6          That case is now going up to the Fourth Circuit for
7    arguments in October.  So we're going to have some more
8    insight as to what the Fourth Circuit thinks about that
9    provision.
10          But what counsel said today is that the provision is
11    saved because it references that the disputes subject to
12    arbitration are tribal, federal, and state law claims,
13    therefore they must be arbitrable.
14          The Fourth Circuit expressly rejected this argument
15    in Hengle.  In doing so, they said that such language does
16    not counteract the effect of the choice of law provisions.
17    Indeed, each of the arbitration agreements in Hayes, Dillon,
18    Haynes and Sequoia required federal claims to be sent to
19    arbitration, but the Court in each case nonetheless found the
20    agreements prevented the effective vindication of federal
21    rights.
22          So the Court concluded, if anything, the inclusion
23    of this language that has been cited by the defendants
24    highlights that the arbitration provision is an impermissible
25    tactic of compelling arbitration of federal claims only to
```

Cynthia L. Bragg, Official Court Reporter

1    nullify those claims by precluding the application of federal
2    law in the arbitration.  So that provision absolutely does
3    not save them.
4         The second basis for the prospective waiver in this
5    case, Your Honor, is that the tribal code mirrors the
6    problematic codes that the Fourth Circuit found in Gibbs.
7         These codes were drafted by the same law firm.  The
8    contracts were drafted by the same law firm who is involved
9    with both of these tribes, and noticeably absent from their
10   code is required compliance with RICO, which is the only
11   federal statute that would govern the loans at issue, or
12   certainly the central one.
13        The tribal code does not allow for claims against
14   anyone other than the lending entity, and it doesn't create a
15   private cause of action.  For all of these reasons, the Court
16   found in Gibbs that the tribal codes were further evidence of
17   these contract's attempts to waive federal law.
18        And here the code is actually worse, and we've
19   pointed this out in our briefing.  The tribal code, the law
20   that must be applied by the arbitrator, states that in any
21   proceeding in which a licensee is a party in interest with
22   respect to the transaction, the licensee's rights and
23   remedies shall be granted upon prima facie proof of
24   entitlement based on the terms of the written transaction and
25   the payment and business records maintained by the licensee.

1    That's at docket 50-1, page 34.  It's LDF code section

2    8.4(i)(3).

3              This essentially mandates an automatic win for the

4    licensee, including their employees who are also defined as

5    part of the licensee.

6              These laws cannot simply be ignored by an

7    arbitrator.  They are bound to apply tribal law under the

8    contract, and arbitration is solely a matter of contract.

9    This is exactly why we have the Prospective Waiver Doctrine

10   and why the Fourth Circuit has repeatedly struck down similar

11   contracts.

12             In addition, the final basis we would say that the

13   contract violates the Prospective Waiver Doctrine is that in

14   *Hengle* the Fourth Circuit expanded the doctrine.  It took

15   issue with the fact that the contract repeatedly waived state

16   law as a basis for finding a violation -- it took issue with

17   the state law waivers finding that that was also part of the

18   prospective waiver.

19             Again, as I said at the beginning of the part about

20   the arbitration, this case highlights the importance of

21   disclaiming a state law in arbitration.  An arbitrator could

22   not apply Virginia's or Georgia's public policy against

23   usurious lending.  They're just bound by the terms of the

24   contract.

25             So for all those reasons, Your Honor, we think that

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/2022    42

 1    this falls squarely within the Fourth Circuit precedent as to

 2    those issues.

 3            One final point, Your Honor, before I wrap it up.

 4    To the extend the Court finds any deficiencies in the

 5    complaint, we've asked for leave to amend.  We haven't

 6    amended the complaint to date.  It was filed over two years

 7    ago, July 24th, 2020.

 8            We certainly, I think, can clean up any of the

 9    deficiencies that have been raised, including more

10    allegations, for example, about the tribal council and

11    substituting parties.

12            So with that, unless the Court has any questions for

13    me, that wraps up what I have to say.

14            THE COURT:  Okay.  Thank you.

15            MR. GUZZO:  Thank you.

16            THE COURT:  Mr. McAndrews?

17            MR. MCANDREWS:  Your Honor, you cut out there.

18            THE COURT:  Yes, go ahead.

19            MR. MCANDREWS:  I just have a couple of points.

20    First, the whole diatribe about Scott Tucker and all these

21    other cases and all these other lending enterprises that have

22    nothing to do with LDF are also in the complaint, and they

23    kind of highlight the nature of the complaint.

24            The plaintiffs want to talk about all these other

25    cases or all these other tribal lending systems, but that's

```
1    not -- that has nothing to do with LDF.  So, you know,
2    striking that as just immaterial from the get-go, we asked
3    for that in the motion and from this oral argument because
4    that's all irrelevant.
5             What is also irrelevant is the settlements in these
6    other cases.  These are very different cases.  They all deal
7    with different business structures, different loan
8    agreements, different arbitration agreements.
9             I congratulation the plaintiffs' counsel on the
10   Hengle settlement as well.  In Hengle, though, Your Honor, as
11   I stated earlier, it's a fundamentally different agreement.
12   It has a different choice of law provision that only allows
13   application of tribal law.
14            Also in Hengle, what the Court principally said was
15   that individual defendants -- the issue before that Court was
16   whether these individual defendants are cloaked with
17   sovereign immunity, and that was the issue that they said,
18   no, they aren't cloaked with sovereign immunity like the
19   tribe.  If you noticed, we're not advancing that argument
20   here in this oral argument.
21            So that's why the case was stayed, because if the
22   Fourth Circuit would have said that individual defendants are
23   cloaked with sovereign immunity, then obviously the
24   plaintiffs couldn't move forward in this case.  So that's the
25   limited ruling that was the similarity or that was the
```

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/2022 44

```
 1    overlap in the Hengle cases.

 2          But, again, in Hengle what it said about the

 3    arbitration agreement and whether or not it's unconscionable

 4    or violates public policy, that's not applicable here mainly

 5    because it's a different agreement.

 6          Second, Mr. Williams is a Georgia resident.  Hengle

 7    analyzed whether the arbitration agreement was in violation

 8    of Virginia public policy, not Georgia's public policy, so

 9    that's also a huge difference in those cases as well.

10          As for the discussion about the necessary parties

11    and that the Hengle case actually made a decision about that,

12    I want to clarify just what Mr. Guzzo said.

13          That issue was not before the Fourth Circuit.

14    Whether or not the tribe needs to be a necessary party, that

15    wasn't analyzed by the Fourth Circuit.  Again, when it was

16    discussed at the trial or the district court level, it was in

17    regards to whether or not individual defendants were cloaked

18    with sovereign immunity, and that's some nuances there and a

19    lot different.

20          I heard a lot in the argument also that the

21    plaintiffs have alleged that the defendants in this case, the

22    individual defendants, have overseen lending operations and

23    that they are high level executives, but they don't ever go

24    forward and explain what they oversaw and how they oversaw.

25          Again, we're kind of two years in.  I think as
```

1    Mr. Guzzo said, he's dealt with a lot of different tribal

2    lending entities.  He knows how to get the information before

3    filing suit because we've seen it in other complaints.  We

4    cite to it in our reply brief.  A lot of this is public

5    information.

6          THE COURT:  Question:  If you are in fact, you know,

7    charged an outrageous illegal amount of interest on these

8    loans, what difference does it make about how they managed to

9    do it?

10         I mean, why isn't it enough to say, look, here is

11   the contract that says I have to pay 120 times what the legal

12   rate is?  It doesn't make any difference what the

13   mechanization is or how the money gets back to the lender.

14         MR. MCANDREWS:  Well, again, if the individual

15   tribal lending entity that actually charged that illegal

16   interest rate was named in this lawsuit, that would be a

17   relevant issue, but they haven't been.

18         Again, you've got to remember the individual

19   defendants in this lawsuit are being individually named in

20   their individual capacity, so they haven't explained how

21   these individual defendants took steps outside of their

22   employment to conspire to charge illegal loans and to collect

23   or to receive any benefit of those illegal loans.

24         Again, separating the fact that the tribal lending

25   entities and the tribe hasn't been named, these individual

1    defendants, you know, have a shoestring connection here.  So

2    in all fairness, their individual assets are on the line, so

3    that's why it's important that we find out exactly what the

4    plaintiffs are alleging for those individual defendants.

5           THE COURT:  Well, why in this case since -- how

6    would anyone know necessarily how these people worked

7    together to do this?

8           MR. MCANDREWS:  Well, I suppose that they could do a

9    pre-suit investigation, Your Honor.  Also, I might point out

10   that the loan agreements, which plaintiffs all have their

11   loan agreements, and on page one at the very bottom it

12   actually fully dives into the fact that the tribe, and

13   they're a federally-registered tribe, they own the business

14   development corp.

15          They explain the ownership structure in the loan

16   agreement, which is in the hands of all the plaintiffs.  They

17   actually get e-mailed a copy.  So purely on the face of the

18   loan agreement they can figure this out and make these

19   allegations.

20          THE COURT:  Okay.  Go ahead.

21          MR. MCANDREWS:  As far as -- so the plaintiffs also

22   mentioned that they had at paragraphs 89 and 94 made all the

23   facts they need about the loans, but if you actually look at

24   these allegations, it just says that they received no less --

25   that the defendants received no less, and then they state a

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/2022 47

```
1    certain amount.
2            But, again, they don't state how these defendants
3    received that amount, and they don't explain anything about
4    the loans.  I don't even know if that amount is the amount of
5    the loans because that's not how they pled that.
6            They basically said that the defendants somehow
7    collected from Mr. Fitzgerald, or just actually got a benefit
8    of $4,000 in connection with Mr. Fitzgerald.  So, again,
9    alleging the loans is key to making most of their causes of
10   action in the complaint.
11           I will say briefly on the Intracorporate Conspiracy
12   Doctrine plaintiffs cited to, and we do brief the issue of
13   the Supreme Court's case in Cedric Kushner, first of all,
14   that was a different type of RICO cause of action than we
15   have here in this case.
16           After the Cedric Kushner case, the Supreme Court
17   case, the Fourth Circuit in Walter v. McMann actually
18   analyzed the Cedric Kushner case and found that plaintiffs
19   still need to allege that a person in a separate corporation
20   in order to allege an enterprise.  So I direct the Court to
21   the Walter v. McMann case regarding their argument on the
22   Cedric Kushner case.
23           Finally, Your Honor, again, all the cases cited by
24   plaintiffs that I went through in my opening, and Mr. Guzzo
25   actually restated them, they all have different loan
```

1    agreements.  They all have different arbitration clauses.

2    All those cases he cited required application of tribal law.

3    Ours allows application of a federal law; therefore, it's not

4    unconscionable, and it's not in violation of --

5         THE COURT:  You say that allows application of

6    federal law.  What application of federal law?

7         MR. MCANDREWS:  So this goes back to, Your Honor,

8    sovereign immunity.  The tribe under the Indian

9    Reorganization Act was basically given it's authority to act

10   as a state -- it acts as a similar state government equal to

11   those of the states, meaning that other state laws cannot

12   regulate or apply to the conduct of the tribes or the tribe's

13   corporations.

14        THE COURT:  What I'm getting to is your position

15   that they have a right to charge rates above the legal limit

16   of these states.

17        MR. MCANDREWS:  Yes, Your Honor.  It's not because

18   of immunity.  It's because all of these loans are approved,

19   given, and operated through, and entered into on the tribal

20   reservation where they are legal.  So really the issue is

21   whether it's on- or off-reservation conduct, which again is

22   something that the arbitrator can decide.

23        If the arbitrator hears the facts and says, you know

24   what, this is off-reservation conduct, I suppose that's

25   something the arbitrator could do, but that's really the

```
 1   issue.

 2          So to say that our loans are subject to Virginia

 3   law, we would assert as a defense that, no, because the loans

 4   were consummated on the tribe's reservation, again, which

 5   acts as a sovereign state.

 6          THE COURT:  How do these other cases come out saying

 7   that there is no sovereign immunity that would allow you to

 8   charge the unlawful rates?

 9          MR. MCANDREWS:  Your Honor, there are actually no

10   cases that have found that.  What they've said is that the

11   individual defendants are not cloaked with the same sovereign

12   immunity as the tribe and the tribal lending corporations.

13   That's what the distinction is.

14          So we're talking about tribal sovereign immunity,

15   and kind of what I think you're talking about or more what

16   the issue is is where do -- what laws apply to the loan when

17   the loan is being consummated and given on the tribe's

18   reservation.

19          THE COURT:  Okay.  Why is it that your tribe can

20   charge the unlawful rate and these others cannot?  Is it just

21   because of the way you drew the contract?

22          MR. MCANDREWS:  So, Your Honor, to say these others

23   cannot, there has been really -- all those cases that

24   Mr. Guzzo cited to, they've settled.  So they've agreed to

25   out-of-court settlements, and I believe all of the
```

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202250

```
 1   settlements, including the one in Hengle, which is publicly
 2   filed, there is no admission of liability.
 3           So I don't know that there has actually been a
 4   finding on that.  That actually is an issue, Your Honor,
 5   that's probably ripe for the Supreme Court.  There is a
 6   circuit split.  You have the Sixth Circuit -- it's a circuit
 7   split on the issue of whether or not giving loans is off- or
 8   on-reservation conduct.
 9           Of course, the Sixth Circuit has said, no, loans are
10   -- those are actually on-reservation conduct because the
11   loans are being consummated and given on the tribe, and other
12   circuits have differed on that, but the issue has not
13   actually been presented at the Supreme Court.
14           THE COURT:  Okay.  So why wouldn't that be the first
15   question?  If you can't charge -- if the tribe cannot charge
16   the unlawful rate, why go further?
17           Why go to all these other things?  Why wouldn't the
18   Fourth Circuit just say the tribe can do it?
19           MR. MCANDREWS:  I mean, as far as in Hengle, I don't
20   know that they -- I don't specifically know if that issue was
21   presented.  I can't recall.  But if it was, there is still a
22   split in the circuit.
23           Again, my clients are up in Wisconsin.  Even if the
24   Fourth Circuit said, yeah, those are -- you know, you can't
25   charge illegal loans, that's off-reservation conduct, again,
```

```
 1   there is a split in the circuit and what laws apply.  I think
 2   this all goes back to kind of --
 3           THE COURT:  Wouldn't I have to apply Fourth Circuit
 4   law?
 5           MR. MCANDREWS:  I'm sorry, what?
 6           THE COURT:  Wouldn't I have to apply Fourth Circuit
 7   law?
 8           MR. MCANDREWS:  To our loan agreement?  The
 9   arbitrator could, if that's what you're asking.
10           THE COURT:  No, I'm asking about me.  In deciding
11   this case, shouldn't I be applying Fourth Circuit law?
12           MR. MCANDREWS:  Yes, in regards to whether or not a
13   claim has been properly brought and indispensable parties.
14   But, again, the arbitration agreement, Your Honor,
15   Mr. Williams is down in Georgia.  We assert, I think in our
16   reply brief on page 6, that actually Georgia law and its
17   circuits apply.
18           THE COURT:  Okay.  Go ahead.
19           MR. MCANDREWS:  I think, Your Honor, that is it for
20   my rebuttal.
21           THE COURT:  All right.  Thank you.  That's been very
22   helpful.  We'll adjourn the hearing.
23           MR. GUZZO:  Your Honor, I know Mr. McAndrews is
24   entitled to the last word here, but if I could just say one
25   thing for 30 seconds real quick here.
```

 1          THE COURT:  You may, and he may respond.

 2          MR. GUZZO:  Okay.  So with respect to whether the

 3   conduct is on- or off-reservation, that was one of the

 4   central issues in *Hengle*, and here is what the Fourth Circuit

 5   said:  "The tribal officials assert that the conduct at issue

 6   here occurred on the reservation unlike the off-reservation

 7   conduct in gaming in *Bay Mills*.  But as the district court

 8   observed, the conduct at issue here is where the parties made

 9   and accepted the agreements."

10          "For example, the defendants allegedly marketed

11   their lending business throughout the country, including in

12   Virginia, to plaintiffs who resided on non-Indian lands where

13   they applied for their loans."

14          "Defendants also collected loan payments from the

15   plaintiffs while they resided in Virginia from bank accounts

16   maintained there, and the effects of defendants' allegedly

17   illegal activities were felt by the plaintiffs in Virginia."

18          "These activities are directly analogous to lending

19   activities that courts have found clearly constitute

20   off-reservation conduct subject to state law."

21          Indeed, the tribal officials have not brought to our

22   attention any court reaching a contrary conclusion.  I don't

23   know what Sixth Circuit case Mr. McAndrews is talking about,

24   but the Fourth Circuit was very clear on this point, and that

25   is that Virginia law applies to this conduct because it is

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/202253

1    off-reservation conduct done over the internet when the

2    consumer is in Virginia.

3         To say that a consumer may go on the internet and do

4    all things in their home state and that it's subject to the

5    law of somewhere else, whether it could be Canada or

6    Wisconsin or California, Virginia has a strong interest in

7    policing the individuals within their border, and the Fourth

8    Circuit definitively decided this issue.  It's one of the

9    central and most important holdings in *Hengle*.

10        Thank you, Your Honor.

11        THE COURT:  All right.  Would the plaintiff like to

12   respond to that?

13        MR. MCANDREWS:  Yeah.  The issue of on- and

14   off-reservation conduct is not an issue of this motion,

15   because now we're getting in the substantive actual claims

16   here which have not even been properly pled.  So I do kind of

17   caution the Court down this path that now we're talking about

18   substantive law.

19        In regards to Mr. Williams, we're now talking about

20   an issue that should be in front of the arbitrator.  The

21   arbitrator should be deciding whether or not on- or

22   off-reservation conduct is subject to certain state laws.

23   That can be for the arbitrator to decide.

24        Again, Your Honor, this is a Motion to Dismiss on

25   whether or not even the claims have been properly pled or

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/2022

1    they're the necessary parties.  So even to get to that

2    substantive, now we're talking about kind of what's going to

3    happen in summary judgment if that case moves forward.

4            THE COURT:  All right.  No further argument, but

5    plaintiffs' counsel mentioned wishing to amend.  How much

6    time do you need to file amendments?

7            MR. GUZZO:  Twenty-one days, Your Honor.

8            THE COURT:  Okay.  We'll allow you 21 days to file

9    any amendments.  Defense counsel, let us know within -- how

10   many days after that would you like to raise any other issues

11   or file any other pleadings?

12           MR. MCANDREWS:  Thank you, Your Honor.  I'll let you

13   know.

14           THE COURT:  I mean, how many days would you like?

15           MR. MCANDREWS:  Oh, if I could get 30.

16           THE COURT:  Okay.

17           MR. MCANDREWS:  I appreciate it.

18           THE COURT:  All right.  Well, 30 and 30 then.  Thank

19   you all very much.  I appreciate you.

20           MR. MCANDREWS:  Thank you, Your Honor.

21           MR. GUZZO:  Thank you, Your Honor.

22           THE COURT:  Thank you.

23           (Proceedings concluded at 3:15 p.m.)

24                          CERTIFICATION

25      I certify that the foregoing is a correct transcript

Cynthia L. Bragg, Official Court Reporter

Fitzgerald, et al v. Wildcat, et al - 3:20cv44 - Hearing Held 9/21/2022

1    from the record of proceedings in the above-entitled matter.

2

3

4                    _____/s/_____

5                         Cynthia L. Bragg

6                         November 4, 2022

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cynthia L. Bragg, Official Court Reporter