**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| LORI FITZGERALD, AARON FITZGERALD, KEVIN WILLIAMS, JADE SINGLETON and ANGELA MAVILLE, *individually and on behalf of others similarly situated*,<br><br>Plaintiffs,<br><br>    v.<br><br>JOSEPH WILDCAT SR., *in his official and individual capacities*; NICOLE CHAPMAN- REYNOLDS, *in her individual capacity*; JESSI PHILLIPS LORENZO, *in her individual capacity*; JOHN JOHNSON, *in his official and individual capacities*; GEORGE THOMPSON, *in his official and individual capacities;* JAMIE ANN ALLEN, *in her official and individual capacities;* JEFFREY BAUMAN, SR., *in his official and individual capacities;* LOUIS ST. GERMAINE, *in his official and individual capacities;* ERIC CHAMPAN SR., *in his official and individual capacities;* RACQUEL BELL, *in her official and individual capacities;* GLORIA COBB, *in her official and individual capacities;* WILLIAM GRAVEEN, *in his official and individual capacities;* SARAH PYAWASIT, *in her official and individual capacities;* WILLIAM CHENEY PRUETT; SKYTRAIL SERVICING GROUP, LLC; and JOHN DOES NOS. 1-20.<br><br>    Defendants. | Case No. 3:20-cv-00044 (NKM)<br><br>**REDACTED VERSION** |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Lori Fitzgerald, Aaron Fitzgerald, Kevin Williams, Jade Singleton, and Angela Maville, *on behalf of themselves and all individuals similarly situated* ("Plaintiffs"), and through counsel, allege as follows for their Second Amended Complaint against Defendants:

## GENERAL ALLEGATIONS

1.       This case is about unlawful loans made and collected by lending entities that claim to be owned and operated by the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "Band" or "Tribe"), a federally recognized Native American tribe. The lending entities imposed triple-digit interest rates—often in excess of 700%—that are illegal in many states, including those where Plaintiffs reside: Virginia, Georgia, Maryland, and Florida.

2.       For the purpose of exploiting the protections of sovereign immunity, the scheme made the loans through the tribal lending business model—"the most recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012). Under this model, non-tribal payday lenders and their business partners use Native American tribes to originate illegal loans in order to facilitate a dubious and legally incorrect claim that the loans are subject to tribal law and, thus, tribal sovereign immunity. *Id.* The payday lenders' belief is that this arrangement circumvents otherwise applicable protections deriving from state usury and licensing laws. *Id.*

3.       Beginning in 2012 or 2013, the Tribe started participating in multiple partnerships with non-tribal payday lenders that wished to to skirt state and federal lending laws. Around that time, Brent McFarland, the Tribe's then-director of business development, explained to the Milwaukee Journal Sentinel that "we're looking for ways to leverage (the tribe's) sovereignty" for profit. Ex. 1. Non-tribal payday lenders were motivated to provide the Tribe with a nominal percentage of their revenue in exchange for shrouding their illegal loans.

4.       Among Defendants is the Band's Tribal Council. As stated in the Band's Bylaws, the Tribal Council is the Tribe's "governing body." Ex. 2 at Art. III. Relevant here, the power and duties of the Tribal Council include: (1) regulation of the use and disposition of tribal property,

such as any of its interests in the laws; (2) management of "all economic affairs and enterprises of the Tribe," including its lending activities; (3) promulgation of all "legislation, statutes, codes and ordinances," including those related to lending activities. *Id*. at Art. VI(a), (f), (i). Pursuant to these Bylaws, the Tribal Council directs, controls, and oversees "all economic affairs and enterprises of the Tribe," including its lending subsidiaries.

5.      Nicole Chapman-Reynolds and Jessi Phillips Lorenzo—two non-tribal members appointed by the Tribal Council to directly oversee and control the Tribe's involvement in the lending scheme—are also Defendants. Chapman-Reynolds is the former president of the LDF Business Development Corporation, which is the parent company of LDF Holdings, Inc. Lorenzo—one of the pioneers of the tribal lending model—is the president of LDF Holdings, which is the parent company for more than a dozen internet lending companies that claim to be owned and operated by the Tribe.[1]

6.      In reality, Chapman and Phillips Lorenzo serve as liaisons between the Tribe and the non-tribal payday lenders, such as Defendant William Pruett and his companies, including Skytrail Servicing Group, LLC. Although the Tribe represents to own and operate Ningodwaaswi, LLC d/b/a Sky Trail Cash (hereafter "Ningodwaaswi"), Pruett and Skytrail Servicing Group

---

[1] These internet lending companies include: Ningodwaaswi, LLC d/b/a/ Sky Trail Cash; Ishwaaswi, LLC d/b/a RadiantCash; Makwa, LLC d/b/a Makwa Finance; Niizhwaaswi, LLC d/b/a Loan at Last; Niizh, LLC d/b/a Bright Star Cash; Niiwin, LLC, d/b/a Lendgreen; Anong, LLC d/b/a Availblue.com; Niibin, LLC, d/b/a Cash Aisle; Midaaswi, LLC d/b/a/ National Small Loan; Naanan, LLC d/b/a Bear Claw Finance; Mitig, LLC d/b/a MitigCapital and Cashcity; Zagime, LLC d/b/a Blue River Lending; Bridge Lending Solutions; Opichi, LLC d/b/a Evergreen Services; Giizis LLC d/b/a Lakeshore Loans; Waawaatesi LLC, d/b/a Quickhelp Loans; Naanan, LLC d/b/a Stone Lake Lending; Nigig, LLC d/b/a Ubicash; Ziibi, LLC d/b/a zFunds; and Zhaangaswi, LLC d/b/a Nine Torches. Hereafter, these entities will be collectively referred to as the LDF Lending Entities.

actually operate the lending business, including the marketing, underwriting, origination, financing, and collection of loans.

7. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

8. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

9.     This lawsuit challenges Defendants' and others' ongoing collection of unlawful debts through its usurious lending enterprise. Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Defendants and others collected millions of dollars in unlawful debts and conspired with each other and others to repeatedly violate state lending laws resulting in the collection of unlawful debts from Plaintiffs and the class members. Defendants' acts violated 18 U.S.C. §§ 1962(c)–(d).

10.    Plaintiffs also seek declaratory relief and injunctive relief against the Tribal Council in their official capacities.

## JURISDICTION AND VENUE

11.    The Court has original jurisdiction over Plaintiffs' RICO claim, 18 U.S.C. § 1965, 28 U.S.C. § 1331; and supplemental jurisdiction over Plaintiffs' state law claims, 28 U.S.C. § 1367. Upon information and belief, the Court also has jurisdiction over all claims under the Class Action Fairness Act because the amount in controversy far exceeds $5 million dollars when considering both the monetary and declaratory relief sought and Plaintiffs are all residents of a different state from any Defendant. 28 U.S.C. § 1332.[2]

12.    Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District. Venue is also proper in this Court

---

[2] Although the amount in controversy is unknown at this time, other cases against members of this industry demonstrate that the amount easily exceeds $5 million. *., Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, ECF No. 114 (E.D. Va. July 9, 2020) (Novak, J.) (granting final approval of a class settlement providing $18.5 million in cash and $170 million in debt relief to borrowers); *Galloway v. Williams*, No. 3:19-cv-470, ECF No. 115 (E.D. Va. Dec. 18, 2020) (Payne, J.) (approving settlement providing $8.7 million in cash and over $100 million dollars in debt relief for over 300,000 consumers); *Gibbs v. TCV V, L.P.*, No. 3:19-cv-789, ECF No. 95 (E.D. Va. Mar. 29, 2021) (Lauck, J.) (granting final approval of a class settlement providing $50 million in cash and $380 million in debt relief to borrowers).

pursuant to 18 U.S.C. § 1965(a) because a civil action may be brought in a district court for "any district" where a person "resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Defendants have transacted their affairs in this District.

<u>**PARTIES**</u>

13.    Plaintiff Lori Fitzgerald is a natural person residing in this District.

14.    Plaintiff Aaron Fitzgerald is a natural person residing in this District.

15.    Plaintiff Kevin Williams is a natural person residing in Georgia.

16.    Plaintiff Jade Singleton is a natural person residing in Chesterfield, Virginia. When Ms. Singleton obtained her loans, she resided in Maryland.

17.    Plaintiff Angela Maville is a natural person residing in Florida.

18.    Defendant Joseph Wildcat, Sr. is a resident of Wisconsin. Defendant Wildcat is currently a general council member and previously served as President of the Band between 2016 and 2020. Both as the President and a general member of the Tribal Council, Defendant Wildcat's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. Ex. 2 at Art. VI(f). In performing these duties, Defendant Wildcat meets twice a month with other members of the Tribal Council to review, perform, and implement high-level management of the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

19.    Defendant John Johnson is a resident of Wisconsin. Defendant Johnson is the President of the Band's Tribal Council. Prior to his election as President, Defendant Johnson served on Tribal Council in various capacities between 2014 and 2020. Both as President and as a

former member of the Tribal Council, Defendant Johnson's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. *Id*. In performing these duties, Defendant Johnson meets twice a month with other members of the Tribal Council to review, perform, and implement high-level management of the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

20.     Defendant George Thompson is a resident of Wisconsin. Defendant Thompson is the Vice President of the Band's Tribal Council. In his capacity as Vice President, Defendant Thompson's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. *Id*. In performing these duties, Defendant Thompson meets twice a month with other members of the Tribal Council to review, perform, and implement high-level management of the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

21.     Defendant Jamie Ann Allen is a resident of Wisconsin. Defendant Allen is the Secretary of the Band's Tribal Council. In her capacity as Secretary, Defendant Allen's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. *Id*. In performing these duties, Defendant Allen meets twice a month with other members of the Tribal Council to review, perform, and implement high-level management of the LDF Lending Entities, including but not limited to: approval of the creation of

7

the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

22.     Defendant William Stone, Sr. is a resident of Wisconsin. Defendant Stone is the Treasurer of the Band's Tribal Council. In his capacity as Treasurer, Defendant Stone's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. *Id.* In performing these duties, Defendant Stone meets twice a month with other members of the Tribal Council to review, perform, and implement high-level management of the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

23.     Defendant Jeffrey Bauman, Sr., is a resident of Wisconsin. Defendant Bauman is a member of the Tribal Council. In this capacity, Defendant Stone's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. *Id.* In performing these duties, Defendant Bauman meets twice a month with other members of the Tribal Council to review, perform, and implement high-level management of the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

24.     Defendant Louis St. Germaine, Sr., is a resident of Wisconsin. Defendant Germaine is a member of the Tribal Council. In this capacity, Defendant Germaine's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. *Id.* In performing these duties, Defendant Germaine meets twice a month with other members of the Tribal Council to review, perform, and implement high-level management

of the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

25.     Defendant Eric Champman, Sr., is a resident of Wisconsin. Defendant Chapman is a member of the Tribal Council. In this capacity, Defendant Chapman's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. *Id.* In performing these duties, Defendant Chapman meets twice a month with other members of the Tribal Council to review, perform, and implement high-level management of the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

26.     Defendant Racquel Bell is a resident of Wisconsin. Defendant Bell is a member of the Tribal Council. In this capacity, Defendant Bell's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. *Id.* In performing these duties, Defendant Bell meets twice a month with other members of the Tribal Council to review, perform, and implement high-level management of the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

27.     Defendant Gloria Cobb is a resident of Wisconsin. Defendant Cobb is a member of the Tribal Council. In this capacity, Defendant Cobb's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. *Id.* In performing these duties, Defendant Cobb meets twice a month with other members of the

Tribal Council to review, perform, and implement high-level management of the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

28.     Defendant William Graveen is a resident of Wisconsin. Defendant Graveen is a member of the Tribal Council. In this capacity, Defendant Graveen's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. *Id*. In performing these duties, Defendant Graveen meets twice a month with other members of the Tribal Council to review, perform, and implement high-level management of the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

29.     Defendant Sarah Pyawasit is a resident of Wisconsin. Defendant Pyawasit is a member of the Tribal Council. In this capacity, Defendant Pyawasit's role and duties include oversight and management of "all economic affairs and enterprises of the Tribe," including its lending activities. *Id*. In performing these duties, Defendant Pyawasit meets twice a month with other members of the Tribal Council to review, perform, and implement high-level management of the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

30.     Defendant Nicole Chapman-Reynolds is a resident of Wisconsin. She is or has previously served as the Board President for the LDF Business Development Corp.

31.     Defendant Jessi Phillips Lorenzo is a resident of Florida and holds herself out as both the President of LDF Holdings and the Vice President of Lending at LDF Holdings. Prior to her employment with LDF Holdings, Defendant Lorenzo worked at Triax Management and Dater Portfolio Management.

32.     Defendant William Cheney Pruett is a resident of Texas. Defendant Pruett has been in the payday lending industry since 1996 and has owned dozens of companies that make high-interest and short-term loans. After regulatory crackdowns on several of his businesses, Defendant Pruett partnered with the Tribe to continue his high-interest lending business through a company named Ningodwaaswi, LLC d/b/a/ Sky Trail Cash. Although the Tribe is held out as the owner and operator of the business, its involvement is a front for Defendant Pruett and his companies, which provide the infrastructure to market, originate, underwrite, fund and collect the loans as evidence by the Servicing Agreement dated June 18, 2014, ██████████████████

33.     Defendant Skytrail Servicing Group, LLC is a limited liability company formed under the laws of Texas. As detailed below, Skytrail Servicing Group, LLC is the de facto lender of loans originated in the name of Sky Trail Cash. Although Sky Trail Cash's loan contract and website claim that it is owned and operated by the tribe, it is nothing more than a front and Skytrail Servicing Group handles all material aspects of the lending business.

## FACTUAL ALLEGATIONS

**A.      State usury and licensing laws protect consumers from usurious loans.**

34.     "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

11

35.    Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these requirements, including Virginia, Georgia, Maryland, and Florida, *i.e.*, the home states of each of the Plaintiffs, where they respectively applied for, received, and repaid their loans.

36.    It is unsurprising that so many states have enacted such laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (citing Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

### i.    Virginia

37.    Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984). The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *See, e.g.*, *id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

38.    In accordance with this policy, Virginia's general usury statute—absent certain exceptions not applicable in this case—provides that "no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year." Va. Code § 6.2-303(A).

39.    In addition to the general usury laws embodied in Virginia's chapter entitled "Interest and Usury," Virginia's legislature has enacted the Consumer Finance Act ("CFA"), which is "part of a comprehensive statutory, financial, and regulatory structure dating back to at

least 1918," when it was known as the Small Loan Act. *Commonwealth v. NC Fin. Sols. of Utah, LLC*, 100 Va. Cir. 232, 2018 WL 9372461, at *5 (Oct. 28, 2018).

40.     The legislature enacted this statute because "the conduct of such business has long been the cause of general complaint and of much hardship and injustice to borrowers, and there is no regulation or provision of law which has proved effective for the protection of borrowers and for the punishment of usurious money lenders." *Id*. (quoting 1918 Va. Acts, ch. 402.); *see also Sweat v. Commonwealth*, 152 Va. 1041, 1057 (1929) (explaining that legislature enacted the Act in response "money loan sharks and salary-buyers").

41.     Unlike the general usury statutes, the CFA "requires all who engage in the business of making noncommercial personal loans in Virginia to be licensed, and therefore regulated and supervised by the [Secretary of the Commonwealth]." *NC Fin. Sols. of Utah, LLC*, 2018 WL 9372461, at *6 (citing Va. Code § 6.2-1501(A)).

42.     "The Legislature intended such lenders be subject to distinct scrutiny, including examination of their affairs and records no less than once every three years." *Id*. (citing Va. Code § 6.2-1531).

43.     Critically, "[n]o distinction is made in the statute between domestic or foreign-based lending entities," *id*., such as tribal lenders.

44.     If a person violates the interest rate cap, the CFA imposes severe consequences, including criminal liability and forfeiture of all principal, interest, and any charges related to the loan. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible).

    **ii.**    **Georgia.**

45.    Similarly, short term loans of $3,000 or less fall within the scope of the Georgia Industrial Loan Act. *See* Ga. Code §§ 7-3-1, *et seq.*

46.    The purpose of Georgia's Industrial Loan Act is to "to define and prevent usury." *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (2012) (citation omitted).

47.    Unless expressly exempted by the terms of the Industrial Loan Act, a lender must obtain a license by the Industrial Loan Commissioner to make loans of $3,000 or less at an interest rate exceeding eight percent (8%). Ga. Code Ann. §§ 7-3-5, 7-3-6, 7-3-8.

48.    Pursuant to Ga. Code Ann. § 7-3-29(a), "[a]ny person who shall make loans under [the Industrial Loan Act] without first obtaining a license . . . shall be guilty of a misdemeanor; and any contract made under [the Industrial Loan Act] by such person shall be null and void."

49.    Georgia's Payday Lending Act also prohibits lenders from making loans of $3,000 or less at an interest rate that exceeds eight percent (8%) unless licensed to make such loans under the Industrial Loan Act or other laws regulating financial institutions. *See* Ga. Code §§ 16-17-1, *et seq.*

50.    A lender who violates of the Payday Lending Act "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both." Ga. Code § 16-17-2(d).

51.    Ga. Code § 16-17-3 bars a lender from collecting any indebtedness created by the illegal loan and declares the loan "void ab initio."

    **iii.**    **Maryland**

52.    Maryland law, Md. Code, Com. Law § 12-306, prohibits lenders from making consumer loans to Maryland residents in excess of 24% or 33% depending on the size of the loan.

14

53.     Moreover, no person may make a loan under Maryland's Consumer Loan Law without being licensed by the Maryland Commissioner of Financial Regulation.  Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204.  Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under this subsection."  Neither the Defendants nor the LDF Lending Entities have obtained licenses to make loans in Maryland.

54.     Because Defendants violated Maryland's licensing and interest rate requirements, it was unlawful for any person, including Defendants, to collect or receive any interest, fees, or charges on the loans.  Md. Code, Com. Law § 12-314.

55.     For willful violations, like those committed here, Maryland law allows consumers to recover principal, interest, or other compensation paid to Defendants with respect to all loans. Md. Code, Com. Law § 12-313.

**iv.     Florida**

56.     Similarly, Florida has enacted usury laws that prohibit lenders from making high interest loans.

57.     The Florida legislature passed laws prohibiting usury as early as 1822, before Florida even became a state in 1845.[3] As the Florida Supreme Court noted, "The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent

---

[3] *See* Jeremiah W. Blydenburgh, *A Treatise On The Law Of Usury; To Which Are Added, The Statutes Of Several States Relating To Interest Now In Force*, 172 (1844), *available at* https://books.google.com/books?id=6Fk9AAAAIAAJ&printsec=frontcover&source=gbs_ge_su mmary_r&cad=0#v=onepage&q&f=false.

them from extorting harsh and undue terms in the making of loans." *Chandler v. Kendrick*, 146 So. 551, 552 (Fla. 1933).

58.     Pursuant to Florida Statute § 687.03, interest rates greater than 18% per annum on loans in the amount of $500,000 or less are usurious. Those who violate the usury provisions must forfeit "the entire interest so charged, or contracted to be charged" and double the amount of usurious interest paid. Fla. Stat. § 687.04.

59.     Additionally, in Florida, lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2). Even with a license, a lender may not charge interest exceeding 30% on the first $3,000 of the principal amount, 24% on the part of the principal amount exceeding $3,000 and up to $4,000, and 18% on that part of the principal amount exceeding $4,000 and up to $25,000. Fla. Stat. § 516.031(1). Neither the Defendants nor the LDF Lending Entities have obtained licenses to make loans in Florida.

60.     If a lender (licensed or unlicensed) charges interest greater than legally permitted, the loan is void and unenforceable. Fla. Stat. § 516.02(2)(c).

61.     Further, under Florida law, it is a criminal offense to make usurious loans at rates of 25% of higher. Fla. Stat. § 687.071. Loan contracts in excess of the 25% threshold triggering criminal liability for usury are similarly "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758–59 (Fla. 1935).

62.     The Florida Attorney General has made clear that payday loans and similar loans are subject to Florida's usury laws. Fla. AGO 2000-26 (Fla. A.G.), 2000 WL 543211.

**B.**      **Overview regarding the creation of the tribal lending business model.**

63.      Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

64.      Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[4] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

65.      Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

66.      It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

---

[4]  *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

67.     Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[5] Others, attempted to evade laws through claims that the loans were subject to the laws of a foreign country or state without any usury laws.

68.     In response to the crackdown on these arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. Martin & Schwartz, *supra* at 759.

69.     For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

70.     Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id.*

71.     Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id.*

72.     Often, at the other side of the table, were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments

---

[5] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* 17–22 (2001), *available at* http://www.consumerfed.org/pdfs/paydayreport.pdf.

and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origin of the tribal lending businesses).

73.     Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received a nominal amount of the proceeds from the loans.

74.     Upon information and belief, Rosette represented the Lac du Flambeau Band of Lake Superior Chippewa Indians, including in the creation and implementation of its lending activities.

75.     Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

76.     Over the past several years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id.*[6]

_____

[6] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

77.     In addition, there have been multiple class actions and government enforcement actions that have returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *See Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, ECF No. 141 (E.D. Va. Dec. 13, 2019) (order granting final approval of the class settlement); *see also* David Ress, *Historic settlement sees online lenders wiping out $380 million in debt. Virginians led the way*, The Virginian Pilot (Dec. 12, 2019), *available at* https://www.pilotonline.com/business/consumer/dp-nw-online-lender-settlement-20191212-n7khtxn7tbbsbauzirehwmpgly-story.html; Press Release, Office of Att'y Gen., Ga., *Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender* (Feb. 8, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40-million-plus-settlement-online ($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and $500,000 attorney's fees and costs).

78.     Two prominent perpetrators also were recently convicted and sentenced to prison for their roles.[7]

79.     Despite all the litigation and enforcement efforts, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

**C.     The Basic Structure of the Tribe's Lending Scheme.**

80.     The tribal lending model revolves around a series of agreements through which the tribe contractually relinquishes the right to control its lending entity.

---

[7] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

81.     This is accomplished primarily through a document dubiously labeled a "servicing agreement."

82.     By way of one example, the Rosette law firm negotiated the terms of the tribal lending arrangement between Matt Martorello and a tribal company formed by the Lac Vieux Desert Band of Chippewa Indians in Michigan (the "LVD").

83.     Consistent with the tribal lending model, Rosette's client, Red Rock, received 2% of the net revenue from the loans in return for the use of its name. Ex. 4 at § 2.25.

84.     By contrast, Martorello's company received the "revenue remaining" and reimbursement for all advances and expenses. *Id*. §§ 3.5.1.

85.     Additionally, under the servicing agreement, one of Martorello's companies, SourcePoint, was contractually entitled to exercise almost exclusive control over Red Rock's operations.

86.     Among other things, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. *Id*. § 3.1.

87.     The non-tribal company also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id*. § 3.5.1.

88.     As explained in a sworn declaration from the Vice Chairwoman of the LVD: "[w]hen Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no

risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 5 at ¶ 3.

89.    This declaration further that "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id.* ¶ 4.

90.    By way of another example, the Rosette law firm also used this same structure for a transaction between National Performance Agency ("NPA") and lending entities formed by the Habematolel Pomo of Upper Lake, a federally recognized Native American tribe ("Upper Lake").

91.    Pursuant to a "Services Agreement" between NPA and Silver Cloud one of Upper Lake's lending entities, NPA agreed to provide essentially all services setup and run the lending operations, including: (1) personnel and equipment to receive and respond to incoming telephone calls, faxes, and emails from Silver Cloud's borrowers; (2) delivery of electronic files for all debits and credits to each borrowers' loan; (3) lead generation; (4) receipt and storage of application materials; (5) servicing of the loans, including collection of payments; and (6) delivery of information "to determine whether to fund the loans" and "credit such potential customers' accounts with the appropriate amounts" for debits and credits. Ex. 6 at 2264–65.

92.    Additionally, nearly all of the revenue went to NPA and its partners, primarily through the use of "Participation Agreements."

93.    Rather than being the direct lender, this "participation model" allowed NPA to purchase essentially all of the economic interests in the loan as detailed in NPA's Business Plan and Roadmap dated January 2012. Ex. 7 at 755 (explaining various "structural approaches to tribal

deals," including a participation model "in which NPA purchases a 99% participation in the loans the tribe makes.").

94.     The participation model, in other words, entitled NPA and its affiliated companies entitled to nearly all of the income and any profits from the loans while, at the same time, disguising its role and creating the façade that the loans were from a tribal government.

95.     The Rosette law firm also setup the enterprise between Think Finance and Great Plains, which used a similar structure of servicing and participation agreements. *See* Ex. 8.

96.     In addition to the servicing agreement, the tribal lending model involves the use of a loan and security agreement between the tribe and the payday lender.

97.     Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities. *See generally* Ex. 9.

98.     According to a lawsuit filed by former employees, "Rosette has set up more than thirty payday loan enterprises at more than a dozen tribes." *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, 2018 WL 2734946, at *5 (S.D. Cal. June 7, 2018).

99.     The Rosette firm has represented the Lac du Flambeau Band of Lake Superior Chippewa Indians, including in its internet lending endeavors.

**D.     Pruett and Sky Trail Servicing Group Establish a Partnership with the Tribe to Avoid Usury Laws.**

100.    Defendant William Pruett has been in the payday lending industy for more than 20 years. Among other things, he is the founder of CashMax, which had 58 storefront locations in Ohio. Laura A. Bischoff, *Payday lending reform bill ready to advance in Ohio Sentate*, Dayton Daily News (July 9, 2018), *available at* https://www.daytondailynews.com/news/payday -lending-reform-bill-ready-advance-ohio-senate/VgvdfS2Y5bwGQXBCCmSryN/.

101.    As early as 2008, Defendant Pruett's payday lending efforts faced scrutiny from regulators, including a cease and desist from the Attorney General of Arksansas. Southern Bancorp, *Payday lenders must shut down or face lawsuits, AG says* (Mar. 19, 2008), available at: https://banksouthern.com/news/payday-lenders-must-shut-down-or-face-lawsuits-ag-says/.

102.    After this scrutiny, Defendant Pruett began using the tribal lending model for some of his usurious lending, including through a partnership ███████████████████ ████████████████████████████████████████████████

103.    ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

104.    ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██ ██ ██ ██ ██ ███ ████ ████ █ ████ ██

105. ███████████████████████████████████

106. ███████████████████████████████████

107. ███████████████████████████████████

108. ███████████████████████████████████

109. ███████████████████████████████████

110.    In sum, while the Band holds itself out as the actual lender of the loans issued in the name of Sky Trail Cash, the tribal entity is merely a front, and Defendant Skytrail Servicing Group provides the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: marketing, lead generation, technology platforms, payment processing, servicing and collection procedures. ████████████████████████████ ███████████████████████████

111.    The Band allows Defendants Pruett and Skytrail Servicing Group to use its name as a front and, in return, receives a nominal flat fee ████████████████████████ ████████████████████████████████████

112.    ████████████████████████████████████████ ████████████████████████████████████████

113.    Because of its limited role, the Band has no control over the income or expenses of Ningodwaaswi or any of its other internet lending entities.

114.    Upon information and belief, tribal members did not participate in the day-to-day operations of Ningodwaaswi nearly all the activities associated with the lending operation occurred off the Band's Reservation, such as the call centers, payment processing, and servicing of the loans.

115.    These activities take place predominantly in Texas where Pruett and his companies are located.

116.    Put differently, nearly all activities performed on behalf of Ningodwaaswi were performed by non-tribal officers and employees of Defendant Skytrail Servicing Group, who were located in offices off the reservation.

117.    Upon information and belief, the money loaned to borrowers (including Plaintiff Maville) was transferred from a bank account owned and operated or controlled by Defendants

Pruett and Sky Trail Servicing, and neither the Band nor its Tribal Council were allowed to access to the accounts that debited and credited payments from consumers.

118.    In addition, upon information and belief, Defendant Pruett and ████████████, provided millions of dollars in capital to fund the loans, and entered into an agreement with the Tribe similar to the loan and security agreement described above.

119.    Upon information and belief, LDF Holdings is the parent company for more than a dozen internet lending companies that claim to be owned and operated by the Tribe, but each of them have entered into similar servicing agreements that outsource the operations and revenue to non-tribal payday lenders.

## E.    The RICO Enterprise(s).

120.    RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1691(4) (emphasis added).

121.    The Supreme Court's decision in *Boyle v. United States* recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

122.    Put differently, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

123.    An association-in-fact enterprise merely requires three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle*, 556 U.S. at 946.

124.    Here, Defendants have established one or more enterprises for one or more association-in-fact enterprises for the purpose of collecting unlawful debts.

125.    Pursuant to Federal Rule of Civil Procedure 8(d)(2), Plaintiffs alternatively allege that each one of the LDF Lending Entities (such as Ningodwaaswi) are separate enterprises as they are distinct legal entities.

126.    As detailed above, Defendants created an array of different companies for the purpose of making usurious loans while, at the same time, concealed the roles of the individuals involved in creating the façade that the loans come from a tribal government and, hence, are not subject to state usury laws.

127.    The Band is an Indian tribal government that was federally recognized by treaty with the United States in 1854.

128.    The Band's 86,000-acre reservation is located in Lac du Flambeau, Wisconsin.

129.    The Tribal Council is its "governing body" as established by the Band's Bylaws. Ex. 2 at Art. III.

130.    Among other things, the power and duties of the Tribal Council include: (1) regulation of the use and disposition of tribal property, such as any of its interests in the laws; (2) management of "all economic affairs and enterprises of the Tribe," including its lending activities; (3) promulgation of all "legislation, statutes, codes and ordinances," including those related to lending activities. *Id*. at Art. IV(a), (f), (i).

131.    Pursuant to these Bylaws, the Tribal Council directs, controls, and oversees "all economic affairs and enterprises of the Tribe," including each of its lending subsidiaries.

132.    In performing these duties, the Tribal Council meets at least twice a month to review and implement high-level management decisions related to the LDF Lending Entities, including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members.

133.    Upon information and belief, the Tribal Council also review the activities of each of the LDF Lending Entities, such as their marketing, origination, collections, and complaints from borrowers.

134.    To assist them with their management of the LDF Lending Entities, the Tribal Council also created LDF Holdings, which holds itself out as a wholly-owned subsidiary of the Lac du Flambeau Business Development Corporation, a wholly owned and operated economic arm and instrumentality of the Band.

135.    LDF Holdings is managed by LDF Business Development Corp.

136.    Although the Tribal Council retains the ultimately authority over management of all economic affairs and enterprises of the Tribe, the Tribal Council has delegated some of this authority to the Lac du Flambeau Business Development Corporation.

137.    And in turn, the Tribal Council and Lac du Flambeau Business Development Corporation (who oversees all of the economic activities of the Tribe), have delegated responsibility over the lending activities to LDF Holdings and its president, Defendant Jessi Phillips Lorenzo.

29

138.   Upon information and belief, Defendant Lorenzo is the primary point of contact for non-tribal individuals who want to engage in a lending scheme with the tribe.

139.   Prior to taking a position with LDF Holdings, Defendant Lorenzo engaged in similar lending schemes during during her employment with Triax Management and Dater Portfolio as Director of Sovereign Sales.

140.   In this capacity, Defendant Lorenzo solicited tribes to engage in online lending in partnership with Triax Management.

141.   On her LinkedIn page, Defendant Lorenzo holds out Triax Management and Dater Portfolio Management as being responsible for connecting tribes and financiers.

142.   Upon information and belief, Triax Management solicited tribes to use the tribal lending model, including on reservation call centers, to support a false claim that the loans are made on the reservation and thus beyond the reach of applicable state and federal laws.

143.   As the president of LDF Holdings, Defendant Lorenzo manages and oversees the LDF Holdings' day-to-day activities, including its relationships more than a dozen subsidiaries that use the Tribe's name to originate their illegal loans.

144.   As detailed above, LDF Holdings' subsidiaries include: Ningodwaaswi, LLC d/b/a/ Sky Trail Cash; Ishwaaswi, LLC d/b/a RadiantCash; Makwa, LLC d/b/a Makwa Finance; Niizhwaaswi, LLC d/b/a Loan at Last; Niizh, LLC d/b/a Bright Star Cash; Niiwin, LLC, d/b/a Lendgreen; Anong, LLC d/b/a Availblue.com; Niibin, LLC, d/b/a Cash Aisle; Midaaswi, LLC d/b/a/ National Small Loan; Naanan, LLC d/b/a Bear Claw Finance; Mitig, LLC d/b/a MitigCapital and Cashcity; Zagime, LLC d/b/a Blue River Lending; Bridge Lending Solutions; Opichi, LLC d/b/a Evergreen Services; Giizis LLC d/b/a Lakeshore Loans; Waawaatesi LLC, d/b/a Quickhelp

Loans; Naanan, LLC d/b/a Stone Lake Lending; Nigig, LLC d/b/a Ubicash; Ziibi, LLC d/b/a zFunds; and Zhaangaswi, LLC d/b/a Nine Torches.

145.    Upon information and belief, each of these lending entities are not actively operated or managed by the Band. Instead, LDF Holdings entered into servicing or similar agreements that allow non-tribal outsiders to handle and control all aspects of the lending businesses, including the marketing, underwriting, risk assessment, compliance, accounting, lead generation, collections, and website management for the businesses.

146.    Upon information and belief, Defendant Lorenzo has been involved with the creation, implementation, and oversight of each of these relationships, including by assisting with: (1) the identification of potential payday lending partners; (2) the negotiation of servicing agremeents, as well as other contracts establishing the structure of the payday partnerships; (3) the signing of all necessary documents for the scheme, including the servicing agreements, control deposit agreements, and lockbox agreements; (4) securing key operational components, including the ability for the LDF Lending Entities to use the ACH network; and (5) identification of potential banking partners so that the LDF Lending Entities could debit and credit payments.

147.    Additionally, to ensure that the Band receives its cut of the revenue, Defendant Lorenzo participates in extensive ongoing monitoring and rigorous oversight of the LDF Lending Entities.

148.    This conduct has been ongoing for more than ten years and continues to this day.

**F.     Defendants and others collected unlawful interest from consumers.**

149.    Defendants, together with others not yet known to Plaintiffs, marketed, initiated, and collected usurious loans throughout the country, including in Virginia, Georgia, Maryland, Florida, as well as other states with similar laws.

150.    Defendants knew the loans were illegal under state usury and licensing laws, but they pursued the scheme anyway.

151.    They charged astronomical interest rates that far exceeded the rates allowed by applicable state laws.

152.    Upon information and belief, all of Defendants' loans to consumers used excessive interest rates far in excess of applicable state laws.

153.    Accordingly, the loans were null and void under applicable state law, and it is unlawful for Defendants, LDF Holdings, or any of their affiliates to collect or receive any principal, interest or charges whatsoever on said loans, including any amounts paid by Plaintiffs.

154.    For example, Plaintiff Aaron Fitzgerald applied for and received five loans from Ishwaaski, LLC d/b/a Radiant Cash.

155.    Each of the loans issued to Mr. Fitzgerald imposed an interest rate ranging from 278% to 711%.

156.    For example, Mr. Fitzgerald entered into a loan agreement dated March 10, 2014, which imposed a 711% annual interest rate on a $200 loan. Ex. 10.

157.    Mr. Fitzgerald paid no less than $740.00 on this loan—all of which was void and uncollectible under Virginia law.

158.    On or around August 29, 2014, Mr. Fitzgerald received another loan for $500.00, which imposed an annual interest rate of 489%. Ex. 11.

159.    Mr. Fitzgerald paid no less than $1,262.32 on this loan—all of which was void and uncollectible under Virginia law.

160.    On or around March 16, 2015, Mr. Fitzgerald received another loan for $500.00, which imposed an annual interest rate of 441%. Ex. 12.

161.    Mr. Fitzgerald paid no less than $1,151.93—all of which was void and uncollectible under Virginia law.

162.    On or around September 9, 2015, Mr. Fitzgerald received another loan for $500.00, which imposed an annual interest rate of 319%. Ex. 13.

163.    Mr. Fitzgerald paid no less than $1,061.86—all of which was void and uncollectible under Virginia law.

164.    On or around March 5, 2016, Mr. Fitzgerald received another loan for $600.00, which imposed an annual interest rate of 278%. Ex. 14.

165.    Mr. Fitzgerald paid no less than $644.77—all of which was void and uncollectible under Virginia law.

166.    For each loan, Mr. Fitzgerald used his Virginia address when applying for the loans, and he used his Virginia bank account with a Virginia ABA routing number to receive the loans and for the subsequent ACH debits to pay down the loans.

167.    Similarly, on or around March 20, 2017, Plaintiff Lori Fitzgerald applied for and received a $400 loan from Niizhwaaswi LLC, d/b/a Loan at Last. Ex. 15.

168.    This loan imposed an interest rate of 756%.

169.    Mrs. Fitzgerald repaid $104.88 on the loan—all of which was void and uncollectible under Virginia law.

170.    For her loan, Mrs. Fitzgerald used her Virginia address on her application for the loan, and she used herVirginia bank account with a Virginia ABA routing number to receive the loans and for the subsequent ACH debits to pay down the loans.

171.    Similarly, Plaintiff Kevin Williams received eight loans from Loan at Last between April 5, 2018, and September 13, 2019.

172.    Mr. Williams also received four loans from Niswi, LLC d/b/a/ Amplify Funding between October 12, 2018, and July 10, 2019.

173.    Mr. Williams also received a loan from Makwa, LLC d/b/a Makwa Finance on or around July 3, 2019. Although Mr. Williams does not have a copy of each loan agreement, it was the standard practice of these entities to impose trible digits interest rates on all loans to consumers.

174.    For example, Mr. Williams's loan from Amplify Funding dated May 11, 2019, imposed an interest rate of 313%.

175.    By way of another example, Mr. Williams's loan from Makwa Finance dated July 2, 2019, imposed an interest rate of 388%.

176.    Similarly, Mr. Williams's loan from Loan at Last dated July 10, 2019, imposed an interest rate of 366%.

177.    Altogether, Mr. Williams borrowed no less than $12,695 on his loans from Loan at Last, Amplify Funding, and Makwa Finance.

178.    Mr. Williams repaid no less than $17,825.39—all of which was void and uncollectible under Georgia law.

179.    Mr. Williams still has an outstanding balance on his last loans from Loan at Last and Makwa Finance.

180.    For each loan, Mr. Williams used his Georgia address on his application for the loan, and he used his Georgia bank account with a Georgia ABA routing number to receive the loans and for the subsequent ACH debits to pay down the loans.

181.    Plaintiff Jade Singleton received three loans from Niswi, LLC d/b/a as Lendumo between October 23, 2020, and December 30, 2021.

182.    Ms. Singleton's first loan imposed an interest rate of 607% on a loan of $1,550.

183.    Over the course of the next six months, Ms. Singleton repaid $4,589.14 on the first loan. It was paid in full as of March 12, 2021.

184.    Ms. Singleton obtained her second loan on April 5, 2021, in the amount of $300. This loan imposed an interest rate of 556%.

185.     Over the course of the next six months, Plaintiff Singleton repaid $904.56 on the second loan. It was paid in full as of September 24, 2021.

186.    Plaintiff Singleton obtained her third loan on December 30, 2021, in the amount of $1,500. This loan imposed an interest rate of 499%.

187.    Plaintiff Singleton repaid $1,184.56 on this loan and, thus, still has an outstanding balance if it is enforceable.

188.    For each loan, Ms. Singleton used her Maryland address on her application for the loan, and she used her Maryland bank account with a Maryland ABA routing number to receive the loans and for the subsequent ACH debits to pay down the loans.

189.    On February 20, 2020, Plaintiff Angela Maville received a loan from Ningodwaaswi, LLC d/b/a Sky Trail Cash.

190.    This loan imposed an interest rate of 771% on a principal amount of $700.

191.    Upon information and belief, Defendants Pruett and Sky Trail Servicing Group performed all of the acts related to the origination of this loan, including both the underwriting of the loan and the funding of the $700 into Ms. Maville's bank account.

192.    As part of the underwriting, Defendant Sky Trail Servicing Group obtained Ms. Maville's credit report from a consumer reporting agency, likely either Clarity Services or Factor Trust.

193.    Between March 3, 2020, and May 6, 2020, Ms. Maville repaid $1,794.21 on the loan.

194.    Upon information and belief, Defendants Pruett and Sky Trail Servicing Group initiated the debits on Ms. Maville's account and received the vast majority of the $1,794.21 paid by Ms. Maville—less the nominal flat fee kicked back to the Tribe for the use of its name.

195.    When she obtained her loan, Ms. Singleton used her Florida address on her application for the loan, and she used her Florida bank account with a Florida ABA routing number to receive the loans and for the subsequent ACH debits to pay down the loans.

**FIRST CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM: ALL PLAINTIFFS AGAINST ALL DEFENDANTS**
**IN THEIR INDIVIDUAL CAPACITIES ONLY)**

196.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

197.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the "RICO Class," initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with the LDF Lending Entities as defined above; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid any amount on the loans.

> All Plaintiffs are a member of this class.[8]

---

[8] Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, and Wisconsin have similar laws that render the loans void as detailed with respect to Virginia, Georgia, Maryland, and Florida as detailed in Part A of this Amended Complaint. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Ariz. Rev. Stat. § 6-613(B) ("Any consumer lender loan that is made by a person who is required to be licensed pursuant to this chapter but who is not licensed is void, and the person making that consumer loan has no right to collect, receive or retain any principal, finance charges or other fees in connection with that consumer lender loan."); Ark. Const. amend. LXXXIX, § 6 (loans that charge excessive interest rates are "void"); Cal. Fin. Code § 22750 (loans

36

198.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Aaron

Fitzgerald brings a claim for himself and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Radiant Cash;
> (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas,
> California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon,
> Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid
> any amount on the loans.

> Plaintiff Aaron Fitzgerald is a member of this class.

199.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Lori

Fitzgerald and Williams bring a claim for themselves and on behalf of a subclass initially defined

as follows:

> All natural persons who: (1) entered into a loan agreement with Loan At Last;
> (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas,
> California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon,
> Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid
> any amount on the loans.

> Plaintiffs Lori Fitzgerald and Williams are members of this class.

---

made without license are "void," including the "right to collect or receive any principal, charges,
or recompense in connection with the transaction"); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made
without a license are "void" and uncollectable); Idaho Code § 28-46-402 (payday loans made
without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10
(payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201 (loans that
charge excessive interest and made without a license are "void"); Minn. Stat. §§ 47.60, 47.601
(provisions in loan contracts charging excessive interest rates are void and unenforceable); N.Y.
Gen. Oblig. Law § 5-511 (usurious loans are "void"); Or. Rev. Stat. § 725.045 (consumer finance
loans made without a license are "void"); Or. Rev. Stat. § 725.045 (consumer finance loans made
without a license are "void"); 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall
be usurious and void"); S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made
without a license are "void and uncollectible"); Tex. Fin. Code Ann. § 305.002 (allowing for
recovery of the "principal amount on which interest is charged and received"); W. Va. Code §
46A-5-101 (loans made in violation of Consumer Credit and Protection Act are "void and the
consumer is not obligated to pay either the principal or the loan finance charge"); Wis. Stat. §
425.305 (declaring usurious transactions "void").

200.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Kevin

Williams brings a claim for himself and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Amplify Funding
> or Makwa Finance; (2) from Virginia, Georgia, Maryland, Florida, Alabama,
> Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota,
> New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or
> Wisconsin; and (3) repaid any amount on the loans.

> Plaintiff Kevin is a member of this class.

201.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Singleton

brings a claim for herself and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Lendumo; (2) from
> Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California,
> Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island,
> South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid any amount on
> the loans.

> Plaintiff Singleton is a member of this class.

202.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Maville brings

a claim for herself and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Sky Trail Cash;
> (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas,
> California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon,
> Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid
> any amount on the loans.

> Plaintiff Maville is a member of this class.

203.    **Numerosity. Fed. R. Civ. P 23(a)(1).** At this time, Plaintiffs do not know the exact

number of members of the RICO Class. However, based on the class sizes in similar cases,

Plaintiffs anticipate that there are likely thousands of members. Thus, the class is so numerous that

joinder of all members is impracticable.

204.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**
Common questions of law and fact exist as to all members of the putative class, and there are no
factual or legal issues that differ between the putative class members. These questions predominate
over the questions affecting only individual class members. The common questions include:
(1) whether an association-in-fact enterprise existed; (2) whether Defendants conducted the affairs
or participated in the enterprise's affairs; (3) whether the loans are "unlawful debt" for purposes
of RICO; (4) whether Defendants violated RICO by collecting on the loans; and (5) what is the
proper recovery for Plaintiffs and the class members against Defendants.

205.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of
each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of
action as the other members of the putative class. All are based on the same facts and legal theories.

206.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are an adequate
representatives of the putative class because their interests coincide with, and are not antagonistic
to, the interests of the members of the class they seek to represent; they have retained counsel
competent and experienced in such litigation; and they have and intend to continue to prosecute
the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of
the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause
them not to vigorously pursue this action.

207.    **Superiority. Fed. R. Civ. P. 23(b).** Questions of law and fact common to the class
members predominate over questions affecting only individual members, and a class action is
superior to other available methods for fair and efficient adjudication of the controversy. The
damages sought by each member are such that individual prosecution would prove burdensome
and expensive. It would be virtually impossible for members of the class individually to effectively

redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

208.    As alleged, the Band, its Tribal Council, its subsidiaries, and non-tribal members including but not limited to Defendants Pruett and Sky Trail Servicing Group have established one or more association in fact enterprises to evade state usury laws.

209.    Alternatively, each one of the LDF Lending Entities constitutes an enterprise as they are legally distinct entities.

210.    This conduct has been ongoing since 2012 and continues today as reflected by the recent lending of the enterprise, as well as the current websites of the LDF Lending Entities.

211.    As detailed above, Defendants violated § 1962(c) of RICO by conducting and/or participating, directly or indirectly, in the conduct of the enterprise's affairs through the collection of unlawful debt.

212.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

213.    All of the loans made to RICO Class members and collected by Defendants and others included interest rates far in excess of twice the enforceable rate in their states.

214.    Plaintiffs and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise which would not have been made but for Defendants' conduct.

215.    Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### SECOND CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. § 1962(d)
### (CLASS CLAIM: ALL PLAINTIFFS AGAINST ALL DEFENDANTS
### IN THEIR INDIVIDUAL CAPACITIES ONLY)

216.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

217.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the "RICO Class," initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with the LDF Lending Entities as defined above; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid any amount on the loans.

> All Plaintiffs are  members of this class.

218.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Aaron Fitzgerald brings a claim for himself and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Radiant Cash; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid any amount on the loans.

> Plaintiff Aaron Fitzgerald is a member of this class.

41

219.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Lori Fitzgerald and Williams bring a claim for themselves and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Loan At Last; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid any amount on the loans.

> Plaintiffs Lori Fitzgerald and Williams are members of this class.

220.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Williams brings a claim for himself and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Amplify Funding or Makwa Finance; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid any amount on the loans.

> Plaintiff Williams is a member of this class.

221.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Singleton brings a claim for herself and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Lendumo; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid any amount on the loans.

> Plaintiff Singleton is a member of this class.

222.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Maville brings a claim for herself and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Sky Trail Cash; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon,

Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid any amount on the loans.

Plaintiff Maville is a member of this class.

223.   **Numerosity. Fed. R. Civ. P 23(a)(1).** At this time, Plaintiffs do not know the exact number of members of the RICO Class. However, based on the class sizes in similar cases, Plaintiffs anticipate that there are likely thousands of members. Thus, the class is so numerous that joinder of all members is impracticable.

224.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an association-in-fact enterprise existed; (2) whether Defendants had knowledge of and facilitate the conspiracy to collect unlawful debt from Plaintiffs and other borrowers; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against Defendants.

225.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

226.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are an adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of

the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

227.    **Superiority. Fed. R. Civ. P. 23(b).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

228.    As alleged, the Band, its Tribal Council, its subsidiaries, and non-tribal members including but not limited to Pruett and Sky Trail Servicing Group have established one or more association in fact enterprises to evade state usury laws.

229.    Alternatively, each one of the LDF Lending Entities constitutes an enterprise as they are legally distinct entities.

230.    This conduct has been ongoing since 2012 and continues today as reflected by the recent lending of the enterprise, as well as the current websites of the LDF Lending Entities.

231.    As alleged above, Defendants violated § 1962(d) of RICO by aiding, abetting, and facilitating a series of agreements designed to § 1962(b)-(c), including but not limited to: (1) the

servicing agreements between LDF Holdings and the LDF Lending Entities; (2) the loan and security agrreements between LDF Holdings and the LDF Lending Entities; and (3) thousands of loan contracts for the origination and collection of triple interest debt, including the contracts originated with the Plaintiffs.

232.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) because their loans would not have been collected but for Defendants' conspiracy to collect the usurious debt.

233.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**Violation of State Usury and Licensing Laws**
**(CLASS CLAIM AGAINST THE TRIBAL COUNCIL**
**DEFENDANTS IN THEIR OFFICIAL CAPACITIES ONLY)**

234.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

235.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with the LDF Lending Entities as defined above; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) have an outstanding balance on their loan.

> Plaintiffs Lori Fitzgerald, Kevin Williams, and Jade Singleton are members of this class.

236.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Lori Fitzgerald bring a claim for herself and on behalf of a subclass initially defined as follows:

All natural persons who: (1) entered into a loan agreement with with the LDF Lending Entities as defined above; (2) from Virginia; and (3) has an outstanding balance on their loan.

Plaintiff Lori Fitzgerald is a member of this class.

237.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Kevin Williams bring a claim for himself and on behalf of a subclass initially defined as follows:

All natural persons who: (1) entered into a loan agreement with with the LDF Lending Entities as defined above; (2) from Georgia; and (3) has an outstanding balance on their loan.

Plaintiff Williams is member of this class.

238.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Singleton brings a claim for herself and on behalf of a subclass initially defined as follows:

All natural persons who: (1) entered into a loan agreement with with the LDF Lending Entities as defined above; (2) from Maryland; and (3) has an outstanding balance on their loan.

Plaintiff Singleton is a member of this class.

239.    Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, and Wisconsin have licensing or usury laws that require a lender to be licensed and/or cap interest rates. *See* Part A & fn. 9.

240.    None of the LDF Lending Entities were licensed to make loans in Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin.

241.    Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

242.     Plaintiffs and members of the class are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

243.     The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

244.     Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

245.     Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are invalid and the loans are uncollectable. Plaintiffs also seek to enjoin the Tribal Council, in their official capacity, from allowing collection on the loans.

### FOURTH CAUSE OF ACTION
#### Declaratory Judgment Under 28 U.S.C. § 2201
#### (CLASS CLAIM AGAINST THE TRIBAL COUNCIL
#### DEFENDANTS IN THEIR OFFICIAL CAPACITIES ONLY)

246.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

247.     Pursuant to Rule 8(d)(2), Plaintiffs allege that, in the alternative to the prospective relief available under state law, a declaratory judgment is available under 28 U.S.C. § 2201.

248.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with the LDF Lending Entities as defined above; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) have an outstanding balance on their loan.

Plaintiffs Lori Fitzgerald, Kevin Williams, and Jade Singleton are members of this class.

249.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Lori

Fitzgerald bring a claim for herself and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with with the LDF Lending Entities as defined above; (2) from Virginia; and (3) has an outstanding balance on their loan.

Plaintiff Lori Fitzgerald is a member of this class.

250.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Kevin

Williams bring a claim for himself and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with with the LDF Lending Entities as defined above; (2) from Georgia; and (3) has an outstanding balance on their loan.

Plaintiff Williams is member of this class.

251.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Singleton

brings a claim for herself and on behalf of a subclass initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with with the LDF Lending Entities as defined above; (2) from Maryland; and (3) has an outstanding balance on their loan.

Plaintiff Singleton is a member of this class.

252.    Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California,

Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota,

Texas, West Virginia, and Wisconsin have licensing or usury laws that require a lender to be

licensed and/or cap interest rates. *See* Part A & fn. 9.

253.    None of the LDF Lending Entities were licensed to make loans in Virginia,

Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois,

Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin.

254.    Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

255.    Plaintiffs and members of the class are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

256.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

257.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

258.    Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are invalid and the loans are uncollectable. Plaintiffs also seek to enjoin the Tribal Council, in their official capacity, from allowing collection on the loans.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**
**(CLASS CLAIM: PLAINTIFF MAVILLE AGAINST PRUETT AND SKY TRAIL SERVICING GROUP)**

259.    Plaintiff Maville restates each of the allegations in the preceding paragraphs as if set forth at length herein.

260.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Maville bring this claim for herself and on behalf of a class—the "Unjust Enrichment Class"—initially defined as follows:

All natural persons who: (1) entered into a loan agreement with Sky Trail Cash; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) repaid any amount on the loans.

Plaintiff Maville is a member of this class.

261.     In addition, pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff

Maville bring this claim for herself and on behalf of a subclass defined as follows:

All natural persons who: (1) entered into a loan agreement with Sky Trail Cash; (2) from Florida; and (3) repaid any amount on the loans.

Plaintiff Maville is a member of this class.

262.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff

Maville alleges that the class members are so numerous that joinder of all is impractical.  The

names and addresses of the class members are identifiable through the internal business records

maintained by Sky Trail Servicing Group and/or Sky Trail Cash, and the class members may be

notified of the pendency of this action by published and/or mailed notice.

263.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**

Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions include:

(1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-

of-law provision used in their loan agreements and selecting the tribal law are enforceable;

(3) whether Plaintiff Maville and the class members conferred a benefit on Defendants;

(4) whether Defendants knew or should have known of the benefit; (5) whether Defendants

retained an unjust benefit because the loan was void; and (6) what is the proper recovery for

Plaintiff Maville and the class members against each of Defendants.

264.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Maville's claims are typical of the claims of each putative class member.  In addition, Plaintiff Maville is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

265.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Maville is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously.

266.   As detailed above, all loans were void and unenforceable when they were made to borrowers in Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin.

267.   As detailed above, although the website and loan contract misrepresented that Sky Trail Cash was owned by the Band, it was really a conduit for Defendants Pruett and Sky Trail Servicing Group's illegal lending efforts.

268.   Through a servicing or similar agreement, Defendants Pruett and Sky Trail Servicing received nearly all the proceeds from loans made in the name of Sky Trail Cash, including the payments made by Plaintiff Maville.

269.   Plaintiff Maville and the class members conferred a benefit on Defendants Pruett and Sky Trail Servicing when they repaid the void loans; Defendants knew or should have known of the benefits; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

270.     Accordingly, on behalf of themselves and the class defined above, Plaintiff Manveilla seeks to recover from Defendant Pruett and Sky Trail Servicing Group, jointly and severally, all amounts repaid on any loans from Sky Trail Cash.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A.     An Order certifying the proposed Classes under Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.     An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C.     An Order declaring that Defendants committed the violations of law alleged herein;

D.     An Order providing for any and all injunctive relief the Court deems appropriate;

E.     An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.     An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.     An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.     An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

I.     Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

Respectfully submitted,
**PLAINTIFFS,** *individually and on behalf of all others similarly situated*

By: */s/*
Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
**KELLY GUZZO PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
*Counsel for Plaintiffs*