**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

LORI FITZGERALD, *et al.*, *individually and
on behalf of others similarly situated*,

                Plaintiffs,

     v.

JOSEPH WILDCAT SR., *et al.*,

                Defendants.

Case No. 3:20-cv-00044 (NKM)

**REDACTED VERSION**

---

### PLAINTIFF'S OPPOSITION TO DEFENDANTS SKYTRAIL SERVICING GROUP, LLC AND WILLIAM CHENEY PRUETT'S MOTION TO COMPEL ARBITRATION

    Plaintiff Angela Maville, by counsel, respectfully submits this Opposition to Defendant Skytrail Servicing Group, LLC and William Cheney Pruett's Motion to Compel Individual Arbitration of Plaintiffs' Claims (Dkt. 144).

### <u>INTRODUCTION</u>

    This case concerns online loans made to borrowers in Virginia, Maryland, Georgia, and Florida. These loans imposed triple-digit interest rates—exponentially higher than the interest rate caps mandated by those states' laws. By way of example, Ms. Maville's loan charged an interest rate of 771%, requiring her to pay $2,163.85 in finance charges over a period of 5 months on a mere $700 loan. These unlawfully high interest rates violate federal law, as well as the usury laws of almost every state, which "[f]rom times immemorial," have sought to "protect desperately poor people from the consequences of their own desperation." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013) (citation omitted).

    Defendants Skytrail Servicing Group, LLC and William Cheney Pruett are alleged to be responsible for originating, underwriting, funding, and collecting on Plaintiff Maville's illegal loan

through a tribal lending scheme. These overarching allegations "and the tribe-payday lending partnership" surrounding them, are "not unique." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019). Over the last decade, "[c]ourts across the country have confronted" these "transparent attempts to deploy tribal sovereign immunity to skirt state and federal consumer protection laws." *Id.* The purpose of these schemes is to allow non-tribal payday lenders to use "Native American tribal entities" as "the nominal lender to cloak the payday lenders in the sovereign immunity . . . and, in doing so, to preclude enforcement of the interest rate caps in state usury laws." *Williams v. Big Picture Loans, LLC*, 2020 WL 6784352, at *2 (E.D. Va. 2020) (citation omitted).

The Second Amended Complaint alleges that Plaintiff Maville's loan originated through one such scheme. Although a tribal lending entity named Ningodwaaswi, LLC d/b/a Sky Trail Cash ("Ningodwaaswi")[1] was identified as the lender of her loan, the tribal entity was merely a front for Skytrail Servicing and Pruett's illegal lending activities. (*See, e.g.*, Second Am. Compl. ("SAC") ¶ 4). To carry out this scheme and disguise Pruett's role, Plaintiff alleges that Ningodwaaswi (the tribal entity) and Pruett's company (Skytrail Servicing) entered into a dubiously labeled "Servicing Agreement"[2] that provided Pruett with essentially all power and authority to originate, market, underwrite, fund, and collect on the high-interest loans made in the name of Ningodwaaswi. (*See, e.g.*, *id.* ¶ 7).

---

[1] To avoid confusion, Plaintiff uses the actual entity's name, Ningodwaaswi, rather than the one that closely resembles the name of Defendant Skytrail Servicing.

[2] As detailed in the Second Amended Complaint, use of a purported "servicing agreement" is a hallmark feature of these tribal lending schemes. (*See* SAC ¶¶ 85–96). These contracts are labeled "servicing agreements" in a dubious attempt to support the industry's form over substance argument that the tribal entities are the actual lenders. Other than the technical labels, these tribal arrangements do not remotely mirror traditional lender/servicer relationships.

Plaintiff not only alleges that Ningodwaaswi is a front for Skytrail Servicing and Pruett's illegal lending activities, but she attached the actual "Servicing Agreement" dated June 18, 2014.

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████—████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

      ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[3] On January 10, 2023, the Court granted a motion to seal the Servicing Agreement. (Dkt. 137). Accordingly, Plaintiff has redacted any portions of this brief that reference the document, which remains under seal.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

## SUMMARY OF THE MOTION TO COMPEL

Skytrail Servicing and Pruett do not deny their significant roles in the tribal lending scheme or that they received most of the profits. Instead, they seek to compel arbitration of Ms. Maville's claims based on an arbitration provision in her contract with Ningodwaaswi. *Six times*, however, the Fourth Circuit has labeled analogous tribal arbitration contracts a "farce," designed specifically "to avoid state and federal law" and deployed "to game the entire system." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 674–76 (4th Cir. 2016); *see also Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023); *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021); *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. 2020); *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020); *Dillon v. BMO Harris Bank*, 856 F.3d 330 (4th Cir. 2017). Other courts of appeal have likewise refused to enforce them. *See Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 244 (3d Cir. 2020); *Gingras*, 922 F.3d at 127; *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 232 (3d Cir. 2018). This uniform view comes as no surprise, given that the respective tribal arbitration contracts at issue in these cases were crafted by the same law firms in a "brazen" attempt to avoid federal and state laws. *Hayes*, 811 F.3d at 676.[4]

---

[4] As detailed in the Second Amended Complaint, the Rosette law firm represented many of the tribes willing to engage in these schemes. Discovery in other cases revealed that Rosette brokered many of these partnerships and received a percentage of certain tribe's revenues generated from

The contract in this case is no different. Although enforcement is sought by members of a different enterprise, the contracts' terms are materially indistinguishable from the ones that have been repeatedly struck down by the Fourth Circuit. Faced with this reality, Defendants argue that the Governing Law clause in Ningodwaaswi's contract is distinguishable because it "expressly provides that the laws of the Tribe and *applicable federal law* govern the agreement." (Dkt. 145 at 9 (emphasis added)).

The Fourth Circuit, however, *very recently*[5] considered a virtually identical contract containing a similar provision stating: "This agreement will be governed by the laws of the [Tribe] ("Tribal Law"), including but not limited to the Code *as well as applicable federal law*." *Martorello*, 59 F.4th at 74 (emphasis added). Despite this "applicable federal law" clause, the Fourth Circuit still found that it violated the prospective waiver doctrine because, *inter alia*, the tribal law made clear that the governing law "does not permit the Borrowers to effectively vindicate their federal rights." *Id*. at 81.

*Martorello* was not the Fourth Circuit's first occasion to consider a tribe's laws when determining whether they prospectively waived a borrowers' rights. Several years earlier, the Fourth Circuit reviewed and invalidated an arbitration contract in *Haynes Investments* based on three sections of that respective tribe's code —all of which mirror the LDF's Tribal Consumer Financial Services Regulatory Ordinance ("LDF's Financial Code").

*First*, the Fourth Circuit observed that "although the tribal code required lenders to comply with 'federal laws as applicable' and listed applicable federal consumer protection statutes, that

---

these schemes. *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461, 2020 WL 6784352, at *4 (E.D. Va. Nov. 18, 2020).

[5] The Fourth Circuit issued its decision in *Martorello* on January 24, 2023.

list did not mention the federal law governing the claims at issue—RICO." *Martorello*, 59 F.4th at 82 (citing *Haynes Invs.*, 967 F.3d at 343). *Second*, the Fourth Circuit found that "while the tribal code required 'licensed lenders' to comply with federal law, it did not say the same about 'non-tribal entities or individuals associated with the lenders who may have violated RICO.'" *Id.* (quoting and explaining *Haynes Invs.*, 967 F.3d at 343). And *third*, "even if the borrowers could bring RICO claims against the defendants under tribal law," the Fourth Circuit added that "the tribal code did not indicate *how* consumers could go about doing so" because there was no private right of action and the code allowed the tribe to investigate the complaint in any manner it decided. *Id.* (citing *Haynes Invs.*, 967 F.3d at 344). LDF's Financial Code is identical in all three respects.

In fact, LDF's Financial Code is even more egregious than the one considered in *Haynes Investments* and *Martorello*. Most notably, in a section entitled "Application of Other Laws," LDF's Financial Code expressly provides that "[a]ny federal law not applicable to Indian tribes or state law limiting the rate or amount of interest . . . shall not apply to extensions of credit under a Loan operated in accordance with this subchapter." (Dkt. 50-1at § 8.4(j)(1)).[6] This operates as a prospective waiver twice over.

*First*, by prohibiting the application of any federal law other than those "applicable to Indian tribes," it naturally excludes all other federal laws, such as those that apply to businesses and individuals. Similar to a clause prohibiting the "the application of any other law other than the laws of the [Tribe]," as in *Hengle*, a law that forbids an arbitrator from applying any federal law "not applicable to Indian tribes," naturally excludes all federal laws related to non-tribal members, such as Defendants Skytrail Servicing and Pruett. *See Hengle*, 19 F. 4th at 340–41 (explaining that

---

[6] A copy of the LDF's Financial Code has been previously filed at Dkt. 50-1. Hereafter, Plaintiff cites to the docket entry.

prohibiting the application of any laws other than the tribe "functions as a prospective waiver of the borrowers' rights to pursue federal statutory remedies").

*Second*, by excluding any state law limiting the amount of interest, LDF's Financial Code also surreptitiously waives borrowers' federal rights under RICO—the most relevant federal statute. Although it isn't apparent at first blush, this statutory provision waives all RICO claims in this context because they "involve the 'collection of debt' under state law." *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 308 (E.D. Va. 2019); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 863–64 (E.D. Va. 2020) (rejecting argument that the "loans do not constitute unlawful debts under RICO" because tribal choice of law clause was unenforceable and, thus, Virginia's interest rate caps applied); *see also* 18 U.S.C. § 1961(6) (defining unlawful debt, in part, as debt that is unlawful due to state usury laws). Put differently, the RICO claims are predicated on a violation of state laws limiting interest rates. By prospectively waiving any "state law limiting the rate or amount of interest," this section dubiously ensures a consumer may not bring a RICO claim—a result prohibited by binding precedent. *See, e.g., Hengle*, 19 F.4th at 343 (explaining "a claimant proceeding under tribal law would be unable to assert a RICO claim against individuals associated with a tribal lender and certainly could not pursue RICO's treble damages remedy," thereby violating the prospective waiver doctrine).

Defendants' efforts to enforce the arbitration agreement fail for two other reasons. *First*, the contracts and tribal law prospectively waive all substantive rights under *state* law, which is forbidden by Supreme Court's recent decision in *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1919, n.5 (2022). In that case, the Supreme Court expressly rejected an argument that "the principle that the [Federal Arbitration Act] does not mandate enforcement of provisions waiving substantive rights is limited to federal statutes." *Id*. The Supreme Court explained that there "is not

anything unique about federal statutes" under the basis of the prospective waiver doctrine. *Id*. In other words, arbitration contracts that waive state law claims and defenses are "equally unjust." *Dunn v. Glob. Tr. Mgmt., LLC*, 506 F. Supp. 3d 1214, 1236 (M.D. Fla. 2020).

*Second*, the arbitration agreement does not cover any claims against Skytrail Servicing and Pruett, who are neither parties to the loan contract nor signatories. And while it is certainly permissible to include non-signatories as third-party beneficiaries, this arbitration contract only covers claims against the "Tribe, [Ningodwaaswi], us and/or any of our employees, agents, directors, officers, governors, managers, members, parent company, or affiliated entities (collectively, 'related third parties')." (Dkt. 145-1 at 12 (emphasis added)).

Other than conclusory sentences claiming that they are "agents," Skytrail Servicing and Pruett fail to establish or even articulate how they fall within the scope of the provision. In *Martorello*, the Fourth Circuit rejected a virtually identical argument from a payday lending operator. *Williams v. Martorello*, 59 F.4th at 78, n.8 (finding waiver for failure to develop an argument because "Martorello's opening brief only briefly mentioned that he should be considered an 'agent,' with no explanation as to that capacity").

In addition, Skytrail Servicing and Pruett claim to be "affiliated entities" with Ningodwaaswi. Binding authority from the Fourth Circuit forecloses this argument. As to Pruett, the Fourth Circuit has squarely rejected an argument that "that the term 'affiliated entities'" in an identical sentence in a loan contract covers individuals. *Martorello*, 59 F.4th at 78. And as to Skytrail Servicing, it does not fall within the ordinary meaning of the word "affiliate," which is "commonly understood as 'a company effectively controlled by another or associated with others under common ownership or control.'" *Mey v. DIRECTV, LLC*, 971 F.3d 284, 289 (4th Cir. 2020) (quoting *Affiliate*, Webster's Third New International Dictionary 35 (2002)). Here, it is undisputed

that neither the Tribe nor Ningodwaaswi has common ownership or control over Skytrail Servicing and Pruett. Thus, they do not fall within the ordinary meaning of "affiliated entities."

## ARGUMENT

I.    **Overview of the Prospective Waiver Doctrine, Including its Applicability to Contracts that Waive Substantive Rights under State Law.**

Under the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Hengle*, 19 F.4th at 334 (quoting 9 U.S.C. § 2). Thus, courts may invalidate arbitration agreements only "based on 'generally applicable contract defenses.'" *Hengle*, 19 F.4th at 334 (quoting *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017)). "One such generally applicable defense is the so-called 'prospective waiver' doctrine, under which an agreement that prospectively waives 'a party's right to pursue statutory remedies' is unenforceable as a violation of public policy." *Hengle*, 19 F.4th at 334 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)).

This oft-repeated lesson of the prospective waiver doctrine boils down to the following: An arbitration agreement that "forbid[s] the assertion of certain statutory rights" is a violation of public policy and cannot be enforced under the FAA. *American Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (the FAA's "effective vindication" exception to the enforceability of arbitration agreements "would certainly cover" this type of arbitration agreement); *see also 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009) ("[A] substantive waiver of federally protected civil rights will not be upheld."). Put differently, "[a]lthough parties possess broad latitude to specify the rules under which their arbitration will be conducted, they must preserve the ability to assert federal statutory causes of action so that 'the statute[s] will continue to serve both

[their] remedial and deterrent function[s].'" *Hengle*, 19 F.4th at 334 (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)).

Although most cases applying the doctrine revolve around prospective waiver of federal laws, the Supreme Court has recently confirmed it applies to prospective waivers of state substantive rights as well. *See Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1919, n.5 (2022). There, the Supreme Court expressly rejected an argument that "the principle that the FAA does not mandate enforcement of provisions waiving substantive rights is limited to federal statutes." *Id*. The Supreme Court explained that there "is not anything unique about federal statutes" for the application of the prospective waiver doctrine. "That is why," the Supreme Court added, it had previously considered the application of the doctrine in a case concerning "claims arising under state law." *Id*. (citing *Preston v. Ferrer*, 552 U.S. 346, 359 (2008) (enforcing an arbitration contract because it relinquished "no substantive rights the TAA or other California law may accord him")).

Waiving substantive claims is a hallmark feature of tribal lending agreements—despite having been now rejected by the Fourth Circuit *in six cases*. In each case, the Fourth Circuit applied the prospective waiver doctrine to invalidate contracts that have the same effect as the agreement here—the terms in the arbitration agreement amount to "an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*." *Dillon*, 856 F.3d at 336; *see also Martorello*, 59 F.4th 68; *Hengle*, 19 F.4th 324 at 349; *Sequoia*, 966 F.3d at 293; *Haynes Invs.*, 967 F.3d at 344; *Hayes*, 811 F.3d at 673.

In *Hayes*, the first of these cases, the Fourth Circuit refused to enforce an arbitration agreement that expressly stated that no federal law or regulation would apply to the agreement. *Hayes*, 811 F.3d at 669. The Fourth Circuit reasoned that "a party may not underhandedly convert

10

a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of federal statutes to which it is and must remain subject." *Id.* at 675. A little over a year later, the Fourth Circuit expanded on this principal in *Dillon*, holding that a loan agreement that even "implicitly accomplishes" what the agreement in *Hayes* expressly stated was likewise unenforceable. *Dillon*, 856 F.3d at 336.

The Fourth Circuit went even further in *Haynes Investments* and *Sequoia* and looked at the tribal law to support its holding that an arbitration agreement prospectively waived federal rights and remedies. Even though the arbitration agreements in those cases did not "explicitly disclaim the applicability of federal law," they still operated as a prospective waiver because the tribal law itself "prevent[ed] claimants from vindicating a RICO claim for treble damages against entities and individuals" such as the non-tribal participants in the scheme. *See Sequoia*, 966 F.3d at 293 (describing and applying the analysis in *Haynes Investments*). As explained below, these recent decisions in *Haynes Investments* and *Sequoia* completely foreclose any attempt by Defendants to enforce the arbitration provisions in this case because the tribal codes in both cases are materially indistinguishable. In fact, LDF's Financial Code is more egregious.

In 2021, the Fourth Circuit considered another tribal lending contract that had a choice-of-law clause that provided that the agreement "shall be governed by applicable tribal law, including but not limited to the" tribe's financial code. *Hengle*, 19 F.4th at 332. In addition to this choice-of-law clause, the arbitration agreement contained a clause that allowed an arbitration to occur off the reservation, but provided that such an election did not "allow for the application of any other law other than the laws of the" tribe. *Id.* Although this provision did not explicitly disclaim the application of federal law, the Fourth Circuit held again that "the pratical effect is the same because

this arbitration provision demands exclusive application of tribal law, thereby preempting application of other authority." *Id*. at 339 (internal citations and quotations omitted).[7]

In 2023, the Fourth Circuit again confronted similar issues in *Martorello*. There, the alleged pioneer of a tribal lending scheme claimed to be an "agent" or "affiliated entity" of two tribal lending entities and, thus, entitled to enforce a class action waiver provision in a loan contract. *See Martorello*, 59 F.4th at 78. The Fourth Circuit rejected this argument on two "separate and independent grounds." *Id*. First, the Fourth Circuit held that Martorello failed to adequately establish that he was an agent of the tribal lending entity and the plain language of the term "affiliated entity" did not cover individuals. *Id*. And second, even if Martorello fell within one of these categories, the Fourth Circuit held that the waiver provision, loan contract, and tribal law incorporated into the loan contract "make clear that the waiver does not permit the Borrowers to effectively vindicate their federal rights." *Id*. at 81. It reached this conclusion even though the governing law provision in the contract incorporated "applicable federal law." *Id*. at 82. "Such a provision," the Fourth Circuit explained, "must be viewed in context to determine its actual meaning." *Id*. at 84 (citing *Hengle*, 19 F.4th at 341). This "context" was the repeated waivers and deprivations created by tribal law, which did not permit the borrowers "to effectively vindicate their federal rights." *Id*. at 85.

Six years ago, the Fourth Circuit labeled these tribal "arbitration" schemes as a "farce" designed specifically "to avoid state and federal law," and deployed "to game the entire system." *Hayes*, 811 F.3d at 674–76. In so holding, the court surmised that its decision might prompt "future

---

[7] As the Court will recall, certain defendants moved to stay this case pending the Fourth Circuit's decision in Hengle, asserting that the "issues before the Fourth Circuit in *Hengle v. Treppa* will have a tremendous impact on, and might even[] dictate the outcome of threshold questions in this case." (Dkt. 62 at. 1).

companies" to "craft [their] arbitration agreements on the up-and-up and avoid the kind of mess" confronting the defendants in that case. *Id*. at 676. Not here. Despite five more decisions from the Fourth Circuit and additional decisions from other courts, Defendants have continued to use a dubious dispute resolution and arbitration scheme that cannot be enforced.

## II.    The Agreement is Unenforceable Because it Prospectively Waives State Laws.

### A.    *The arbitration agreements prospectively waive state law.*

To obtain her loan, Plaintiff Maville signed a loan contract containing a "Governing Law" clause. (*See, e.g.*, Dkt. 145-1 at 9-10). This "Governing Law" clause states:

> The laws of the Tribe and applicable federal law will govern this Agreement, *without regard to the laws of any state* or other jurisdiction, including the conflicts of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law and applicable federal law *shall exclusively* apply to such dispute.

(Dkt. 145-1 at 9–10 (emphasis added)). The arbitration agreement, in turn, provides that the arbitration "will be governed by the rules and procedures of the American Arbitration Association applicable to consumer disputes, *to the extent those rules and procedures do not contradict the express terms of this Agreement* or this Arbitration Provision, *including the limitations on the arbitrator below*." (*Id*. at 12 (emphasis added)). One of the "limitations on the arbitrator" in the next paragraph then provides that the "arbitrator shall *apply applicable substantive law consistent with the Governing Law set forth above*, and the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ('FAA') and applicable statute of limitations, and shall honor claims of privilege recognized at law." (*Id*. (emphasis added)).

The Governing Law provision's plain language takes the forbidden step of preventing an arbitrator from considering state law, such as Virginia's or Florida's public policy and statutory regime targeted at usurious lending. Unequivocally, the first sentence of the Governing Law clause

states that tribal and applicable federal law will govern the agreement "without regard to the laws of any state." (*Id*. at 16–17). This means what it says: Tribal law applies without any consideration of state law. *See Regard*, Black's Law Dictionary (11th ed. 2019) (defining regard as "attention, care, or consideration" and providing an example of its use as "without regard for the consequences"). By explicitly disclaiming the application of state law, the Governing Law Provision ensures that the arbitrator could not invalidate the contract based on state law, *i.e.*, the precise grounds used by the district court and Fourth Circuit in *Hengle*. *See Hengle*, 19 F.4th at 352 ("Our review likewise leads us to conclude that the Supreme Court of Virginia would not enforce the governing-law clause because it violates Virginia's compelling public policy against unregulated usurious lending."). This Governing Law provision, in other words, forbids any arbitrator from considering state law, thereby preventing one of the key outcomes of *Hengle*, which relied on state law to invalidate the tribal choice of law provision (which was being used to negate the usury claims).

The second sentence of the Governing Law clause reinforces the waiver. Although unnecessary because of the express disclaimer of state law, the second sentence further provides that "Tribal law and applicable federal law shall ***exclusively*** apply to such dispute." (Dkt. 145-1 at 16-17 (emphasis added)). Although this provision does not expressly disclaim state law, the Fourth Circuit has explained that the "practical effect is the same" because this provision "demands exclusive application of tribal law, thereby preempting application of other authority," such as the laws of Virginia or Florida. *Hengle*, 19 F.4th at 339 (internal citations and quotations omitted). This provision, thus, "implicitly accomplish[es]" a prospective waiver of state law by requiring the exclusive application of tribal law. *Id*. (quoting *Dillon*, 856 F.3d at 335).

In short, the contract's express waiver of state law, standing alone, renders it unenforceable as a matter of public policy. *Viking River Cruises*, 142 S. Ct. at 1919, n.5 (rejecting an argument that the prospective waiver doctrine is limited to provisions waiving substantive rights under federal statutes); *Dunn*, 506 F. Supp. 3d at 1236 (applying prospective waiver doctrine to tribal arbitration contract that waived Florida laws).

> **B.    *The paragraph defining "Disputes" subject to arbitration does not counteract the express disclaimer of state law.***

Defendants ignore the dual waivers of state law in the Governing Law clause. And perhaps recognizing their potential problem, Defendants preemptively argue that the contract does not waive state law because of the paragraph defining the "disputes" subject to arbitration. (*See* Dkt. 145 at 9–12). In relevant part, this provision states:

> The words "dispute" and "disputes" are given the broadest possible meaning and include without limitation (a) all claims, disputes, or controversies arising from or relating directly or indirectly to this Dispute Resolution Proceudre and Arbitration Provision ("this Provision"), the validity and scope of this Provision and any claim or attempt to set aside this Provision; (b) all U.S. federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to this Agreement… (e) all claims based upon a violation of any state or federal constitution, statute, or regulation[.]

(Dkt 145-1 at 12). Relying on this language, Defendants contend that the loan contract "does not waive state law substantive rights." (Dkt. 145 at 9).

An *identical* argument was made and rejected by the Fourth Circuit in *Hengle* and *Martorello*. Just like this case, the defendants in *Hengle* "emphasiz[ed] that the disputes subject to arbitration explicitly include 'all tribal, federal, or state law claims' and 'all claims based upon a violation of any tribal, state or federal constitution, statute or regulation.'" 19 F.4th at 343 (quoting a loan contract from the joint appendix). Because of this, the defendants "urge[d]" that the "arbitration provision contemplate[d] arbitration of federal claims." *Id*. Relying on its prior precedent, the Fourth Circuit held that "such language does not counteract the effect of the choice-

of-law provisions." *Id*. (citation omitted). It further noted that "the arbitration agreements in *Hayes*, *Dillon*, *Haynes Investments*, and *Sequoia Capital* each required federal claims to be sent to arbitration, but the Court in each case nevertheless found that the agreements prevented effective vindication of federal statutory claims." *Id*. (citations omitted).

The Fourth Circuit not only held that the defintional provision did not counteract the effect of the choice-of-law provision, but it concluded that it made the arbitration agreement even more problematic. To that end, it explained:

> If anything, such language highlights the arbitration provision's impermissible tactic of compelling arbitration of federal claims only to nullify those claims by precluding application of federal law.
>
> Reading the arbitration provision as encompassing disputes it does not empower the arbitrator to resolve is far from fanciful. As another example, the provision requires that all class claims be sent to arbitration but, a few paragraphs later, explicitly forbids class arbitration. We offer this example not to criticize the contractual waiver of class proceedings, which is unquestionably permissible, but merely to illustrate that interpreting this arbitration provision to waive claims explicitly within its scope is not contradictory but rather, in some instances, exactly what the contract intends. The difference, of course, is that waiver of a party's substantive federal rights in arbitration is forbidden.

*Id*. at 343 (internal citations omitted).

Less than two months ago, the Fourth Circuit reaffirmed this point in *Martorello*. 59 F.4th at 82. There, the defendant similarly argued that the contract allowed for "claims to be brought under federal law based on its definition of 'disputes,'" which encompassed "all Tribal and U.S. federal or state law claims[.]" *Id*. (citation omitted). Following its earlier decisions, the Fourth Circuit explained that it did not counteract the effect of the governing law provision. *Id*. at 85. "If Borrowers attempted to bring claims" under the definitional language, the Fourth Circuit explained, the Tribal Code would still nonetheless "prevent vindication of them." *Id*.

16

Although *Hengle* and *Martorello* focused on the waiver of federal law, they are otherwise directly on point regarding the interplay between the choice-of-law provision and the provision defining "disputes" subject to arbitration. As *Hengle* teaches, the dispute provision "does not counteract the effect of the choice-of-law provisions," *id*., including an express disclaimer that an arbitrator must apply tribal law "without regard to the laws of any state" or "exclusively" apply tribal law. The purpose of defining "disputes" to include state law claims simply ensures that a court will send any such claims to arbitration, only then to have the arbitrator to quickly deny such claims under tribal law. Put differently, "[w]ith one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away." *Hayes*, 811 F.3d at 673–74.

Rather than "selecting the law of a certain jurisdiction to agreement, as is normally done with a choice of law clause, this arbitration agreement uses its 'choice of law' provision to waive all of a potential claimant's [state] rights." *Id*. at 675. The contract's express disclaimer of state law, coupled with the requirement that the arbitrator exclusively apply tribal law, prospectively waives all potential state claims and defenses. These substantive waivers alone render the arbitration agreement unenforceable.

**III.    The Arbitration Provision is Unenforceable Because the Contract and LDF's Financial Code Deprive Consumers of Opportunity to Vindicate Federal Rights.**

*A.    The LDF's tribal law contains identical waivers condemned by the Fourth Circuit in* Haynes Investments, Sequioa, Hengle, *and* Martorello.

In addition to the prospective waiver of state law, the arbitration agreement is unenforceable because LDF's Financial Code prospectively waives a borrowers' rights and deprives them of any meaningful opportunity to vindicate their claims. On three occasions, the Fourth Circuit has examined the substance of similar tribal laws to invalidate arbitration agreements. *See, e.g.*, *Martorello*, 59 F.4th at 85 ("[T]he [Tribal] Code provisions referenced by

17

the Loan Agreement would not permit the B°rrowers to effectively vindicate their federal statutory rights."); *Hengle*, 19 F.4ᵗʰ at 343 ("[W]e conclude that a claimant proceeding under tribal law would be unable to assert a RICO claim against individuals associated with a tribal lender and certainly could not pursue RICO's treble damages remedy."); *Haynes Investments*, 967 F.3d at 343 (finding that the arbitration agreements were unenforceable because the "relevant tribal codes would not permit" a borrower "to effectively vindicate the federal protections and remedies they seek."). In these cases, the Fourth Circuit took issue with three sections of the Otoe-Missouria's tribal code—all of which mirror LDF's Financial Code.

*First*, the Fourth Circuit observed that "although § 5.1 of the Otoe-Missouria Tribal Consumer Financial Services Ordinance" provided that lenders shall comply with "federal laws as applicable," the Racketeer Influence and Corrupt Organizations Act was "noticeably absent from the list of federal consumer protection statutes with which a lender must apply." *Haynes Investments*, 967 F.3d at 343 (citing *Otoe-Missouria Tribal Consumer Fin. Servs. Ord*. §§ 5.2(a) (2018)).[8] "And even for the laws listed," the Fourth Circuit noted that the "Ordinance makes clear that a lender's compliance does not constitute 'consent . . . related to the applicability of federal laws[.]" *Id*. (citing § 5.2(a)). Since the tribe in *Haynes Investments* and the Tribe here were represented by the same law firm, it is no surprise that § 7.2 of this Tribe's Tribal Code is *identical* in this respect. (*Compare* Dkt. 50-1 at LDF0047 (providing that a licensee "shall conduct business in a manner consistent with the principles of federal consumer protection law" and omitting any reference to RICO in the list of statutes), *with* Dkt. 50-2 at 12).

---

[8] A copy of the Otoe's Financial Code has been previously filed at Dkt. 50-2. Hereafter, Plaintiff cites to the docket entry.

*Second*, although tribal law allowed for a claim against the lending entity, the Fourth Circuit further found a prospective waiver occurred because tribal law did not allow for claims against individuals or non-tribal entities: "[A] borrower's ability to assert a federal statutory claim under tribal law against an individual or entity (such as the Haynes Defendants) related to a lender remains even more elusive: although the Ordinance governs 'licensed lenders' and mandates their compliance with tribal and applicable federal law, it says nothing about non-tribal entities or individuals associated with the lenders who may have violated RICO." *Haynes Investments*, 967 F.3d at 343. Once again LDF's Financial Code is identical in this respect. (Dkt. 50-1 at LDF0047).

*Third*, "even if the borrowers could assert a RICO claim against the Haynes Defendants under tribal law," the Fourth Circuit concluded that "the rest of the Ordinance fail[ed] to clarify how any consumer could meaningfully pursue any claims under it." *Haynes Investments*, 967 F.3d at 344. Stated differently, "[a]lthough the Ordinance contain[ed] a consumer complaint procedure," the tribal code "does not provide for or establish a private right of action for violations of any provisions, let alone any federal laws." *Id.* (citing §§ 8.1–8.4). The same is true here— LDF's Financial Code allows only for the imposition of fines against the lender. (Dkt. 50-1 at LDF0058 (establishing the enforcement power of the Commission)). Worse yet, the Fourth Circuit found it problematic that—just as in this case—the "tribal commission overseeing such a claim" was permitted to "grant or deny any relief as the Commission deems appropriate," thereby making it "clear that a claimant would be unable to assert a RICO claim against entities associated with a tribal lender." *Id.* Just as in *Haynes Investments*, § 10.3(c) of LDF's Financial Code provides that the "Authority may grant or deny a Consumer complaint and grant or deny such relief, if any, as the Authority determines in its sovereign discretion." (*See* Dkt. 50-1 at LDF0060).

        B.   *The LDF's tribal law contains <u>additional</u> waivers beyond those in* Haynes Investments, Hengle, *and* Martorello, *including an express waiver of the relevant federal law related to the loans.*

LDF's Financial Code not only contains virtually identical code provisions to those considered in *Haynes Investments*, *Hengle*, and *Martorello*, it goes several steps further. Most notably, in a section entitled "Application of Other Laws," it provides:

> Any federal law not applicable to Indian tribes or state law limiting the rate or amount of interest, discount, points, finance charges, service charges, or other charges which may be charged, taken, collected, received, or reserved shall not apply to extensions of credit under a Loan operated in accordance with this subchapter.

(*See* Dkt. 50-1 at § 8.4(i)(1)). This operates as a prospective waiver twice over. First, by prohibiting the application of any federal law other than those "applicable to Indian *tribes*," it naturally excludes *every* other federal law, such as those that apply to businesses and individuals. The LDF's Financial Code, in other words, waives all federal laws applicable to its business partners, such as Defendants Pruett and Skytrail Servicing. This is the most harmonious—and, for all intents and purposes, the only—construction of the phrase. It is also consistent with the other provisions of LDF's Financial Code that carve out claims against "non-tribal entities or individuals associated with the lenders who may have violated RICO" as recognized by *Haynes Investments*.

Second, by excluding any state law limiting the amount of interest, LDF's Financial Code surreptitiously waives borrowers' federal rights under the most relevant federal statute, RICO, which is predicated on state usury laws. Because there is no federal usury statute, this provision ensures that a consumer may not bring a RICO claim for collection of unlawful debt—a result prohibited by *Hengle*. 19 F.4th at 343 (explaining "a claimant proceeding under tribal law would be unable to assert a RICO claim against individuals associated with a tribal lender and certainly could not pursue RICO's treble damages remedy," thereby violating the prospective waiver doctrine). This is the reason why RICO is "noticeably absent from the list of federal consumer

protection statutes with which a lender must apply" in the other section of the code. *Haynes Investments*, 967 F.3d at 343

LDF's Financial Code not only prohibits the vindication of all relevant substantive rights, but it also guarantees victory for the Tribe, its employees, and any "vendor"—thereby further waiving any federal rights and remedies. This is accomplished through § 8.4(i)(3), which provides:

> In *any proceeding* in which a Licensee is a party in interest with respect to *any transactions* with a consumer, the Licensee's rights and remedies shall be granted based upon prima facie proof and entitlement based upon the terms of the written transaction documents and the payment and business records maintained by the Licensee.

(Dkt. 50-1 at LDF0034(emphasis added)).[9]  Tribal law, in short, mandates an automatic win for Defendants in "any proceeding," such as arbitration, so long as they: (1) produce the loan contract; and (2) any documents relating to payments. This unconscionable law ensures that consumers cannot vindicate any relevant substantive rights "in any proceeding," including arbitration.

The contract reinforces these waivers. Most notably, in the section entitled "Dispute Resolution Procedure and Arbitration Provision," it expressly states that a consumer's dispute "shall be considered in nature to a petition for redress submitted to a sovereign government" and "does not create any binding procedural or substantive rights." (Dkt. 145-1 at 11). This means precisely what it says—a borrower has no "procedural or substantive rights" under the contract. And "[i]f this dispute is not resolved" to the consumer's "satisfaction," then the parties "shall arbitrate *that* dispute in accordance with the terms of the Arbitration Provision, described below." (*Id*. at 60–61 (emphasis added)). When read together, especially within the context of the repeated waivers in LDF's Financial Code, these provisions make clear that: (1) the consumer has no

---

[9] LDF's Financial Code defines "Licensee" to include third parties such as Skytrail Servicing and Pruett, who are considered a "Vendor Licensee" under LDF's Financial Code. (Dkt. 50-1 at §§ 3.14, 3.23).

substantive or procedural rights under the first instance; and (2) any subsequent arbitration would be of that same "dispute" where the consumer had no rights to begin with.

Although easier to identify, an express waiver of federal law *in a loan contract* is not the only way to violate the prospective waiver doctrine. There are myriad ways in which creative legal minds can implicitly achieve the same result. One such way is to enact laws that prevent an arbitrator from applying any federal laws to non-tribal members like Skytrail Servicing and Pruett. Another way is to enact a law that disclaims state interest rate caps, thereby surreptitiously waiving a borrowers' relevant federal rights predicated on those very laws. Another way is to enact a law that requires an automatic win for Skytrail Servicing and Pruett upon production of a loan contract and payment history. Here, the Defendants' system does all three, thereby preventing borrowers from effectively vindicating the "federal protections and remedies they seek." *Haynes Invs.*, 967 F.3d at 343. Because of this, the arbitration agreement is unenforceable.

C.    *The Governing Law clause's reference to "Applicable Federal Law" cannot save the prospective waivers.*

Defendants attempt to distinguish *Hengle* and other cases by emphasizing that their contract includes a choice of law provision that permits application of "the laws of the Tribe and *applicable* federal law." (Dkt. 145 at 9). In any event, this "applicable federal law" clause cannot save the express waivers of state law. And regardless, the tribal lending contract in *Martorello* contained a virtually identical provision, which provided:

> This Agreement will be governed by the laws of the [Tribe] ("Tribal law"), including but not limited to the Code *as well as applicable federal law*. All disputes shall be solely and exclusively resolved pursuant to the [Tribal Dispute Resolution Procedure] set forth in Section 9 of the Code and summarized below for Your convenience.

*Martorello*, 59 F.4th at 74 (emphasis added). The Fourth Circuit nonetheless concluded that "[r]eferences to federal law in the Loan Agreement" could not save the contract because "such a

provision must be viewed in context to determine its actual meaning." *Id.* at 84. In addition to other language in the contract, this "context" was the repeated waivers and deprivations created by tribal law, which did not permit the borrowers "to effectively vindicate their federal rights." *Id.* at 85.

The same is true here. As *Martorello* instructs, use of the phrase "applicable federal law" cannot be read in isolation. Rather, the phrase must be read in conjunction with the contract as a whole, including its incorporation of LDF's Financial Code that: (1) expressly waives "[a]ny federal law not applicable to Indian tribes"; and (2) guarantees a victory to Defendants "in any proceeding." *See also Hayes*, 811 F.3d at 676 ("[I]t is only natural for us to interpret the arbitration agreement in light of the broader contract in which it is situated.").

Indeed, the attendant requirement of "applicable" is completely superflous unless the contract and tribal law rendered certain federal laws inapplicable. This is because neither a court nor an arbitrator would ever apply "*in*applicable federal law." Using the "applicable," in other words, serves one purpose: to preserve the waivers created through the contract and tribal law. Absent some carve out, there is no other reason to qualify the term "federal law" with the word "applicable." And to the extent there is any doubt, the contract's use of the term "tribal law" in the very same sentence—without qualification—shows that the purpose of the word "applicable" was not mere redundance. If it were, the contract would state: "*applicable* tribal law and *applicable* federal law" will govern the dispute. But rather than using the same terminology for these provisions, the contract uses the term "applicable" only in connection with federal law—even though hundreds of tribal laws are entirely irrelevant to the transaction, such as the LDF Financial Code's provisions regarding removal of a regulatory agent. (*See, e.g.,* Dkt. 50-1 at § 4.12).

"The presumption always is that the parties have not used words aimlessly and that no provision is merely a superfluity unless it is plainly merely a repetition." *United States for use &*

*benefit of Engineered Servs., Inc. v. Hanover Ins. Co.*, 2015 WL 13309943, at *5 (E.D. Va. Jan. 23, 2015) (citation omitted). Here, the omission of the word "applicable" when referencing tribal law but the addition of it in the same sentence when referencing federal law shows that the word was not used aimlessly. Rather, it was used because tribal law surreptitiously waives federal rights through sections in LDF's Financial Code. Thus, just as in *Martorello*, the Governing Law's reference to "applicable federal law" cannot be read in isolation to counteract the repeated waivers of federal law in LDF's Financial Code.

### III.    Pruett and Skytrail Servicing—Nonsignatories to the Arbitration Contract—Are Not Third Party Beneficiaries of the Contract.

It is "axiomatic that a contract is only binding on the parties to the contract, absent certain limited exceptions." *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461, 2021 WL 2930976, at *3 (E.D. Va. July 12, 2021) (citing 13 *Williston on Contracts* § 37.1 (4th ed.), *aff'd sub nom. Martorello*, 59 F.4th 68. One of these limited exceptions is the third-party beneficiary doctrine, which is the *sole* basis supplied by Skytrail Servicing and Pruett to allow them to enforce the arbitration agreement. "Of course, it is possible that third-parties can be made beneficiaries of a contract," thereby making it possible for them to "claim its benefits," including enforcement of an arbitration provision. *Id.* at *3; *see also Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006) ("It is well-established, however, that a nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate.").

To determine whether Skytrail Servicing and Pruett are third-party beneficiaries, a court must consider "the four corners" of the contract. *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005) (quoting *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 164 (4th Cir. 2004)). To be a third-party beneficiary, the language of the contract must "clearly

indicate, that, at the time of contracting, the parties intended to" provide the third-party "with direct benefit." *Id*. at 397 (quoting *Griffin*, 384 F.3d at 165).

In their motion, Skytrail Servicing and Pruett contend that the contract intends to cover them because it includes claims against "related third parties," which is defined as Ningodwaaswi's "employees, agents, directors, officers, governors, managers, members, parent company or affiliated entities." (Dkt. 145-1 at 12). Skytrail Servicing and Pruett argue that they fall within this provision as either "agents" or "affiliated entities" with Ningodwaaswi. (Dkt. 147 at 7–8). Other than conclusory statements, however, neither Skytrail Servicing nor Pruett submit any evidence in support of their claims. Skytrail Servicing and Pruett's conclusory statements fail to satisfy their burden of proof on this issue. Moreover, the unrefuted allegations and evidence in the record proves otherwise.

> A.    *Skytrail Servicing and Pruett failed to establish that they are agents, and all allegations and evidence prove to the contrary.*

"Agency is a fiduciary relationship from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to act." *Giordano v. Atria Assisted Living, Va. Beach, L.L.C.*, 429 F. Supp. 2d 732, 736 (E.D. Va. 2006) (quoting *Reistroffer v. Person*, 247 Va. 45, 439 (1994)). In "determining whether an agency relationship exists, the critical test is the nature and extent of control exercised by the purported principal over the agent." *Butterworth v. Integrated Res. Equity Corp.*, 680 F. Supp. 784, 789 (E.D. Va. 1988) (citing *Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 492 (1975)). And critically, the "burden of proving agency rests upon the party alleging that agency exists." *Atria Assisted Living*, 429 F. Supp. 2d at 737.

Here, Skytrail Servicing and Pruett do not come close to satisfying their burden of proving an agency relationship with Ningodwaaswi. Instead, Skytrail Servicing summarily argues that

"[a]s the loan servicer hired by Sky Trail Cash, Skytrail Servicing is an agent of Sky Trail Cash, thus making Skytrail Servicing an intended third-beneficiary of the Arbitration Provision." (Dkt. 145 at 7). Other than this single sentence, Skytrail Servicing provides no other information to enable the Court to determine "the nature and extent of control exercised by the purported principal over the agent." *Butterworth*, 680 F. Supp. at 789. In *Matorello*, the Fourth Circuit rejected similar conclusory statements, explaining:

> Martorello also claims that he is an "agent," "consultant," or "servicer" of Red Rock and Big Picture; however, Martorello's opening brief only briefly mentioned that he should be considered an "agent," with no explanation as to that capacity. He therefore waived this argument. And the fact that he slightly expanded on the argument in his Reply cannot salvage it. Further, "consultant" and "servicer" are not included in the Loan Agreement's definition of "related third parties," so Martorello's claim that he is a "consultant" and "servicer" is a non-starter.

59 F. 4th at 78 (citations omitted). So too here. Skytrail Servicing cannot summarily claim to be an "agent" of Ningodwaaswi.

And to be clear, Plaintiff does not assert that Skytrail Servicing or Pruett are "agents" of Ningodwaaswi. Just as the district court recognized in *Martorello*, it is "quite the opposite actually" because Plaintiff alleges that Skytrail Servicing and Pruett are the masterminds and run the lending business without tribal involvement. *Williams*, 2021 WL 2930976, at *5. These allegations—that the Tribe exercises no control over or involvement with the actual lending operations—must be taken as true in the absence of evidence to the contrary. *See, e.g., Berkeley Cnty. Sch. Dist. V. Hub Int'l Ltd.*, 944 F.3d 225, 233 (4th Cir. 2019) (explaining that, in reviewing a motion to compel, courts "accept as true the allegations of the Operative Complaint"); *see also Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012) (explaining that, in reviewing the denial of a § 4 motion, a court accepts as true the allegations in the "complaint that relate to the underlying dispute between the parties"); *Suburban Leisure Ctr., Inc. v. AMF Bowling Prods.*,

Inc., 468 F.3d 523, 525 (8th Cir. 2006) (accepting allegations of complaint as true in reviewing court's denial of motion to compel arbitration).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ ████████. In other words, the Servicing Contract does not reflect a "fiduciary relationship" whereby Skytrail Servicing assented to "act on [Ningodwaaswi]'s behalf and subject to [Ningodwaaswi]'s control." *Restatement (Third) Of Agency* § 1.01 (2006).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.

These provisions, when considered together or alone, reflect that Skytrail Servicing is not an agent acting on behalf of Ningodwaaswi. Instead, just as the Second Amended Complaint alleges, Ningodwaaswi is nothing more than a front for the illegal lending activities. And

regardless, *Martorello* teaches that a nonsignatory cannot satisfy its burden by summarily claiming to be an "agent."

        **B.**     *Skytrail Servicing and Pruett are not "affiliated entities" under* Martorello.

The arbitration includes "affiliated entities," but does not define the phrase so it must be interpreted in accordance with its common and ordinary meaning. *See, e.g., Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502, 518 (E.D. Va. 2011) ("Words that the parties used are normally given their usual, ordinary, and popular meaning." (citing *D.C. McClain, Inc. v. Arlington Cnty.*, 249 Va. 131, 135 (1995))). "When a contract does not define a particular term," courts "look to the 'ordinary meaning' of that term." *Martorello*, 59 F. 4th at 78 (citing *Bratton v. Selective Ins. Co. of Am.*, 776 S.E.2d 775, 780 (Va. 2015)).

The word "affiliated" means "closely associated with another typically in a dependent or subordinate position." *Martorello*, 59 F. 4th at 78 (quoting *Affiliated*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/affiliated)). When used together with the word "entity," it typically refers to companies with a corporate nexus, *i.e.*, a parent and subsidiary. *See id.*; *see also Bd. of Trs. V. Agilent Techs., Inc.*, 2019 WL 4729602, at *1 (N.D. Cal. Aug. 13, 2019) ("If one company owns another, those companies are affiliated entities in the ordinary sense of the term."); *Aquino v. Ceva Logistics U.S., Inc.*, No. 14-cv-01795, 2015 WL 13919076, at *3 (C.D. Cal. Mar. 24, 2015) (explaining that "[e]very dictionary consulted by the Court ascribes a distinct corporate nexus to ['affiliated or related entities']")). "This is especially true where 'affiliated entities' immediately follows 'parent corporation,' suggesting that 'affiliated entities' refers to business units such as subsidiaries or sister companies." *Martorello*, 59 F. 4th at 78 (citation omitted).

As *Martorello* teaches, neither Skytrail Servicing nor Pruett are "affiliated entities" of the Tribe or Ningodwaaswi under the ordinary meaning of the term "affiliated entities." While they certainly have a business relationship, it is contractual in nature—not by virtue of a corporate nexus of common ownership and control. A contractual relationship does not make two companies with separate and distinct ownership groups "affiliated entities" under the ordinary meaning. This is especially true here because the contract uses the term "affiliated entities" immediately following parent company, thereby suggesting it only covers Ningodwaaswi's parent or sister companies. *Id.* at 78.

Beyond this, it is inconceivable that Pruett himself is an "entity." *Entity*, Black's Law Dictionary (11th ed. 2019) (defining "entity" as an "organization (such as a business or a governmental unit) that has a legal identity apart from its members or owners"). By using the word "entity," the drafter categorically excluded natural persons like Pruett—just as the Fourth Circuit held in *Martorello*. 59 F. 4th at 79 ("[W]e conclude that the term 'affiliated entities' in the Loan Agreement does not refer to individuals. Because Martorello is an individual, he is not a party exempted from class-action claims and liability.").

## IV.    The Delegation Clause is Unenforceable Under Fourth Circuit Precedent.

A contract's "prospective waiver of statutory rights renders the entire arbitration agreement (delegation clause included) unenforceable." *Williams*, 2020 WL 3968078, at *9. Because the contracts expressly forbid the arbitrator from applying any other law other than the Tribe's, enforcing them places the arbitrator "in the impossible position of deciding the enforceability of the agreement without authority to apply any applicable federal or state law." *Smith v. W. Sky Fin., LLC*, 168 F. Supp. 3d 778, 786 (E.D. Pa. 2016). A contract's "prospective waiver of statutory rights renders the entire arbitration agreement (delegation clause included) unenforceable."

*Williams*, 2020 WL 3968078, at *9. Because the contracts expressly forbid the arbitrator from applying any other law other than the Tribe's, enforcing them places the arbitrator "in the impossible position of deciding the enforceability of the agreement without authority to apply any applicable federal or state law." *Smith v. W. Sky Fin., LLC*, 168 F. Supp. 3d 778, 786 (E.D. Pa. 2016).

The Fourth Circuit's recent decisions confirm this settled rule. For example, in *Haynes Investments* and *Sequoia*, the Fourth Circuit squarely rejected the defendants' arguments that "any threshold questions as to the enforceability of the arbitration agreements should have first been sent to an arbitrator." *Haynes Invs.*, 967 F.3d at 337; *Sequoia*, 966 F.3d at 290. Instead, the Fourth Circuit explained that where a claimant "specifically attacks the validity of the delegation clause itself, a court may consider that clause's enforceability." *Haynes Invs.*, 967 F.3d at 337; *Sequoia*, 966 F.3d at 290. The Second Circuit's recent decision in *Gingras* similarly explained that where "'a party challenges the validity under [9 U.S.C.] § 2'" of the arbitration contract, courts "must consider the challenge before ordering compliance with that agreement under § 4'"—even where a delegation clause "appears to give the arbitrator blanket authority over the parties' disputes." 922 F.3d at 126 (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)).

In *Hengle*, the Fourth Circuit again addressed this issue, writing: "[t]his is not the first time this Court has encountered a prospective waiver challenge to an arbitration provision with a delegation clause in a tribal lending agreement." *Hengle*, 19 F.4th at 336. The Fourth Circuit further noted that "[i]n four prior cases," it had "assessed arbitration provisions requiring application of tribal law to the practical exclusion of other law and, in each case," it "held the arbitration provision (including the delegation clause) invalid as a prospective waiver" of substantive rights. *Id.* (citation omitted). Against this backdrop, the Fourth Circuit determined that

30

there was "no material distinction between the case at hand" and its prior precedent because "the choice-of-law clauses of the arbitration provision operate as a prospective waiver twice over, waiving not only a borrower's right to pursue federal remedies… but also the very federal *and state defenses* to arbitrability that preserve that right." *Id.* at 339 (emphasis added). In other words, "[a] delegation clause that requires an arbitrator to determine whether a valid and enforceable arbitration agreement exists" without access to federal or state laws "necessary to make that determination" is "unenforceable as a violation of public policy." *Id.*

So too here. As explained above, the Governing Law provision in the contract prospectively waives all states defenses to arbitrability by requiring an arbitrator to apply tribal law "without regard to the laws of any state," and to "exclusively" apply "Tribal Law and applicable federal law" in the event of a dispute. (Dkt. 145-1 at 9–10). Standing alone, this makes the delegation clause unenforceable because it prevents an arbitrator from determining whether a valid arbitration agreement exists without access to the necessary state law—unconscionability, mutuality, formation etc.—to make that determination. And when considered together with the provisions in the LDF Financial Code (including, *inter alia*, its express waiver of any federal law unless it is applicable to tribes), the terms comprise a "sham system unworthy even of the name arbitration." *Hooters of Am. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999).[10]

---

[10] Even if the Court finds otherwise, the delegation provision does not preclude the Court from deciding whether Plaintiff, Skytrail Servicing, and Pruett formed an agreement to arbitrate. *See Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 n.9 (4th Cir. 2019) ("[P]rovisions requiring the arbitration of arbitrability questions do not ... preclude a court from deciding that a party never made an agreement to arbitrate any issue (which would necessarily encompass an arbitrability issue)."); *Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021) ("There is a difference between disputes over arbitrability and disputes over contract formation."). Here, the dispute is one of formation because the evidence shows that Plaintiff never agreed to arbitrate any dispute with Skytrail Servicing or Pruett.

**V.      If the Court Compels Arbitration, the Case Should Be Dismissed.**

Finally, Defendants request the Court to stay this case pending arbitration rather than dismissing it. However, the Fourth Circuit has instruct that "dismissal is a proper remedy when all the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001). Accordingly, Plaintiff Maville asks this Court to dismiss the claims without prejudice.

<u>**CONCLUSION**</u>

For the reasons explained above, Plaintiff requests the Court to deny Defendants' motion in its entirety.

Respectfully submitted,
**PLAINTIFFS**

By: _____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
*Counsel for Plaintiffs*