**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

LORI FITZGERALD, *et al.*, *individually and*
*on behalf of others similarly situated*,

                Plaintiffs,

     v.

JOSEPH WILDCAT SR., *et al.*,

                Defendants.

Case No. 3:20-cv-00044 (NKM)

**REDACTED VERSION**

**PLAINTIFFS' OPPOSITION TO THE TRIBAL DEFENDANTS' MOTION TO**
**COMPEL ARBITRATION AND MOTION TO DISMISS FOR LACK OF SUBJECT**
**MATTER JURISDICTION**

      Plaintiffs, by counsel, respectfully submit this Opposition to the Motion to Compel

Arbitration and Stay Claims and Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt.

148) filed by Defendants Joseph Wildcat, John Johnson, George Thompson, Jamie Ann Allen,

Jeffrey Bauman, Sr., William Stone, Sr., Louis St. Germaine, Eric Chapman, Sr., Racquel Bell,

Gloria Cobb, William Graveen, Sarah Pywasit, Jessi Lorenzo, and Nicole Reynolds.

**BACKGROUND**

      Almost every state has enacted usury laws that limit the amount of interest that a lender

can charge on a loan. To evade these laws, payday lenders previously originated high-interest loans

in the names of national banks, which are exempt from state interest-rate caps under the National

Bank Act. *See* 12 U.S.C. § 85. Under these arrangements, a bank would serve as a conduit for the

loans in exchange for a fee, but the payday lender would fund, service, and collect the loans—a

tactic known as "rent-a-bank." When federal regulators began cracking down on rent-a-bank

arrangements, payday lenders developed a solution—they adapted the structure to use Native

American tribal entities as the conduit to ostensibly cloak the loans in tribal sovereign immunity.[1] Hence, this model is often referred to as the tribal lending business model.

This case concerns online loans made to borrowers in Virginia, Maryland, Georgia, and Florida, which imposed triple-digit interest rates exponentially higher than the interest rate caps mandated by those states' laws. One of Mr. Williams' loans, for example, charged an interest rate of 600%, requiring him to pay $2,019.24 in finance charges over a period of 5 months on a $1,000 loan. These unlawfully high interest rates violate federal law, as well as the usury laws of almost every state, which "[f]rom times immemorial," have sought to "protect desperately poor people from the consequences of their own desperation." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013) (citation omitted).

This case has been filed against multiple individuals, including those that oversee and formally control the lending businesses created by the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "LDF" or "Tribe"). One set of those defendants are the LDF's Tribal Council, *i.e.*, its "governing body." (LDF Const., Art. III, § 1).[2] The Tribal Council consists of a President, Vice-President, Secretary, Treasurer, and eight additional at-large members. (LDF Const., Art. III, § 2).[3] Pursuant to the LDF's Constitution and Bylaws, the power and duties of the

---

[1] *See, e.g.*, Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012) (providing background on payday loans and describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance").

[2] Plaintiffs filed a copy of the LDF's Constitution and Bylaws as Exhibit 2 to the Second Amended Complaint. *See* Dkt. 135-2.

[3] The Tribal Officials are Defendants Joseph Wildcat, John Johnson, George Thompson, Jamie Ann Allen, Jeffrey Bauman, Sr., William Stone, Sr., Louis St. Germaine, Eric Chapman, Sr., Racquel Bell, Gloria Cobb, William Graveen, and Sarah Pywasit. Plaintiffs will refer to them collectively as the "Tribal Officials."

Tribal Council include management of "all economic affairs and enterprises of the Tribe," such as its lending businesses. (SAC ¶ 4 (quoting LDF Const., Art. VI(f))).

In 2012 or 2013, the Tribe began openly "looking for ways to leverage (the tribe's) sovereignty" for profit through tribal lending. Cary Spivak, *Lac du Flambeau Chippewa enter payday loan business with eye to online gambling*, (Dec. 29, 2013) (Dkt. 135-1). To facilitate these efforts, the Tribal Council formed LDF Holdings, Inc., which is the parent company for more than a dozen internet lending companies that claim to be owned and operated by the Tribe.[4] (SAC ¶ 5). The LDF Business Development Corporation is the parent company of LDF Holdings, Inc. Although the Tribal Officials have ultimate oversight and responsibility over both entities, they have delegated the day-to-day management over the entities to certain individuals, including Defendants Nicole Chapman-Reynolds and Jessi Phillips Lorenzo, who directly oversaw and managed the Tribe's involvement in the lending scheme. *Id.*

Chapman-Reynolds is the former president of the LDF Business Development Corporation. Lorenzo—one of the pioneers of the tribal lending model—is the president of LDF Holdings, which claims to wholly own and operate the LDF Lending Entities. In reality, the roles of Defendants Chapman and Phillips Lorenzo (the "Tribal Employees") are to serve as liaisons

---

[4] These internet lending companies include: Ningodwaaswi, LLC d/b/a/ Sky Trail Cash; Ishwaaswi, LLC d/b/a RadiantCash; Makwa, LLC d/b/a Makwa Finance; Niizhwaaswi, LLC d/b/a Loan at Last; Niizh, LLC d/b/a Bright Star Cash; Niiwin, LLC, d/b/a Lendgreen; Anong, LLC d/b/a Availblue.com; Niibin, LLC, d/b/a Cash Aisle; Midaaswi, LLC d/b/a/ National Small Loan; Naanan, LLC d/b/a Bear Claw Finance; Mitig, LLC d/b/a MitigCapital and Cashcity; Zagime, LLC d/b/a Blue River Lending; Bridge Lending Solutions; Opichi, LLC d/b/a Evergreen Services; Giizis LLC d/b/a Lakeshore Loans; Waawaatesi LLC, d/b/a Quickhelp Loans; Naanan, LLC d/b/a Stone Lake Lending; Nigig, LLC d/b/a Ubicash; Ziibi, LLC d/b/a zFunds; and Zhaangaswi, LLC d/b/a Nine Torches. Hereafter, these entities will be collectively referred to as the LDF Lending Entities.

between the Tribe and the non-tribal payday lenders, such as Defendants William Pruett and Skytrail Servicing Group, LLC.

The relationship between one tribal entity, Ningodwaaswi, LLC d/b/a Sky Trail Cash ("Ningodwaaswi") and Skytrail Servicing illustrates how these relationships work. Although a tribal lending entity named Ningodwaaswi, LLC d/b/a Sky Trail Cash (hereafter "Ningodwaaswi")[5] was identified as the lender of Plaintiff Maville's loan, it is alleged that the tribal entity was a front for Defendants Skytrail Servicing and Pruett's illegal lending activities. (*See, e.g.*, SAC ¶ 4). ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

Plaintiffs not only allege that Ningodwaaswi is a front for Skytrail Servicing and Pruett's illegal lending activities, but they attached the actual "Servicing Agreement" dated June 18, 2014.[6]

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[5] To avoid confusion, Plaintiff uses the actual entity's name, Ningodwaaswi, rather than the one that closely resembles the name of Defendant Skytrail Servicing.

[6] As detailed in the Second Amended Complaint, use of a purported "servicing agreement" is a hallmark feature of these tribal lending schemes. (*See* SAC ¶¶ 85–96). These contracts are dubiously labeled "servicing agreements" in an effort to support the industry's form over substance argument that the tribal entities are the actual lenders.

[7] On January 10, 2023, the Court granted a motion to seal the Servicing Agreement. Dkt. 137. Accordingly, Plaintiff has redacted any portions of this brief that reference the document, which remains under seal.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

        ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████.

Plaintiffs further allege that all LDF Lending Entities are fronts, and each has contractually relinquished its right to control the operations and receive the profits from these illegal loans. (*See, e.g.*, SAC ¶ 119). Because the LDF Lending Entities *may* be entitled to immunity as arms of the

Tribe, Plaintiffs have sued the Tribal Officials and Tribal Employees in *their official capacities* seeking declaratory relief. Plaintiffs have also sued the Tribal Officials and Tribal Employees in *their individual capacities* for monetary damages for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The monetary damages sought by Plaintiffs are the unlawful amounts paid by each of the Plaintiffs on their illegal loans.

## SUMMARY OF THE ARGUMENT

In the present motion, Defendants seek to dismiss this case on three grounds—none of which are novel. *First*, Defendants seek to compel arbitration of Mr. Williams's, Ms. Singleton's, and Ms. Maville's claims. *Six times*, however, the Fourth Circuit has labeled analogous tribal arbitration contracts a "farce," designed specifically "to avoid state and federal law" and deployed "to game the entire system." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 674–76 (4th Cir. 2016); *see also Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023); *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021); *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. 2020); *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020); *Dillon v. BMO Harris Bank*, 856 F.3d 330 (4th Cir. 2017).

Other courts of appeal have likewise refused to enforce them. *See Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 244 (3d Cir. 2020); *Gingras*, 922 F.3d at 127; *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 232 (3d Cir. 2018). This uniform view comes as no surprise, given that the respective tribal arbitration contracts at issue in these cases were crafted by the same law firms in a "brazen" attempt to avoid federal and state laws. *Hayes*, 811 F.3d at 676.[8]

---

[8] As detailed in the Second Amended Complaint, the Rosette law firm represented many of the tribes willing to engage in these schemes. Discovery in other cases revealed that Rosette brokered many of these partnerships and received a percentage of certain tribe's revenues generated from these schemes. *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461, 2020 WL 6784352, at *4 (E.D. Va. Nov. 18, 2020).

*Second*, Defendants argue that sovereign immunity bars this lawsuit. The Supreme Court, however, has held that "tribal immunity does not bar" a "suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). And as this Court is aware,[9] the Fourth Circuit recently applied this settled principle to other tribal officials involved in a tribal lending scheme, holding that that "substantive state law applies to off-reservation conduct, and although the Tribe itself cannot be sued for its commercial activities, its members and officers can be." *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021) (citation omitted).

Likewise, tribal sovereign immunity is "simply not in play" when a person seeks recovery from a tribal employee in his or her individual capacity—even when the wrongful conduct was within the scope of tribal employment. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017). These are two of the "panoply of tools" recognized by the Supreme Court to "shutter, quickly and permanently" unlawful conduct involving tribes. *Bay Mills*, 572 U.S. at 796.

Despite this controlling precedent, Defendants nonetheless claim that they are entitled to sovereign immunity because "the Tribe is the real party in interest." (Dkt. 149 at 24). This test often arises "in the context of lawsuits against state and federal employees," *Lewis*, 137 S. Ct. at 1290, and seeks to prevent efforts to circumvent sovereign immunity where the relief sought is "nominally against an officer" and truly against the sovereign. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). This test, however, does not apply to claims against government officials *in their official capacity* as they simply stand in the shoes of the government

---

[9] As the Court will recall, certain defendants moved to stay this case pending the Fourth Circuit's decision in *Hengle*, asserting that the "issues before the Fourth Circuit in *Hengle v. Treppa* will have a tremendous impact on, and might even[] dictate the outcome of threshold questions in this case." Dkt. 62 at. 1. Defendants now refuse to accept this decision as controlling law.

entity. It also does not apply to claims against government officials *in their individual capacity* because sovereign immunity "does not erect a barrier against suits to impose individual and personal liability" against government officials. *Lewis*, 581 U.S. at 163 (quoting *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991)). When sued in their personal capacities, officers "'come to court as individuals[,]' and the real party in interest is the individual, not the sovereign." *Lewis*, 581 U.S. at 162–63 (quoting *Hafer*, 502 U.S. at 27). Thus, Plaintiffs' claims track bedrock principles established by the Supreme Court precedent with respect to sovereign immunity. Indeed, they seek *only*: (1) prospective relief against the Tribal Officials *in their official capacity*; and (2) monetary damages against Defendants *in their individual capacities*.

*Third*, Defendants raise three personal immunity defenses: (1) absolute immunity; (2) qualified immunity; and (3) legislative immunity. None of these defenses, however, apply to the claims brought against them in their official capacities. *See, e.g.*, *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006). Similarly, absolute immunity is not available for these type of government officials. *See, e.g., Butz v. Economou*, 438 U.S. 478, 506 (1978). And while qualified immunity and legislative immunity may be asserted by this type of government official in certain situations, none apply here for the extensive reasons explained below.

*Fourth*, Defendants also contend that Plaintiffs lack standing. This argument lacks merit because the RICO claims against Defendants in their individual capacities seek money damages to compensate Plaintiffs for losses suffered in the amounts of monies paid on illegal loans. Pursuant of monetary damages satisfies every element of Article III standing. So does the claims against the Tribal Officials in their official capacities as there is a genuine dispute regarding the enforceability of Plaintiffs' loans, and the Tribal Officials are the appropriate party as they stand in the shoes of the tribal entities as confirmed by the LDF's Constitution.

## ARGUMENT

**I.      The Arbitration Agreements are Unenforceable.**

In the interest of preserving judicial economy, and as permitted by Federal Rule of Civil Procedure 10(c), Plaintiffs Williams, Singleton, Maville adopt and incorporate the arguments submitted by Plaintiff Maville in her the Opposition to the Motion to Compel Arbitration filed by Defendants Skytrail Servicing and Pruett. (*See* Dkt. 152). Because the Tribal Officials, Lorenzo, and Chapman-Reynolds make arguments identical to the other defendants, Plaintiffs will not repeat the extensive briefing on these issues. As explained at length in Plaintiff Maville's briefing, the arbitration agreements are unenforceable because the loan contracts and tribal law: (1) prospectively waive all state claims and defenses; and (2) prospectively waive all federal rights and remedies, including any claims under RICO. Plaintiffs do concede, however, that the Tribal Officials, Lorenzo, and Chapman Reynolds—despite their status as non-signatories—are third party beneficiaries of the arbitration contract because they fall within the definition of employees of the Tribe.

Plaintiffs Lori and Aaron Fitzgerald further note that their loan contracts do not have arbitration clauses. Thus, even if the Court orders the other plaintiffs to arbitrate their claims, there is no dispute that Plaintiffs Lori and Aaron Fitzgerald's claims are not subject to arbitration and should move forward in this Court.

**II.     The Second Amended Complaint Conforms to Supreme Court Precedent Regarding Sovereign Immunity.**

Defendants argue that sovereign immunity bars this lawsuit because "the Tribe is the real party in interest." (Dkt. 149 at 24). This test often arises "in the context of lawsuits against state and federal employees," *Lewis*, 137 S. Ct. at 1290, and seeks to prevent efforts to circumvent sovereign immunity where the relief sought is "nominally against an officer" and truly against the

sovereign. *Pennhurst*, 465 U.S. at 101. Typically, this occurs when a plaintiff seeks monetary damages against a government employee in their official capacity, which would be paid by the state's treasury. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A] plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself."). Because an official-capacity suit for damages would be paid by the government, the "real party in interest is the government entity, not the named official," and sovereign immunity applies. *Lewis*, 137 S. Ct. at 1291.

In this case, Plaintiffs' claims conform to Supreme Court precedent with respect to the "real party in interest" test by seeking *only*: (1) prospective relief against the Tribal Council in their official capacities; and (2) monetary damages against each individual defendant in their individual capacities. Moreover, *Hengle* confirmed that "substantive state law applies to off-reservation conduct, and although the Tribe itself cannot be sued for its commercial activities, its members and officers can be." *Hengle*, 19 F.4th at 349. Thus, "though the tribe itself retains sovereign immunity, it cannot shroud its officials with immunity in federal court when those officials violate applicable state law." *Id.*

A.     *An official capacity suit for prospective relief is permissible as confirmed by the Fourth Circuit's decision in Hengle.*

The Supreme Court has expressly "recognized an important exception" to sovereign immunity, which allows official-capacity suits against government officials so long as they request only injunctive or declaratory relief. *Pennhurst*, 465 U.S. at 102; *see also Kroll v. Bd. of Trustees of Univ. of Illinois*, 934 F.2d 904, 908 (7th Cir. 1991) ("Under an exception to the general rule, however, official-capacity actions may not be barred by the eleventh amendment insofar as they request prospective relief—*i.e.*, an injunction or a declaratory judgment."). This exception was created by "the holding in *Ex parte Young*," where the Supreme Court established that sovereign

immunity "did not prohibit issuance" of an injunction to prevent a state official's violation of federal law. *Pennhurst*, 465 U.S. at 102 (citing *Ex parte Young*, 209 U.S. 123 (1908)). And since it was first created, it has been repeatedly applied[10] and expanded "far beyond its original office in order 'to vindicate the federal interest in assuring the supremacy of federal law.'" *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)).

Most recently, the Supreme Court reaffirmed these principles in *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). In that case, the State of Michigan brought an action to enjoin the Bay Mills Indian Community from operating a casino on land in Michigan. 572 U.S. at 785. The question before the Supreme Court was simple: "whether tribal sovereign immunity" barred "Michigan's suit against Bay Mills for opening a casino outside Indian lands." *Id*. Declining to revisit its prior decisions, the Supreme Court held that "immunity protects Bay Mills" even though the gaming occurred outside of the reservation. *Id*. In doing so, the Supreme Court rejected Michigan's argument that its holding left it without recourse, explaining that "tribal immunity does not bar such a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Id*. (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978)).

The Supreme Court not only expressly stated that "tribal immunity does not bar such a suit for injunctive relief against individuals," but it provided examples of the "panoply of tools"

---

[10] *See, e.g., Graham v. Richardson*, 403 U.S. 365, 370 (1971) (enjoining the Arizona's commissioner of its Department of Public Welfare from enforcement of state welfare laws that violated the Fourteenth Amendment); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (enjoining the New York City's commissioner of Social Services from enforcement of state law terminating welfare benefits without a hearing); *Edelman v. Jordan*, 415 U.S. 651, 667 (1974) (enjoining the Director of Illinois's Department of Public Aid from following state regulations that did not comply with federal time limits).

available to Michigan "to enforce its laws on its own lands." *Id*. One of those tools was denying "a license to Bay Mills for an off-reservation casino." *Id*. (citing Mich. Comp. Laws §§ 432.206–432.206a (2001)). And if the tribe "went ahead anyway," the Supreme Court said that Michigan "could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gaming without a license" in violation of Michigan's gaming laws. *Id*. (citing Mich. Comp. Laws § 432.220).

Following *Bay Mills*, multiple courts have rejected arguments that "sovereign immunity bars" claims against tribal officials "seeking prospective relief to enjoin violations of *state* law," including the Fourth Circuit in *Hengle*. 19 F.4th 324 at 345. There, the Fourth Circuit unequivocally held that "[t]ribal sovereign immunity does not bar state law claims for prospective injunctive relief against tribal officials for conduct occurring off the reservation." *Id*. (citing *Gingras*, 922 F.3d at 120; *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015)). And while Defendants contend that *Hengle's* holding "should not be followed," Dkt. 149 at 28, a district court "must follow binding circuit precedent" even if it disagrees with the decision. *Stinnie v. Holcomb*, 2021 WL 2292807, at *4 (W.D. Va. June 4, 2021) (Moon, J.).

   B.    *The individual is the real party in interest in an individual capacity suit for monetary damages.*

In addition to an official-capacity suit for prospective relief, the Supreme Court has held that government employees may be sued in their individual capacities for monetary damages even when acting within the scope of their employment. *Lewis*, 137 S. Ct. at 1289 (holding that "in a suit brought against a tribal employee in his individual capacity, the employee, not the tribe, is the real party in interest and the tribe's sovereign immunity is not implicated"). The Supreme Court explained "[t]hat the employee was acting within the scope of his employment at the time the tort was committed is not, on its own, sufficient to bar a suit against that employee on the basis of tribal

12

sovereign immunity." *Id*. Instead, the Supreme Court instructed courts to "look to whether *the sovereign is the real party in interest* to determine whether sovereign immunity bars the suit." *Id*. at 1290 (emphasis added).

In determining "whether the sovereign is the real party in interest," the Supreme Court explained that "[t]he distinction between individual-and official-capacity suits is paramount." *Id*. at 1291. As to the former, "the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself." *Id*. "Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." *Id*. (quoting *Hafer*, 502 U.S. at 27). Because the *Lewis* lawsuit sought to impose individual liability upon a tribal employee, albeit for actions taken while acting within the scope of his employment, the Supreme Court concluded that the tribal employee was the "real party in interest" because it was "simply a suit against [the employee] to recover for his personal actions, which 'will not require action by the sovereign or disturb the sovereign's property.'" *Id*. (quoting *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 687 (1949)).

In further explaining its decision, the Supreme Court acknowledged that it was "cognizant of the Supreme Court of Connecticut's concern that plaintiffs not circumvent tribal sovereign immunity." *Id*. at 1291. It explained, however, that in an action against a tribal employee in his individual capacity, "that immunity is simply not in play." *Id.* To hold otherwise, the Supreme Court reasoned, would "extend sovereign immunity for tribal employees beyond what common-law sovereign immunity principles would recognize for either state or federal employees." *Id*. at 1292 (citing *Graham*, 473 U.S. at 167–68). Because the "protections offered by tribal sovereign immunity" should be "no broader than the protection offered by state or federal sovereign immunity," the Supreme Court denied the tribal employee's plea for sovereign immunity. *Id*.

The Supreme Court's decision in *Lewis* accords with its jurisprudence governing the availability of sovereign immunity for state and federal employees. Most notably, in *Hafer*, the Supreme Court rejected the argument that a state official could not be sued in his personal capacity in federal court for actions taken in an "official capacity." 502 U.S. at 29. The Court acknowledged that "imposing personal liability on state officers may hamper their performance of public duties." *Id.* at 31. But "such concerns" were "properly addressed within the framework of [the Court's] personal immunity jurisprudence." *Id.* Therefore, the Court concluded that, to the extent the plaintiffs sought "damages against [the state official] personally," Eleventh Amendment sovereign immunity did "not restrict [the plaintiffs'] ability to sue in federal court." *Id.*

Here, Defendants' sovereign immunity argument is foreclosed by a straightforward application of the Supreme Court's decision in *Lewis*. The Second Amended Complaint makes clear that Plaintiffs seek monetary damages against Defendants *only* in their individual capacities. (*See, e.g.*, SAC at 36 (alleging the § 1962(c) claim against defendants "IN THEIR INDIVIDUAL CAPACITIES ONLY); *id.* at 41 (alleging the § 1962(d) claim against defendants "IN THEIR INDIVIDUAL CAPACITIES ONLY")). If the Plaintiffs are successful on these claims, the Tribe and the tribal entities will not have to pay anything or do anything because Plaintiffs' sole recourse will be collection from the *personal assets* of Defendants.

Ignoring this, Defendants contend that the Tribe is the real party in interest because Plaintiffs seek "a declaration that the loans are invalid," which would "prevent the Tribe from collecting on its loans, thereby invading the Tribe's sovereign and proprietary interests." (Dkt. 149 at 37). This argument, of course, conflates the official-capacity claims with the individual capacity claims. Plaintiffs do not—and cannot—seek any declaratory or injunctive relief under RICO as held by the Fourth Circuit in *Hengle*. 19 F.4th at 356 (holding that RICO "does not authorize

14

private RICO plaintiffs to sue for prospective injunctive relief"). Instead, they have alleged their RICO claims against the Tribal Officials in their individual capacity for monetary damages. And if they are successful on those claims, they will be able to collect from the personal assets of the defendants. A judgment on the RICO claims, in other words, will not require the tribes to do or refrain from doing anything.

Defendants also cite to the district court's decision in *Acres Bonusing, Inc. v. Marston*, No. 19-cv-05418, 2020 WL 1877711, at *7 (N.D. Cal. Apr. 15, 2020), in support of their position that the Tribe is the real party in interest. But the Ninth Circuit reversed that decision and held that tribal sovereign immunity did not bar the action for damages against individual tribal employees and tribal agents in their personal capacities. *Acres Bonusing, Inc v. Marston*, 17 F.4th 901, 905 (9th Cir. 2021), *cert. denied sub nom*. 142 S. Ct. 2836 (2022). The Ninth Circuit explained: "Acres sought money damages from the defendants in their individual capacities. Under *Lewis*[], and our precedents, the Tribe was not the real party in interest and tribal sovereign immunity thus did not preclude this suit." *Id*. So too here.[11]

Defendants cite no authority, rule, or reason why a plaintiff cannot allege *both* individual capacity and official capacity claims in the same case. Here, the Plaintiffs' individual capacity claims for alleged violations of RICO seek nothing more than monetary damages. Defendants

---

[11] Defendants also suggest that *Lewis* is distinguishable because it involved a tribal employee on state land. But nothing in *Lewis* suggests that the location of the activity makes any difference. Nor should it, especially in a case involving a violation of *federal* law. And regardless, *Hengle* makes clear that the conduct at issue in this case—the making and collection of loans— constitutes off-reservation conduct subject to generally applicable state laws, such as Virginia's usury statute. 19 F.4th at 348–49 ("Defendants allegedly marketed their lending businesses throughout the country, including in Virginia, and Plaintiffs resided on non-Indian lands when they applied for their loans online. Defendants allegedly collected loan payments from Plaintiffs while they resided in Virginia from bank accounts maintained there, and the effects of Defendants' allegedly illegal activities were felt by Plaintiffs in Virginia.").

cannot obtain dismissal of these claims by pointing to the relief sought by the other claims alleged against them in their official capacity claims.

### C.    Indirect impacts on the Tribe's treasury does not make it the real party in interest.

Defendants argue that the Tribe is the real party in interest because it may be indirectly impacted by a judgment against its employees. (Dkt. 149 at 37). This argument is similarly foreclosed by *Lewis*, where the tribal employee argued that the tribe was "the real party in interest" because tribal law required the tribe to indemnify him for any adverse judgment. 137 S. Ct. at 1292. Rejecting this argument, the Supreme Court explained that the real party test turns "on where the potential legal liability lay, not from whence the money to pay the damages award ultimately came." *Id*. The Supreme Court further added that "the critical inquiry is who may be legally bound by the court's adverse judgment, not who will ultimately pick up the tab." *Id*. Here, the potential legal liability lies: (1) against all Defendants in their individual capacity for monetary damages; and (2) against the Tribal Council in their official capacities for prospective relief. This is exactly what is permitted by *Ex Parte Young*, *Bay Mills*, *Lewis*, and *Hengle*.

Defendants further argue that the Tribe is the real party in interest because Plaintiffs cannot proceed without the Tribe's involvement in discovery. (Dkt. 149 at 3). This argument fails for several reasons. *First*, even if this case does not ultimately proceed as a class action, Plaintiffs have sufficiently alleged claims against Defendants, and they already possess the necessary evidence to support those claims, *i.e.*, the amounts paid on their loans.[12] *Second*, even assuming that the tribal

---

[12] Although the Tribal Officials did not receive the payments, they have joint and several liability as members of the enterprise. *See, e.g., States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) ("Every circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations.");

entity is entitled to immunity,[13] the "the doctrine of sovereign immunity is inapplicable" to a third-party subpoena. *Arista Records LLC v. Does 1-14*, No. 7:08-cv-205, 2008 WL 5350246, at *3 (W.D. Va. Dec. 22, 2008) (overruling a state university's objection to a subpoena despite the court's assumption that it was "an arm of the state for Eleventh Amendment purposes");[14] *see also United States v. Juvenile Male 1*, 431 F. Supp. 2d 1012, 1016 (D. Ariz. 2006) ("The service of a federal subpoena on an employee of an entity of a tribe is neither a suit, nor one against a tribe.").

*Third*, even if this Court were to determine that the doctrine of sovereign immunity applied to a third-party subpoena, there is no derivative sovereign immunity for third parties that possess tribal documents. *Miccosukee Tribe of Indians of Florida v. United* States, 698 F.3d 1326, 1330 (11th Cir. 2012) ("The Tribe voluntarily disclosed its confidential financial information to third-party financial institutions before these summonses were issued. After disclosure, that information became the property of the third parties."); *accord EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 203–55 (2d Cir. 2012) (finding Argentina's sovereign immunity not infringed by subpoenas to third-party banks seeking information regarding Argentina's assets). Plaintiffs, thus, could obtain information about the class members' loan histories from other parties, such as Skytrail

---

[13] Plaintiffs do not concede that the tribal entities are immune as this case presents far different facts from those considered by the Fourth Circuit in *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019).

[14] Courts routinely hold that state must respond to discovery requests, including subpoenas, issued by federal courts. *See, e.g.*, *In re Mo. Dep't of Natural Res.*, 105 F.3d 434, 436 (8th Cir. 1997) ("There is simply no authority for the position that the Eleventh Amendment shields government entities from discovery in federal court."); *Allen v. Woodford*, 544 F. Supp. 2d 1074, 1078–79 (E.D. Cal. 2008) (concluding that "issuance and required compliance with a third-party subpoena by State custodians of records in an action in which the State is not a party" does not constitute "any suit in law or equity" within the meaning of the Eleventh Amendment, and thus that "the Eleventh Amendment does not apply to preclude discovery from a State agency"); *United States v. University of Mass., Worcester*, 167 F. Supp. 3d 221 (D. Mass. 2016) (same).

Servicing and Pruett, who have that information.

In short, sovereign immunity "does not erect a barrier against suits to impose individual and personal liability" against government officials. *Lewis*, 581 U.S. at 163 (quoting *Hafer*, 502 U.S. at 30–31). When sued in their personal capacities, officers "'come to court as individuals[,]' and the real party in interest is the individual, not the sovereign." *Lewis*, 581 U.S. at 162–63 (quoting *Hafer*, 502 U.S. at 27). Plaintiffs have thus followed the Supreme Court's sovereign immunity decisions with respect to the "real party in interest" test by seeking *only*: (1) prospective relief against the Tribal Officials in their official capacities; and (2) monetary damages against them in their individual capacities.

## III.   None of Defendants' Personal Immunity Defenses Warrant Dismissal.

Although a sovereign immunity defense is unavailable to officials sued in their individual capacity, *Lewis* teaches that an "officer in an individual-capacity action, on the other hand, may be able to assert *personal* immunity defenses, such as, for example, absolute prosecutorial immunity in certain circumstances." *Lewis*, 581 U.S. at 163 (emphasis in original) (citing *Van de Kamp v. Goldstein*, 555 U.S. 335, 342–44 (2009)). Here, Defendants raise three personal immunity defenses: (1) absolute immunity; (2) qualified immunity; and (3) legislative immunity. For the reasons explained below, none of these defenses are available under the facts of this case.

### A.   *Absolute immunity is not available to the Tribal Officials.*

It is well established that "all individuals, whatever their position in government, are subject to federal law." *Butz v. Economou*, 438 U.S. 478, 506 (1978) (citing *United States v. Lee*, 106 U.S. 196, 220 (1882) ("All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it."). Following this principle, the Supreme Court has held that "federal executive officials exercising discretion are entitled to only" to "qualified immunity" unless there are "exceptional situations where it is demonstrated that absolute immunity

18

is essential for the conduct of the public business." seeking *Id*. at 506. This means that "qualified immunity from damages liability should be the general rule for executive officials" unless their "special functions require a full exemption." *Id*. at 508.

To obtain the protection of absolute immunity, the officials "bear the burden of showing that public policy requires an exemption of that scope." *Id.* at 506. Moreover, "courts are obliged to apply absolute immunity sparingly, because '[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.'" *Goldstein v. Moatz*, 364 F.3d 205, 212 (4th Cir. 2004) (quoting *Burns v. Reed*, 500 U.S. 478, 486–87 (1991)).

Here, the Tribal Officials come nowhere close to satisfying their burden to show that public policy requires an exemption to the general rule that qualified—rather than absolute—immunity is sufficient to protect government officials. Instead, the Tribal Officials offer a single sentence justification: "Any actions Tribal Council Defendants would have taken, such as voting to approve the lending subsidiaries creation or passing ordinances legalizing lending operations on the Tribe's Reservation, would be deemed 'conduct of public business,' shielding the Tribal Defendants from any suit related to those actions." (Dkt. 149 at 43 (citing and quoting *Butz*, 438 U.S. at 507)). This single sentence argument fails to satisfy their burden.

The Tribal Officials also fail to provide any authority for their position that absolute immunity extends to a government official engaged in purely commercial (and illegal) activities. This is no surprise because absolute immunity has been extended in very limited circumstances, including to (1) the President of the United States; (2) judges acting in their judicial capacity; and (3) prosecutors. *Nixon v. Fitzgerald*, 457 U.S. 731, 747 (1982) (explaining the limited situations where absolute immunity has been applied); *see also Stump v. Sparkman*, 435 U.S. 349 (1978)

(affording absolute immunity to judges for judicial functions). Indeed, the Supreme Court has expressly rejected attempts to extend blanket immunity to high-ranking executives like "governors and cabinet officers." *Nixon*, 457 U.S. at 750 (citing *Butz*, 438 U.S. at 478; *Scheuer v. Rhodes*, 416 U.S. 232 (1974)).

The Tribal Officials' argument fails for two other reasons. First, the Second Amended Complaint does not merely allege that the Tribal Official voted to approve the creation of the entities or passed ordinances. Instead, the Second Amended Complaint alleges that the Tribal Officials oversee and have ultimately responsibility over the actions of these *commercial* enterprises engaging in illegal loans throughout the country. In support of this assertion, Plaintiffs attached the LDF's Constitution and Bylaws, which establish that the tribal council has the power and duty to "manage all economic affairs and enterprises of the Tribe." (*See* LDF Const., Art. VI(f)). The Second Amended Complaint further alleges that the Tribal Officials meet twice a month to review, perform, and implement high-level management of the commercial enterprises including but not limited to: approval of the creation of the entities and approval of "servicing agreements" or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members. (SAC ¶ 18). Thus, contrary to the Tribal Officials' assertions, this is not a case about the mere approval of an entity or the passing of an otherwise generally applicable ordinance.

Second, the acts performed by the Tribal Officials are contrary to public policy as recognized by *Hengle* and other cases. As the Supreme Court has held and consistently reaffirmed: "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973) (citing *Puyallup Tribe*

*v. Department of Game*, 391 U.S. 392, 398 (1968)). Based on these principles, the Fourth Circuit refused to enforce tribal choice of law clauses because they violated "Virginia's compelling public policy against unregulated usurious lending." *Hengle*, 19 F.4th at 352. While acknowledging "that contractual choice-of-law clauses should be enforced absent unusual circumstances," the Fourth Circuit found that "the circumstances here—unregulated usurious lending of low-dollar short-term loans at triple-digit interest rates to Virginia borrowers—unquestionably 'shocks . . . one's sense of right' in view of Virginia law." *Id*. (emphasis added) (citation omitted). From these principles, it naturally flows that public policy considerations should not protect the individuals responsible for the creation, oversight, and ongoing activities of tribal entities—especially those being used as front for non-tribal outsiders offering 700% loans in violation of state laws.

B.     *The Tribal Officials are not entitled to qualified immunity.*

The Tribal Officials also contend that they are entitled to qualified immunity. (Dkt. 149 at 43–44). Qualified immunity "is an affirmative defense, and the burden of pleading it 'rests with the defendant.'" *Ripath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 305 (4th Cir. 2006) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Here, the Tribal Officials attempt to satisfy their burden with a conclusory, four sentence paragraph that provides:

> Here, Plaintiffs sued the Tribal Council Defendants in connection with discretionary actions they took to establish consumer lending on the Reservation. These actions did not violate a clearly established statutory or constitutional right when the actions occurred. In fact, there is and was no federal usury law that bars tribal lending at the time the Tribal Council Defendants voted to legalize online consumer lending on the Reservation. And, it still remains undecided in the courts whether tribal lending entities originating loans on reservation land and through the internet, are required to comply with state's usury and license laws.

(Dkt. 149 at 44).[15]

_____

[15] It is unclear from the Tribal Officials' briefing whether they seek qualified immunity for claims brought against them in their official capacities. If they do, the Court should swiftly reject that

As a threshold matter, the Tribal Officials' qualified immunity defense should be deferred to another day because it fails "to provide any explanation as to how or why qualified immunity might apply." *Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000); *see also McVey v. Stacy*, 157 F.3d 271, 273–74 (4th Cir. 1998) (affirming the district court's deferral of the question of qualified immunity to allow for further development of the factual record); *Roncales v. Cty. of Henrico*, No. 3:19-cv-234, 2020 WL 1545883, at *12 (E.D. Va. Mar. 31, 2020) ("Although [officials] may yet possess a claim of qualified immunity in their individual capacities, the Court cannot conclusively reach that finding at this stage of the litigation. What the individual Defendants did here may be better explained through discovery") (citing *DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir. 1995)); *Flanagan v. Pittsylvania Cnty., Virginia*, 2020 WL 2754754, at *7 (W.D. Va. May 27, 2020) (same).

Deferral is particularly appropriate here because the Tribal Officials' qualified immunity defense revolves around a mischaracterization of the facts. More specifically, the Tribal Officials claim that they are entitled to immunity for actions taken "to establish consumer lending," including for voting "to legalize online consumer lending." But as explained above, the Second Amended Complaint alleges far more than one-time misconduct for approving the creation of the entities or passed ordinances. Instead, the Second Amended Complaint alleges that the Tribal Officials oversee and have ultimately responsibility over the actions of these *commercial*

---

request.  *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) ("Qualified immunity may be invoked by a government official sued in his personal, or individual, capacity. This defense is not available in an official-capacity suit brought against a government entity or a government officer as that entity's agent." (internal citation omitted)). Accordingly, Plaintiffs' response focuses on their RICO claims against the officials in their individual capacities.

enterprises engaging in illegal loans throughout the country. And the LDF's Constitution—which is attached to the Second Amended Complaint—confirms this much.

In addition to ignoring the allegations, the Tribal Officials offer a puzzling, one-sentence justification for why they should be able to escape liability for their repeated and *ongoing* violations of RICO. In their view, the unlawfulness of their conduct cannot be clearly established because "it *still remains* undecided in the courts whether tribal lending entities originating loans on reservation land and through the internet, are required to comply with state's usury and license laws." (Dkt. 149 at 44 (emphasis added)). The Court should reject this theory because it defies the Fourth Circuit's holdings in *Hengle*, as well as a litany of cases establishing that: (1) tribes must comply with generally applicable state laws; (2) internet loans constitute off-the-reservation activity subject to state law; and (3) these loans thus clearly violate the law, including RICO's prohibition of the collection of unlawful debt.

To begin, it is clearly established that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973) (citing *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398 (1968)); *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) ("Unless federal law provides differently, 'Indians going beyond reservation boundaries' are subject to any generally applicable state law." (quoting *Mescalero*, 411 U.S. at 148–49)); *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 113 (2005) (reaffirming this principle from *Mescalero Apache Tribe*); *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465 (1995) (same); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144, n.11 (1980) (same); *Organized Village of Kake v. Egan*, 369 U.S. 60, 75–76 (1962); *Tulee v. Washington*, 315 U.S. 681, 683 (1942); *Shaw v. Gibson-*

*Zahniser Oil Corp.*, 276 U.S. 575 (1928); *Ward v. Race Horse*, 163 U.S. 504 (1896)). This has been bedrock precedent from the Supreme Court for more than 100 years.

It is also clearly established that the conduct at issue in this case—the making and collection of illegal loans over the internet—constitutes off-the-reservation activity subject to state law (and, thus, RICO's prohibition against the collection of unlawful debt). As the *Hengle* court explained, those defendants "marketed their lending business throughout the country," the plaintiffs "resided on non-Indian lands when they applied for their loans online," and the collection efforts occur on non-Indian lands. 19 F.4th at 348. Such "activities are 'directly analogous to the lending activity that other courts have found to *clearly* constitute off-reservation conduct subject to nondiscriminatory state regulation." *Id*. at 348–49 (emphasis added) (quoting *Hengle*, 433 F. Supp. 3d at 876; and citing *Gingras*, 922 F.3d at 121 (finding that tribal officials "engaged in conduct outside of Indian lands when they extended loans to the Plaintiffs in Vermont."); *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin*. Servs., 974 F. Supp. 2d 353, 360–61 (S.D.N.Y. 2013); *Colorado v. W. Sky Fin., LLC*, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011); *United States v. Hallinan*, NO. 16-cr-130, 2016 WL 7477767, at *1 n.2 (E.D. Pa. Dec. 29, 2016). Like the defendants in *Hengle*, the Tribal Officials have not cited "any court reaching a contrary conclusion." *Id*. at 348–49.[16]

---

[16] In making this point, the Fourth Circuit cited cases using the Latin phrase "e.g.," meaning it was not intended to be exhaustive. *See Hengle*, 19 F.4th at 349. Countless other decisions provided the Tribal Officials with ample notice that their conduct constitutes off-the-reservation activity subject to state law. *See, e.g.*, *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 782 (7th Cir. 2014) ("Plaintiffs have not engaged in *any* activities inside the reservation. They did not enter the reservation to apply for the loans, negotiate the loans, or execute loan documents. They applied for loans in Illinois by accessing a website. They made payments on the loans and paid the financing charges from Illinois. Because the Plaintiffs' activities do not implicate the sovereignty of the tribe over its land and its concomitant authority to regulate the activity of nonmembers on that land"); *Inetianbor v. Cashcall, Inc.*, 2016 WL 4702370, at *7 (S.D. Fla. Aug. 18, 2016) (quoting and following *Jackson*); *MacDonald v. CashCall, Inc*, 2017 WL 1536427, at *8 (D.N.J. Apr. 28, 2017)

In addition to these federal cases, a decision from the Supreme Court of Georgia *unquestionably* establishes that the Tribal Officials have and continue to violate the rights of Georgia borrowers, such as Plaintiff Williams. *See W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016). In that case, the court held that tribal affiliated loans offered over the internet were subject to Georgia's usury laws. *Id*. The court noted that there was no prohibition from enforcement of its laws "against persons and entities whose activities cross the reservation boundary into this State, as do the activities at issue in this case." *Id*. at 348. The court further added that the defendants offered and made usurious loans "to Georgia borrowers by use of interstate commerce, and the record reflects no evidence or assertion that any Georgia borrowers travelled outside Georgia for any reason related to the application, funding, or repayments of loans Defendants made to them." *Id*.

The Tribal Officials' motion ignores this long line of cases clearly establishing that generally applicable state laws apply to tribes, their entities, and employees, including state laws related to usury. They also ignore a long line of similar cases finding that similar misconduct

_____

(quoting and following *Jackson*); *State ex rel. Suthers v. Cash Advance & Preferred Cash Loans*, 205 P.3d 389, 400–01 (Colo. App. 2008) (finding that operating a tribal internet lending business constituted off-reservation conduct because the evidence showed that the contracts "were entered into and negotiated in Colorado; the loans are delivered to consumers in Colorado; and performance will occur in Colorado because consumers will repay the principal and pay interest" in Colorado). Similar results have been applied with equal force to non-tribal internet lenders as well. *See, e.g.*, *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1304 (10th Cir. 2008) (finding that usury statutes regulated in-state activity where Utah-based lender made loans over the internet to residents in Kansas); *State ex rel. Swanson v. Integrity Advance, LLC*, 846 N.W.2d 435, 442 (Minn. Ct. App. 2014) (holding that "extension of payday loans to Minnesota residents did not occur wholly outside Minnesota's borders" thereby requiring online lender from Utah to comply with lending statutes); *Kaneff v. Delaware Title Loans, Inc.*, 587 F.3d 616, 623 (3d Cir. 2009) ("[I]t is well settled in constitutional law that the regulation of interest rates is a subject within the police power of the state particularly when it comes to cases involving small loans, which profoundly affect the social life of the community." (quoting *Pennsylvania Department of Banking v. NCAS of Delaware, LLC*, 596 Pa. 638, 1038 (2008))).

violates RICO, including government enforcement actions, class actions,[17] and criminal convictions against multiple individuals who were sentenced to prison for their roles in these schemes. For example, the Third Circuit recently affirmed the criminal convictions of Charles Hallinan and Wheeler Neff, whose "RICO convictions" were "based on their efforts to skirt state usury laws by partnering with American Indian tribes to offer usurious payday loans." *United States v. Neff*, 787 F. App'x 81, 85 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2674 (2020). Rejecting the defendant's argument about the legality of the tribal loans, the Third Circuit explained: "Tribal sovereign immunity thus limits how states can enforce their laws against tribes or arms of tribes, but, contrary to Neff's understanding, *it does not transfigure debts that are otherwise unlawful under RICO into lawful ones.*" *Id.* at 92 (emphasis added).

These cases all have provided sufficient notice to the Tribal Officials that their past and ongoing conduct violates RICO. Considering these decisions, the Tribal Officials should have ceased allowing the tribal entities to lend in many states, especially Virginia, Georgia, Florida, and Maryland. They also should have ceased and prohibited all collection efforts on these loans, which clearly violate RICO's prohibition against the collection of unlawful debt. Because they have and

---

[17] Over the past five years, the United States District Court for the Eastern District of Virginia alone has considered multiple tribal lending cases, including class actions that have returned more than $150 million dollars to consumers and cancelled more than $1 billion in loans. *Turner v. Zest Finance, Inc.*, No. 3:19-cv-293, Dkt. 114 (E.D. Va. June 30, 2020) (final order approving settlement providing $18.5 million in cash and $170 million in debt relief to borrowers); *Galloway v. Williams*, No. 3:19-cv-470, 2020 WL 7482191, at *1 (E.D. Va. Dec. 18, 2020) (approving settlement providing $8.7 million in cash and over $100 million dollars in debt relief for over 300,000 consumers); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Dkt. 141 (E.D. Va. Dec. 13, 2019) (order granting final approval of $60 million settlement and more than $380 million dollars in debt relief to consumers); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-789, Dkt. 95 (E.D. Va. Mar. 29, 2021) (order granting preliminary approval of a $50.5 million dollar fund and $380 million dollars in debt relief); *Hengle v. Asner*, No. 3:19-cv-250, Dkt. 230 (E.D. Va. Oct. 25, 2022) (order granting final approval of a settlement compromised of $39 million dollars and $450 million dollars in debt relief).

*continue* to engage in clearly unlawful conduct, the Court should deny their request for qualified immunity. This is especially true where, as here, the qualified immunity defense is raised at the motion to dismiss stage and amounts to nothing more than a conclusory and erroneous assertion that "it still remains undecided in the courts whether tribal lending entities originating loans on reservation land and through the internet, are required to comply with state's usury and license laws." (Dkt. 149 at 44).

      C.    *Oversight and management of a commercial lending enterprises is not a legislative action entitled to legislative immunity.*

It is well settled that "[m]embers of local governing bodies are entitled to absolute legislative immunity from claims against them arising from their actions in a 'legislative capacity.'" *Roberson v. Mullins*, 29 F.3d 132, 134 (4th Cir. 1994) (quoting *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal*, 865 F.2d 77, 79 (4th Cir.1989); *Bruce v. Riddle*, 631 F.2d 272, 279 (4th Cir. 1980)). "Legislative immunity does not automatically attach whenever a defendant claims the title of 'legislator,' but rather when the action taken qualifies as 'legislative.'" *Stokes v. Benham*, No. 3:14–cv–536, 2015 WL 4139274, at *3 (E.D. Va. July 8, 2015) (quoting *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 484 (4th Cir. 2014)), *aff'd*, 626 F. App'x 431 (4th Cir. 2015).

An official in "a local governing body only acts in a legislative capacity when it engages in the process of 'adopt[ing] prospective, legislative-type rules." *Roberson*, 29 F.3d at 135 (quoting *Front Royal*, 865 F.2d at 79). For this reason, the Fourth Circuit routinely reject claims of legislative immunity when the actions taken by a person are unrelated to the process of adopting legislative rules. S*ee, e.g., Roberson*, 29 F.3d at 135 (holding that county board of supervisors and board members were not entitled to legislative immunity for civil rights suit arising out of termination of former employee); *Front Royal*, 865 F.2d at 79 (holding that two officials were not

entitled to legislative immunity for civil rights suit arising from the alleged failure to provide sewer service); *Scott v. Greenville Cnty.*, 716 F.2d 1409 (4th Cir. 1983) (holding that county council members were not entitled to legislative immunity arising from the alleged wrongful withholding of a building permit); *cf. Allen v. Cooper*, 895 F.3d 337, 358 (4th Cir. 2018) (granting legislative immunity to officials because the "only actual conduct alleged" involved introducing, lobbying, and passing a bill).

Defendants' legislative immunity defense is nothing more than a single sentence, conclusory statement that: "Essentially, Plaintiffs' claims are that the elected Tribal Council Defendants enacted Tribal laws and created tribal lending businesses, and that those businesses caused the alleged harm to Plaintiffs." (Dkt. 149 at 46). Here again, Defendants simply mischaracterize the Second Amended Complaint, which alleges that the Tribal Officials oversee and have ultimately responsibility over the actions of these *commercial* enterprises engaging in illegal loans throughout the country. In support of this assertion, Plaintiffs attached the LDF's Constitution and Bylaws, which establish that the tribal council has the power and duty to "manage all economic affairs and enterprises of the Tribe." (*See* LDF Const., Art. VI(f)). The Second Amended Complaint further alleges that the Tribal Officials perform these duties, including meeting twice a month to review, perform, and implement high-level management of the commercial enterprises. (SAC ¶ 18). Thus, contrary to the Tribal Officials' assertions, this is not a case about the mere approval of a legislation. Rather, it is about their ongoing management and oversight of commercial entities, which is conduct purely outside of any legislative function. *See, e.g.*, *Supreme Ct. of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 734 (1980) (explaining that "If the sole basis" for the action against the court and its chief judge "were the

issuance of, or failure to amend, the challenged rules, legislative immunity would foreclose the suit," but allowing the action because the court performed "more than a legislative role" ).

Even if the Court disagrees with Plaintiffs on this first point, it only matters as to the claims against the Tribal Officials *in their individual capacities*. As the Supreme Court has explained, proper application of a public officials' immunity and liability "requires careful adherence to the distinction between person—and official-capacity action suits." *Graham*, 473 U.S. at 165. An "official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," such as Ningodwaaswi. *Id*. at 166. "When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses," such as absolute or qualified immunity. *Id*. (gathering cases). But "[i]n an official-capacity action, these [personal immunity] defenses are unavailable." *Id*. at 167. The "*only* immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, qua entity, may possess[.]" *Id*. (emphasis added).

Plaintiffs recognize that several out-of-circuit opinions have held that legislative immunity bars an official capacity lawsuit. Other courts have explained why these decisions are wrong. *Fuller v. Acklman*, 616 F. Supp. 2d 1307, 1309, n.3 (N.D. Ga. 2009). Because *Graham* makes clear that the "only immunities" that "can be claimed in an official-capacity action are forms of sovereign immunity," a straightforward application of *Graham* controls on this issue. Moreover, the Tribal Officials' position would effectively gut the Fourth Circuit's decision in *Hengle*, which held that "substantive state law applies to off-reservation conduct, and although the Tribe itself cannot be sued for its commercial activities, its members and officers can be." *Hengle*, 19 F.4th at 349. Put differently, a tribe "cannot shroud its officials with immunity in federal court when those officials violate applicable state law." *Id*.

In sum, the Tribal Defendants' management and oversight of commercial lending enterprises is not a legislative action entitled to legislative immunity.

## IV.   Plaintiffs Have Standing to Pursue Their Claims.

Standing is a threshold jurisdictional injury, and to establish standing, a plaintiff must demonstrate that she has '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable decision.'" *Antunes v. Rector & Visitors of Univ. of Va.*, No. 3:21-cv-00042, 2022 WL 4213031, at *3 (W.D. Va. Sept. 12, 2022) (Moon, J.) (quoting *Spokeo v. Robins*, 578 U.S. 330, 338 (2016)).

Defendants tersely argue that Plaintiffs lack standing here because the alleged injuries are not: (1) traceable; or (2) redressable. Both arguments fail.

### A.   *Overview of Plaintiffs' claims*

Before responding to Defendants' standing arguments, Plaintiffs note again that they assert claims against Defendants in both their individual and official capacities. The claims against Defendants in their individual capacities seek money damages to compensate Plaintiffs for losses suffered in the amounts of monies paid on illegal loans. (*See* SAC ¶¶ 157, 159, 161, 163, 165, 169, 178, 183, 185, 187, 193) (detailing the unlawful amounts paid by each plaintiff). Those injuries were caused by and are traceable to Defendants' involvement in the illegal lending scheme. *See, e.g., Gibbs v. Elevate Credit, Inc.*, No. 3:20-cv-632, 2021 WL 4851066 (E.D. Va. Oct. 17, 2021) (finding that the plaintiffs established a "direct line of causation" based on allegations that a third-party company "facilitated Think Finance's usurious loan program by providing it with essential employees and data"); *Solomon v. Am. Web Loan*, 2019 WL 1320790, at *11 (E.D. Va. Mar. 20, 2019) (finding allegations against a private equity fund and its owners satisfied the proximate cause requirement because their actions "serve as a direct and foreseeable cause" of the injuries because "Plaintiffs would not have been subjected to the allegedly usurious loans" if the financier

"did not incentivize the profitability of those loans"); *Duggan v. Martorello*, 2022 WL 952183, at

*22 (D. Mass. Mar. 30, 2022) (explaining that proximate cause was satisfied because plaintiff "and

other consumers who made payments on the loans" obtained from tribal lending entities "were the

direct victims" of the individual's actions"); *Smith v. Martorello*, 2021 WL 1257941, at *20 (D.

Or. Jan. 5, 2021) (finding borrowers had standing and causation was established because the

plaintiff "sufficiently pleaded" that an individual was "intimately involved in creating" two tribal

entities and operating the scheme); *Gingras v. Rosette*, 2016 WL 2932163, at *29 (D. Vt. May 18,

2016) (finding "a sufficiently direct relationship to satisfy proximate cause" because "the conduct

at issue included the alleged marketing and collection of usurious interest rates," and the "injury

is the alleged payment of interest at excessive rates"). And without question, these injuries can be

redressed by a money judgment. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801–02 (2021)

(noting that even a request for nominal damages satisfies the redressability element necessary for

Article III standing where a plaintiff's claim is based on a completed violation of a legal right).

As to the claims against Defendants in their official capacities, they seek prospective relief

in the form of: (1) "a declaratory judgment that the loan agreements are invalid and the loans are

uncollectable," and (2) an injunction prohibiting "collection on the loans." (SAC ¶ 245). Multiple

cases have recognized the viability of such claims in similar context. *Hengle*, 433 F. Supp. 3d at

889 (finding plaintiffs had standing to seek declaratory relief); *Duggan*, 596 F. Supp. 3d at 188

(denying motion to dismiss declaratory judgment claim that tribal loan provisions are void and

unenforceable because the motion demonstrated "the existence of a controversy between the

parties"); *Smith*, 2021 WL 1257941, at *23 (denying motion to dismiss declaratory judgment claim

and rejecting contention that individual "lacks any authority to modify lending activities"). Indeed,

as the district court explained in *Hengle*, even borrowers who have paid their loans "have standing

to seek a declaratory judgment that their loans are void . . . because the avoidance of their loans has a likelihood of redressing at least some of the harm from the loans issued to them, including allowing the Paid-Off Plaintiffs to remove the loans from their credit histories." *Hengle*, 433 F. Supp. 3d at 889.

Outside the tribal lending context, it is also well established a party may seek a declaratory judgment to determine their rights with respect to a contract. For example, the Supreme Court has found that there was a sufficient case and controversy where a party sought a declaratory judgment that a patent licensing agreement was "invalid, unenforceable, or not infringed." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 137 (2007). By way of another example, the Fourth Circuit has acknowledged that an actual controversy existed when "a plaintiff seeks declaratory relief in order to avoid the accrual of potential damages for past actions," such as the breach of a dealership agreement. *Volvo Const.*, 386 F.3d at 593; *see also United Capital Ins. Co. v. Kapiloff*, 155 F.3d 488, 494 (4th Cir. 1998) ("It is well established that a declaration of parties' rights under an insurance policy is an appropriate use of the declaratory judgment mechanism."). District courts have also routinely considered declaratory judgments where there was a controversy over rights and obligations contemplated by the parties' contract. *Kersey v. PHH Mortg. Corp.*, 682 F. Supp. 2d 588, 595 (E.D. Va. 2010) ("The parties' contract gives rise to the Plaintiff's claim, and the Declaratory Judgment Act provides an avenue through which the Court can hear the Plaintiff's controversy related to the rights and obligations contemplated by the parties' contract."), *vacated on other grounds*, 2010 WL 3222262 (E.D. Va. Aug. 13, 2010); *Harleysville Ins. Co. v. Holding Funeral Home, Inc.*, 2016 WL 4703755, at *4 (W.D. Va. Sept. 8, 2016) (finding complaint stated a claim for declaratory judgment to clarify obligations under insurance contract).

Here, aside from the monetary damages, Plaintiffs seek a declaratory judgment that their contracts are void and unenforceable under state law. Absent declaratory relief, Plaintiffs will be subject to ongoing collection of the illegal loans, which have unlawful interest rates as high as 700%. Such a debt—arising from an illegal loan—could easily subject a low-income borrower to a lifetime of ongoing collection and other negative consequences, such as derogatory credit reporting. Until the amounts are repaid or a court orders otherwise, the LDF Lending Entities will continue to impose their finance charges and attempt to collect the illegal amounts, which they believe are lawful. Because of this, Plaintiffs have standing for the prospective relief requested.

> B.   *Defendants' conduct need not be the sole cause of Plaintiffs' injuries for Plaintiffs to have standing.*

Defendants contend that Plaintiffs' injuries are not "fairly traceable" to Defendants because it was not Defendants who "directly issued" the illegal loans to Plaintiffs. (Dkt. 149 at 38). Defendants suggest that the allegations against them—that is, "voting to enact certain Tribal laws and voting to create tribal lending businesses"—are "too attenuated" to support a finding of causation. (*Id.* at 39). Put differently, Defendants admit that their actions were a but-for cause of Plaintiffs' injuries, but they argue that Plaintiffs cannot sue them because other parties (*e.g.*, the lender) were purportedly *more responsible*. A standing analysis—in a RICO case especially—does not limit redress to suing the must culpable defendant.

Indeed, "the causation element of standing does not require the challenged action to be the sole or even the immediate cause of the injury." *Seaman v. Virginia*, 593 F. Supp. 3d 293, 313 (W.D. Va. 2022) (Moon, J.) (quoting *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018)), *appeal dismissed*, No. 22-1455, 2022 WL 15798679 (4th Cir. Aug. 24, 2022). The concern is simply whether Plaintiffs can "demonstrate that the alleged harm was caused by [Defendants], as opposed to the *independent action* of some third party not before the court." *Id.*

(emphasis added) (quoting *Disability Rights of S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022)); *see also Bennett v. Spear*, 520 U.S. 154, 169, (1997) ("While, as we have said, it does not suffice if the injury complained of is the result of the *independent* action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." (citations omitted) (cleaned up)).

Here, Plaintiffs allege that Defendants knowingly participated in a scheme through which Plaintiffs were issued illegal loans. While the lender may have issued the precise illegal loans at issue, the Tribal Defendants manage, oversee, and supervise the operations of the business that caused Plaintiffs' injuries. In other words, it was not the lender's *independent* action that caused Plaintiffs' injuries—Defendants were a cause even if they were not *the sole* cause. Moreover, because the Second Amended Complaint alleges a conspiracy, the actions of other parties can be imputed to Defendants themselves. Regardless, because Defendants cannot hide behind the lender's more immediate responsibility to disclaim their own causal contributions to Plaintiffs' injuries, Plaintiffs plausibly allege traceability.

    C.    *Plaintiffs request for injunctive relief is related to their injuries and is redressable.*

Defendants also argue that Plaintiffs' injuries are not redressable by injunctive relief because the "alleged injuries cannot be redressed *by the Tribal Defendants*." (Dkt. 149 at 39 (emphasis added)). Defendants specifically argue that Defendant Lorenzo and Defendant Reynolds are "no longer employed by the Tribe" and that, in any event, Tribal Council members cannot be enjoined collectively. (*Id*).[18] Similarly, Defendants argue that, because of their inability to void the loans, "the injunction would have no effect." (*Id.* at 40).

---

[18] The Second Amended Complaint does not seek prospective relief against Defendants Lorenzo and Reynolds. Thus, this argument immediately fails.

At the outset, Defendants ignore that Plaintiffs seek relief for financial injury suffered in addition to injunctive relief. Plaintiffs satisfy the redressability on that remedy alone. In any event, the redressability inquiry pertains not to whether Defendants are ultimately capable of complying with this Court's order (as Defendants claim they are not vis-à-vis injunctive relief) but to whether the requested relief—if ordered by this Court—would theoretically redress Plaintiffs' injuries. Indeed, "[t]o determine whether an injury is redressable, a court will consider *the relationship between the judicial relief requested and the injury suffered*." *Antunes*, 2022 WL 4213031, at *4 (Moon, J.) (emphasis added) (quoting *California v. Texas*, 141 S. Ct. 2104, 2115 (2021)). To that end, "[a] plaintiff's burden to establish redressability is not onerous." *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 903 (4th Cir. 2022) (quoting *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018)).

Bearing that in mind, Plaintiffs easily satisfy the redressability requirement here. To be sure, Plaintiffs allege injuries caused by the illegal loans on which they purportedly owe monies. A decision by this Court requiring Defendants to void Plaintiffs' loans would redress Plaintiffs' injuries by eliminating the financial obligations currently burdening them. And the allegations and evidence before this Court demonstrate that the Tribal Officials are the proper party because: (1) LDF's Constitution provides the Tribal Council with authority and power over all economic affairs and enterprises relating to the Tribe (*See* LDF Const., Art. VI(f)); and (2) the loan contracts claimed that the loans originate from entities "wholly-owned and controlled by" the LDF—thereby inferring that they are managed and run by the Tribal Council. (*See, e.g.*, Dkt. 135-10 at pg. 2; *see also* Dkt. Nos. 135-11, 135-12, 135-13, 135-14, and 135-15).

## CONCLUSION

For the reasons explained above, Plaintiffs request the Court to deny Defendants' motion in its entirety.


Respectfully submitted,
**PLAINTIFFS**

By: _____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
*Counsel for Plaintiffs*