## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

LORI FITZGERALD, et al.,     )    Case No. 3:20-cv-00044-NKM-JCH
    )
       Plaintiffs,    )
    )
vs.    )
    )
JOSEPH WILDCAT SR., et al.,    )
    )
       Defendants.    )

**DEFENDANTS JOSEPH WILDCAT, SR., JOHN JOHNSON, GEORGE THOMPSON, JAMIE ANN ALLEN, JEFFREY BAUMAN, SR., LOUIS ST. GERMAINE, ERIC CHAPMAN, SR., RACQUEL BELL, GLORIA COBB, WILLIAM GRAVEEN, SARAH PYAWASIT, JESSI LORENZO, AND NICOLE REYNOLD'S REPLY IN SUPPORT OF MOTION TO COMPEL INDIVIDUAL ARBITRATION OF PLAINTIFFS WILLIAMS, SINGLETON, AND MAVILLE CLAIMS AND STAY PLAINTIFFS' CLAIMS PENDING ARBITRATION AND MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

This case concerns loans originated by a tribal lender, the Lac du Flambeau Band of Lake Superior Chippewa Indians ("Tribe"), a federally recognized Indian tribe. Arbitration Plaintiffs' loans are governed by loan agreements that expressly require all claims, including arbitrability, be brought in arbitration.[1]  Plaintiffs do not dispute this. Instead, Plaintiffs attempt to avoid arbitration by focusing on language in *other* loan agreements, each of which contains language significantly different from the loan agreements here. Tribal Defendants do not dispute that the Fourth Circuit has found those loan agreements, which require *exclusive application of Tribal law*, impermissibly waive plaintiffs' rights. But the relevant loan agreements here – those signed by Mr. Williams, Ms. Singleton, and Ms. Maville – simply do not suffer the same flaw. This

---

[1] Mr. Williams, Ms. Singleton, and Ms. Maville ("Arbitration Plaintiffs") all entered into loan agreements that contained identical Arbitration Provisions. The remaining Plaintiffs' loan agreements do not contain arbitration provisions.

distinguishing fact is fatal to Arbitration Plaintiffs' argument and requires that Arbitration Plaintiffs' claims be sent to arbitration.

Further, to avoid tribal sovereign immunity from suit and attempt to obtain monetary damages, Plaintiffs have sued a number of individuals who undisputedly did nothing more than serve the Tribe and its TLEs as they were elected or hired to do. Plaintiffs trumpet that they seek damages against the Defendants individually, but the essential nature and effect of Plaintiffs' Complaint[2] demonstrates otherwise. As Defendants previously noted, the Complaint demonstrates that the judgment Plaintiffs seek would invalidate the Tribe's loans, which would interfere with the Tribe's public administration and/or the effect of it would be to restrain the Tribe, through its TLEs, from acting (or compel it to act). Plaintiffs' attempt to skirt the Tribe and its TLEs' sovereign immunity should not be countenanced, and these individuals should not be forced to stand trial for claims that are truly against the Tribe itself. Plaintiffs fail to direct this Court to allegations in the Complaint that are truly against the individuals, and Plaintiffs' claims are therefore not maintainable against Defendants Joseph Wildcat, Sr., John Johnson, George Thompson, Jamie Ann Allen, Jeffrey Bauman, Sr., Louis St. Germaine, Eric Chapman, Sr., Racquel Bell, Gloria Cobb, William Graveen, Sarah Pyawasit and Joseph Wildcat Sr. (collectively "Tribal Council Defendants"), Jessi Lorenzo, and Nicole Reynolds (herein "Tribal Council Defendants," Ms. Lorenzo, and Ms. Reynolds are collectively "Tribal Defendants") for numerous reasons.

---

[2] All references to Complaint herein refer to Plaintiffs' Second Amended Complaint [Doc. 135] filed on January 10, 2023.

I.    **ARGUMENT**[3]

   A. **Arbitration Plaintiffs' Claims Must be Compelled to Arbitration**

Arbitration Plaintiffs do not dispute that their loan agreements contain arbitration provisions that cover their claims here. Instead, Arbitration Plaintiffs seek to avoid arbitration by arguing the loan agreements contain impermissible waivers and are therefore unenforceable, relying on Fourth Circuit precedent in *Hayes, Williams, Hengle, Haynes, Dillon,* and *Sequoia Cap*. But the arbitration provisions in each of the above cases require ***exclusive application of Tribal law***. Arbitration Plaintiffs' loan agreements do not require such exclusivity and therefore do not impermissibly waive Plaintiffs' right to bring federal and state law claims. Accordingly, Arbitration Plaintiffs' claims must be compelled to arbitration, and any issue Arbitration Plaintiffs may have with the loan agreement may be raised in the proper forum: arbitration. *See Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 340 (4th Cir. 2020) ("the arbitrator should determine in the first instance whether the choice of law provision would deprive a party of those [federal substantive statutory] remedies.").

   1. **The relevant loan agreements do not limit Arbitration Plaintiffs' remedies to tribal law only**

Despite Arbitration Plaintiffs' repeated attempts at distraction, the only relevant loan agreements are those signed by Arbitration Plaintiffs. Those agreements provide:

> The arbitrator shall apply applicable substantive law consistent with the Governing Law set forth above, and the Federal Arbitration Act . . . .[4]

---

[3] Before turning to Plaintiffs' legal arguments, it should be noted that the Opposition spends an inordinate amount of time discussing the "rent-a-tribe scheme" in an attempt to cast aspersions on Tribal Defendants. Plaintiffs' references to such "scheme" are not relevant, disparage to the Tribe, and should be disregarded as scandalous and immaterial.

[4] *See* Doc. 149, Exhibit 1-A, Exhibit 1-B, Exhibit 1-C.

In turn, the Governing Law section of the loan agreements states:

> **GOVERNING LAW**:  The laws of the Tribe _and applicable federal law_ will govern this Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state.  You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law _and applicable federal law_ shall exclusively apply to such dispute.[5]

Arbitration Plaintiffs give short shrift to their own loan agreements and haughtily cite to unrelated tribal lending agreements examined by the Fourth Circuit, misleadingly positing that the agreements in those cases are "virtually identical" to the arbitration provisions here. This representation is categorically false. Arbitration Plaintiffs' loan agreement does not require exclusive application of Tribal law, and for that reason, _Hayes, Williams, Hengle, Haynes, Dillon, and Sequoia Cap._ are inapplicable here. _See Hayes v. Delbert Services Corp._, 811 F.3d 666, 675 (4th Cir. 2016) (finding prospective waiver in loan agreement that required the arbitrator to apply "**_the laws of the [tribe]_**" but not "any law other than the law of the [tribe]" no matter where the arbitration occurred; _Williams v. Martorello_, 59 F.4th 68, 84 (4th Cir. 2023) ("we conclude that the prospective waiver doctrine renders the class-action waiver here unenforceable because it is governed **_solely by Tribal law_**"); _Hengle v. Treppa_, 19 F.4th 324, 332 (4th Cir. 2021) (finding prospective waiver in loan agreement that provided "dispute[s] will be governed by the laws of the Tribe"); _Gibbs v. Haynes Invs., LLC_, 967 F.3d 332, 342 (4th Cir. 2020) (finding prospective waiver in loan agreements that "shall be governed **_by Tribal law_**," because the loan agreement "provides that **_tribal law shall preempt the application of any contrary law_**."); _Dillon v. BMO Harris Bank, N.A._, 856 F.3d 330, 335 (4th Cir. 2017) (finding prospective waiver in loan agreement "governed by [Tribal law]" because the arbitrator could not apply "**_any law other than tribal law_**"); _Gibbs v. Sequoia Cap. Operations, LLC_, 966 F.3d 286, 293 (4th Cir. 2020) (finding

---

[5] _Id._

prospective waiver in loan agreement that "shall be governed *by Tribal law*," required the arbitrator to "*apply Tribal law*," and mandating that the arbitrator's decision "be consistent with…Tribal law.").

Arbitration Plaintiffs' reliance on *Martorello* is particularly misplaced. In their Opposition, Arbitration Plaintiffs argue that *Martorello* considered a "virtually identical" loan agreement, particularly because that loan agreement similarly used the language of "applicable federal law." *See* Opposition at 5. But Arbitration Plaintiffs conveniently ignore two major distinguishing facts of *Martorello*, both of which render the analysis there inapplicable to Arbitration Plaintiffs' agreements.

*First*, and most notably, the loan agreements in *Martorello* do not even allow for arbitration, but instead, require that all disputes be sent to, and governed by, a "Tribal Dispute Resolution Procedure" ("TDRP") set forth under Tribal law. *Martorello*, 59 F.4th at 73. The loan agreements further provided that the consumer is "bound *solely* by the TDRP," and that "NO LITIGATION OR ARBITRATION IS AVAILABLE" to the consumer. *Id.* at 75. The loan agreements here contain no similar provisions, but instead, provide limited waivers of sovereign immunity for claims brought in arbitration, in front of a neutral arbitrator (the American Arbitration Association) and governed by "applicable substantive law…and the Federal Arbitration Act." Arbitration Plaintiffs cannot argue in good faith that the complaint process in *Martorello* is "virtually identical" to the process here when it is, on its face, governed by an entirely different forum and body of law.

*Second*, the loan agreement in *Martorello* is further distinguishable because, just like the agreements in *Hayes, Williams, Hengle, Haynes, Dillon, and Sequoia Cap.*, it is expressly governed *exclusively* by Tribal law. *See Martorello* at 75, 84 ("we conclude that the prospective

waiver doctrine renders the class-action waiver here unenforceable ***because it is governed solely by Tribal law***…the [consumers] acknowledged in signing [that] the Loan Agreement …was ***subject solely and exclusively to the Tribal law and jurisdiction of the [Tribe]***.").  The same is not true here, as the Arbitration Plaintiffs' loan agreements are expressly governed by Tribal law ***and*** applicable federal law.

Although the loan agreement in *Martorello* refers to "applicable federal law," that language is included in the definition of Tribal law, not included as an additional applicable set of laws.  *See Id*. at 74 ("[t]his Agreement will be governed by the laws of the [Tribe][], ***including*** but not limited to the Code as well as ***applicable federal law***."). Conversely, Arbitration Plaintiffs' agreements allow ***both*** Tribal law and applicable federal law. *See* Doc. 149, Exhibit 1-A ("[t]he laws of the Tribe ***and*** applicable federal law will govern this Agreement."). Put differently, the *Martorello* loan agreement is governed solely by Tribal law, and only those federal laws recognized under the Tribal code will be considered. The loan agreements here are governed by Tribal law ***and*** applicable federal law, and are in no way limited to the Tribal code only. It cannot be said, then, that the language considered in *Martorello*, and the court's interpretation of the same, is applicable to the agreements at  issue here.

The agreements in *Martorello*, *Hayes, Williams, Hengle, Haynes, Dillon, and Sequoia Cap.* differ significantly from Arbitration Plaintiffs' loan agreements here. Arbitration Plaintiffs' loan agreements are not limited to tribal law, but instead, expressly provide that they are governed by "the law of the Tribe ***and applicable Federal law***." Each of those cases are therefore distinguishable and do not support Arbitration Plaintiffs' argument that their loan agreements impermissibly waive substantive rights.

Plaintiffs fail to cite a single case finding a loan agreement applying both Tribal and federal law equally is invalid. The reason why is simple: one does not exist. Thus, no prospective waiver exists and any issues Arbitration Plaintiffs may have with arbitrability are for the arbitrator, not this Court, to decide.   In fact, in *Haynes*, the court made clear that only where there is "no uncertainty" that the choice-of-law provisions amount to an "unambiguous and categorical waiver of federal statutory rights" that the Court—as opposed to the arbitrator—may decide that a delegation clause is unenforceable.  *Gibbs v. Haynes Invs. LLC*, 967 F.3d 332, 340 (4th Cir. 2020). Here, at worst, there <u>is</u> uncertainty.[6]  "When there is uncertainty whether the foreign choice of law would preclude otherwise applicable federal substantive statutory remedies, ***the arbitrator should determine*** in the first instance whether the choice of law provision would deprive a party of those remedies."  *Haynes*, 967 F.3d at 340 (emphasis added).   Thus, pursuant to *Haynes*, Plaintiffs' claims must be compelled to arbitration and any prospective waiver issue "would not become ripe for final determination until the federal court was asked to enforce the arbitrator's decision." *Id.*

## 2.   The relevant loan agreements do not waive Arbitration Plaintiffs' federal or state law claims

Arbitration Plaintiffs further argue that the loan agreements contain impermissible waivers of state and federal claims. This argument is, at best, a complete misunderstanding of Arbitration Plaintiffs' loan agreements.

Looking to state law first, Arbitration Plaintiffs argue that the loan agreements "take the forbidden step of preventing an arbitrator from considering state law, such as Virginia's or Florida's public policy…" Opposition at 13. But as Tribal Defendants extensively explained in

---

[6] The Tribal Defendants maintain that Arbitration Plaintiffs' loan agreements do *not* contain an impermissible waiver of Arbitration Plaintiffs' rights.

their initial motion, the loan agreements explicitly allow the arbitrator to consider all applicable substantive law, including state law, in interpreting the agreements and the parties' claims.

Although the loan agreements are governed by Tribal and federal law, the loan agreements explicitly allow application of all applicable substantive law consistent with governing Tribal and federal law. Contrary to Arbitration Plaintiffs' arguments, this language does not prevent the arbitrator from considering Arbitration Plaintiffs' state law claims. Instead, in agreeing to a limited waiver of sovereign immunity for claims brought by borrowers in arbitration, the Tribe directs the arbitrator to look to Tribal and federal case law when analyzing those claims. If those federal cases, in turn, look to applicable state law, the arbitrator is free to do the same.

Further solidifying this outcome, the majority of federal tribal lending cases cited by Arbitration Plaintiffs look to and apply applicable state law. *See, e.g.*, *MacDonald v. CashCall, Inc*, No. 16-2781, 2017 WL 1536427 at *8 (D.N.J. April 28, 2017) (looking to and applying New Jersey state law); *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 308 (E.D. Va. 2019) (looking to and applying Virginia state law); *Dunn v. Glob. Tr. Mgmt., LLC*, 506 F.Supp.3d 1214, 1237 (M.D. Fla. 2020) (looking to and applying Florida law); *Hengle*, 19 F.4th at 351 (looking to and applying Virginia law). Once Arbitration Plaintiffs' claims are brought in the proper forum, an arbitrator will similarly be free to consider all of Arbitration Plaintiffs' claims and arguments, including those under state law. Arbitration Plaintiffs therefore cannot avoid arbitration by summarily arguing, without support, that the loan agreement waives all state law remedies.

The same is true for Arbitration Plaintiffs' argument that the loan agreements waive federal substantive rights. They simply do not. The loan agreements are governed by Tribal law and applicable federal law, therefore allowing, on their face, federal statutory claims. Arbitration Plaintiffs provide no argument for how this language waives federal substantive rights, instead

relying (yet again) on Fourth Circuit case law finding waiver in loan agreements requiring *exclusive* application of Tribal law. *See, e.g., Martorello*, 49 F.4th at 85 ("*the [Tribal] Code*…would not permit the borrowers to effectively vindicate their federal statutory rights"); *Hengle*, 19 F.4th at 343 ("a claimant *proceeding under tribal law* would be unable to assert a RICO claim"); *Haynes*, 967 F.3d at 343 (prospective waiver existed where the "relevant tribal codes would not permit" a borrower "to effectively vindicate the federal protections and remedies they seek.").

But Arbitration Plaintiffs' claims are not governed exclusively by Tribal law. Instead, they are governed by Tribal law *and* applicable federal law. Arbitration Plaintiffs have therefore failed to show how their loan agreements contain an impermissible waiver, and their claims must be compelled to arbitration. There, if desired, they may raise the prospective waiver argument to the arbitrator, who is free to decide the issue one way or another.

In fact, the Ninth Circuit has recently explained the practical effect of compelling this exact issue to arbitration when the parties dispute whether a prospective waiver has occurred:

> If Borrowers succeed in convincing an arbitrator that the arbitration agreement is unenforceable as a prospective waiver, Borrowers may return to federal court and assert their claims. If Borrowers' prospective-waiver argument fails to convince the arbitrator because she concludes the agreement allows Borrowers to assert their federal claims, the obvious result is that Borrowers can bring their federal claims in arbitration and they did not prospectively waive anything. And if the arbitrator concludes she cannot consider a prospective-waiver challenge to enforceability of the arbitration agreement, Borrowers can return to court and argue the arbitrator exceeded her powers. No matter what, Borrowers will have the opportunity to assert their federal claims or show that the arbitration agreements "foreclosed" their ability to do so. Flowing logically from these alternatives—one of which must occur if this dispute continues—is our conclusion in this case: ***Borrowers cannot show the delegation clause itself prospectively waives their opportunity to pursue their federal rights. How could it where the worst-case scenario is that an arbitrator may prevent Borrowers from presenting their federal claims and, if so, Borrowers will have the opportunity to object to a court that the arbitrator exceeded her authority and ask that any award be vacated***. In such circumstances, compelling arbitration is consistent with congressional policy—strictly enforced by

9

the Supreme Court—of placing arbitration agreements on equal footing with other contracts and reversing centuries of judicial hostility to arbitration agreements.

*Brice v. Haynes Invs., LLC,* 13 F.4th 823, 837 (9th Cir. 2021), *reh'g en banc granted, opinion vacated sub nom. Brice v. Plain Green, LLC,* 35 F.4th 1219 (9th Cir. 2022) (internal citations and quotations omitted) (emphasis added).[7]

The cases relied upon by Arbitration Plaintiffs do no support Arbitration Plaintiffs' attempt to avoid arbitration. Arbitration Plaintiffs entered valid and enforceable loan agreements containing arbitration provisions, and the loan agreements do not contain an impermissible waiver. Arbitration Plaintiffs' claims must therefore be compelled to arbitration.

### B. The Tribal Defendants Are Not the Real-Party-In-Interest

Plaintiffs seek prospective relief against the Tribal Defendants in their official capacity. That is, Plaintiffs seek a declaratory judgment that the loans are invalid and an injunction barring the tribal lending entities that issued the loans, namely Niizhwaaswi, LLC, Ishwaaswi, LLC, Niswi, LLC, Makwa, LLC and Ningodwaaswi, LLC, from collecting on those loans. Plaintiffs also seek monetary damages against the Tribal Defendants in their individual capacities, seeking a return of the amounts it paid to the tribal lending entities. As Plaintiffs readily admit in their Opposition, this not-so-clever pleading device was all done in an attempt to avoid application of tribal sovereign immunity.

All of the arguments advanced in Plaintiff's Opposition, were preemptively addressed in Tribal Defendants' motion. However, a few points bear repeating:

First, the holding in *Lewis* does not support Plaintiffs' assertion that sovereign immunity is unavailable merely by naming the Tribal Defendants in their individual capacities. The Court in

---

[7] The *Brice* decision was subsequently settled after the Ninth Circuit agreed to rehear the case en banc. Accordingly, although the opinion was vacated pending rehearing (that never happened), it remains highly persuasive.

*Lewis v. Clarke* recognized that, regardless of the capacity in which a defendant is sued, courts must still evaluate "whether tribal sovereign immunity applies by evaluating whether the sovereign is the 'real party in interest.'" 137 S. Ct. 1285, 1291 (2017). The test provided by the Supreme Court for determining whether the sovereign is the real party in interest is if "[t]he judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' of it the effect of the judgment would be 'to restrain the Government from acting or to compel it to act.'" *Roemen v. United States*, 463 F. Supp. 3d 990, 999 (D.S.D. 2020) (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102, n.11 (1984)). Here, a judgment against the Tribal Defendants could impact the public treasury. Plaintiffs seek an injunction barring the Tribe and its tribal lending arms from collecting on the loans. The proceeds of those loans are contributed to the Tribe's general fund which is then used to support the Tribe's public works and operations.

Second, Plaintiffs' bald assertion that the claims are against the Tribal Defendants in their individual capacity does not make it so. Plaintiffs' Complaint contains no well-pleaded allegations as to the Tribal Defendants' individual, personal actions. Instead, the actions which Plaintiffs claim are the basis for the Tribal Defendants' individual liability are all actions taken by on behalf of Tribe and its tribal lending arms. There are no individual actions alleged (unlike *Lewis*, where the tribal employee was the one driving a limousine). As such, the only actions alleged against the Tribal Defendants, are those action taken in their official capacity.

Third, the Tribe and its tribal lending arms are the real parties in interest given that Plaintiffs' suit cannot proceed without the Tribe and its tribal lending arms' involvement through discovery.  The Tribal Defendants, in either their individual or official capacities, do not possess the information about the loans issued by the tribal lending arms. That information can only come

from the Tribe itself and its tribal lending arms. Highlighting the fact that the Tribe and its tribal lending arms are the real parties in interest.

Finally, *Ex parte Young* does not provide an exception to sovereign immunity for private plaintiffs to enjoin tribal officials from violating state law.  209 U.S. 123, 159-60 (1908).  *Ex parte Young* only provides an exception to sovereign immunity for official-capacity suits for violations of federal law.  And, the Fourth Circuit's expansion of the *Ex parte Young* doctrine in *Hengle* is suspect at best and unchallenged.  Since the claims against the Tribal Defendants all stem from private plaintiffs' claimed violations of state law, *Ex parte Young* does not apply to save Plaintiffs' claims from dismissal.

For all of these reasons and for the reasons stated in the motion, the claims, which are based on the Tribe's issuance of loans, are essentially a claim against the Tribe and must be barred by the Tribe's sovereign immunity.

## C. The Claims Against the Tribal Council Defendants Should be Dismissed because of Absolute, Qualified and Legislative Immunity

This Court has a platter of viable personal immunity defenses it can choose from to dismiss the claims against Tribal Council Defendants.  Plaintiffs' Opposition offers nothing that should dissuade the Court from granting dismissal based on Tribal Council Defendants' personal immunity from suit. Plaintiffs, throughout their Complaint, lump the defendants together and fail to allege specific actions taken by each of the ten Tribal Council Defendants. Plaintiffs use the same perfunctory phrases when they described the Tribal Council Defendant's conduct. Namely, that each Tribal Council Defendant had "oversight and management" of the Tribe's business affairs. Yet, Plaintiffs do not allege facts or anything more than these passing phrases. When Tribal Council Defendants asserted in their motion that the "oversight and management" of the Tribe's business affairs is administrative, legislative, or executive functions such that absolute, qualified

and legislative immunity apply, Plaintiffs pivoted. In their Opposition, Plaintiffs argue they asserted that the Tribal Council Defendants took "far more" actions besides oversight and management, and their personal immunity is not available for these other actions. This argument is contradicted by a simple reading of the Complaint. In the Complaint, Plaintiffs merely allege that the Tribal Council Defendants passed laws and ordinances legalizing lending and then exercised "oversight and management" of the business affairs of the Tribe, which included the Tribe's lending operation. Nothing more.[8]

Accordingly, Tribal Council Defendants urge the Court to find they are entitled to personal immunity from the claims raised in the Complaint and grant their Motion to Dismiss without leave, for the third time, to amend.

1.  **The Tribal Council Defendants are executives of a federally-recognized Tribe and enjoy absolute immunity as a result**

Plaintiffs argue that Tribal Council Defendants cannot assert absolute executive immunity because the Unites States Supreme Court in *Nixon v. Fitzgerald*, 457 U.S. 731, 747 (1982), held that state executive officials, such as governors, are not entitled to absolute immunity. Plaintiffs, however, readily concede that certain federal executives (such as the President of the United States, federal judges, and federal prosecutors) enjoy absolute immunity. Opposition at 19.

*First*, modern tribes, such as the Lac du Flambeau Band of Lake Superior Chippewa Indians, are not like state governments and are more aligned with that of the federal government.

---

[8] The structure of the Second Amended Complaint, specifically in regard to the Tribal Council Defendants, is notable. In Paragraphs 18 through 29, Plaintiffs use the same cut-and-paste legal conclusions in an attempt to describe the conduct of each Tribal Council Defendant. Mainly, that each Tribal Council Defendant had "oversight and management of all economic affairs and enterprises of the Tribe including its lending activities," and that each Tribal Council Defendant "review[ed], perform[ed], and implement[ed] high-level management of the LDF Lending Entities." The only other time the Tribal Council Defendants are specifically mentioned in the Second Amended Complaint is at Paragraphs 129 through 134. However, these paragraphs do not contain any factual allegations. They contain a word-for-word regurgitation of the **exact same** legal conclusions found in paragraphs 18 through 29. *See*, Doc. 135.

13

Their long, troubled relationship with the United States has left them a uniquely defeasible sovereignty, with powers of independent self-government. After centuries of military and commercial negotiation, forced displacement, physical and cultural extermination, and coerced assimilation, today "[t]he special brand of sovereignty the tribes retain—both its nature and its extent—rests in the hands of Congress." *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978); *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788–89 (2014). Even a cursory survey of a small fraction of the relevant treaties, proclamations, legislation and case law suffices to illustrate Chief Justice Marshall's observation that "[t]he condition of the Indians in relation to the United States is perhaps unlike that of any other . . . [as it] is marked by peculiar and cardinal distinctions which exist nowhere else." *Cherokee Nation v. Georgia*, 30 U.S. 1, 16 (1831). Those peculiar and cardinal distinctions make tribes different than state governments. As such, Plaintiffs' argument that the Tribal Council Defendants are equivalent to state governors, and thus not entitled to absolute executive immunity, flies in the face of almost 200 years of Indian law jurisprudence.

*Second*, as explained in Defendants' Motion to Dismiss, the Tribal Council Defendants are the highest elected officials, tasked with executive oversight of the Tribe. This includes executive oversight of those business operations that contribute to the Tribe's general fund. Tribal Council Defendants' absolute immunity from suit is "essential for the conduct of public business." *Butz v. Economou*, 438 U.S. 478, 507 (1977). Plaintiffs seem to be more focused on the fact Tribal Council Defendants do not hold certain titles, such as "President." Absolute immunity, however, is less focused on the official's job title or organizational position, and more on the nature of the official's responsibilities. *Stevens v. Osuna*, 877 F.3d 1293 (11th Cir. 2017).

Here, any actions Tribal Council Defendants would have taken, such as approving the lending subsidiaries' creation, passing ordinances legalizing lending operations on the Tribe's

Reservation, and performing "high-level" oversight of the businesses would be deemed "conduct of public business," taken by the highest elected officials, thus shielding the Tribal Defendants from any suit related to those actions.

### 2.  Alternatively, Tribal Council Defendants Enjoy qualified immunity from suit

In the Opposition, Plaintiffs seemingly concede that qualified immunity is available to the Tribal Defendants. Plaintiffs had no choice. The Supreme Court has made clear that personal immunity defenses, which include qualified immunity, are available to tribal government officials. *See Lewis*, 137 S. Ct. at 1292 n.2 (reasoning that tribal defendants had personal immunity defenses but finding that the "defense [was] not properly before [the Court]" because of the procedural posture of the case.) Instead, Plaintiffs argue that such immunity should not be applied to Tribal Defendants as the activities Plaintiffs alleged Tribal Defendants participated in violated a clearly established law. Opposition at 22-3.

The qualified immunity defense[9] protects government officials who are sued in their individual capacities. *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 965 (9th Cir. 2010). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731,

---

[9] Plaintiffs argue, as an initial matter, that the issue of qualified immunity is premature and the Court should stay ruling on application of the immunity until "another day." However, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunder v. Bryant*, 502 U.S. 224, 227 (1991). In fact, the "'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (quoting *Anderson v. Creighton* 483 U.S. 635, 640 n.2 (1987)).

743 (2011). Assessing if a government official violated a clearly established statutory or constitutional right, turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken. *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

The court is charged with evaluating the complaint against the public official and determining if there are enough facts alleged to prove of a wrongful motive to commit a clearly established law. *Crawford- EL v. Britton*, 523 U.S. 574, 589 & n.11 (2001) ("When a plaintiff files a complaint against a public official alleging a claim that requires proof of wrongful motive, the trial court . . . must determine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law."). Since the court must "exercise its discretion in a way that protects the substance of the qualified immunity defenses," the "court must insist that the plaintiff put forward specific, nonconclusory factual allegations that establish improper motive causing a cognizable injury in order to survive a prediscovery motion for dismissal or summary judgment." *Id*. (internal citations omitted).

Plaintiffs' RICO allegations against the Tribal Council Defendants all flow from their passing of tribal ordinances legalizing lending and their "oversight and management of all economic affairs and enterprises of the Tribe," including its lending activities. The Tribal Council Defendants' decision to pass the lending ordinance and oversee the affairs of tribal lending is a policy-based exercise of discretion consistent with the authority granted under the Constitution and Bylaws of the Tribe. Thus, the Tribal Council Defendants are entitled to qualified immunity unless they had a wrongful motive to violate a "clearly established" constitutional or statutory right. *Messerschmidt*, 565 U.S. at 546.

Whether the Tribal Council Defendants wrongfully violated a clearly established statutory right depends on whether consumer lending in and of itself was legal at the time the Tribe first established lending. Plaintiffs do not dispute that Congress has never passed a federal statute regulating the rate of interest that can be charged on consumer loans. Instead, Plaintiffs argue that there are state laws regulating the rate of interest that can be charged on consumer loans. Yet, it remains an open question of law as to whether tribal corporations doing business off the reservation are subject to state laws given their unique immunity status.[10] Accordingly, at the time the lending ordinance was passed (December 10, 2012), the Tribal Council Defendants did not violate a clearly established statutory right. And, they certainly did not have a wrongful motive or intent to commit unlawful actions.

In an attempt to get around the fact that the legal issue is unsettled, Plaintiffs assert that the Fourth Circuit's 2021 decision in *Hengle v. Asner*, 19 F.4th 324 (4th Cir. 2021), settled the issue of whether online tribal lending must comply with state laws. Plaintiffs, however, read too far into the *Hengle* decision. The Court was faced with the issue of whether the arbitration provision in a consumer loan agreement was enforceable. The Court found that the governing law provision in the loan agreements, which elected tribal law, is not enforceable because the provision violates Virginia's public policy against unregulated lending, *Id.* at 349-53. The Court did not, as Plaintiff asserts, find that the making and collection of high-interest loans over the internet was in and of

---

[10] *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 800 (2014) (finding Tribe immune to state's suit challenging off-reservation commercial operation of a casino); *see also Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 760 (1998) ("Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation."); *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509–10 (1991) (finding Tribe immune to State's counterclaim seeking damages and injunctive relief for Tribe's failure to collect state sales taxes on cigarettes sold by Tribe in its convenience store); *Puyallup Tribe, Inc. v. Wash. Dep't of Game*, 433 U.S. 165, 172 (1977) ("Absent an effective waiver or consent, it is settled that a state court may not exercise jurisdiction over a recognized Indian tribe.").

itself illegal. And, even if the *Hengle* decision went so far, the decision was issued in 2021 which was nine years after the LDF Tribal Council passed the lending ordinance. There were still open legal questions that remained undecided, and it was objectively reasonable for Tribal Council Defendants to believe that tribal lending was legal when they passed the lending ordinance.

In the absence of any other factual allegations that the Tribal Council Defendants wrongfully intended to offer illegal loans when they passed the ordinance or extended the loans, Plaintiffs failed to establish the requisite improper motive needed to overcome application of qualified immunity. As a result, Tribal Defendants are entitled to qualified immunity from suit.

### 3. As legislative officials, the Tribal Council Defendants are immune from suit for the actions they took in their legislative capacity

The limited allegations against the Tribal Council Defendants in Plaintiffs' Second Amended Complaint are as follows:

1. The LDF Tribal Council is composed of the elected Tribal Council Defendants and is the legislative body of the Tribe, with authority to pass tribal laws and ordinances;

2. The LDF Tribal Council, pursuant to the Constitution and Bylaws of the Tribe, is tasked with legislative oversight of the Tribe's "economic affairs," including oversight of tribally owned businesses that contribute to the Tribe's general fund; and,

3. The LDF Tribal Council's exercise of its oversight functions, including high-level oversight of the Tribe's lending businesses, is the basis for the individual capacity claims against the Tribal Council Defendants. [11]

---

[11] Paragraph 4 of the Second Amended Complaint (Doc. 135) states as follows:

4. Among Defendants is the Band's Tribal Council. As stated in the Band's Bylaws, the Tribal Council is the Tribe's "governing body." Ex.4 at Art. III. Relevant here, the power and duties of the Tribal Council include: (1) regulation of the use and disposition of tribal property such as any interest in the laws; (2) management of "all economics affairs and enterprises of the Tribe,' including its lending activities; (3) promulgation of all "legislation, statutes, codes and ordinances," including those related to lending activities. Id. at Art VI(a), (f), (i). Pursuant to these Bylaws, the

Legislative immunity clearly attaches to each of the actions Plaintiffs allege the Tribal Council Defendants took regarding the Tribe's lending operations. "Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity'" which "typically involve[s] the adoption of prospective, legislative-type rules, rules that establish a general policy affecting the larger population," and budgetary decisions. *Bogan v. Scott Harris*, 523 U.S. 44, 54 (1998) (citing *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)); *E.E.O.C. v. Washington Suburban Sanitary Com'n*, 631 F.3d 174, 184 (4th Cir. 2011); *Cooper v. Lee County Bd. of Supervisors,* 966 F. Supp. 411, 414 (W.D. Va. 1997); *Rateree v. Rockett,* 852 F.2d 946, 950 (7th Cir. 1988); *Alexander v. Holden,* 66 F.3d 62, 65 (4th Cir. 1995).

Plaintiffs, looking to avoid application of legislative immunity, argue that oversight of the Tribe's businesses, including its lending operations, is not legislative action entitled to legislative immunity. Without any legal support, Plaintiffs argue that the Tribal Council Defendants' conduct related to "commercial enterprises" is the type of activity that is not protected by legislative immunity. Just because the Tribal Council Defendants, by mandate from the Tribe's Constitution and Bylaws, is tasked with oversight and responsibility of the Tribe's economic affairs, does not somehow diminish the immunity.

The Fourth Circuit has held if the action taken was in a "legislative capacity," the legislative body is entitled to immunity. *Roberson v. Mullins*, 29 F.3d 132, 134 (4th Cir. 1994)[12](citing *Front Royal & Warren County Indus. Park Corp v. Town of Front Royal*, 865 F.2d 77, 79 (4ᵗʰ Cir. 1989).

---

Tribal Council directs, controls, and oversees "all economic affairs and enterprises of the Tribe," including its lending subsidiaries.

[12] *Roberson* was heavily relied on by Plaintiffs in their Opposition. In *Roberson*, the Court found that a county board's decision to terminate a public works employee was not a legislative function and refused to dismiss a case brought by the terminated employee. While the Fourth Circuit's reasoning is applicable, the Court's ultimate decision is not relevant to the facts in this case.

In order to determine if the action was taken in a "legislative capacity," the court is to evaluate if the action was an "integral part" of the legislature's responsibilities. *Scott v. Greenville County*, 716 F.2d 1409 (4th Cir. 1983); *Gravel v. United States*, 408 U.S. 606, 625 (1972). And, whether a vote did or did not occur related to the legislative action does not impact whether the action is entitled to legislative immunity. *Scott*, 716 F.2d at 1423.

Here, the Tribal Council Defendants are mandated by the Tribe's Constitution and Bylaws to direct and oversee the "economic affairs" of the Tribe.[13] Plaintiffs' allegations against the Tribal Council Defendants all stem from the actions they took to pass the Tribe's lending ordinance and to oversee the Tribe's lending operation, of which the proceeds from the commercial activity are contributed to the Tribe's general fund. The Tribal Council Defendants oversight actions were clearly an integral part of the Tribal Council Defendants' mandate under the Tribe's Constitution and Bylaws. As a result, the Tribal Council Defendants are entitled to legislative immunity related to all claims stemming from their passage of the lending ordinance and oversight of the Tribe's lending operation. These include all claims brought by Plaintiff in the Complaint against the Tribal Council Defendants.

Plaintiffs have failed to put forth sufficient factual allegations to overcome application of absolute immunity, qualified immunity and legislative immunity. As a result, the Court should dismiss all claims brought against the Tribal Council Defendants.

### D. Plaintiffs Lack Standing Under Article III to Raise Claims Against Tribal Defendants[14]

---

[13] *See*, Doc. 135-2, LDF's Constitution and Bylaws at Article IV(a)-(i).

[14] "Tribal Defendants" include all members of the Tribal Council, along with Ms. Lorenzo and Ms. Reynolds-Chapman.

Plaintiffs must show that they have Article III standing for each of their claims. *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (Article III requires injury in fact, causation and redressability for each claim); *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) (same). Plaintiffs have no standing to bring claims against any of the Tribal Defendants because not one of Tribal Defendants extended a loan to Plaintiffs and Tribal Defendants cannot offer relief to redress Plaintiffs' injury.

Notably, in Plaintiffs' Opposition, they do not dispute that: (1) the Tribal Defendants are not lenders; (2) the Tribal Defendants never directly issued loans to Plaintiffs; and (3) the Tribal Defendants never attempted to collect on the loans to Plaintiffs. Instead, Plaintiffs' argument rests on precisely the kind of "speculation about 'the unfettered choices made by independent actors not before the Court'" that the Supreme Court has consistently rejected. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)). Plaintiffs did not sue the Tribe or the tribal lending entities that actually issued the loans. Since the actual lenders are "not parties to the suit, they would not be obligated to honor [any] incidental legal determination the suit produced." *Lujan*, 504 U.S. at 569. Plaintiffs' requested relief, therefore, would do nothing to redress Plaintiffs' alleged injuries.

Plaintiffs, however, assert that neither the Tribe nor the tribal lending companies that issued the loans need to be parties to the suit for Plaintiffs to have standing, as Plaintiffs are seeking non-monetary relief. That is, Plaintiffs are asking the Court to issue a declaratory judgment that the loans are illegal and an injunction barring the tribal lending companies from collecting on the loans.  Injunctive relief, however, is not available here, because the Tribal Defendants cannot accord the relief Plaintiffs seek.  Tribal Council Defendants, individually, cannot be enjoined in their official capacities to vote collectively. Such a remedy would not be against an individual Tribal Official, but against the Tribe itself. As noted in *Imperial Granite Co. v. Pala Band of*

*Mission Indians*, individual votes cast by tribal officials are not operative, but the effect of such votes is Tribal governmental action. 940 F.2d 1269, 1271 (9th Cir. 1991). However, neither the Tribe nor the tribal lending entities are parties to this action as they are entitled to sovereign immunity.

As for the other Tribal Defendants, namely Ms. Lorenzo and Ms. Reynolds-Chapman, they are no longer employed by the Tribe. They cannot redress Plaintiffs' claimed injuries. If injunctive relief was issued to stop collections of the loans, they would have no authority or ability to offer relief to Plaintiffs. Plaintiffs lack standing because the relief they seek here—an injunction against Ms. Lorenzo and Ms. Chapman's prospective enforcement of the loans they have no authority over—would not redress their claimed injury.

Plaintiffs contend that, along with injunctive relief, Plaintiff seek relief from the Tribal Council Defendants in their official capacity for "financial injury suffered" by Plaintiffs. Again, without the Tribe as a party, the Tribal Council Defendants cannot redress Plaintiffs' claimed injuries. The only funds available to redress Plaintiffs' financial injuries related to the loans would be from the operating accounts in the name of the tribal lending entities or the Tribe's general fund. Since neither the Tribe nor the tribal lending companies are parties to the suit, Plaintiffs would not be able to attach a judgment to any available funds.

Plaintiffs also argue that they seek relief from the Tribal Defendants in their ***individual capacities*** in connection with the alleged RICO violations. Doc. 135 ¶¶ 196-233. However, the Second Amended Complaint only describes conduct undertaken by the Tribal Defendants in their ***official capacities***. There is not one allegation of ***individual conduct*** of the Tribal Defendants, outside of the employ at the Tribe or their role on the LDF Tribal Council. In fact, with the exception of a heading in the Complaint stating that Plaintiffs are bringing claims against Tribal

22

Defendants in their individual capacity, the Complaint's allegations lump the actions of all defendants together and never allege individualized conduct outside of their roles with the Tribe. Accordingly, and as discussed above, the Tribal Council Defendants are entitled to tribal immunity, legislative immunity, and/or qualified immunity for all alleged actions and damages are unavailable. Because Plaintiffs cannot establish (and have not alleged) any conduct of the Tribal Defendants in their individual capacities, the Court cannot award damages in the Tribal Defendants' individual capacities. This deprives Plaintiffs from a means of redress in the form of damages, plainly demonstrating their lack of standing.

Not one of Plaintiffs' requested relief can redress their alleged injuries. Accordingly, the Second Amended Complaint does not satisfy the requisite elements of Article III, which mandates dismissal of this action.

## II.    CONCLUSION

For the reasons set forth above, the Tribal Defendants ask that Arbitration Plaintiffs' claims be compelled to arbitration or, alternatively, dismissed. In regard to all Plaintiffs, the Tribal Defendants ask that their claims also be dismissed for the reasons stated above.

By: /s/ *John E. Komisin*
    Alan D. Wingfield (VSB No. 27489)
    John E. Komisin (VSB No. 84061)
    Troutman Pepper Hamilton Sanders LLP
    1001 Haxall Point
    Richmond, VA  23219
    Telephone: (804) 697-1200
    Facsimile: (804) 697-1339
    Email: alan.wingfield@troutman.com
    Email:  jed.komisin@troutman.com

    and

    Shilee T. Mullin *(admitted pro hac vice)*
    Spencer Fane LLP

13520 California Street, Suite 290
Omaha, NE 68154
Telephone: (402) 965-8600
Fax: (402) 965-8601
E-mail: smullin@spencerfane.com

Patrick J. McAndrews (*admitted pro hac vice*)
Spencer Fane LLP
1000 Walnut
Kansas City, MO 64106
Telephone: (816) 292-8300
Fax: (816) 474-3216
E-mail: pmcandrews@spencerfane.com


and

Andrew Adams III (*admitted pro hac vice*)
Hogen Adams PLLC
1935 County Road B2 W., Suite 460
Saint Paul, MN 55113
Telephone: (651) 842-9100
Fax: (651) 842-9101
E-mail: aadams@hogenadams.com

*Counsel for John Johnson, George Thompson, Jamie Ann Allen, Jeffrey Bauman, Sr., Louis St. Germaine, Eric Chapman, Sr., Racquel Bell, Gloria Cobb, William Graveen, Sarah Pyawasit, Jessi Lorenzo, Nicole Reynolds and Joseph Wildcat, Sr., Jessi Lorenzo, Nicole Reynolds and Joseph Wildcat, Sr.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2023, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system.

<div align="center" style="margin-left:40%">

/s/ John E. Komisin

John E. Komisin

</div>