# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| LORI FITZGERALD, *et al.*, | CASE NO. 3:20-cv-00044 |
| *Plaintiffs*, | |
| v. | MEMORANDUM OPINION |
| JOSEPH WILDCAT, SR, *et al.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

Plaintiffs Lori Fitzgerald, Aaron Fitzgerald, Kevin Williams, Jade Singleton, and Angela Maville have filed a class action complaint against Tribal officials, Tribal employees, and a non-tribal payday lender and its owner,[1] claiming they participated in an illegal tribal lending operation involving short-term, high interest loans. They seek damages and prospective relief for Defendants' alleged RICO and state law violations for issuing, and collecting on, their high-interest loans. Defendants move to compel arbitration of Plaintiffs Singleton, Williams, and Maville's claims. They also move to dismiss Plaintiffs' claims for lack of subject matter jurisdiction, for failure to join a necessary party, for failure to state a claim for relief, and for lack of personal jurisdiction.

The Court will deny Defendants' motions to compel arbitration of Plaintiffs Singleton, Williams, and Maville's claims because their loan agreements prospectively waive all state substantive rights and remedies in violation of public policy. The Court will also deny

---

[1] Defendants include Joseph Wildcat, Sr., Nicole Chapman-Reynolds, Jessi Phillips Lorenzo, John Johnson, George Thompson, Jamie Ann Allen, Jeffrey Bauman, Sr., Louis St. Germaine, Eric Chapman, Sr., Racquel Bell, Gloria Cobb, William Graveen, Sarah Pyawasit, William Stone, Sr., William Cheney Pruett, and Skytrail Servicing Group, LLC.

Defendants' motions to dismiss. At this stage of the litigation, the Court has jurisdiction over Plaintiffs' claims, and Plaintiffs have sufficiently stated claims under RICO and state law.

## Background[2]

### A. Overview of the Tribal Lending Scheme

Around 2012 or 2013, the Lac du Flambeau Band of Lake Superior Chippewa Indians ("Tribe"), a federally recognized Native American tribe, began partnering with non-tribal payday lenders that allegedly "wished to skirt state and federal lending laws." Dkt. 135 ¶ 3. Through these partnerships, non-tribal payday lenders have entered into agreements, allowing them to oversee and collect on loans issued by lending entities owned by the Tribe ("Tribal Lending Entities"). *Id.* ¶¶ 3, 119, 145. The Tribal Lending Entities have issued short-term, high interest loans to Virginia, Georgia, Maryland, and Florida residents and others over the internet. *Id.* ¶ 2.

Non-tribal payday lenders allegedly believe this arrangement "circumvents otherwise applicable protections deriving from state usury and licensing laws" through tribal sovereign immunity. *Id.* ¶ 2 (cleaned up). In exchange for helping them circumvent liability, non-tribal payday lenders provide the Tribe with a percentage of their revenue from the high interest loans. *Id.* ¶ 3. Plaintiffs allege that Defendants and other unnamed parties "collected millions of dollars in unlawful debts and conspired with each other and others to repeatedly violate state lending laws resulting in the collection of unlawful debts from Plaintiffs and the class members." *Id.* ¶ 9.

### B. The Tribal Council and Tribal Employee Defendants' Involvement in the Scheme

The Tribe is governed by the Tribal Council. *Id.* ¶ 4. According to the Tribe's Bylaws,

---

[2] The following alleged facts are assumed true for purposes of resolving this motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (reiterating the appropriate standard of review).

the Tribal Council (1) regulates the use and disposition of tribal property; (2) manages, controls, and oversees "'all economic affairs and enterprises of the Tribe,' including its lending activities;" and (3) passes "'legislation, statutes, codes and ordinances,' including those related to lending activities." *Id.* (quoting Dkt. 135-2 at Art. VI(a), (f), (i)).

Most of the named Defendants—Wildcat, Johnson, Thompson, Allen, Stone, Bauman, Germaine, Chapman, Bell, Cobb, Graveen, and Pyawasit—serve on the Tribal Council (collectively, the "Tribal Council Defendants").[3] The Tribal Council Defendants meet twice a month "to review, perform, and implement high-level management of" the Tribal Lending Entities.[4] *Id.* ¶¶ 18–29. They approve the creation of the Tribal Lending Entities and "'servicing agreements' or similar documents delegating nearly all responsibilities over the day-to-day operations to non-tribal members." *Id.* They also review the Tribal Lending Entities' activities, including "their marketing, origination, collections, and complaints from borrowers." *Id.* ¶ 133.

To help with management of the Tribal Lending Entities, the Tribal Council created LDF Holdings, a subsidiary of the LDF Business Development Corporation. *Id.* ¶¶ 134–35. While the

---

[3] Defendant Wildcat served as the Tribe's president from 2016 to 2020 and currently serves as a general member on the Tribal Council. Dkt. 135 ¶ 18. Defendant Johnson is currently the Tribal Council's president and previously served in other capacities on the Tribal Council from 2014 to 2020. *Id.* ¶ 19. Defendant Thompson is the Tribal Council's vice president, Defendant Allen is the Tribal Council's secretary, and Defendant Stone is the Tribal Council's treasurer. *Id.* ¶¶ 20–22. Defendants Bauman, Germaine, Chapman, Bell, Cobb, Graveen, and Pyawasit are members of the Tribal Council. *Id.* ¶¶ 23–29.

[4] The Tribal Lending Entities include: Ningodwaaswi, LLC d/b/a/ Sky Trail Cash; Ishwaaswi, LLC d/b/a RadiantCash;Makwa, LLC d/b/aMakwa Finance; Niizhwaaswi, LLC d/b/a Loan at Last; Niizh, LLC d/b/a Bright Star Cash; Niiwin, LLC, d/b/a Lendgreen; Anong, LLC d/b/a Availblue.com; Niibin, LLC, d/b/a Cash Aisle; Midaaswi, LLC d/b/a/ National Small Loan; Naanan, LLC d/b/a Bear Claw Finance; Mitig, LLC d/b/a MitigCapital and Cashcity; Zagime, LLC d/b/a Blue River Lending; Bridge Lending Solutions; Opichi, LLC d/b/a Evergreen Services; Giizis LLC d/b/a Lakeshore Loans; Waawaatesi LLC, d/b/a Quickhelp Loans; Naanan, LLC d/b/a Stone Lake Lending; Nigig, LLC d/b/a Ubicash; Ziibi, LLC d/b/a zFunds; and Zhaangaswi, LLC d/b/a Nine Torches. *Id.* at 3, n.1.

Tribal Council "retains the ultimate[] authority over management of all economic affairs and enterprises of the Tribe," it "has delegated some of this authority to the [LDF] Business Development Corporation," and in turn, the LDF Business Development Corporation and the Tribal Council have delegated some responsibility to LDF Holdings. *Id.* ¶¶ 136–37.

The Tribal Council appointed Defendants Nicole Chapman-Reynolds and Jessi Phillips Lorenzo (collectively, the "Tribal Employee Defendants") to oversee and direct the Tribe's involvement in the lending scheme. *Id.* ¶ 5. Chapman-Reynolds and Lorenzo are "non-tribal members." *Id.* Chapman-Reynolds is the former president of the LDF Business Development Corporation, the parent company of LDF Holdings. *Id.* Lorenzo is the president of LDF Holdings, the parent company for "more than a dozen" Tribal Lending Entities. *Id.*

Chapman-Reynolds and Lorenzo serve as liaisons between the Tribe and non-tribal payday lenders. *Id.* ¶ 6. Lorenzo is "the primary point of contact for non-tribal individuals who want to engage in a lending scheme with" the Tribe. *Id.* ¶ 138. For the past decade, she has assisted with identifying potential payday lending partners, negotiating servicing agreements, signing "necessary documents for the [alleged] scheme," "securing key operational components," and identifying potential banking partners for the Tribal Lending Entities to debit and credit payments. *Id.* ¶¶ 146, 148.

### C. Servicing Agreements

The Tribe has relinquished the right to control its lending entities to non-tribal payday lenders through servicing agreements. *Id.* ¶¶ 80, 119. While LDF Holdings is the parent company for the Tribal Lending Entities, each Tribal Lending Entity has entered into "servicing agreements that outsource the operations and revenue to non-tribal payday lenders." *Id.* ¶ 119. Because of these agreements, the Tribe allegedly "has no control over the income or expenses

of" the Tribal Lending Entities. *Id.* ¶ 113. Non-tribal payday lenders "handle and control all aspects of the lending businesses, including the marketing, underwriting, risk assessment, compliance, accounting, lead generation, collections, and website management for the businesses." *Id.* ¶ 145.

Defendant Pruett is the owner of Defendant Skytrail Servicing, a non-tribal payday lender. *Id.* ¶¶ 32–33. Skytrail Servicing entered into a servicing agreement with Ningodwaaswi, LLC, a Tribal Lending Entity. The agreement provided Skytrail Servicing the right to market, originate, renew, service, and collect loans made in the name of Ningodwaaswi. Dkt. 138 ¶¶ 6–7, 102–05, 110.[5] The Tribe allegedly permits Pruett and Skytrail Servicing "to use its name as a front and, in return, receives a nominal flat fee." Dkt. 135 ¶ 111.

Skytrail Servicing is the alleged "de facto lender of loans originated in the name of" Ningodwaaswi. *Id.* ¶ 33. The money loaned to borrowers, including Plaintiff Maville, by Ningodwaaswi was transferred from a bank account owned and operated by Pruett and Skytrail Servicing. *Id.* ¶ 117. The Tribe and the Tribal Council were not given access to these accounts. *Id.*

### D.  Plaintiffs' Loans

Plaintiffs allege that Defendants, along with other unknown parties, marketed and collected usurious loans, despite knowing these loans were illegal under state usury and licensing laws. *Id.* ¶¶ 149–50. Between 2014 and 2016, Plaintiff Aaron Fitzgerald applied for and received five loans from Ishwaaski, LLC, a Tribal Lending Entity. *Id.* ¶ 154. Under each of his loan

---

[5] The Magistrate Judge previously granted Defendant Skytrail Servicing's motion to seal the agreement between Ningodwaaswi and Skytrail Servicing for containing "confidential, propriety information." Dkt. 128. Because detailed information in the agreement is not necessary for evaluating the motions, the Court limits its discussion on that agreement.

agreements, he borrowed about $200 to $1,000 at an annual interest rate ranging from about 400% to 700%. *Id.* ¶¶ 155–65. He used his Virginia address on his loan applications and his Virginia bank account with a Virginia ABA routing number to receive the loans. *Id.* ¶ 166. He still has an outstanding balance on his loans. *Id.* ¶¶ 156–65.

Plaintiff Lori Fitzgerald borrowed $400 at an interest rate of 756% from Niizhwaaswi LLC, a Tribal Lending Entity. *Id.* ¶¶ 167–68. She has repaid $104.88 on her loan. *Id.* ¶ 169. She used her Virginia address on her loan application and her Virginia bank account with a Virginia ABA routing number to receive the loan. *Id.* ¶ 170.

Between 2018 and 2019, Plaintiff Williams took out eight loans from Niizhwaaswi. *Id.* ¶ 171. He also received five additional loans from other Tribal Lending Entities. *Id.* ¶¶ 172–73. Some of his loans had a 300% interest rate. *Id.* ¶¶ 174–76. In total, he borrowed about $12,695, repaid about $17,825.39, and has an outstanding balance on some of his loans. *Id.* ¶¶ 177–79. For each loan, he used his Georgia address for his loan application and his Georgia bank account with a Georgia ABA routing number to receive the loans. *Id.* ¶ 180.

Between 2020 and 2021, Plaintiff Singleton borrowed three loans from Niswi, LLC, a Tribal Lending Entity. *Id.* ¶ 181. She paid her first two back in full. *Id.* ¶¶ 182–85. For her third, she borrowed $1,500 at an interest rate of 499% and still has an outstanding balance. *Id.* ¶¶ 186–87. For each loan, she used her Maryland address for her loan application and her Maryland bank account with a Maryland ABA routing number to receive the loans. *Id.* ¶ 188.

In 2020, Plaintiff Maville borrowed $700 at an interest rate of 771% from Ningodwaaswi, the Tribal Lending Entity that entered into a servicing agreement with Skytrail Servicing. *Id.* ¶¶ 189–90. Pruett and Skytrail Servicing performed all acts related to the loan, including underwriting the loan and funding $700 into Maville's bank account. *Id.* ¶ 191. She

has only repaid $1,794.21 on the loan. *Id.* ¶ 194. Pruett and his company, Skytrail Servicing, "initiated the debits on [] Maville's account and received the vast majority of the $1,794.21 paid by [] Maville," minus fees sent to the Tribe. *Id.* For each loan, she used her Florida address for her loan application and her Florida bank account with a Florida ABA routing number to receive the loans. *Id.* ¶ 195.

Plaintiffs allege that because these "loans were null and void under applicable state law," "it is unlawful for Defendants, LDF Holdings, or any of their affiliates to collect or receive any principal, interest or charges whatsoever on said loans, including any amounts paid by Plaintiffs." *Id.* ¶ 153.

### E. Loan Agreements with Arbitration Provisions

Plaintiffs Williams, Singleton, and Maville entered into loan agreements with arbitration provisions. Dkts. 145-1, 149-1.[6] Their loan agreements specifically contain a Dispute Resolution Procedure and Arbitration Provision. It provides that if a "dispute is not resolved" to the consumer's satisfaction through the internal dispute resolution procedures, the parties agree they "shall arbitrate that dispute in accordance with the terms of the Arbitration Provision." Dkt. 145-1 at 11–12. The Arbitration Provision states that an arbitrator

> shall apply applicable substantive law consistent with the Governing Law set forth above, and the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA") and applicable statutes of limitation, and shall honor claims of privilege recognized at law.

*Id.* at 12.

The referenced Governing Law section provides:

---

[6] Defendants attach Plaintiffs Williams, Singleton, and Maville's loan agreements to their briefs in support of their motions to compel arbitration. Dkts. 145-1, 149-1. Because each loan agreement contains identical language on the Arbitration Provision and the Governing Law section, the Court only cites Maville's loan agreement to avoid unnecessary and duplicative citations.

The laws of the Tribe and applicable federal law will govern this Agreement, without regard to the laws of any state or other jurisdiction, including the conflicts of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law and applicable federal law shall exclusively apply to such dispute.

*Id.* at 9–10.

The Arbitration Provision defines "dispute" or "disputes" to include, in relevant part:

(a) all claims, disputes or controversies arising from or relating directly or indirectly to this Dispute Resolution Procedure and Arbitration Provision ("this Provision"), the validity and scope of this Provision and any claim or attempt to set aside this Provision; (b) all U.S. federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to this Agreement . . .; (d) all common law claims, based upon contract, tort, fraud, or other intentional torts; (e) all claims based upon a violation of any state or federal constitution, statute or regulation . . .

*Id.* at 12.

The Arbitration Provision further provides that "arbitration shall occur before the American Arbitration Association" unless the parties "mutually agree to select a different arbitrator who is an attorney, retired judge, or arbitrator registered and in good standing with an arbitration association and arbitrate pursuant to such arbitrator's rules." *Id.* It states that the "arbitration hearing will be conducted in the county of [the consumer's] residence, unless [she or he] agree to a different location" and that both parties "acknowledge and agree that this Arbitration Provision is made pursuant to a transaction involving interstate commerce and shall be governed by the FAA." *Id.* The Arbitration Provision states:

> **YOU AGREE TO THE TERMS OF THIS ARBITRATION PROVISION AND YOU HEREBY AGREE AND ACKNOWLEDGE THAT YOU ARE WAIVING YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES.**

*Id.* (emphasis in original). Plaintiffs Williams, Singleton, and Maville each electronically signed their loan agreement containing the Arbitration Provision. *See* Dkts. 145-1, 149-1.

### F. Class Action Complaint and Pending Motions

In their second amended complaint, Plaintiffs bring a class action against all Defendants, in their individual capacities, claiming they violated §§ 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Dkt. 135 ¶¶ 196–233. They also claim that the Tribal Council Defendants, in their official capacities, violated state usury and licensing laws. *Id.* ¶¶ 234–45. They seek (1) a declaratory judgment "that the loan agreements are invalid and the loans are uncollectable" under state law, or alternatively, under 28 U.S.C. § 2201; and (2) an injunction enjoining the Tribal Council Defendants, in their official capacities, "from allowing collection on the loans." *Id.* ¶¶ 245, 258. Lastly, Plaintiff Maville brings an unjust enrichment claim against Defendants Pruett and Skytrail Servicing for herself and on behalf of a class. *Id.* ¶¶ 259–70.

Defendants Pruett and Skytrail Servicing move to compel arbitration of Plaintiff Maville's claims. Dkt. 144. Alternatively, they move to dismiss the second amended complaint for lack of personal jurisdiction, for failure to join a necessary party, and for failure to state a claim for relief. Dkt. 146. The Tribal Council and Tribal Employee Defendants move to compel arbitration of Plaintiffs Williams, Singleton, and Maville's claims. Dkt. 148. In the same motion, they move to dismiss Plaintiffs' second amended complaint for lack of subject matter jurisdiction. *Id.* Alternatively, the Tribal Council and Tribal Employee Defendants move to dismiss Plaintiffs' second amended complaint for failure to state a claim for relief. Dkt. 150.

## Motions to Compel Arbitration

The Court first considers Defendants' motions to compel arbitration under the terms of Plaintiffs Williams, Singleton, and Maville's loan agreements, pursuant to Rule 12(b)(3).[7] Dkts. 144, 148. For the following reasons, Defendants' motions to compel will be denied.

### A.  Legal Standard

Under Federal Rule of Civil Procedure 12(b)(3), a party may move to dismiss a case for improper venue. A motion to dismiss based upon a forum-selection clause is treated as a motion to dismiss for improper venue. *Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 549 (4th Cir. 2006). Thus, because an arbitration clause is a "specialized kind of forum selection clause," Rule 12(b)(3) is the proper means to dismiss an action due to an arbitration clause. *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 365 n.9 (4th Cir. 2012) (internal quotation marks omitted). When considering a 12(b)(3) motion, a court "is permitted to consider evidence outside the pleadings." *Id.* at 365–66. To survive a 12(b)(3) motion to dismiss, a plaintiff must only make a "prima facie showing of proper venue," and the court must view the facts "in the light most favorable to the plaintiff." *Id.* at 366.

### B.  Analysis

Under the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA establishes a presumption of validity for arbitration agreements.  *See* 9 U.S.C. § 1 *et seq.*; *see Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012). Thus, "any doubts concerning the scope of arbitrable issues should be

---

[7] Defendants do not move to compel arbitration of Plaintiffs Lori Fitzgerald and Aaron Fitzgerald's claims.

resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

> A party can compel arbitration under the FAA if it demonstrates:
>
> (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.

*Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002) (internal quotation marks and citation omitted).

Here, the parties dispute the second element: whether a binding arbitration provision exists. Defendants specifically argue the Court should compel arbitration as to Plaintiffs Williams, Singleton, and Maville's claims because: (1) the Arbitration Provision contains a delegation clause, specifying that an arbitrator will determine whether the Arbitration Provision is enforceable; and (2) the Arbitration Provision does not amount to an impermissible prospective waiver of federal rights. The parties also dispute (3) whether the Arbitration Provision impermissibly waives state substantive rights and remedies. The Court considers each of these issues below.

### 1. The Delegation Clause

Parties to an arbitration agreement may agree to have a delegation clause. This clause delegates "gateway questions of arbitrability, such as whether the parties have agreed to arbitrate," to an arbitrator. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019). "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id.* at 530. But "when a party challenges a delegation clause specifically, the court must evaluate the validity of the delegation 'before ordering compliance' with the clause." *Hengle v. Treppa*, 19 F.4th 324, 335 (4th Cir.

2021) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)). A party may "contest the enforceability of the delegation clause with the same arguments it employs to contest the enforceability of the overall arbitration agreement." *Id.*; *see Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 338 (4th Cir. 2020).

Here, the Arbitration Provision contains a delegation clause. It specifically provides that any "dispute" not resolved by the Tribal Lending Entity's internal review will be resolved by arbitration. Dkt. 145-1 at 11–12. And it defines "dispute" as including "the *validity and scope of this Provision* and any claim or attempt to set aside this Provision." *Id.* at 12 (emphasis added). Because of this delegation clause, Defendants argue that Plaintiffs Williams, Singleton, and Maville's claims should be compelled to arbitration and that any issues with the delegation clause's validity or enforceability should first be addressed by the arbitrator, not the Court. Dkt. 145 at 4–5; Dkt. 149 at 23–24.

But Plaintiffs have properly challenged the delegation clause's validity based on the same reasons they provide for the Arbitration Provision being unenforceable, arguing that the Arbitration Provision prospectively waives statutory rights and remedies. Dkt. 152 at 29–31. Given Plaintiffs' challenge, the Court, rather than an arbitrator, "will assess the enforceability of the delegation clause." *Hengle*, 19 F.4th at 336; *see Haynes Invs.*, 967 F.3d at 338.

### 2. *Prospective Waiver of Federal Rights*

The parties next dispute whether the Arbitration Provision amounts to a prospective waiver of federal statutory rights and remedies, rendering the delegation clause unenforceable. Courts "must enforce arbitration agreements on an equal footing with other contracts and may invalidate an arbitration agreement based on 'generally applicable contract defenses." *Hengle*, 19 F.4th at 334 (internal quotation marks and citations omitted). One such general defense is the

12

"prospective waiver" doctrine. Under this doctrine, "an agreement that prospectively waives 'a party's right to pursue statutory remedies' is unenforceable as a violation of public policy."[8] *Id.* at 334 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 637 n.19 (1985)).

Applying this doctrine, the Fourth Circuit has repeatedly "refused to enforce arbitration agreements that limit a party's substantive claims to those under tribal law, and hence forbid federal claims from being brought" in arbitration. *Id.* at 335 (internal quotation marks omitted); *see Haynes Invs., LLC*, 967 F.3d at 339–45; *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 292–294 (4th Cir. 2020); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 333–337 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 673–676 (4th Cir. 2016); *see cf. Williams v. Martorello*, 59 F.4th 68, 80 (4th Cir. 2023) (applying the prospective waiver doctrine to loan agreements limiting relief to tribal court).[9]

In those cases, the Fourth Circuit held that the arbitration agreements impermissibly waived federal rights when they explicitly required an arbitrator to apply only tribal law or

---

[8] The prospective waiver doctrine originated from the Supreme Court stating in a footnote

> in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy.

*Mitsubishi Motors Corp.*, 473 U.S. at 637 n.19. Since then, the Supreme Court has referenced the *Mitsubishi Motors* footnote when discussing concerns about waiving statutory rights. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009) (noting "a substantive waiver of federally protected civil rights [would] not be upheld"); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35 (1991); *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 232 (1987); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 541 (1995); *see also Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 235–36 (2013).

[9] Other circuit courts have made similar holdings. *See, e.g.*, *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229 (3d Cir. 2020); *Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019).

prohibited an arbitrator from applying federal law. For instance, in *Hayes*, the court found that the arbitration agreement's choice of law provision "waive[d] all of a potential claimant's federal rights" when the agreement explicitly stated that it "shall be governed by the law of the [tribe]," that the arbitrator must "apply the laws of the [tribe] and the terms of this Agreement,'" and that the arbitrator would not apply "any law other than the law of the [tribe] to this Agreement.'" 811 F.3d at 675 (internal quotation marks omitted) (cleaned up). In *Dillon*, the Fourth Circuit similarly concluded that the arbitration agreement prospectively waived a potential claimant's federal rights by stating, in part, "[t]his Agreement and the Agreement to Arbitrate are governed by [tribal law]" and that a borrower "agree[s] that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation." 856 F.3d at 335–36 (internal quotation marks omitted).

Here, Plaintiffs claim the Governing Law section's language is like the loan agreements' language in *Martorello*, 59 F.4th 68.[10] And therefore, Plaintiffs argue the Arbitration Provision should be found unenforceable like the class action-waiver in *Martorello*. Dkt. 152 at 5. In *Martorello*, the Fourth Circuit held that "the prospective waiver doctrine render[ed] the class-action waiver [in the borrowers' tribal lending agreements] unenforceable because it [was] governed solely by Tribal law." 59 F.4th at 84. In making that conclusion, it cited the agreements' language stating that the agreements were "governed by the laws of the [tribe]," that "[a]ll disputes . . . shall be resolved by the [tribal dispute resolution procedure] only on an individual basis with You as provided for pursuant to the Tribal law," and that the borrowers

---

[10] Plaintiffs contend that because LDF's Financial Code, the governing Tribal law, does not incorporate federal law, the Arbitration Provision amounts to a prospective waiver of federal rights. Dkt. 152 at 17–22. Because the Arbitration Provision here allows a potential claimant to assert federal rights in arbitration, the Court need not consider whether the LDF's Financial Code incorporates federal rights.

"acknowledge and agree that this Agreement is subject solely and exclusively to Tribal law." *Id.* (internal quotation marks omitted).

Unlike like those cases, the Arbitration Provision here is not requiring the arbitrator to apply only Tribal law, nor does the loan agreements' Governing Law section state that only Tribal law applies in arbitration. Instead, an arbitrator must apply tribal law, applicable federal law, and the FAA. *See* Dkt. 145-1 at 9–10, 12 (providing an arbitrator "shall apply applicable substantive law consistent with the Governing Law" section, which provides that the "laws of the Tribe and applicable federal law will govern this Agreement" and that "Tribal law and applicable federal law shall exclusively apply to such dispute").

Still, Plaintiffs contend that the term "applicable" being placed before "federal law" in the Governing Law section demonstrates that Tribal law prospectively waives federal rights just like in *Martorello*. Dkt. 152 at 5. Plaintiffs correctly note that the choice-of-law provision in *Martorello* contained the term "applicable federal law," like the loan agreements' Governing Law section in this case. But the Fourth Circuit did not base its holding in *Martorello* on that specific language. Rather, in making its conclusion that the agreements impermissibly waived federal rights, the court emphasized the agreements' language that stated the agreements were governed exclusively by tribal law. *Martorello*, 59 F.4th at 84. Here, unlike *Martorello*, an arbitrator is being directed by the Governing Law section to apply Tribal and federal law. *See* Dkt. 145-1 at 9–10, 12. Thus, the use of the phrase—"applicable federal law"—in the Governing Law section reasonably means that a potential claimant may assert any "applicable" federal claim based on the facts of his or her case. Accordingly, Plaintiffs' loan agreements do not undisputedly waive federal substantive rights and remedies.

Lastly, Plaintiffs argue that if their claims go to arbitration, Williams, Singleton, and

Maville will be unable to bring their RICO claims (which are predicated on state law violations) because of the loan agreements' Governing Law section. Dkt. 152 at 7. Their argument appears premature for the Court to decide at this time. *See generally Dillon*, 856 F.3d at 334 (noting "the arbitrator should determine in the first instance whether the choice of law provision would deprive a party of those remedies" if there is uncertainty as to "whether the foreign choice of law would preclude otherwise applicable federal substantive statutory remedies"). But the Court need not resolve this issue for the reasons discussed in the next section.

### 3.  *Prospective Waiver of State Rights*

Even though the agreements do not undisputedly waive federal rights, Plaintiffs still argue that Defendants' motions to compel should be denied because the prospective waiver doctrine extends to arbitration agreements waiving state substantive rights and remedies. Dkt. 152 at 9–17. Thus, according to Plaintiffs, their loan agreements prospectively waiving *state* substantive rights and remedies violate public policy, rendering the delegation clause and the Arbitration Provision unenforceable. *Id.* The Court agrees, in part, concluding that the delegation clause and the entire Arbitration Provision here violate public policy because the loan agreements prospectively waive the vindication of *any* state substantive remedies and rights in arbitration, including Plaintiffs' rights to pursue state usury claims. Therefore, they are unenforceable.

Fourth Circuit precedent supports extending the prospective waiver doctrine to an arbitration provision prospectively waiving *all* state substantive rights. The Fourth Circuit has repeatedly emphasized that arbitration agreements waiving both state and federal substantive rights are unenforceable. *See, e.g.*, *Dillon*, 856 F.3d at 336 (finding arbitration agreement unenforceable when its terms were interpreted "as an unambiguous attempt to apply tribal law *to*

16

*the exclusion of federal and state law*") (emphasis in original); *Hayes*, 811 F.3d at 670 (same);

*Hengle*, 19 F.4th at 339 (same). And in those cases, the Fourth Circuit warned that a defendant

cannot use arbitration as "a calculated attempt to avoid the application of state and federal law."

*Dillon*, 856 F.3d at 337; *see Hayes*, 811 F.3d at 676 (noting defendant "seeks to deploy

[arbitration] to avoid state and federal law and to game the entire system").

  A recent Supreme Court case further supports extending the doctrine to an agreement

prospectively waiving a borrower's right to pursue any state statutory remedy. In *Viking River

Cruises, Inc. v. Moriana*, the Supreme Court reiterated the principle that a party who agrees to

arbitrate a statutory claim "does not forgo the substantive rights afforded by the statute;" rather,

"it only submits to their resolution in an arbitral forum."[11] 142 S. Ct. 1906, 1919 (2022) (citing

*Preston v. Ferrer*, 552 U.S. 346, 359 (2008) (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 628))

(cleaned up). In that case, a party had argued, similar to Defendants here, "the principle that the

FAA does not mandate enforcement of provisions waiving substantive rights is limited to federal

statutes." *Id.* at 1920, n.5. But the Supreme Court responded: "This argument is erroneous." *Id.* It

explained that:

> The basis of this principle is not anything unique about federal statutes. It is that the FAA
> requires only the enforcement of "provision[s]" to settle a controversy "by arbitration," §
> 2, and not any provision that happens to appear in a contract that features an arbitration
> clause. That is why we mentioned this principle in *Preston*, which concerned claims
> arising under state law. See 552 U.S. at 360, 128 S.Ct. 978 (noting that under the
> agreement, a party "relinquishe[d] no substantive rights . . . California law may accord
> him").

*Id.* Thus, based on the reasoning underlying Fourth Circuit and Supreme Court precedent, an

arbitration agreement prospectively waiving all state substantive rights and remedies can be

---

[11] In *Viking*, the Supreme Court held that the FAA preempted a state rule precluding the
division of a state statute action into individual and non-individual claims through an arbitration
agreement. 142 S. Ct. at 1913.

found unenforceable for violating public policy.

Having outlined that legal reasoning, the Court now turns to the loan agreements at issue in this case. Here, Plaintiffs' loan agreements mandate that an arbitrator apply Tribal and federal law to the exclusion of *all* state substantive law. The Governing Law section provides that "[t]he laws of the Tribe and applicable federal law will govern this Agreement, *without regard to the laws of any state* or other jurisdiction" and that "Tribal law and applicable federal law *shall exclusively* apply to such dispute." Dkt. 145-1 at 9–10 (emphasis added). And the Arbitration Provision mandates an arbitrator to "apply applicable substantive law consistent with the Governing Law" section.[12] *Id.* at 12. As such, the Governing Law section and Arbitration Provision operate in tandem to prevent an arbitrator from applying state law and thus prospectively waive Plaintiffs Maville, Singelton, and Williams' rights to pursue state substantive remedies, including their right to seek remedies under state usury laws. In effect, the loan agreements would require the arbitrator to determine whether the Arbitration Provision impermissibly waives state substantive rights without recourse to state substantive law. *See*

---

[12] Tribal Council and Tribal Employee Defendants argue that the loan agreements do not waive state statutory rights because the Arbitration Provision defines "disputes" subject to arbitration as including "all U.S. federal or state law claims," "all common law claims," and "all claims based upon a violation of any state or federal constitution, statute or regulation." Dkt. 149 at 26–27 (citing Dkt. 145-1 at 12). However, the Fourth Circuit has repeatedly rejected a similar argument. *See, e.g.*, *Hengle*, 19 F.4th at 343. In *Martorello*, for example, the defendant argued that the agreement allowed for "claims to be brought under federal law based on its definition of 'disputes,'" which included "all Tribal and U.S. federal or state law claims." 59 F.4th at 85. But the Fourth Circuit found that argument meritless, noting that if the borrowers "attempted to bring claims under such language, the [tribal law and dispute resolution procedure] would prevent vindication of them." *Id.* Likewise, here, the Arbitration Provision defining "disputes" to include state law claims cannot counteract the effect of the Governing Law section and the Arbitration Provision precluding the arbitrator from applying state law. Ultimately, such language highlights the Arbitration Provision's "impermissible tactic of compelling arbitration of" state claims "only to nullify those claims by precluding application of" state law. *See Hengle*, 19 F.4th at 343.

*Hengle*, 19 F.4th at 338. Therefore, the delegation clause is unenforceable for contravening public policy. *See Sequoia Cap. Operations, LLC*, 966 F.3d at 294.

The entire Arbitration Provision is also unenforceable as a violation of public policy. Here, Plaintiffs took out the loans at issue online while residing in Maryland, Virginia, Georgia, or Florida. Each of their respective states have enacted usury laws to protect and safeguard the public from predatory lending practices, such as the ones alleged in this case. Thus, under these circumstances, Defendants seek to compel arbitration as "a calculated attempt to avoid the application of" any liability under state usury laws. *See Dillon*, 856 F.3d at 337. For these reasons, the entire Arbitration Provision is unenforceable for violating public policy.[13] *See Hengle*, 19 F.4th at 342 (holding that the entire arbitration provision was unenforceable when the choice-of-law clauses "operate[d] as a prospective waiver of the borrowers' federal statutory rights and remedies"); *Dillon*, 856 F.3d at 335–37. As such, the Court will deny Defendants' motions to compel arbitration.

### Motions to Dismiss for Lack of Subject Matter Jurisdiction

Next, the Court considers the Tribal Council and Tribal Employee Defendants' motion to dismiss Plaintiffs' claims under Rule 12(b)(1). Dkt. 148. For the following reasons, the Court concludes it has subject matter jurisdiction over Plaintiffs' claims.

---

[13] Of course, "parties are free within bounds to use a choice of law clause in an arbitration agreement to select which *local law* will govern the arbitration." *Hayes*, 811 F.3d at (citation omitted) (emphasis added). But here, the loan agreements are not merely asking the arbitrator to apply the law of one state to the exclusion of all others. Rather, the effect of the loan agreements would prevent the vindication of *any* state substantive rights in arbitration, including Plaintiffs' right to assert state usury claims. And notably, Plaintiffs took out the loans at issue while residing in states that enacted state usury laws to protect the public from predatory loan practices. Thus, Defendants, through the loan agreements, attempt to "convert a choice of law clause into a choice of no law clause" by renouncing the authority of any state statutes. *See Hayes*, 811 F.3d at 675. As such, the entire Arbitration Provision runs afoul of public policy.

## A. Legal Standard

A party may attack the subject matter jurisdiction of a court under Federal Rule of Civil Procedure 12(b)(1). *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431–32 (2007). Where, as here, a defendant challenges the sufficiency of a plaintiff's allegations to establish subject matter jurisdiction, the court must accept the truth of the plaintiff's allegations. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). But, ultimately, the "burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

## B. Analysis

The Tribal Council and Tribal Employee Defendants move to dismiss Plaintiffs' claims, asserting (1) that tribal sovereign immunity, or (2) alternatively, personal immunity defenses bar Plaintiffs' claims and (3) that Plaintiffs lack Article III standing. Dkt. 149 at 34–50.

### 1. Tribal Sovereign Immunity

First, Tribal Council and Tribal Employee Defendants assert the Court lacks subject matter jurisdiction over the claims asserted against them because the Tribe is the real party in interest and thus is entitled to sovereign immunity. *Id.* at 34–38. Indian tribes "exercise inherent sovereign authority" while still being "subject to plenary control by Congress." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (internal quotation marks omitted). Unless there is congressional action or tribal consent, tribes enjoy "common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58 (1978); *see also Bay Mills Indian Cmty.*, 572 U.S. at 789.

This immunity does not bar "a suit for injunctive relief against *individuals,* including tribal officers, responsible for unlawful conduct." *Bay Mills Indian Cmty.*, 572 U.S. at 796

(emphasis in original). And it "does not bar state law claims for prospective injunctive relief against tribal officials for conduct occurring off the reservation." *Hengle*, 19 F.4th at 345.[14] Here, the Tribal Council Defendants' alleged conduct involves overseeing the Tribal Lending Entities that have issued loans online to non-tribal members who are located on non-tribal lands. Because this conduct occurs off the reservation, tribal sovereign immunity does not bar Plaintiffs' claims seeking prospective relief under state law against the Tribal Council Defendants, in their official capacities. *See id.* at 348–49 (finding defendants' activities of collecting loan payments from plaintiffs while "they resided in Virginia from bank accounts maintained there" constituted "off-reservation conduct").

But when tribal officials and employees are sued for damages in their individual capacities, courts must assess "whether the sovereign is the real party in interest to determine whether sovereign immunity bars the suit." *Lewis v. Clarke*, 581 U.S. 155, 161 (2017). In making this determination, "courts may not simply rely on the characterization of the parties in the complaint, but rather must determine in the first instance whether the remedy sought is truly against the sovereign." *Id.* (citation omitted). And "the distinction between individual-and official-capacity suits is paramount." *Id.* at 1291. A suit for damages against a tribal officer, in his official capacity, is really a suit against the "government entity, not the named official." *Id.* (citing *Edelman v. Jordan,* 415 U.S. 651, 663–665 (1974)). In such a case, the individual can successfully assert sovereign immunity. *Id.*

---

[14] Defendants contend that the "*Hengle* decision flew in the face of the Supreme Court's prior decisions" and that this Court should decline to follow *Hengle*'s holding extending "the *Ex parte Young* doctrine to provide an exception to tribal sovereign immunity in suits against tribal officials seeking prospective injunctive relief to enjoin alleged violations of *both* federal and state law." Dkt. 149 at 39–41. This Court, however, is bound to follow *Hengle*, as it is bound to follow all Fourth Circuit precedent.

In contrast, a suit for damages against a tribal officer, in his individual capacity, means that "the real party in interest is the individual, not the sovereign." *Id.* (citing *Hafer v. Melo,* 502 U.S. 21, 27 (1991)). In such a case, "sovereign immunity 'does not erect a barrier against suits to impose individual and personal liability.'" *Id.* (quoting *Hafer*, 502 U.S., at 30–31). Immunity does not bar a suit for damages even if it occurred "within the scope of [a tribal employee's] employment." *Id.* at 1291; *see also Pistor v. Garcia*, 791 F.3d 1104, 1112 (9th Cir. 2015).

In very limited circumstances, immunity can still bar a suit for damages against an officer, in his individual capacity, when an action is really against the tribe. Examples include when a plaintiff attempts to reach the tribal treasury or when a suit interferes with tribal self-government or undermines the tribal forum's authority. *See, e.g.*, *Genskow v. Prevost*, 825 F. App'x 388, 391 (7th Cir. 2020) (holding a tribal member's excessive force claims against tribal officers were barred by tribal sovereign immunity when the alleged excessive force occurred while she was being removed from a tribal governing body meeting at the tribal chairman's direction); *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1087 (9th Cir. 2013).

Here, Plaintiffs seek damages for their RICO claims against the Tribal Council and Tribal Employee Defendants, in their individual capacities, based on loans issued online to them when they were located on non-tribal lands. They do not seek relief from the Tribal treasury, nor do they seek to interfere with the Tribe's self-governance or authority.[15] Accordingly, the Tribe is

---

[15] Defendants argue that "Plaintiffs' suit cannot proceed without the Tribe's and its tribal lending arm's involvement through discovery" and thus Plaintiffs will likely need to issue third-party subpoenas against the Tribe and the Tribal Lending Entities. Dkt. 149 at 37–38. Their argument, however, lacks merit. The second amended complaint attaches loan agreements between most named Plaintiffs and the Tribal Lending Entities, indicating Plaintiffs most likely can obtain the necessary evidence during discovery without involving the Tribe. In addition, the Court agrees with other district courts who have concluded that sovereign immunity does not bar subpoena requests to tribal entities, employees, or officers. *See, e.g.*, *Grand Canyon Skywalk Dev. LLC v. Cieslak*, No. 2:13-cv-596, 2015 WL 4773585, at *7 (D. Nev. Aug. 13, 2015); *United*

not the real party in interest and thus the Tribe's sovereign immunity is not implicated.

2. *Personal Immunity Defenses*

In the alternative, Defendants assert that the Tribal Council Defendants, in their individual capacities, are immune from damage liability based on personal immunity defenses. Like a state officer, a tribal officer, in his or her individual capacity action, may be able to assert personal immunity defenses. *See Lewis*, 581 U.S. at 164 n.2.

First, the Tribal Council Defendants contend they are entitled to absolute immunity as high-level tribal government officials because they acted with "the power as the highest elected officials of the Tribe." Dkt. 149 at 42–43. Under "exceptional situations," an executive official is entitled to absolute immunity when acting "for the conduct of the public business." *Butz v. Economou*, 438 U.S. 478, 507 (1978). To establish absolute immunity, an officer bears "the burden of showing that public policy requires an exemption of that scope." *Id.* at 506. However, "courts are obliged to apply absolute immunity sparingly, because the presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Goldstein v. Moatz*, 364 F.3d 205, 212 (4th Cir. 2004) (internal quotation marks omitted) (cleaned up).

The Tribal Council Defendants fail to meet their burden of demonstrating "that absolute immunity is essential for the conduct of the public business." *Butz*, 438 U.S. at 507. Defendants provide no authority for their position that absolute immunity extends to tribal officials overseeing and managing loans. Thus, the Court concludes that "qualified rather than absolute

---

*States v. Juvenile Male 1*, 431 F. Supp. 2d 1012, 1016 (D. Ariz. 2006); *see also Arista Recs. LLC v. Does 1-14*, No. 7:08-cv-205, 2008 WL 5350246, at *3–5 (W.D. Va. Dec. 22, 2008) (finding state sovereign immunity does not shield a non-party state entity from having to respond to a lawfully issued subpoena. Thus, Plaintiffs may subpoena non-party Tribal Lending Entities or Tribal officials without running afoul of sovereign immunity.

immunity is sufficient to protect [the Tribal Council Defendants] in the exercise of their duties." *See Goldstein*, 364 F.3d at 212.

Second, the Tribal Council Defendants claim they are entitled to qualified immunity. Tribal officials sued in their individual capacities for violations of federal constitutional or statutory rights are entitled to qualified immunity if the right was not clearly established at the time of the violation. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, a court must ask (1) whether the facts "make out a violation of a constitutional" or statutory right and (2) "whether that right was 'clearly established' at the time of [Defendants'] alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Here, Plaintiffs allege the Tribal Council Defendants violated RICO through an alleged unlawful lending scheme. While the Tribal Council Defendants may possess a claim of qualified immunity, the Court is unable to "conclusively reach that finding at this stage of the litigation." *Roncales v. Cnty. of Henrico*, 451 F. Supp. 3d 480, 500 (E.D. Va. 2020); *McVey v. Stacy*, 157 F.3d 271, 279 (4th Cir. 1998) ("affirm[ing] the district court's ruling to defer deciding on the qualified immunity issue until the record is better developed on the immunity issues"); *Willingham v. Crooke*, 412 F.3d 553, 558–59 (4th Cir. 2005) (noting "the question of qualified immunity should be decided at the summary judgment stage"). At this stage of the litigation, no clear picture emerges regarding the extent of the Tribal Council Defendants' oversight of the Tribal Lending Entities or whether the Tribal Council Defendants' oversight continued after they reasonably should have had notice that tribal lending practices violating state usury laws can amount to a RICO violation. *See, e.g.*, *Hengle v. Asner*, 433 F. Supp. 3d 825, 897–98 (E.D. Va. 2020), *aff'd sub nom. Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021). Ultimately, "[w]hat the individual Defendants did here may be better explained through discovery." *Roncales*, 451 F.

Supp. 3d at 500. Thus, the Court will defer ruling on whether the Tribal Council Defendants are entitled to qualified immunity.

Lastly, the Tribal Council Defendants contend they have absolute legislative immunity. Officers are immune from claims seeking damages and prospective relief for their legislative activities. *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951); *Supreme Ct. of Va. v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 731 (1980) (explaining absolute legislative immunity covers prospective relief or damages); *Runs After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985). This immunity determination "is based on the function being fulfilled–not the title of the actor claiming immunity." *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 485 (4th Cir. 2014). Actions that qualify as legislative include adopting "prospective rules that establish a general policy affecting the larger population," introducing and enacting a budget, voting for an ordinance, signing into law an ordinance, or lobbying a bill. *Id.* at 485; *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998).

But not "all actions undertaken" by bodies "that have legislative responsibilities are necessarily 'legislative.'" *Roberson v. Mullins*, 29 F.3d 132, 134 (4th Cir. 1994). A member of a governmental body "does not necessarily act in a legislative capacity when his participation in the action of the body takes the form of a vote; the action of the body must itself be legislative to make the member's act of voting legislative." *Id.* at 134, n.3.

Here, Plaintiffs allege that the Tribal Council passes "all 'legislation, statutes, codes and ordinances,' including those related to lending activities." Dkt. 135 ¶ 130. Such activities are legislative. Thus, the Tribal Council Defendants would be entitled to absolute legislative immunity if Plaintiffs' claims were based on them promulgating statutes, codes, or ordinances.

But Plaintiffs' claims are not based on such activities. Rather, they are seeking to hold the

Tribal Council Defendants liable for their executive, not legislative, activities. They allege that the Tribal Council Defendants oversee and manage all economic affairs of the Tribe, "review, perform, and implement high-level management of" the Tribal Lending Entities, and approve servicing agreements between non-tribal payday lenders and the Tribal Lending Entities. *Id.* ¶¶ 18–29. Thus, Plaintiffs' claims are not barred by absolute legislative immunity. *See Hengle*, 433 F. Supp. 3d at 888 (rejecting tribal officials' argument that plaintiffs' "desired relief will violate their immunity as legislators" because plaintiffs did not seek to hold tribal officials liable "for passing the Ordinance or for licensing the Tribal Lending Entities, but merely for allowing the continued collection of loans").

### 3. Standing

Next, Tribal Council and Tribal Employee Defendants contend Plaintiffs lack Article III standing for their RICO and state law claims against them. Dkt. 149 at 47–50. For each claim, Plaintiffs must demonstrate they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of [Defendants], and (3) that it is likely to be redressed by a favorable decision." *Spokeo v. Robbins*, 578 U.S. 330, 338 (2016); *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The parties only dispute elements two and three.

To establish traceability, Plaintiffs must show "a causal connection between the injury and the [Defendants'] conduct complained of by [Plaintiffs]." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (internal quotation marks omitted). While Defendants' "conduct need not be the last link in the causal chain," Plaintiffs "must be able to demonstrate that the alleged harm was caused by [Defendants], as opposed to the independent action of some third party not before the court." *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir.

2022) (internal quotation marks omitted). Defendants contend that Plaintiffs' alleged injuries are "not traceable" to the actions of the Tribal Council and Tribal Employee Defendants because they did not directly issue any loans to Plaintiffs. Dkt 149 at 48–49. They also argue that the Tribal Council Defendants' conduct of creating Tribal Lending Entities is too attenuated from Plaintiffs' injuries. *Id.*

While the Tribal Lending Entities may have issued the precise loans at issue, the loans would not have been issued or collected on *but for* the Tribal Council Defendants approving the creation of these lending entities and the Tribal Council and Tribal Employee Defendants overseeing and managing the Tribal Lending Entities, including reviewing their loan collections from borrowers. Dkt. 135 ¶¶ 5–6, 18–29, 31, 133, 146–47. Through their oversight and management of the Tribal Lending Entities, Tribal Council and Tribal Employee Defendants are alleged to have knowingly participated in a lending scheme, resulting in Plaintiffs being issued allegedly unlawful loans. *Id.* ¶¶ 149–50. Thus, Plaintiffs' injuries were not "the result of the independent action of some third party not before the court." *McMaster*, 24 F.4th at 901. Plaintiffs have therefore alleged sufficient facts to show a causal connection between Plaintiffs' loan debt and the Tribal Council and Tribal Employee Defendants' conduct.

To establish redressability, Plaintiffs must show that it is "likely, as opposed to merely speculative, that [their] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (citation and internal quotation marks omitted). Plaintiffs' burden to establish redressability "is not onerous": they must only "show that [they] personally would benefit in a tangible way from the court's intervention." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018) (internal quotation marks omitted). A plaintiff seeking injunctive relief demonstrates redressability by alleging a "continuing violation or the imminence of a future violation of the

statute at issue." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000) (internal quotation marks omitted). But redressability is "problematic when third persons not party to the litigation must act in order for an injury to arise or be cured." *McMaster*, 24 F.4th at 903 (internal quotation marks omitted).

Here, Plaintiffs seek prospective relief against the Tribal Council Defendants, in their official capacities,[16] for violating state usury and licensing laws.[17] Specifically, they seek (1) a declaratory judgment "that the loan agreements are invalid and the loans are uncollectable"; and (2) an injunction enjoining the Tribal Council, in their official capacities, "from allowing collection on the loans." Dkt. 135 ¶ 245. Defendants contend that an injunction enjoining the collection of loans would have no effect because the Tribal Council Defendants did "not issue or collect any of the debts" at issue, nor do they own, or have any personally held interest in, the Tribal Lending Entities. Dkt. 149 at 50. They also claim, "the Court cannot issue the requested injunctive relief as it pertains to the" Tribal Lending Entities because they are not defendants in this case. *Id.*

Contrary to Defendants' argument, Plaintiffs have alleged enough facts to satisfy redressability for their requested prospective relief. Plaintiffs allege a continuing violation of state law because Plaintiffs still have amounts due on their loans issued. *See Friends of the*

---

[16] While Defendants raise concerns about Plaintiffs lacking standing for their requested injunctive relief against Defendants Lorenzo and Chapman-Reynolds, Plaintiffs only seek injunctive relief against the Tribal Council Defendants, in their official capacities. Dkt. 135 at 45, 47.

[17] Defendants assert that Plaintiffs lack standing for their requested injunctive relief because "RICO does not authorize injunctive relief in actions brought by private parties." Dkt. 149 at 50. While the Fourth Circuit has held that RICO "does not authorize private RICO plaintiffs to sue for prospective injunctive relief," *Hengle*, 19 F.4th at 356, Plaintiffs may still seek, as requested in their second amended complaint, prospective injunctive relief from violations of state usury and licensing laws. Dkt. 135 at 45–47; *see generally Hengle*, 19 F.4th at 346.

*Earth, Inc*, 204 F.3d at 162. In addition, the Tribal Council Defendants allegedly create, oversee, and manage the Tribal Lending Entities that issued the loans to Plaintiffs, and they specifically review the collection of their loans. Dkt. 135 ¶¶ 18–29, 133. Based on these allegations at this stage of the litigation, the Court may issue an injunction directing the Tribal Council Defendants, through their oversight and control of the Tribal Lending Entities, to invalidate Plaintiffs' loans and to not allow the collection of their loans. Such an injunction voiding "their loans has a likelihood of redressing at least some of the harm from the loans issued to them." *Hengle*, 433 F. Supp. 3d at 889 (finding plaintiffs had standing for a claim for injunctive relief against tribal officials to declare their loans issued by tribal lending entities null and void); *see Larson v. Valente*, 456 U.S. 228, 243 (1982) (explaining a plaintiff satisfies the redressability requirement when he has shown a favorable decision would redress "*an* injury" not "*every* injury") (emphasis in original).

Plaintiffs have also alleged enough to meet redressability for their RICO claims seeking actual damages, treble damages, and costs from Tribal Council and Tribal Employee Defendants, in their individual capacities. A judgment requiring Defendants to pay damages will redress the alleged financial harm Plaintiffs experienced. Plaintiffs thus have standing for their claims against Tribal Council and Tribal Employee Defendants. For these reasons, the Court will deny Tribal Council and Tribal Employee Defendants' 12(b)(1) motion to dismiss Plaintiffs' claims.

## Motion to Dismiss for Failure to Join Necessary Party

Defendants Pruett and Skytrail Servicing move to dismiss for failure to join the Tribe and the Tribal Lending Entities pursuant to Rule 19. Dkt. 146. For the following reasons, the Court will deny their motion.

### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(7) permits a party to move for dismissal for failure to join a party under Rule 19. Rule 19 sets forth a two-step inquiry for a court to determine whether a party should be joined: (1) whether the party is "necessary" to the action under Rule 19(a); and (2) if deemed "necessary," whether the party is "indispensable" under Rule 19(b). Fed. R. Civ. P. 19; *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 249 (4th Cir. 2000). Under Rule 19(a), a party is necessary if "in that person's absence, the court cannot accord complete relief among the existing parties" or "that person claims an interest relating to the subject matter of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest . . . or leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(A)–(B). A party asserting a Rule 19 dismissal bears the burden of showing "that the person who was not joined is needed for a just adjudication." *Am. Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005) (internal quotation marks omitted).

### B. Analysis

In their motion, Defendants Pruett and Skytrail Servicing argue that the Tribe and the Tribal Lending Entities are necessary parties because the Tribal Lending Entities issued the loans to Plaintiffs. Dkt. 147 at 14–15. Therefore, according to Defendants, the Tribe and the Tribal Lending Entities cannot be joined to this suit because they have tribal immunity, and as such, the claims against them should be dismissed. *Id.* at 15.

Contrary to Defendants' argument, Plaintiffs' claims against Tribal Council Defendants, in their official capacities, renders the inclusion of the Tribe and Tribal Lending Entities

unnecessary under Rule 19. *See Hengle*, 433 F. Supp. 3d at 870 (finding plaintiffs' "claims against the Tribal Officials in their official capacities renders the inclusion of the Tribal Lending Entities unnecessary under Rule 19"); *Gingras v. Rosette*, No. 5:15-cv-101, 2016 WL 2932163, at *20 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that the presence of the tribal officials satisfies the requirements of Rule 19 because "tribal interests may be adjudicated through *Ex Parte Young*"). Plaintiffs seek prospective relief against Tribal Council Defendants in the form of (1) a declaratory judgment "that the loan agreements are invalid and the loans are uncollectable"; and (2) an injunction enjoining them "from allowing collection on the loans." Dkt. 135 ¶¶ 245, 258. Because Plaintiffs allege that the Tribal Council Defendants oversee and manage the Tribal Lending Entities who issued Plaintiffs' loans, the Court can award Plaintiffs' prospective relief against Tribal Council Defendants, rending the Tribe and the Tribal Lending Entities unnecessary to "accord complete relief." *Id.* ¶¶ 18–29; Fed. R. Civ. P. 19(a)(1)(A).

Moreover, the Tribal Council Defendants, as members of the Tribe's governing body, can adequately represent the interests of the Tribe and the Tribal Lending Entities. *See* Fed. R. Civ. P. 19(a)(1)(B); *see also Hengle*, 433 F. Supp. 3d at 871; *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1180 (9th Cir. 2012) (finding that the tribe did not constitute a necessary party under Rule 19(a)(1)(B)(i) because the tribal officials "can be expected to adequately represent" the tribe's interests). And while the Tribe and the Tribal Lending Entities would not be directly bound by the prospective relief, the Tribal Lending Entities could not continue to collect on the issued loans without the aid of the Tribal Council Defendants who oversee them. *See Hengle*, 433 F. Supp. 3d at 871 (explaining that while "any injunction against the Tribal Officials will not directly enjoin the Tribal Lending Entities, by the Tribal Officials'

own admission, they retain control of those Entities such that any act or omission by the Entities could not be undertaken without the Officials' consent, meaning Plaintiffs would not be exposed to inconsistent obligations if they succeed on the merits"). Because the Tribe and Tribal Lending Entities are unnecessary, the Court need not consider if they are "indispensable" under Rule 19(b). Thus, Defendants' motion for failure to join a necessary party will be denied.

## **Motion to Dismiss for Failure to State a Claim**

Defendants also move to dismiss Plaintiffs' claims under Rule 12(b)(6). Dkts. 146, 150. Because Plaintiffs have sufficiently pleaded claims for relief, the Court will deny their motions.

### A. **Legal Standard**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all its allegations taken as true and all reasonable inferences drawn in the plaintiff's favor, *King*, 825 F.3d at 212. A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv.*, *LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (quotation marks omitted). This is not to say

Rule 12(b)(6) requires "heightened fact pleading of specifics," instead the plaintiff must plead

"only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at

570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

**B. Analysis**

   *1. Plaintiffs' § 1962(c) claims*

Plaintiffs allege that Defendants violated 18 U.S.C. § 1962(c), which prohibits "any

person employed by or associated with any enterprise engaged in . . . interstate or foreign

commerce" from conducting or participating "directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To

properly allege a § 1962(c) violation for collection of unlawful debt, as alleged here, Plaintiffs

must state that Defendants "(1) conducted the affairs of an enterprise (2) through collection of

unlawful debt (3) while employed by or associated with (4) the enterprise engaged in . . .

interstate or foreign commerce." *Hengle*, 433 F. Supp. 3d at 897 (internal quotation marks

omitted).

Defendants first contend that Plaintiffs' § 1962(c) claims should be dismissed as a mere

"shotgun pleading," arguing that Plaintiffs allege the same misconduct by Tribal Council

Defendants collectively and therefore fail to attribute misconduct to any defendant on an

individual basis. Dkt. 151 at 14–18; *see* Dkt. 147 at 16–17. Rule 8(a)(2) requires a complaint to

contain a "short and plain statement showing that the pleader is entitled to relief."[18] Fed. R. Civ.

P. 8(a)(2). A so-called "shotgun pleading" occurs when a complaint "fails to articulate claims

---

[18] "The non-fraud elements of a RICO claim are assessed using Rule 8, not Rule 9(b)." *Mao v. Glob. Tr. Mgmt., LLC*, No. 4:21-cv-65, 2022 WL 989012, at *11 (E.D. Va. Mar. 31, 2022). Because "RICO defines 'unlawful debt' in terms of gambling and usury, not fraud," Plaintiffs' RICO claims "based on unlawful debt are assessed under the standards of Rule 8, not Rule 9(b)." *Id.* (citing 18 U.S.C. § 1961(6)).

with sufficient clarity to allow the defendant to frame a responsive pleading," or "it is virtually impossible to know which allegations of fact are intended to support which claims for relief." *Lee v. Meyers*, No. 21-1589, 2022 WL 252960, at *11 (D. Md. Jan. 27, 2022) (internal quotation marks omitted). A "court that receives a shotgun pleading should strike it and instruct counsel to replead the case." *Estate of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020).

Here, Plaintiffs group together the Tribal Council Defendants and allege they committed the same conduct that allegedly violated RICO and state law. But grouping together several defendants, without distinguishing most allegations among them, does not "*per se*" violate Rule 8. *Commonwealth of Pa. v. Think Fin., Inc.*, No. 14-cv-7139, 2016 WL 183289, at *11 (E.D. Pa. Jan. 14, 2016) (emphasis in original); *see Frazier v. U.S. Bank Nat. Ass'n*, No. 11-c-8775, 2013 WL 1337263, at *3 (N.D. Ill. Mar. 29, 2013). At most, it would be "group pleading that fails to provide defendants with fair notice of what they are being accused." *Think Fin., Inc.*, 2016 WL 183289, at *11. But Plaintiffs' allegations here provide fair notice to Defendants. Each Tribal Council Defendant has "notice of what services they are alleged to have illegally undertaken to advance [the tribal lending] scheme." *See id.* at *12. In addition, Plaintiffs provide specific allegations regarding Defendants Pruett and Skytrail Servicing's conduct: namely, that Skytrail Servicing had a servicing agreement with a Tribal Lending Entity that allowed it and its owner, Pruett, the right to market, originate, renew, service, and collect loans, including collecting loan payments from Plaintiff Maville. Dkt. 135 ¶ 117; Dkt. 138 ¶¶ 6–7, 102–05, 110.

Moreover, other courts have found similar allegations sufficient to state a claim under RICO. *See, e.g.*, *Hengle*, 433 F. Supp. 3d at 897 (finding plausible RICO claims based on allegations that non-tribal members "established several of the Tribal Lending Entities" and "performed nearly all of the operations of the Tribal Lending Entities, working in tandem with

those entities to issue and collect on triple-digit, high-interest loans"); *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 312 (E.D. Va. 2019) (finding plausible RICO claims based on allegations that defendants "helped design and implement the Tribal lending business through their ownership and control of Think Finance, which developed the Tribal lending business model at the heart of this allegedly unlawful RICO enterprise"). As such, the second amended complaint does not exhibit impermissible shotgun pleading.

Next, the parties dispute whether Plaintiffs have pleaded sufficient facts to establish a RICO enterprise, a required element for a § 1962(c) claim. Dkt. 147 at 18–21; Dkt. 151 at 18–19. A RICO "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). An association-in-fact enterprise must have at least three structural features: (1) a purpose; (2) "'relationships among those associated with the enterprise;'" and (3) "'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). However, it does not need a hierarchical structure, members with fixed roles, or established rules. *Boyle*, 556 U.S. at 948.

Here, Plaintiffs have sufficiently alleged that the Tribe, the Tribal Council, the Tribe's subsidiaries, and non-tribal payday lenders, including Defendants Pruett and Skytrail Servicing, form an association-in-fact enterprise that meets the three structural features. First, each of the Defendants and non-parties are alleged to share the common purpose of collecting unlawful debts. Dkt. 135 ¶ 124; *see Mao*, 2022 WL 989012, at *8.

Second, Plaintiffs' allegations are sufficient to establish relationships among those associated in the enterprise. *See Mao*, 2022 WL 989012, at *8. Specifically, Plaintiffs allege that

Tribal Council Defendants oversee and manage the Tribal Lending Entities that have issued unlawful loans to Plaintiffs. Dkt. 135 ¶¶ 18–29. The Tribal Council appointed Tribal Employee Defendants, Lorenzo and Chapman-Reynolds, to "directly oversee and control the Tribe's involved in the lending scheme" and "serve as liaisons between the Tribe and the non-tribal payday lenders." *Id.* ¶¶ 5–6. In turn, the Tribal Lending Entities and non-tribal payday lenders, including Defendants Pruett and Skytrail Servicing, have entered into servicing agreements, allowing non-tribal payday lenders to collect on loan payments from Plaintiffs and other borrowers. *Id.* ¶¶ 3, 119. Third, Plaintiffs establish longevity by alleging that the Tribe began partnering with non-tribal payday lenders around 2012 or 2013 and that Plaintiffs still owe payments on loans issued between 2014 and 2021. *Id.* ¶¶ 3, 155–94.

Defendants also contend that Plaintiffs have failed to plead distinctness. Dkt. 147 at 21–22; Dkt. 151 at 19–20. For their § 1962(c) claims, Plaintiffs "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). The "person"[19] alleged to have violated RICO must be separate and distinct from the "enterprise" or tool through which the RICO violation occurred. *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 588 (D. Md. 2014*)*; *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 842 (D. Md. 2013). Liability "depends on showing that the defendants conducted or participated in the conduct of the *enterprise*'s affairs, not just their *own* affairs." *Cedric Kushner Promotions, Ltd.*, 533 U.S. at 163 (internal quotation marks omitted) (emphasis in original). A defendant, however, can "be a person under the statute and also be part of the

---

[19] The RICO statute defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

enterprise." *Solomon v. Am. Web Loan*, No. 4:17-cv-145, 2019 WL 1320790, at *6 (E.D. Va. Mar. 22, 2019) (internal quotation marks omitted). "'The prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise.'" *Id.* (quoting *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000)).

Here, Plaintiffs have sufficiently alleged facts to meet the distinctness requirement. The allegations support a "person," comprised of the Tribal Council and Tribal Employee Defendants, and "an association-in-fact enterprise," comprised of the Tribe, the Tribe's subsidiaries, the Tribal Council, and non-tribal payday lenders, including Defendants Pruett and Skytrail Servicing. *See Cedric Kushner Promotions, Ltd.*, 533 U.S. at 161. While the Tribal Council and Tribal Employee Defendants work for the Tribe, the Tribe is not the only entity comprising the enterprise. *See Solomon*, 2019 WL 1320790, at *7 (finding plaintiffs sufficiently stated a RICO enterprise by alleging "that each of the defendants, as distinct entities, associated with each other and nonparties for the common purpose of exploiting the sovereignty of the Tribe to engage in the practice of issuing usurious loans"); *MacDonald v. CashCall, Inc*, No. cv-16-2781, 2017 WL 1536427, at *14 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018) (finding plaintiffs had alleged "a RICO enterprise that is not simply the same 'person' referred to by a different name" because of "the inclusion of third party Western Sky, a separate legal entity with a different owner than Defendants").[20]

---

[20] Defendants cite *Myers v. Lee* to support their argument that Plaintiffs fail to plead distinctness. Dkt. 151 at 19–20. In that case, the plaintiff alleged that "he was systematically indoctrinated and defrauded . . . by the defendants acting through a network of affiliated entities formed and controlled by defendant Lee." No. 1:10-cv-131, 2010 WL 3745632, at *1 (E.D. Va. Sept. 21, 2010). The court concluded that the plaintiff failed to plead distinctness because "the purposes and personality of defendant Lee dominate[d] both the defendants and the enterprise, neither of which ha[d] a purpose distinct from the goals and objectives of the other, from

Lastly, Defendants Pruett and Skytrail Servicing argue that Plaintiffs do not plausibly allege they conducted or controlled the affairs of the enterprise. Dkt. 147 at 21–23. According to Defendants, Plaintiffs allege "only that Pruett and Skytrail Servicing provided services as an agent for [Ningodwaaswi] and that each profited indirectly." *Id.* at 22.

The Supreme Court has adopted the "operation or management" test to determine whether a party has "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs" pursuant to § 1962(c). *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993). Under this test, an enterprise is "'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* "An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it." *Id.* But merely "'acting in an advisory professional capacity (even if in a knowingly fraudulent way)'" is not enough to be liable under § 1963(c). *Hengle*, 433 F. Supp. 3d at 887 (quoting *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 633 F. Supp. 2d 214, 230 (E.D. Va. 2008)).

Here, Plaintiffs' allegations support a reasonable inference that Defendants Pruett and Skytrail Servicing operated the affairs of the alleged RICO enterprise. Pruett, the owner of Skytrail Servicing, allegedly has used "the tribal lending model for some of his usurious lending, including through a partnership" with the Tribe. Dkt. 135 ¶¶ 101–02. From this partnership, Plaintiffs allege that Skytrail Servicing entered into an agreement with Ningodwaaswi, providing Skytrail Servicing the right to market, originate, renew, service, and collect loans made in the

---

defendant Lee himself, or from his inherently fraudulent philosophy and activities." *Id.* at *5. Unlike *Myers*, Plaintiffs here allege non-tribal payday lenders, including Defendants Pruett and Skytrail Servicing, separate and distinct from the Tribe, took part in the alleged unlawful lending scheme.

name of Ningodwaaswi. Dkt. 138 ¶¶ 6–7, 102–05, 110. Plaintiffs further allege that the money

loaned to borrowers, including Plaintiff Maville, by Ningodwaaswi was transferred from a bank

account owned and operated by Pruett and Skytrail Servicing. Dkt. 135 ¶ 117. These allegations

support the inference that Pruett and Skytrail Servicing were not merely agents of

Ningodwaaswi, but rather, they had sufficient control to issue and collect on the high-interest

loan issued to Plaintiff Maville. *See, e.g.*, *Hengle*, 433 F. Supp. 3d at 897 (finding plaintiffs

plausibly stated that lenders conducted the affairs of the alleged RICO enterprise when, in part,

their allegations indicated that lenders "were not mere passive investors in the lending scheme

but possessed significant authority and influence over the alleged enterprise"); *Think Fin.*, 2016

WL 183289, at *18. Thus, Plaintiffs' § 1962(c) claim will not be dismissed for failure to state a

claim for relief.

### 2. *Plaintiffs' § 1962(d) claims*

Plaintiffs assert § 1962(d) claims against the Tribal Council and Tribal Employee

Defendants, in their individual capacities, alleging they aided, abetted, and facilitated a series of

agreements for the collection of unlawful debt. Dkt. 135 ¶ 231. To state a RICO conspiracy,

Plaintiffs must establish: "'(1) that two or more people agreed to commit a substantive RICO

offense and (2) that the defendant knew of and agreed to the overall objective of the RICO

offense.'" *Solomon*, 2019 WL 1320790, at *11 (quoting *United States v. Posada-Rios*, 158 F.3d

832, 857 (5th Cir. 1998)). Defendants move to dismiss Plaintiffs § 1962(d) claims on two

grounds.

First, Defendants contend that Plaintiffs' claims are barred by the so-called

"intracorporate conspiracy doctrine." Dkt. 147 at 23–24; Dkt. 151 at 20–21. This doctrine

provides that "a corporation cannot conspire with its employees, and its employees, when acting

in the scope of their employment, cannot conspire among themselves." *Baltimore-Washington Tel. Co. v. Hot Leads Co., LLC*, 584 F. Supp. 2d 736, 744 (D. Md. 2008); *see, e.g.*, *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986); *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985). Because Plaintiffs allege the conspiracy extended beyond affiliated entities to non-tribal payday lenders, Dkt. 135 ¶¶ 228–33, this doctrine does not bar their claims. *See Think Fin., Inc.*, 2016 WL 183289, at *18.

Second, Defendants claim that Plaintiffs fail to plead an agreement, as required for a § 1962(d) claim.[21] Dkt. 147 at 24; Dkt. 151 at 21–22. Plaintiffs may establish a RICO conspiracy "even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997). Still, "liability only attaches to 'the knowing agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute.'" *Solomon*, 2019 WL 1320790, at *11 (citing *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012)). "Proof of such an agreement may be established solely by circumstantial evidence." *Hengle*, 433 F. Supp. 3d at 898 (internal quotation marks omitted).

Here, Plaintiffs have sufficiently pleaded an agreement. According to Plaintiffs, each of the Tribal Lending Entities, which the Tribal Council and Tribal Employee Defendants oversee, have entered into "servicing agreements that outsource the operations and revenue to non-tribal payday lenders." Dkt. 135 ¶¶ 5–6, 18–29, 119. For instance, one of the Tribal Lending Entities

---

[21] Defendants argue that Plaintiffs fail to plead an agreement because they "do not explain how, when, or where an agreement by Tribal Defendants was reached." Dkt. 151 at 21; see Dkt. 147 at 24. The Court finds no support for Defendants' suggestion that Plaintiffs must allege "when or where an agreement" was reached to survive a motion to dismiss a § 1962(d) claim. Such a demand would place an unreasonable burden on Plaintiffs at the motion to dismiss stage prior to discovery.

entered into a servicing agreement with Defendant Skytrail Servicing, providing Skytrail Servicing the right to market, originate, renew, service, and collect loans made in the name of the Tribal Lending Entity. Dkt. 138 ¶¶ 6–7, 102–05, 110. The Tribe also allegedly receives revenue from Plaintiffs and other borrowers' loan payments. Dkt. 135 ¶ 3. This scheme was allegedly designed to avoid legal liability by taking advantage of the Tribe's sovereign immunity. Thus, Plaintiffs' allegations support a reasonable inference that the Tribal Council and Tribal Employee Defendants as well as non-payday lenders, including Defendants Pruett and Skytrail Servicing, "'objectively manifested an agreement to participate directly or indirectly in the affairs of the enterprise' through the collection of unlawful debts and 'had knowledge of the essential nature of the plan' of the conspiracy." *Hengle*, 433 F. Supp. 3d at 898 (quoting *United States v. Tillett*, 763 F.2d 628, 632 (4th Cir. 1985)); *see also Duggan v. Martorello*, 596 F. Supp. 3d 158, 194 (D. Mass. 2022).

### 3.  *Plaintiff Maville's Unjust Enrichment Claim*

Plaintiff Maville brings an unjust enrichment claim against Defendants Pruett and Skytrail Servicing for herself and on behalf of a class. Dkt. 135 ¶¶ 259–70. To state an unjust enrichment claim under Florida law,[22] Plaintiff Maville must allege "(1) that the plaintiff conferred a benefit on the defendant, who has knowledge thereof; (2) that the defendant voluntarily accepted and retained the benefit conferred; and (3) that the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Edmondson v. Caliente Resorts, LLC*, No. 8:15-cv-2672, 2018 WL 1565453, at *3 (M.D. Fla. Mar. 30, 2018) (internal quotation marks omitted) (cleaned up).

---

[22] Both parties agree Florida law governs Plaintiff Maville's unjust enrichment claim because she was issued the loan while in Florida and used a Florida bank account to receive the loan. Dkt. 147 at 24; Dkt. 153 at 38.

Defendants Pruett and Skytrail Servicing challenge element one, arguing that Plaintiff Maville fails to allege that she directly conferred a benefit on Pruett or Skytrail Servicing. Dkt. 147 at 25. Specifically, they contend her allegations are insufficient like those in *Extraordinary Title Servs., LLC v. Fla. Power & Light Co.,* 1 So. 3d 400 (Fla. Dist. Ct. App. 2009). Dkt. 147 at 25–26. In that case, the plaintiff's allegations indicated that it had not contracted with the defendant, nor had the defendant provided it services. *Extraordinary Title Servs., LLC*, 1 So. 3d at 403. Rather, the plaintiff's allegations indicated that it "ha[d] absolutely no relationship with" the defendant. *Id.* Based on these allegations, the court affirmed the trial court's dismissal of the plaintiff's unjust enrichment claim because the plaintiff had failed to establish that it conferred a direct benefit upon the defendant. *Id.*

Plaintiff Maville's allegations are materially different than the allegations in *Extraordinary Title Servs.* Unlike that case, she specifically alleges that Defendants Pruett and Skytrail Servicing "initiated the debits on [] Maville's account and received the vast majority of the $1,794.21 paid by [] Maville." Dkt. 135 ¶ 194. Thus, Plaintiff Maville's allegations sufficiently establish that she conferred a benefit directly on Defendants Pruett and Skytrail Servicing. Accordingly, her unjust enrichment claim survives the motion to dismiss.

### 4. *Plaintiffs' Remaining State Law Claims*

Plaintiffs assert that the Tribal Council Defendants have violated Virginia, Maryland, Georgia, and Florida law by participating in the issuance of loans at triple-digit interest rates to Plaintiffs.[23] *Id.* ¶¶ 234–45. For these alleged state law violations, Plaintiffs seek (1) a declaratory

---

[23] In their second amended complaint, Plaintiffs claim that the "Void Debt Class" will assert that the Tribal Council Defendants violated Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin laws. Dkt. 135 ¶ 235. Because the class has yet to be certified and the remaining Plaintiffs resided in and signed

judgment "that the loan agreements are invalid and the loans are uncollectable" under state law, or alternatively, under 28 U.S.C. § 2201; and (2) an injunction enjoining the Tribal Council Defendants, in their official capacities, "from allowing collection on the loans." *Id.* ¶ 245. Defendants move to dismiss Plaintiffs' state law claims seeking prospective relief on several grounds.

First, Defendants contend that the Tribal Lending Entities who issued Plaintiffs' loans, but are not named as defendants in this case, constitute the "lender" under state law. Dkt. 151 at 22–23. Therefore, according to Defendants, Plaintiffs cannot assert their state law claims against Tribal Council Defendants. *Id.*

The Court disagrees for the same reasons provided in *Hengle*, a very similar case. There, the Eastern District of Virginia concluded the plaintiffs could seek *Ex parte Young*-style relief against tribal officials, in their official capacities, to seek prospective relief under Virginia's Consumer Finance Act ("VCFA"). *Hengle*, 433 F. Supp. 3d at 879. The court explained that the tribal officials qualify as the "lender" for purposes of the VCFA "under the fiction of *Ex parte Young*, because . . . Tribal Lending Entities cannot act without the explicit or implicit approval of the Tribal Officials." *Id.* at 880. Further, the Supreme Court has explained that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Thus, they are not "suit[s] against the official personally, for the real party in interest is the entity." *Id.* at 166. Here, because the Tribal Lending Entities are directed and overseen by the Tribal Council Defendants, the Tribal Council Defendants constitute the "lender" under *Ex parte Young*.

---

their loan agreements while in Virginia, Maryland, Georgia, or Florida, the Court need only consider Plaintiffs' claims under Virginia, Maryland, Georgia, and Florida law.

Second, Defendants generally argue that "to the extent any of these claims rely on state-law licensing requirements," such laws do not provide a private cause of action. Dkt. 151 at 23. But the states' statutory language and courts' interpretations of them directly undermine Defendants' argument. For example, under the VCFA, a "borrower who pays more than 12% annual interest on a loan may bring an action against 'the person taking or receiving such payments'" if they don't have a license.[24] *Stinson*, 421 F. Supp. 3d at 308; *see Lendmark Fin. Servs. v. St. Clair*, No. 18-554, 2018 WL 11291193, at *2 (Va. Cir. Dec. 4, 2018) (finding that "[c]onsumer finance companies that conduct the business of making loans in the Commonwealth of Virginia in violation of [Virginia Code § 6.2-1501] shall not be able to enforce the loan agreement"); *Hengle*, 433 F. Supp. 3d at 880. Likewise, Georgia, Florida, and Maryland law allow for a borrower to bring an action seeking prospective relief for usury loans issued by a lender without a license.[25] Thus, Plaintiffs, as private parties, may seek prospective relief against the Tribal Council Defendants, in their official capacities, under *Ex parte Young* for state licensing and/or usury violations under Virginia, Georgia, Florida, and Maryland law.

---

[24] Under the VCFA, a lender is prohibited from charging an interest more than 12% annually unless it has obtained a consumer finance license. Va. Code § 6.2-1502(A). A loan contract that violates § 6.2-1501 "'shall be void' and the lender to that void contract agreement cannot 'collect, receive, or retain any principal, interest, or charges whatsoever with respect to the loan.'" *Stinson*, 421 F. Supp. 3d at 308 (quoting Va. Code § 6.2-1541(A)–(B)).

[25] *See, e.g.*, Ga. Code § 16-17-3 (providing "[a] civil action . . . may be brought on behalf of an individual borrower or on behalf of an ascertainable class of borrowers"); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 350, 793 S.E.2d 357, 367 (Ga. 2016) (interpreting Georgia's Payday Lending Act, Ga. Code Ann. § 16-17-3, as authorizing injunctive relief); *In re Boling*, No. 6:05-bk-16267, 2008 WL 5100204, at *9 (Bankr. M.D. Fla. July 24, 2008) (entering judgment that the loan was usurious and unenforceable under Florida law); Md. Code, Com. Law § 12-314 (providing a "loan made in the amount of $25,000 or less" is "void and unenforceable if" a "person who is not licensed under or exempt from the licensing requirements . . . made the loan"); *Small Bus. Fin. Sols., LLC v. Cavalry, LLC*, 2023 WL 284449, at *7 (D. Md. Jan. 18, 2023) (providing it will issue a declaration that the loan agreement was not usurious under Maryland law).

Lastly, Defendants argue that "[a]bsent an independent valid cause of action against" the Tribal Council Defendants, Plaintiffs' claims seeking prospective relief under state law and the Declaratory Judgment Act must be dismissed. Dkt. 151 at 23–25. A district court may exercise jurisdiction in a declaratory judgment proceeding when:

> (1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction.

*Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004) (quoting 28 U.S.C. § 2201) (cleaned up). Plaintiffs' allegations sufficiently meet these requirements. Plaintiffs have stated valid claims for prospective relief against the Tribal Council Defendants, in their official capacities, and this Court has jurisdiction over Plaintiffs' claims.

In addition, several courts have concluded plaintiffs may seek a declaratory judgment declaring usurious loan agreements void. *See, e.g.*, *Hengle*, 433 F. Supp. 3d at 843 (finding plaintiffs' claim seeking to declare issued loans null and void survived the motion to dismiss); *Duggan*, 596 F. Supp. 3d at 188. Thus, Plaintiffs' state law claims seeking a declaratory judgment and an injunction survive the motion to dismiss. For these reasons, the Court will deny Defendants' motions to dismiss Plaintiffs' claims under Rule 12(b)(6).

## Motion to Dismiss for Lack of Personal Jurisdiction

Lastly, Defendants Pruett and Skytrail Servicing move to dismiss Plaintiff Maville's claims under Rule 12(b)(2), arguing this Court cannot exercise personal jurisdiction over them. Dkt. 146. For the following reasons, the Court will deny their 12(b)(2) motion.

45

### A.  Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) challenges the

court's personal jurisdiction over a defendant. Where, as here, a district court "considers a

question of personal jurisdiction based on the contents of a complaint and supporting affidavits,

the plaintiff has the burden of making a prima facie showing in support of its assertion of

jurisdiction." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014). In

conducting its analysis, the court "must construe all relevant pleading allegations in the light

most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the

existence of jurisdiction." *Id.*

### B.  Analysis

Plaintiffs have established a prima facie showing of personal jurisdiction over Defendants

Pruett and Skytrail Servicing pursuant to RICO and Fourth Circuit precedent.[26] RICO authorizes

service of process "in any judicial district in which such person resides, is found, has an agent, or

transacts his affairs." 18 U.S.C. § 1965(d). The Fourth Circuit has held that where "a defendant

has been validly served pursuant to a federal statute's nationwide service of process provision,"

like the one in § 1965(d), "a district court has personal jurisdiction over the defendant so long as

jurisdiction comports with the Fifth Amendment." *Trs. of the Plumbers & Pipefitters Nat.*

*Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 443 (4th Cir. 2015) (citing *ESAB Grp., Inc.*

*v. Centricut, Inc.*, 126 F.3d 617, 626–27 (4th Cir. 1997)).

To establish a Fifth Amendment challenge to personal jurisdiction, Defendants must

show that "the district court's assertion of personal jurisdiction over them would result in such

---

[26] The Court declines Defendants' request "to ignore the dictates of binding Fourth
Circuit precedent." *Gibbs v. Elevate Credit, Inc.,* No. 3:20-cv-632, 2021 WL 4851066, at *12
(E.D. Va. Oct. 17, 2021); *see Solomon*, 2019 WL 1320790, at *18.

extreme inconvenience or unfairness as would outweigh the congressionally articulated policy evidenced by a nationwide service of process provision." *Id.* at 444 (cleaned up). "Normally, when a defendant is a United States resident, it is 'highly unusual . . . that inconvenience will rise to a level of constitutional concern.'" *Id.* (quoting *ESAB*, 126 F.3d at 627).

Here, the record reflects that Defendants Pruett and Skytrail Servicing have been validly served. Dkts. 103, 104. And as discussed, Plaintiffs have adequately pleaded claims under RICO. Consequently, Defendants Pruett and Skytrail Servicing bear the burden of establishing "such extreme inconvenience or unfairness" as to "outweigh the congressionally articulated policy" in RICO's "national service of process provision." *Plumbing Servs.*, 791 F.3d at 444. But they put forth no argument to establish a Fifth Amendment challenge to personal jurisdiction. *See* Dkt. 147. Therefore, the Court has personal jurisdiction over Defendants Pruett and Skytrail Servicing. As such, their 12(b)(2) motion will be denied.

<u>**Conclusion**</u>

For the above reasons, the Court will deny Defendants' motions to compel arbitration of Plaintiffs Williams, Singleton, and Maville's claims. Dkts. 144, 148. The Court will also deny the Tribal Council and Tribal Employee Defendants and Defendants Pruett and Skytrail Servicing's motions to dismiss for lack of subject matter jurisdiction, for failure to join a necessary party, for failure to state a claim for relief, and for lack of personal jurisdiction. Dkts. 146, 148, 150. In summary, all of Plaintiffs' claims will survive Defendants' motions. An accompanying order will be issued.

The Clerk of Court is directed to send this Memorandum Opinion to all counsel of record.

Entered this ___18th___ day of August, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE