**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

LORI FITZGERALD, *et al.*, *individually and on
behalf of others similarly situated*,

        Plaintiffs,

    v.

JOSEPH WILDCAT SR., *et al.*,

        Defendants.

Case No. 3:20-cv-00044 (NKM)

**MEMORANDUM IN SUPPORT OF MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

    Plaintiffs Lori Fitzgerald, Aaron Fitzgerald, Kevin Williams, Jade Singleton, and Angela

Maville, on behalf of themselves and all individuals similarly situated ("Plaintiffs"),[1] submit this

Memorandum in Support of their Motion for Final Approval of Class Action Settlement.

## INTRODUCTION

    This case arises from the making and collection of high-interest loans from online lending

companies owned by the LDF Business Development Corporation and its subsidiary, LDF

Holdings, LLC (the "LDF Tribal Lending Entities"). The LDF Tribal Lending Entities were

formed by the Lac du Flambeau Band of Lake Superior Chippewa Indians, a federally recognized

Native American tribe (the "Tribe" or "LDF"). Because the LDF Tribal Lending Entities and their

subsidiaries may have been entitled to immunity as arms of the Tribe, Plaintiffs brought this case

against the members of the LDF's Tribal Council (the "Tribal Officials"), as well as several high-

---

[1] Three other borrowers, Daniel Goodman, Gustinna De Silva, and John Tucker, have been
involved in this case and settlement. Because of the motions to dismiss and appeal, these borrowers
were not added as named plaintiffs, but would have been if the Settlement was not agreed to.
Because of their involvement, they have been included as signatories to the Settlement and are
included when referring to "Plaintiffs."

level employees of the LDF Tribal Lending Entities. In addition, Plaintiffs sued several of the LDF Tribal Lending Entities' non-tribal business partners, namely William Pruett and Skytrail Servicing, LLC.

As soon as Plaintiffs filed this case in July 2020, Defendants vigorously defended it, including by filing motions to compel arbitration and to dismiss that raised complex and novel issues of arbitrability, sovereign immunity, and the failure to join necessary parties. *See, e.g., Fitzgerald v. Wildcat*, 687 F. Supp. 3d 756, 767 (W.D. Va. 2023). The Court denied those motions in an extensive opinion—spanning 61 pages—that addressed several matters of first impression in this District and the Fourth Circuit, including (1) the applicability of the prospective waiver doctrine to waivers of rights under state law; and (2) absolute and legislative immunity. *See generally id*. Defendants then appealed that decision to the United States Court of Appeals for the Fourth Circuit. *See Fitzgerald v. Wildcat*, Case No. 23-cv-1930 (4th Cir.); *Fitzgerald v. Skytrail Servicing Group, LLC*, Case No. 23-cv-1929 (4th Cir.).

During the pendency of the appeal, the parties attended eleven mediation sessions with the Honorable Jane M. Roush (Ret.) with the McCammon Group. Through these mediation sessions, as well as countless communications, the parties have entered into a Stipulation and Agreement of Settlement ("Settlement Agreement"), which is attached hereto as Exhibit 1. The proposed settlement affords substantial relief to class members, including: (1) cancellation of approximately $1,400,000,000.00 ($1.4 billion) of outstanding loans; and (2) creation of a $37,350,000.00 ($37.35 million) common fund to be distributed to consumers who repaid unlawful amounts. *See* Ex. 1 at §§ 3.4(a)(i); 3.4(b)(1). Put differently, the proposed settlement provides almost 1.5 billion dollars in benefits to class members before even accounting for other valuable forms of consideration, like deletion of any negative credit reporting associated with the loans.

The proposed settlement is the **<u>largest</u>** ever obtained against participants in the tribal lending industry, and it surpasses multiple settlements approved by other federal courts in similar tribal lending cases. *See Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order, Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order, Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order, Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order, Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order, Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146, Final Approval Order, Dkt. 228 (E.D. Va.) (granting final approval of a class settlement creating a common fund of $25.5 million). And critically, the proposed settlement does not release viable claims against other alleged co-conspirators, who will be sued in a new case that will seek to recover even more relief for the class. Ex. 1 at § 4.2.

On August 1, 2024, the Court granted preliminary approval of the class action settlement. *See generally* Dkt. 187. Since then, the Administrator has provided notice to more than 1.4 million borrowers—none of whom objected to any aspect of the settlement. As more fully explained below, this landmark settlement satisfies Rule 23(e)(2)'s requirements that a class settlement be

fair, reasonable, and adequate, and Plaintiffs respectfully request that the Court approve the Settlement.

Plaintiffs and Class Counsel further request that the Court approve service awards of $15,000.00 per named plaintiff and attorneys' fees of $12,449,999.90 (*i.e.*, one third of the cash consideration created by the settlement). Courts have routinely granted similar service awards and attorneys' fees in tribal lending cases, and they are warranted here given the extraordinary efforts and unprecedented results of this case. Indeed, when assessing the reasonableness of fees, "forgiveness of debts owed is routinely included in the value of the settlement." *See, e.g., Hash v. First Fin. Bancorp*, 2021 WL 12269064, at *3 (S.D. Ind. Nov. 22, 2021) (gathering cases). Applying the same principles here, the requested fee award is approximately 0.0088% of the settlement's total value—a patently reasonable result. And, like the settlement itself, no class member or regulator has filed objections to the requested fee or service awards. Accordingly, Plaintiffs and Class Counsel respectfully request that the Court award these amounts.

## KEY SETTLEMENT TERMS

### A.    Class Definition

Under the Settlement Agreement, the parties agreed to resolve the claims of a nationwide class ("Settlement Class") defined as:

> All consumers residing within the United States who executed loan agreements with any LDF Tribal Corporation between July 24, 2016, and October 1, 2023.

Ex. 1 at § 2.29. "LDF Tribal Corporation," in turn, is defined as L.D.F. Business Development Corporation, LDF Holdings, LLC, and their subsidiaries, which are Niiwin d/b/a Lendgreen, Niswi d/b/a LendUMo, Ziibi d/b/a Zfunds, Makwa d/b/a Makwa Financial, Niizh d/b/a Brightstar Cash, Midaaswi d/b/a National Small Loan, Naanan d/b/a Bear Claw Lending, Ningodwaaswi d/b/a Sky Trail Cash, Niizhwaaswi d/b/a Loan at Last, Zhaangaswi d/b/a Nine Torches, Biboon d/b/a Bridge

Lending Solutions, Giizis d/b/a Lakeshore Loans, Nigig d/b/a UbiCash, Niibin d/b/a Cash Aisle, Mitig d/b/a MitigCapital, Anong d/b/a Avail Blue, Opichi d/b/a Evergreen Services, Zagime d/b/a Blue River Lending, Waawaatesi d/b/a Quick Help Loans (Greenline), and Ishwaaswi d/b/a Radiant Cash. *Id.* at § 2.17. The subsidiaries were the companies that contracted directly with consumers, including each of the Plaintiffs.

The class definition covers all of the tribal lending entities owned by the LDF during the class period. The class definition also mirrors other class definitions approved in similar cases. *See, e.g.*, *Galloway v. Williams* (*Galloway III*), No. 3:19-cv-470, 2020 WL 7482191, at *2 (E.D. Va. Dec. 18, 2020) (granting final approval of settlement class defined as "[a]ll consumers residing within the United States or its territories who executed loan agreements with Red Rock Tribal Lending, LLC or Big Picture Loans, LLC (including loans assigned to Big Picture Loans, LLC) from June 22, 2013 to December 20, 2019," subject to certain exclusions such as plaintiffs' attorneys or any judge working on the case); *Hengle,* No. 3:19-cv-250, Dkt. 230 (granting final approval of a settlement class defined as "[a]ll consumers residing in the United States who executed loans agreements with: (1) Golden Valley Lending, Inc., Silver Cloud Financial Inc., Majestic Lake Financial Inc., or prior to February 1, 2021, Mountain Summit Financial, Inc.").

In total, 1,487,971 class members have been identified through the loan-level data provided to the Settlement Administrator. Ex. 2, ALCS Decl. at ¶ 4.

**B.    The Settlement Provides Significant and Meaningful Relief to Borrowers.**

The Settlement provides significant consideration to Settlement Class Members, primarily in the form of debt cancellation and cash payments. As for debt cancellation, the Tribal Officials have agreed to eliminate the balance due on *all* outstanding debt originated by the LDF Tribal Lending Entities during the class period. Ex. 1 § 3.4(a)(i) ("Within thirty (30) days after the

Effective Date, with respect to the Outstanding Loans, the Tribal Officials agree to reduce the balance due on each such loan for all Settlement Class Members to zero on the basis that the debt is disputed."). Based on the loan-level data, the Tribal Officials "estimate that this will result in the cancellation of approximately $1,400,000,000.00 ($1.4 billion) in outstanding debt." *Id.*

In addition to debt cancellation, the Tribal Officials further agreed to cease collecting any of the class members' loans upon the entry of the Preliminary Approval Order. *Id.* § 3.4(a)(ii). And "[t]o the extent any amounts are collected, inadvertently or otherwise, after the entry of the Preliminary Approval Order, the Tribal Officials will remit the funds back to the Settlement Class Member." *Id.* This means that borrowers have already received *immediate* relief from the burdens of their loans without having to wait months for the notice and approval process to be completed.

The proposed settlement will also result in the creation of a Settlement Fund in the amount of $37,350,000.00 ($37.35 million), which will be distributed to borrowers who repaid more than the principal balance of their loans. *Id.* § 2.14. As outlined in the Settlement Agreement and approved by several courts in similar cases,[2] the payments will be allocated after deducting the service awards, attorneys' fees, and costs approved by this Court using the following tiered formula:

> Tier 1:  The dollar amount of all payments made by each Settlement Class Member if the original principal amount of their loan was repaid and if the Settlement Class Member resided in Arizona, Colorado, Connecticut, Idaho, Illinois, Indiana, Kansas, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New

---

[2] This tiered formula—which takes into account the differences in remedies available to borrowers in each state—has been approved by multiple courts in other tribal lending cases. *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Dkt. 95 (E.D. Va. Mar. 29, 2021); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, *Gibbs v. Stinson*, Case No. 3:18-cv-676, Dkt. 141 (E.D. Va. Aug. 16, 2022); *Turner v. Zest Finance, Inc.*, Case No. 3:19-cv-00293, Dkt. 114 (E.D. Va. July 9, 2020); *Hengle v. Asner*, No. 3:19-cv-250-DJN, Dkt. 230 (E.D. Va. Oct. 25, 2022); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146, Dkt. 228 (E.D. Va. Mar. 2, 2024); *Galloway v. Martorello*, 3:19-cv-00314, Dkt. 662 (E.D. Va. June 4, 2024).

Jersey, New Mexico, North Carolina, Ohio, South Dakota, Vermont, and Virginia, at the time the Settlement Class Member took out the loan.

Tier 2: The dollar amount of payments made above the legal interest limits in that respective state if the original principal amount of their loan was repaid and if the Settlement Class Member resided in Alabama, Alaska, Delaware, Florida, Georgia, Hawaii, Iowa, Louisiana, Maine, Maryland, Michigan, Mississippi, Missouri, Nebraska, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Washington, Washington D.C., or Wyoming at the time the Settlement Class Member took out the loan.

Tier 3: Settlement Class Members in Nevada and Utah will not receive cash payments.

*Id.* § 3.4(b)(ii).[3] Settlement Class Members in Tier 1 or Tier 2 who repaid more than the principal amount borrowed will receive a cash award based on a pro rata calculation rounded down to the nearest cent. *Id.* § 3.4(b)(iii)(2). In the event any Settlement Class Member took out more than one loan during the class period, his or her claim amount will be calculated by determining the claim amount for each loan and adding them together. *Id.* § 3.4(b)(ii).

The relief provided by the proposed class action settlement is significant. Every consumer will receive either a cash payment or debt cancellation, and many will receive both. As summarized by the Settlement Administrator, a breakdown of the estimated payments and principal forgiveness will be as follows:

| Estimated Payment | Count | Average Amount of Principal to be Forgiven | Aggregate Amount of Principal to be Forgiven |
|---|---|---|---|
| $1000.01 - $3597.41 | 61 | $4,349.14 | $265,297.42 |
| $250.01 - $1000.00 | 4,991 | $2,160.61 | $10,783,592.66 |
| $100.01 - $250.00 | 36,365 | $1,456.81 | $52,977,009.18 |
| $50.01 - $100.00 | 81,109 | $993.07 | $80,546,917.74 |
| $2.00 - $50.00 | 695,196 | $579.38 | $402,781,612.00 |
| No Cash Payment | 670,249 | $675.34 | $452,646,169.71 |

---

[3] Arkansas, New York, West Virginia, and Wisconsin are not included in the list because the LDF Tribal Lending Entities never made loans in these states.

Ex. 2 at ¶ 12.[4] This is an excellent result. *At a minimum*, all consumers are receiving approximately $600 in either cash or debt cancellation (without even considering the amount of interest being forgiven). *Id*. And those consumers who repaid the highest amounts on their unlawful loans will receive more than $5,000 in combined cash and debt cancellation. *Id*.

In addition to the monetary value of the Settlement, the Tribal Officials have also agreed that "they will not sell, transfer, or assign for collection any Outstanding Loans of Settlement Class Members," and they will "request permanent removal of any negative tradelines for Settlement Class Members previously reported to [any Credit Reporting Agency] in the name of the LDF Tribal Corporations." *Id.* § 3.4(a)(ii), (iv). This will ensure that borrowers will not be subject to any future collection efforts or suffer adverse consequences to their credit.

Importantly, Settlement Class Members will receive all of the foregoing consideration without having to submit a claim form, prove any harm, or take any affirmative action.

**C.    Class Action Fairness Notice.**

On July 26, 2024, the Settlement Administrator, American Legal Claims Services, LLC ("ALCS"), "mailed, via certified mail, a Notice of Proposed Class Action Settlement pursuant to 28 U.S.C. § 1715 (the 'CAFA Notice') to Attorneys General of 49 states," the Attorney General of the United States, and Attorneys General for certain territories. Ex. 2 at ¶ 3. ALCS also emailed the Attorney General's office for the state of Nevada. *Id*. None of these governmental agencies have sought to intervene or lodged any objections to the settlement.

---

[4] The loan-level data provided by the Tribal Officials did not have complete information for the aggregate interest balance. However, given the triple-digit nature of the loans and standard amortization schedule, the debt cancellation likely far exceeds $1.4 billion dollars at this juncture when considering that the total principal amount of the forgiven loans alone is $1 billion.

**D.    The Settlement Administrator Provided Direct Notice to Settlement Class Members.**

In its Preliminary Approval Order, the Court approved the proposed Notice Plan and ordered that the Class Notice be sent to Settlement Class Members by ALCS.  Dkt. 187 at ¶¶ 8-13. Consistent with the Settlement Agreement and Court's Preliminary Approval Order, ALCS obtained the loan information from the Tribal Officials, and compiled a class list that initially included 1,466,438 Class Members. Ex. 2 at ¶ 4. As the Court is aware, on or about October 17, 2024, the Tribal Officials discovered that 21,533 consumers did not receive a class notice because their loan-level details were inadvertently omitted from the data provided by the Tribal Officials to the Settlement Administrator. To rectify this, the parties jointly filed a Motion for Leave to Provide Notice to 21,533 Class Members and Extend Their Deadlines. *See generally* Dkt. 190. On October 23, 2024, the Court granted that motion. Dkt. 191.

On September 1, 2024, ALCS began emailing the Class Notice to the "1,311,209 class members" whose emails were initially verified. Ex. 2 at ¶ 5. Additionally, on August 30, 2024, ALCS began mailing notices to the 155,344 class members who did not have a valid email address. *Id*. To locate these class members, ALCS utilized several means of confirming their most accurate mailing addressing, including identifying addresses through the "National Change of Address through USPS, skip-tracing, and manual updates from class members." *Id*. at ¶ 4. And after the Court granted the Motion for Leave to Provide Notice, ALCS "mailed the Notice via First Class Mail (with updated Exclusion and Objection deadlines) to [the] 21,533 newly identified class members." *Id*. at ¶ 5.

ALCS also processed the notices that were returned by USPS, as well as for the 18,549 e-mail notices that were deemed undelivered. After these efforts, only 11,656 notices have been

deemed undelivered, while 1,476,315 notices are presumed delivered. *Id*. ¶ 7. In other words, approximately 99.22% of the Class received the Class Notice. *Id*.

**E.      Objections and Exclusions.**

As of November 13, 2024, not a single class member has objected to the Settlement. *Id*. at ¶ 9. Only 40 consumers excluded themselves from the Settlement. *Id*. at ¶ 8.

**ARGUMENT**

**I.      The Notice Program Satisfied the Requirements of Rule 23(c)(2)(B).**

When a class is "certified for purposes of settlement under Rule 23(b)(3)," a district court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). This notice may be provided by "United States mail, electronic means, or other appropriate means." *Id*. The Rule also requires that the notice inform potential class members that: (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out; (3) and any member who does not opt out may appear through counsel. *Id.* In assessing the sufficiency of the notice, the Court must consider both the method of delivery and the notice's content. *See* Federal Judicial Center, *Manual for Complex Litigation* § 21.312 (4th ed. 2004).

In this case, just as in other tribal lending cases, Class Members were identified from the loan records (which typically include name, address, social security number, and e-mail address). Ex. 2, ALCS Decl. ¶ 4. Using this information, ALCS identified and compiled a class list containing initially 1,466,438 class members, which was subsequently increased by 21,533 when the additional records were discovered. After ALCS identified Class Members, it took reasonable measures to provide individual notice to those Members through the Notice Plan previously approved by the Court. As detailed above, this Notice Plan, which included both emailed and mailed notices, resulted in a 99.22% delivery success rate to the Class. *Id*. at ¶ 7.

As Judge Payne has previously explained, "[w]hat amounts to reasonable efforts under the circumstances is for the Court to determine after examining the available information and possible identification methods . . . 'In every case, reasonableness is a function of [the] anticipated results, costs, and amount involved.'" *Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 227 (E.D. Va. 2003) (citations omitted). Here, 99.22% of the notices are presumed delivered. Courts—including those within the Fourth Circuit—have approved mailed-notice programs that reached a much smaller percentage of class members than the success rate here. *See In re Serzone*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*, No. 3:05cv143 (E.D. Va. Aug. 29, 2006) (granting final approval where class notice had approximately 85% delivery success).

In sum, the parties here have complied fully with the Court's Preliminary Approval Order and have taken reasonable steps to ensure that the Class Members received notice—in the best and most direct manner possible—of the Settlement's terms and significant benefits, as well as their right to exclude themselves or object.

## II. The Settlement Satisfies the Requirements of Rule 23(e)(2).

"Rule 23(e) of the Federal Rules of Civil Procedure obliges parties to seek approval from the district court before settling a class-action lawsuit." *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 483 (4th Cir. 2020) (citing Fed. R. Civ. P. 23(e)). When a court "reviews a proposed class-action settlement, it acts as a fiduciary for the class." *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 525 (4th Cir. 2022). "In fulfilling this role, the district court must conclude that a proposed settlement is 'fair, reasonable, and adequate.'" *Id*. (quoting Fed. R. Civ. P. 23(e)(2)). "In

determining whether a settlement is fair, reasonable, and adequate," Rule 23(e)(2) requires the court to consider whether:

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

(C)     the relief provided for the class is adequate, taking into account:

    (i)     the costs, risks, and delay of trial and appeal;

    (ii)     the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii)     the terms of any proposed award of attorneys' fees, including timing of payments; and

    (iv)     any agreement required to be identified under Rule 23(e)(3);

(D)     the proposal treats class members equitably relative to each other.

*Galloway v. Williams*, No. 3:19-cv-470, 2020 WL 7482191, at *4 (E.D. Va. Dec. 18, 2020) (Payne, J.) (quoting Fed. R. Civ. P. 23(e)(2)). In making this assessment, district courts are provided with "considerable deference" because "the court 'is exposed to the litigants, and their strategies, position[s], and proofs, and is on the firing line and can evaluate the action accordingly.'" *Lumber Liquidators*, 952 F.3d at 484 (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000)).[5]

---

[5] On December 1, 2018, "Rule 23(e)(2) was amended to specify factors for assessing the 'fairness, reasonableness, and adequacy' of a class-action settlement." *Lumber Liquidators*, 952 F.3d at 484, n.8. Prior to this, the Fourth Circuit developed and applied its "own multifactor standards" for fairness and adequacy. *See, e.g.*, *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991). Because the Fourth Circuit's prior considerations "almost completely overlap with the new Rule 23(e)(2) factors," *Lumber Liquidators*, 952 F.3d at 484, n.8, decisions prior to the amendment to Rule 23(e)(2) continue to be relevant.

*1.      Plaintiffs and Class Counsel have adequately represented the Class.*

Rule 23(e)(2)'s first factor examines whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). This assessment is "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively." *In re Flint Water Cases*, 571 F. Supp. 3d 746, 780 (E.D. Mich. 2021) (quoting Albert Conte & Herbert Newberg, *Newberg on Class Actions* § 13:48 (5th ed. June 2021 update)). Rule 23's adequacy requirements are met if: "(1) the named plaintiff[s] [have] interests common with, and not antagonistic to, the Class's interests; and (2) the plaintiff[s'] attorney is qualified, experienced and generally able to conduct the litigation." *Gibbs v. Stinson*, No. 3:18-cv-676, 2021 WL 4812451, at *16 (E.D. Va. Oct. 14, 2021) (quoting *Milbourne v. JRK Residential Am., LLC*, No. 3:12-cv-861, 2014 WL 5529731, at *8 (E.D. Va. Oct. 31, 2014)).

This first factor is easily satisfied here. As to the named Plaintiffs, their interests and those of members of the proposed class are fully aligned, as they are all victims of the same alleged usurious lending scheme. *See, e.g.*, *Stinson*, 2021 WL 4812451, at *16 (finding that the plaintiffs were adequate in a comparable case because they had "no interests antagonistic to the class's interest" and shared "identical interest of establishing Defendants' liability based on the same questions of law and fact"); *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 59 (E.D. Va. 2021) (finding that the plaintiffs were adequate in a comparable case because the "Plaintiffs' interests are in line with those of the broader classes"); *MacDonald v. Cashcall, Inc.*, 333 F.R.D. 331, 345 (D.N.J. 2019) ("There is nothing in the record to suggest that either proposed class representative has a claim or interest antagonistic to the remainder of the class: both MacDonald and Spearman took out loans from Western Sky allegedly at usurious interest rates."); *Brice v. Haynes Invs., LLC.*, 2021 WL 1916466, at *6 (N.D. Cal. Apr. 23, 2021) (same). Indeed, in its

Preliminary Approval Order, the Court already found that "Plaintiffs have fairly and adequately represented the interest of the Settlement Class." Dkt. 187 at ¶ 4(d). Nothing has changed since the Court's Preliminary Approval Order to warrant revisiting these conclusions.

As to Class Counsel, courts have repeatedly found them to be qualified, experienced, and adequate under Rule 23, including in tribal lending cases. *See, e.g.*, *Hengle*, Dkt. 230 ¶ 6 (finding on final approval that "Class Counsel have and continue to adequately and fairly represent Settlement Class Members"); *Galloway v. Williams*, No. 3:19-cv-470, 2020 WL 7482191, at *8 (E.D. Va. Dec. 18, 2020) (finding that "Class Counsel and their firms have extensive backgrounds in complex and class action litigation and consumer protection litigation" and further noting that counsel "have significant experience in litigating class action lawsuits against tribal lenders" (*citing, e.g.*, *Hayes v. Delbert Servs. Corp.*, No. 3:14-cv-258, Dkt. 193 ¶¶ 4, 14 (E.D. Va. Jan. 20, 2017)); *Turner v. Zestfinance, Inc.*, No. 3:19-cv-293 (E.D. Va.) ("[W]e have Ms. Kelly and Mr. Bennett here, who are well known to me as being experts in this field, but it looks like the other class counsel is like the all-star team of consumer litigation."); *Stinson*, 2021 WL 4812451, at *16 (finding that Class Counsel were adequate and noting that they had been involved for four years and "already obtained substantial relief for borrowers by securing two courts' approval of a class action settlement").

Plaintiffs' counsel has not only been approved in these cases, but expressly called out and commended for their work. For example, when granting approval to a similar settlement, Judge Lauck commented:

> The representation by class counsel is certainly adequate. I don't want to belabor the issue at the expense of folks, one, getting tired of hearing me, but, two, also maybe feeling a little too good about themselves. But it is the case that the track record here and the success of litigating complex cases, and specifically in tribal payday lenders, is, I think, as high as it gets in this country.

*Gibbs v. TCV V, L.P.,* 3:19-cv-789, Fairness Hr'g Tr. at 139:10-17 (E.D. Va. Mar. 25, 2021).

Similarly, when recently approving a settlement in the *Blackburn* matter, Judge Novak noted:

> Plaintiffs and lead counsel have adequately represented the class. Actually, they've done it in an exceptional manner considering where we started in *Hengle* and now we're here. I don't think I can overstate that.

*Blackburn v. A.C. Israel Enterprises,* 3:22-cv-146, Fairness Hr'g Tr. at 6:18-21 (E.D. Va. Oct. 30, 2023); *see also In re Think Finance, LLC*, 17-33964-hdh11 (N.D. Tex.) (Dkt. 1432 at 40) (finding that the settlement of a tribal lending case was the product of "the most hard-fought bankruptcy case that [the Court] presided over in [] 17 years as a judge" litigated by "some of the best lawyers in America").

Also, despite the successful delivery of over one million class notices, not a single Class Member has objected to the Settlement, and only 40 have validly requested exclusion from the class. "Such a lack of opposition … strongly supports a finding of adequacy, for '[t]he attitude of the members of the Class, as expressed directly or by failure to object, after notice to the settlement is a proper consideration for the trial court.'" *In re Microstrategy*, 148 F. Supp. 2d at 668 (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)).

## 2. *Negotiations were arm's length, including the use of the Honorable Jane Marum Roush (Ret.) as mediator.*

The second factor examines whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B); *see also Flint Water Cases*, 571 F. Supp. 3d at 780 (explaining that the second factor requires courts to "consider whether the negotiations were conducted at arm's length with no evidence of collusion or fraud"). "Courts presume the absence of fraud or collusion unless there is evidence to the contrary." *Id*. (quoting *UAW v. Gen. Motors, Corp.*, 2006 WL 891151, at *21 (E.D. Mich. Mar. 31, 2006)). Here, there is no evidence suggesting the presence of collusion or fraud between the parties.

To help confirm that the negotiations were arm's length, courts have looked at several other factors, including the presence of a mediator. As the leading class action treatise explains: "There appears to be no better evidence of [a truly adversarial bargaining process] than the presence of a third-party mediator." Conte & Newberg, *supra*, § 13:48; *see also Flint Water Cases*, 571 F. Supp. 3d at 780 ("highly experienced mediators" provided "ample protections in their roles"). Here, Plaintiffs and Defendants had lengthy negotiations, including 11 mediation sessions with the Honorable Jane Marum Roush (Ret.). *See, e.g.*, Ex. 1 at pg. 4-5 ("WHEREAS, Plaintiffs and Defendants participated in multiple negotiations with one another, including mediations sessions with the Honorable Jane Marum Roush (Ret.) on September 26, 2023, October 6, 2023, November 9, 2023, December 15, 2023, February 2, 2024, February 26, 2024, March 27, 2024, April 8, 2024, April 30, 2024, May 22, 2024, and June 14, 2024."). Justice Roush—a former Virginia Supreme Court Justice and Fairfax County Circuit Court Judge who was on the bench for more than two decades—has significant experience in settling cases as a mediator at the McCammon Group, and her extensive involvement in this settlement further establishes that there was no collusion among the parties.

Additionally, "[c]onsidering the posture of the case at the time of settlement allows the Court to determine whether the case has progressed far enough to dispel any wariness of 'possible collusion among the settling parties.'" *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 571 (E.D. Va. 2016). Here, there should be no concerns that the case did not progress far enough because this litigation commenced on July 24, 2020, *i.e.*, almost four years before the execution of the settlement agreement in July 2024. During this time, the parties litigated multiple high stakes, dispositive issues, and Defendants appealed several of them, including this Court's arbitration and sovereign immunity rulings. *See Fitzgerald v. Wildcat*, Case No. 23-cv-1930 (4th Cir.); *Fitzgerald*

*v. Skytrail Servicing Group, LLC*, Case No. 23-cv-1929 (4th Cir.). If Defendants succeeded on any of the issues, they could have disposed of the entire litigation. *See, e.g., Dunn v. Glob. Tr. Mgmt., LLC*, 2024 WL 4379966, at *1 (11th Cir. Oct. 3, 2024) (tribal lending case where appellate court reversed district court's decision regarding enforceability of delegation provision). And even if they were unsuccessful, Defendants' appeal likely would have delayed this case for years—all while they continued to collect on the loans to the detriment of Class Members. *See, e.g., Dunn*, 2024 WL 4379966, at *1 (on appeal for over two years). This litigation history further establishes that there was no possible collusion among the parties.

### 3.     *The relief provided to the Settlement Class is adequate.*

Rule 23(e)(2)(C) requires the Court to consider whether the relief is adequate, considering:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C). These subfactors overlap with the factors that the Fourth Circuit has held are required to evaluate a class settlement's fairness, reasonableness, and adequacy. *Lumber Liquidators*, 952 F.3d at 484 n.8 (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159). An analysis of each subfactor shows that this settlement is fair, reasonable, and adequate here.

First, the costs, risks, and delay of trial and appeal supports approval of the Settlement. While Class Counsel strongly believes in the strength of this case, they also acknowledge that there are substantial risks associated with continued litigation. Defendants have disputed Plaintiffs' claims since the inception of this case and have raised several defenses, including the enforceability of arbitration and availability of sovereign immunity—both of which were subject to interlocutory review by the Fourth Circuit. *See, e.g., Williams v. Big Picture Loans, LLC*, 929

F.3d 170, 174 (4th Cir. 2019). Were the litigation to continue, it would have been delayed at least a year (and likely longer) just on these potentially dispositive issues. And even if Plaintiffs prevailed before the Fourth Circuit, Defendants likely would have filed a petition for certiorari with the Supreme Court. All of this would have delayed the case for years—to the detriment of Class Members paying on their loans—before Defendants' liability defenses were even tested. The Settlement avoids this significant cost, risk, and time by providing meaningful settlement benefits to the Class Members now.

Second, the effectiveness of the proposed method of distributing relief to the class, including the method of processing class-member claims, likewise supports approval. Here, just as with multiple other tribal lending settlements approved by courts,[6] Class Members will receive the cash benefits based on the unlawful amount repaid on their loans without having to submit a claim form or any proof of their damages. Cash payments will thus be automatically distributed. This is important because "[t]he use of objective criteria to determine settlement distribution is a hallmark of fairness." *Flint Water Cases*, 571 F. Supp. 3d at 781. Because an automatic cash payment is based on objective criteria and does not require any action by Class Members, this factor weighs strongly in favor of approving the Settlement.

Third, the request for attorneys' fees and the timing of the request do not suggest that "counsel sold out the class's claims at a low value in return for [a] high fee." Conte & Newberg, *supra*, § 13:54. As outlined above, there is no sign that Class Counsel left any money on the negotiating table. Instead, they have obtained the **largest** settlement ever obtained against

---

[6] This tiered formula—which takes into account the differences in remedies available to borrowers in each state—has been approved by courts in other tribal lending cases. *Gibbs III*, No. 3:19-cv-00789, Dkt. 95; *Gibbs I*, No. 3:17-cv-495, Dkt. 141; *Gibbs II*, Case No. 3:18-cv-676, Dkt. 141; *Turner*, Case No. 3:19-cv-00293, Dkt. 114; *Hengle*, No. 3:19-cv-250-DJN, Dkt. 230; *Blackburn*, Case No. 3:22-cv-146, Dkt. 228.

participants in the tribal lending industry; one that surpasses multiple, combined settlements approved by courts in similar tribal lending cases. The requested attorneys' fees award also comprises the usual percentage of the settlement fund—one third of the cash value—and when measured against the Settlement's total value in this case, Class Counsel is seeking only a 0.0088% fee. Moreover, the attorneys' fee component of the settlement was discussed only after all other material settlement terms had been finalized, and they were negotiated under the supervision of Justice Roush, who is experienced enough to notice if Class Counsel were compromising the class members' claims for their own benefit. *Flint Water Cases*, 571 F. Supp. 3d at 782. Nor is the timing of the request such that the "attorney fees is unknown and could upset the compensation to claimants at the time of final approval." *Id.* The proposed fee award was included in the class notice, and no class member or regulator has filed an objection to the proposed amount.

Finally, there are no agreements that need to be identified under Rule 23(e)(3).

### 4.       *The Settlement treats Class Members equitably relative to each other.*

The final factor under Rule 23(e)(2) requires a court to consider whether "the proposal treats class members *equitably* relative to each other." Fed. R. Civ. P. 23(e)(2)(D) (emphasis added). This factor considers whether class members have been treated in a fair and impartial manner, but "[t]here is no requirement that all class members in a settlement be treated *equally*." *Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 876 (S.D. Iowa 2020) (emphasis in original) (citation omitted). And when considering this factor, a court "must balance the claims of those with potentially substantial damages with those with potentially minimal or insignificant damages." *Id*. (citation omitted).

Just as in *Turnage*, *Gibbs*, *Hengle*, and *Blackburn*, the Settlement here achieves this balance. It limits payments to only those Members who made unlawful payments on their loans

based on the legal protections of their respective states of residence. The Settlement further awards payments on a *pro rata* basis after considering the amount of each qualifying Class Member's payments above the lawful amount in their respective states. As a result, a breakdown of the estimated payments and principal forgiveness will be as follows:

| Estimated Payment | Count | Average Amount of Principal to be Forgiven | Aggregate Amount of Principal to be Forgiven |
|---|---|---|---|
| $1000.01 - $3597.41 | 61 | $4,349.14 | $265,297.42 |
| $250.01 - $1000.00 | 4,991 | $2,160.61 | $10,783,592.66 |
| $100.01 - $250.00 | 36,365 | $1,456.81 | $52,977,009.18 |
| $50.01 - $100.00 | 81,109 | $993.07 | $80,546,917.74 |
| $2.00 - $50.00 | 695,196 | $579.38 | $402,781,612.00 |
| No Cash Payment | 670,249 | $675.34 | $452,646,169.71 |

Ex. 2 at ¶ 12. This is an excellent result. *At a minimum*, all consumers are receiving approximately $600 in either cash or debt cancellation (without even considering the amount of interest being forgiven). *Id*. And those consumers who repaid the highest amounts on their unlawful loans will receive more than $5,000 in combined cash and debt cancellation. *Id*.

This structure not only considers the total dollars paid by each borrower, but it also accounts for the strength of each state's usury laws, as some states allow for recovery of both principal and interest. *Compare, e.g.*, Va. Code § 6.2-1541 (declaring a loan void and permitting "any principal or interest paid on the loan" to be recoverable); *with* 41 P.S. § 502 (allowing Pennsylvania borrowers to recover excess interest paid, but not principal). And again, this tiered formula that has been approved by courts in other tribal lending cases. *See e.g.*, *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Dkt. 114 (E.D. Va. July 9, 2020); *Gibbs v. TCV V, L.P.*, No. 3:19-cv-789, Dkt. 95 (E.D. Va. Mar. 29, 2021). The Settlement thus maximizes the possible payout for Class Members who have suffered actual monetary harm, while providing for debt cancellation

for those consumers who did not repay the balances of their loans. Class Members, therefore, will be treated equitably relative to each other.

* * *

Because all the Rule 23(e)(2) factors confirm that the Settlement is fair, reasonable, and adequate, Plaintiffs and Class Counsel respectfully request that the Court approve the Settlement.

## III. The Requested Service Awards Are Reasonable.

Plaintiffs further request—and none of the Defendants oppose—an award of $15,000 for each of the eight Plaintiffs' participation and service to the Class. Given the result obtained, this award only reduces the total cash settlement amount by 0.0032%. This amount is reasonable because Plaintiffs took an active role in this case and obtained an excellent result that took years to achieve. They also stuck their neck out for other class members and pursued the claims despite the embarrassing nature of the events—being financially vulnerable enough to take out a loan with an interest rate of more than 600% APR.

In comparable tribal lending cases, courts have awarded similar—and sometimes higher—amounts. *See Hengle*, Dkt. 230 ¶¶ 21-22 (awarding $10,000 per named plaintiff); *Gibbs v. Stinson*, No. 3:18-cv-676, Dkt. 346 ¶ 20 (E.D. Va. Aug. 16, 2022) (awarding $20,000 service awards to each of the 13 class representatives); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-789, Dkt. 95 (E.D. Va. Mar. 29, 2021) (approving a $7,500 service award)[7]; *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Dkt. 114 (E.D. Va. July 9, 2020) (awarding $5,000 service awards to the 25 class representatives). A similar result is warranted here because Plaintiffs participated in years of

---

[7]As part of the same global settlement, the Court approved an additional $7,500 to each of the named plaintiffs for service awards related to another defendant. *Gibbs v. Rees*, No. 3:20-cv-717, Dkt. 68 ¶ 21 (E.D. Va. Mar. 26, 2021). When considered together, the service awards for the plaintiffs in that settlement were $15,000, which are equal the amount requested here.

litigation and were vital to achieving this excellent result. Ex. 3, Kelly Decl. ¶¶ 24–27. If they were unwilling to step up or gave up at any point, none of this would have been possible.

The requested service award not only tracks other tribal lending cases, but an empirical study published in 2006 suggests that the average award per class representative is about $16,000. 4 *Newberg on Class Actions* § 11:38 (4th ed.). Since that time, it has not been uncommon for courts to award amounts even higher than those sought by Plaintiffs here. *See, e.g.*, *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508, 534 (N.D. Cal. 2020) (granting $25,000 service awards to each institutional investor plaintiff); *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, No. 14-md-2541, 2017 WL 6040065, at *11 (N.D. Cal. Dec. 6, 2017), *aff'd*, 768 F. App'x 651 (9th Cir. 2019) (awarding each of the four class representatives $20,000 service awards); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-cv-1365, 2010 WL 1687832, at *17 n.8 (N.D. Cal. Apr. 22, 2010) (collecting Ninth Circuit cases with service awards of $20,000 or higher); *Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*, 275 F. Supp. 3d 1350, 1359 (N.D. Ga. 2017) (approving $20,000 service award); *Zhu v. Wanrong Trading Corp.*, No. 18-cv-417, 2024 WL 4351357, at *13 (E.D.N.Y. Sept. 30, 2024) ("The Class representatives' requested service awards of $20,000 and $10,000 are reasonable . . . .").

Plaintiffs spent significant time and effort to achieve the excellent result in this case. The settlement is a direct byproduct of their efforts, and none of the class members have objected to the award. Accordingly, Plaintiffs and Class Counsel request the Court to approve the $15,000 service award for each of the plaintiffs.

## IV.     The Requested Attorneys' Fees are Reasonable.

Class Counsel seeks an award of $12,449,999 for their attorneys' fees and costs. This request represents one third of the Settlement Fund in this case, which is standard for these types

of cases. Moreover, when coupled with the overall value of the Settlement obtained for the Class, which exceeds $1.4 billion, the requested fee award is approximately 0.0088% of the Settlement's total value. This award is reasonable under the relevant factors.

**1.  Awarding a percentage of the fund is permitted under Fourth Circuit precedent.**

Rule 23(h) gives the Court authority to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement" in class actions. Fed. R. Civ. P. 23(h). As the Fourth Circuit has explained, "[t]here are two main methods for calculating the reasonableness of attorneys' fees—the lodestar method and the percentage-of-recovery method." *McAdams v. Robinson*, 26 F.4th 149, 162 (4th Cir. 2022). The lodestar method calculates the fees based on the number of hours spent, while the "percentage-of-recovery method considers the portion of the total settlement fund that will go to attorneys' fees." *Id*. The "district court may choose the method it deems appropriate based on its judgment and the facts of the case." *Id*. (citing *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 760 (S.D. W. Va. 2009) ("The Fourth Circuit has neither announced a preferred method for determining the reasonableness of attorneys' fees in common fund class actions nor identified factors for district courts to apply when using the percentage method.").

The percentage of the fund doctrine originates from the equitable principles of quantum meruit and unjust enrichment and aims to shift the expense of litigation from named plaintiffs, who obtained the fund's benefits, to the absent class members, who benefit from the fund but likely contributed little, or nothing, to the process. *Brundle ex rel. Constellis Employee Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 785 (4th Cir. 2019), *as amended* (Mar. 22, 2019). As the Fourth Circuit has explained, awarding fees as a percentage of the common fund "hold[s] the

beneficiaries of a judgment or settlement responsible for compensating the counsel who obtained the judgment or settlement for them." *Id.* at 786.[8]

Courts' preference for the percentage method is common sense. It is easily administered and saves valuable court and party resources, which heeds the Supreme Court's mandate that the "request for attorney's fees . . . not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The percentage method also aligns the interests of class counsel and the class members because it both motivates class counsel to generate the largest possible recovery for the class and rewards efficient litigation. This is because counsel's fee increases with the class's take, removing any incentive to run up their hours in order obtain a higher fee. A percentage fee also encourages early settlements because class counsel will not receive additional fee for unnecessary motions or discovery. *Johnson v. Metro-Goldwyn-Mayer Studios, Inc.*, No. C17-541, 2018 WL 5013764, at *11 (W.D. Wash. 2018) (noting that "the percentage-of-recovery method plays an important role in aligning the interests of the class and class counsel" and "[i]n such situations, class counsel is motivated to obtain the largest tangible benefit possible, to provide for the best possible notice to the class, and to assure that the claims process is not overly burdensome"); *In re Anthem, Inc. Data Breach Litig.*, No. 15-md-02617, 2018 WL 3960068, at *5 (N.D. Cal. 2018) ("By tying the award to the recovery of the Class, Class Counsel's interests are aligned with the Class, and Class Counsel are incentivized to achieve the best possible result."); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014) ("The percentage method better aligns the incentives of plaintiffs' counsel

---

[8] Most Circuits either permit or require the percentage method. 5 Newberg on Class Actions § 15:66 (5th ed. Dec. 2020 Update). For example, the Eleventh Circuit and the District of Columbia require the use of the percentage method. *Id.* at n.6 (citing cases). The Third Circuit prefers the percentage method. *Id.* at n.7. And the First, Second, Fifth, Sixth, Eight, Ninth, and Tenth Circuits allow district courts to use either method. *Id.* at n.5 (citing cases).

with those of the class members because it bases the attorneys' fees on the results they achieve for their clients, rather than on the number of motions they file, documents they review, or hours they work."); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268–69 (D.C. Cir. 1993) (noting that "using the lodestar approach in common fund cases encourages significant elements of inefficiency," whereas "if a percentage-of-the-fund calculation controls, inefficiently expended hours only serve to reduce the per hour compensation of the attorney expending them").

Conversely, the lodestar method is time consuming and requires lawyers to submit voluminous records that courts must then review and scrutinize in detail. Furthermore, a lodestar fee incentivizes class counsel to increase the number of hours they spend on a case to maximize their fees, regardless of whether that time actually advances the case or class members' interests. *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 821 (3d Cir. 1995) ("[T]he lodestar method has been criticized as giving class counsel the incentive to delay settlement in order to run up fees while still failing to align the interests of the class"). Indeed, the lodestar method is used in only a small percentage of class-action cases, usually those involving fee-shifting statutes or where the settlement provides injunctive relief that cannot be reliably calculated. *See, e.g.*, Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. Law Review 937, 945 (2017) (finding the lodestar method used only 6.29% of the time from 2009-2013, down from 13.6% from 1993-2002 and 9.6% from 2003-2008); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 832 (2010) (finding the lodestar method used in only 12% of settlements).

While the Fourth Circuit has not explicitly required its use in class actions, the percentage method is overwhelmingly preferred by the district courts in this circuit. *Galloway v. Williams*, No. 3:19-cv-470, 2020 WL 7482191, at *5 (E.D. Va. Dec. 18, 2020) (noting in a comparable tribal-

lending case, "Nevertheless, over time, certain customs have developed, both in the Fourth Circuit and across the country; for example, the favored method for calculating attorneys' fees in common fund cases is the percentage of the fund method."); *Thomas v. FTS USA, LLC*, No. 3:13-cv-825 (REP), 2017 WL 1148283, at *3 (E.D. Va. Jan. 9, 2017), *report and recommendation adopted,* No. 3:13-cv-825, 2017 WL 1147460 (E.D. Va. Mar. 27, 2017) ("District Courts within this Circuit have also favored the percentage of the fund method."(citations omitted)); *see also Kelly v. Johns Hopkins Univ.*, No. 1:16-cv-2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020); *Seaman v. Duke Univ.*, No. 1:15-cv-462, 2019 WL 4674758, at *2 (M.D.N.C. Sept. 25, 2019); *Cox v. Branch Banking & Tr. Co.*, No. 5:16-cv-10501, 2019 WL 164814, at *5 (S.D.W. Va. Jan. 10, 2019) (collecting cases and stating "In sum, there is a clear consensus among the federal and state courts, consistent with Supreme Court precedent, that the award of attorneys' fees in common fund cases should be based on a percentage of the recovery. This consensus derives from the recognition that the percentage of fund approach is the better-reasoned and more equitable method of determining attorneys' fees in such cases."); *Krakauer v. Dish Network, L.L.C.*, No. 14-333, 2018 WL 6305785, at *2 (M.D.N.C. Dec. 3, 2018); *Phillips v. Triad Guar. Inc.*, No. 1:09-cv-71, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016); *Archbold v. Wells Fargo Bank, N.A.*, No. 13-cv-24599, 2015 WL 4276295, at *5 (S.D. W. Va. July 14, 2015) ("[T]he Court concludes that there is a clear consensus . . . that the award of attorneys' fees in common fund cases should be based on a percentage of the recovery.").

The Fourth Circuit has not established a benchmark for fee awards in common-fund cases. Class Counsel is requesting one third of the settlement amount. This is well within the 25-to-40-percent range that courts within the Fourth Circuit have held appropriate—especially when

considering the $1.4 billion dollars of debt relief.[9] It is also within the appropriate range found by

the recent comprehensive study of attorneys' fees in class action cases. Theodore Eisenberg &

Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical

Legal Studies 27, 31, 33 (2004) (noting "a remarkable uniformity in awards between roughly 30%

to 33% of the settlement amount."). Indeed, several courts considering tribal lending settlements

have approved fees constituting one-third of the cash value of the settlement fund. *See Hengle*,

Dkt. 230 ¶ 20 (approving $13 million in fees, representing one third of the settlement's $39 million

cash value); *Gibbs*, No. 3:17-cv-495, Dkt. 141 ¶ 24 (awarding $5,248,227.93 in fees, representing

one-third of fund value); *Gibbs*, No. 3:19-cv-789, Dkt. 95 ¶ 19 (awarding $11,677,165.50,

representing one-third of fund value); *Gibbs*, No. 3:20-cv-717, Dkt. 68 at 9–11 (same); *Turner*,

No. 3:19-cv-293, Dkt. 114 (same); *Gibbs*, No. 3:18-cv-676, Dkt. 346 ¶ 20  (same); *Blackburn*,

Case No. 3:22-cv-146, Dkt. 228 (E.D. Va.) (same).

2. **An award of one-third of the common fund is reasonable, especially when considering the total value of the settlement's debt cancellation.**

Unlike other circuits, the Fourth Circuit has not established a benchmark for fee awards in

common-fund cases.  However, district courts in this Circuit typically consider the following

factors: (1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys

involved; (3) the risk of nonpayment and the duration and complexity of the case; (4) objections

---

[9] Indeed, "empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in the class actions average around one-third of the recovery." 4 Newberg *on Class Actions* § 14:6 (4th ed.); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (review of 289 class action settlements shows "average attorney's fees percentage [of] 31.31%" with a median value that "turns out to be one-third."). In an analysis of such historic patterns, Silber and Goodrich explained that empirical evidence does not necessarily establish what a court should do in any given case, but it does provide guidance to the court in determining whether a fee is reasonable. Reagan W. Silber & Frank E. Goodrick, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 Rev. Litig. 525, 545–46 (1998).

by members of the class to the settlement terms or fees requested by counsel; (5) awards in similar cases; and (6) public policy. *Fangman v. Genuine Title, LLC,* No. CV RDB-14-0081, 2017 WL 86010, at \*3-4 (D. Md. Jan. 10, 2017). Here, each of these factors supports the requested fee of one third of the common fund.

### i. *The Settlement achieves landmark relief for Class Members.*

In the Fourth Circuit, "the most critical factor in calculating a reasonable fee award is the degree of success obtained." *McDonnell v. Miller Oil Co.*, 134 F.3d 638, 641 (4th Cir. 1998) (citation and internal quotation omitted). Here, there is no question that the Settlement achieves significant results for the Class. As explained above, the proposed settlement is the **largest** ever obtained against participants in the tribal lending industry, and it surpasses multiple settlements approved by courts in similar tribal lending cases. *See Turner*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs I*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs II*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million); *Hengle,* No. 3:19-cv-250, Final Approval Order at Dkt. 230 (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million).

Standing alone, the amount of debt cancellation is substantial. If approved, the settlement will wipe out more than $1.4 billion of loans. And in reality, the debt cancellation has a far greater

total value when considering that the loans carried triple-digit interest rates. If the loans remained unpaid for just another six months, the $1.4 billion outstanding balance could *quickly skyrocket* to billions of dollars from the compounding interest, alone. This is why it was also critical that the Tribal Officials agreed to cease collecting any of the class members' loans upon the entry of the Preliminary Approval Order. *Id.* § 3.4(a)(ii).

The Settlement also creates a common fund, which will result in substantial payments to borrowers based on the amounts they paid on their usurious loans and the applicable state law. For example, 61 borrowers will receive a payment between $1,000 and $3,597; 4,991 borrowers will receive a payment between $250 and $1,000; 36,365 borrowers will receive a payment between $100 and $250; and 696,196 borrowers will receive payments between $2.00 and $100.00. Ex. 2 at ¶ 12. These amounts track the payments to representative class members in similar tribal lending cases, including *Hengle. See, e.g.*, *Hengle*, Dkt. 222-2 ¶ 20 (noting that settlement would provide payments between $0 and $928.0 based on payments and applicable statutes); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Dkt. 135 at 23 n.10 (E.D. Va.) (noting that settlement would provide payments between $3.80 and $382.73 based on same factors); *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Dkt. 101 at 19 (E.D. Va.) (payments between $0 and $295.98 based on same factors). These amounts were also obtained in light of potentially viable defenses, as well as the inability to obtain a monetary judgment against the tribal lending entities because of their sovereign immunity. *See, e.g., Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 174 (4th Cir. 2019) (dismissing case against tribal lending entities because they were arms of the tribe).

To remove any doubt, Dale Pittman, a consumer lawyer who has been practicing for more than 47 years, has reviewed the Settlement and opines that the settlement is an extraordinary result for consumers. Ex. 4, Pittman Decl. ¶¶ 21, 22, & 30. He has also opined about the reasonableness

of the requested fees. *Id*. at ¶¶ 21, 22, & 30. And critically, the proposed settlement does not release viable claims against other alleged co-conspirators, who will be sued in a new case that will seek to recover even more relief for the class. Ex. 1 at § 4.2.

### ii. *Class Counsel are highly experienced in tribal lending cases.*

The quality and skill of Class Counsel in this case also supports an award of one-third of the common fund in this case. As outlined above, courts, including this Court, have repeatedly found Class Counsel to be among the most experienced lawyers in tribal lending cases and consumer class actions. *See, e.g.*, *Galloway*, 2020 WL 7482191, at *8 (finding that "Class Counsel and their firms have extensive backgrounds in complex and class action litigation and consumer protection litigation" and further noting that counsel "have significant experience in litigating class action lawsuits against tribal lenders" (*citing, e.g.*, *Hayes v. Delbert Servs. Corp.*, No. 3:14-cv-258, Dkt. 193 ¶¶ 4, 14 (E.D. Va. Jan. 20, 2017)); *Turner*, No. 3:19-cv-293 (E.D. Va.) ("[W]e have Ms. Kelly… here, who are well known to me as being experts in this field, but it looks like the other class counsel is like the all-star team of consumer litigation."); *Stinson*, 2021 WL 4812451, at *16 (finding that Class Counsel were adequate and noting that they had been involved for four years and "already obtained substantial relief for borrowers by securing two courts' approval of a class action settlement").

Indeed, Class Counsel have been lead counsel in almost every major tribal lending case in the country (especially those in the Fourth Circuit and Virginia), such as the Fourth Circuit's landmark decision in *Hengle*, which held that "substantive state law applies to off-reservation conduct, and although the Tribe itself cannot be sued for its commercial activities, its members and officers can be." *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021) (citation omitted). Class Counsel's win in *Hengle* further established that "though the tribe itself retains sovereign

immunity, it cannot shroud its officials with immunity in federal court when those officials violate applicable state law." *Id.* Consistent with this, *Hengle* further confirmed that the conduct at issue here—making and collecting an internet loan—constitutes off-reservation conduct subject to generally applicable state laws, such as Virginia's usury statute. 19 F.4th at 348-349.

Similarly, Class Counsel are the lead counsel in the *Williams* litigation. In that case, Counsel successfully certified a class against a participant in a tribal lending scheme. *Williams v. Big Picture Loans, LLC*, 339 F.R.D. at 52. The defendant then requested permission to appeal the class certification opinion, which was granted. *See Williams v. Martorello*, 59 F.4th 68, 76 (4th Cir. 2023). On January 24, 2023, the Fourth Circuit affirmed the class certification decision. *Williams*, 59 F.4th at 87. Following six years of litigation (including almost 2,000 docket entries) and after cross-motions for summary judgment, Class Counsel also obtained a final judgment against the defendant in September 2023 in the amount of $43,401,817.17. *See Williams*, Sept. 22, 2023 Final Judgment Order.

Class Counsel utilized their skill in experience in tribal lending cases to obtain key wins in this case against Defendants, as well as to leverage this landmark settlement.

### iii. The risk of non-payment and complexity of this case favor the requested percentage.

Courts have repeatedly observed that tribal lending cases are complex. *Brice v. Haynes Invs., LLC.*, No. 18-cv-01200, 2021 WL 1916466, at *6 (N.D. Cal. Apr. 23, 2021) (explaining that a class representative's knowledge "in the admittedly complex tribal lending schemes" was not a bar to adequacy); *Gibbs v. Stinson*, No. 3:18-cv-676, 2021 WL 4812451, at *20 (E.D. Va. Oct. 14, 2021) ("Certainly, the Court understands the complexity of this case as it has pended for three years and presented issues warranting a lengthy Memorandum Opinion by this Court and a decision by the Fourth Circuit."); *see also Brice*, 2021 WL 2936733, at *4 (similarly noting on a

different occasion that the case involves "complex financial arrangements"); *Galloway v. Williams*, No. 3:19-cv-470, 2020 WL 7482191, at *1, n.1 (E.D. Va. Dec. 18, 2020) ("These lending entities had a complex corporate structure that evolved over time.").

Recent cases and trials further demonstrate the complexity of this matter. For example, the government recently brought a case against two individuals, who were ultimately convicted "of conspiring to collect unlawful debts in violation of [RICO]." *United States v. Neff*, 787 F. App'x 81, 85 (3d Cir. 2019). The defendants' "RICO convictions" were "based on their efforts to skirt state usury laws by partnering with American Indian tribes to offer usurious payday loans." *Id*. This trial lasted more than 30 days, *see USA v. Hallinan*, Case No. 2:16-cr-00130-ER-1, Dkt. 310 (E.D. Pa.), and focused on many of the same issues in this case, *i.e.*, a conspiracy to violate usury laws through the rent-a-tribe business model. Similarly, the trial against Scott Tucker, another rent-a-tribe pioneer, lasted five weeks and involved many of the same issues in this case.[10]

Class Counsel's *Williams* litigation also illustrates both the complexity and risk of non-payment. *See generally Williams*, Case No. 3:17-cv-461 (E.D. Va.). Over the past seven years, that case has generated more than 1,600 docket entries and three appeals to the Fourth Circuit. In addition, after the plaintiffs obtained a $43 million dollar judgment against the defendant, he filed for bankruptcy—the same tactic deployed by another participant in the tribal lending industry after litigation commenced against it. *See In Re Matthew Brandon Martorello*, Case No. 24-90017-

---

[10] *See USA v. Tucker*, Case No. 1:16-cr-00091-PKC-1 (S.D. N.Y.) (Dkt. 310); *see also* Press Release, Dep't of Justice, U.S. Att'y's Office, S.D. of N.Y., *Scott Tucker Sentenced to More Than 16 Years in Prison for Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 18, 2018) ("[A]s part of their multi-year effort to evade law enforcement, the defendants formed sham relationships with Native American tribes and laundered the billions of dollars they took from their customers through nominally tribal bank accounts to hide Tucker's ownership and control of the business."), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

mxm-11 (N.D. Tex. 2024); *In re Think Finance, LLC*, 17-33964-hdh11 (N.D. Tex.). Also, cases involving tribal lending have a high risk of non-payment because the sovereign immunity of the tribe is shared with arms of the tribe, thereby leaving consumers with limited options against the tribal officials and any non-tribal partners.

Class Counsel's success came with a significant risk because they litigated this case—for four years—on a contingency basis, fronting all the resources and costs. *See, e.g.*, *Hash*, 2021 WL 12269064, at *4 (finding an award of 33% was reasonable, in part, because "the risk of non-payment at the outset of the case was high because Class Counsel took the case on a 100% contingent fee basis and advanced litigation expenses"). The complexity, coupled with the risk of non-payment as evidenced by other cases, supports the requested fee award.

### iv. There have been no objections to the requested fees.

As detailed above, ALCS sent Class Notice to all the Settlement Class Members. Of the 1,487,971 class members, notice has been presumed delivered to 99.22%. Ex. 2, ALCS Decl. at ¶ 7. It is now several weeks after the objection deadline and neither Class Counsel nor ALCS have received any objection to the proposed settlement or the proposed service awards and attorneys' fees, which were listed in the class notice. Defendants also worked with ALCS to timely serve the required Class Action Fairness Act notices to 57 federal and state officials, including the attorneys general of each U.S. state and territory and the District of Columbia. None have filed an objection to the Settlement, including the requested fees.

As the Fourth Circuit has explained, an "almost complete lack of objection to the fee request provides additional support for the district court's decision to approve it." *Berry*, 807 F.3d at 619 (noting that only two of 300,000 class members objecting to fee request is a "rare phenomenon" and evidence that the district court did not abuse its discretion in awarding fees).

Here, the lack of *any* objection—from more than 1.4 million people—demonstrates the reasonableness of the service awards and attorneys' fees.

> ### v. The award of one-third of the common fund is on-par with other tribal lending cases.

Class Counsel's request for one third of the monetary value of the Settlement also tracks with other tribal lending cases. Indeed, in other tribal lending cases, courts have repeatedly approved fees constituting one-third of the cash value of the settlement fund. *See Hengle*, Dkt. 230 ¶ 20 (approving $13 million in fees, representing one third of the settlement's $39 million cash value); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Dkt. 141 ¶ 24 (E.D. Va. Dec. 13, 2019) (awarding $5,248,227.93 in fees, representing one-third of fund value); *Gibbs v. TCV V, L.P.*, No. 3:19-cv-789, Dkt. 95 ¶ 19 (E.D. Va. Mar. 29, 2021) (awarding $11,677,165.50, representing one-third of fund value); *Gibbs v. Rees*, No. 3:20-cv-717, Dkt. 68 at 9–11 (E.D. Va. Mar. 26, 2021) (same); *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Dkt. 114 (E.D. Va. July 9, 2020) (same); *Gibbs v. Stinson*, No. 3:18-cv-676, Dkt. 346 ¶ 20 (E.D. Va. Aug. 16, 2022) (same).

The same percentage is appropriate here. Even standing alone, Class Counsel's request for one-third of the monetary value of the Settlement is well within the 25-to-40-percent range that courts within the Fourth Circuit have found appropriate.[11] But when considered together with the $1.4 billion in debt cancellation, the percentage would amount to less than 0.0088% of the total

---

[11] Indeed, "empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in the class actions average around one-third of the recovery." 4 Newberg *on Class Actions* § 14:6 (4th ed.); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (review of 289 class action settlements shows "average attorney's fees percentage [of] 31.31%" with a median value that "turns out to be one-third."). In an analysis of such historic patterns, Silber and Goodrich explained that empirical evidence does not necessarily establish what a court should do in any given case, but it does provide guidance to the court in determining whether a fee is reasonable. Reagan W. Silber & Frank E. Goodrick, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 Rev. Litig. 525, 545–46 (1998).

value of the settlement. This is before considering the additional value of Defendants' agreement, including the deletion of credit reporting and agreement not to sell consumer's information (so they cannot be solicited by other lenders). *See* Ex. 1 at § 3.4(a)(ii), (iv). This will ensure that borrowers will not be subject to any ongoing adverse consequences.

Compared to the overall relief obtained for the Class in this case, therefore, the fees request is patently reasonable, and it is also below the appropriate range found by a comprehensive study of attorneys' fees in class action cases. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Studies 27, 31, 33 (2004) (noting "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount").

> ### vi. *The total value of the settlement further demonstrates that the requested percentage is reasonable.*

It is well established that a court "must also consider the overall benefit to the class, including non-monetary benefits, when evaluating the fee request." *Bell v. Pension Comm. of ATH Holding Co., LLC*, 2019 WL 4193376, at *2 (citing *Spano v. Boeing Co*, 2016 WL 3791123, at *1 (S.D. Ill. Mar. 31, 2016)). In other words, when using the percent-of-the-fund approach, the awarded percentage should be "*based on both the monetary and non-monetary value of the settlement.*" *Martin v. Caterpillar Inc.*, 2010 WL 11614985, at *3 (C.D. Ill. Sept. 10, 2010) (emphasis original). In litigation involving unlawful fees, such as improper overdraft fees, "forgiveness of debts owed is routinely included in the value of the settlement." *Hash*, 2021 WL 12269064 at *3 (citing *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, No. 6:15MN02613 (D.S.C. Jan. 9, 2020), Dkt. 233 (for fee calculation, including in total value of $70 million settlement $43 million in cash and $27 million in debt forgiveness); *In re: Checking Account Overdraft Litig. (Commerce Bank)*, No. 1:09-md-02036, 2013 WL 11319243, *11-12 (S.D. Fla.

Aug. 2, 2013) (for fee calculation, including in total value of $23.2 million settlement value $18.3 million in cash and a change in posting practice with value of $4.9 million); *In re: Checking Account Overdraft Litig. (JP Morgan Chase Bank)*, No. 09-md-02036-JLK (S.D. Fla. Dec. 19, 2012), Dkt. 3134 (for fee calculation, including in $162 million settlement value $110 million in cash and change in overdraft fee policy with an estimated value of $52 million over a two-year period)); *see also Gradie v. C.R. England, Inc.*, No. 2:16-cv-00768, 2020 WL 6827783, at *12 (D. Utah Nov. 20, 2020) ("The Court finds it appropriate to include the debt relief portion of the Settlement in the gross value because the debt relief provides real and tangible benefit to Participating Class Members, and courts routinely include debt relief as part of the total settlement fund, as the cases cited by Plaintiffs demonstrate.").[12]

Here, the total value of the settlement exceeds $1.4 billion dollars. The requested attorneys' fees amount, therefore, represents only approximately 0.0088% of the total value of the settlement. Far less than 1% of the value is patently reasonable.

### vii. *Public policy favors the requested percentage.*

Finally, public policy favors an award of one-third of the Settlement's monetary value. When assessing the reasonableness of a class-action fee award, the "court must strike the appropriate balance between promoting the important public policy that attorneys continue litigating class action cases that 'vindicate rights that might otherwise go unprotected,' and

---

[12] *See also Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 147 (E.D. Pa. 2000) (finding it reasonable to include debt forgiveness in the "total settlement value" in a student loan case); *Sorace v. Wells Fargo Bank*, No. 20-cv-4318, 2024 WL 643229, at *10 (E.D. Pa. Feb. 15, 2024) ("Courts frequently include debt forgiveness in the value of settlements."); *Cosgrove v. Citizens Auto. Fin., Inc.*, No. 09-cv-1095, 2011 WL 3740809, at *7 (E.D. Pa. Aug. 25, 2011) ("The Court finds that debt forgiveness provides a valuable award to class members."); *Smith v. CRST Van Expedited, Inc.*, No. 10-cv-1116, 2013 WL 163293 (S.D. Cal. Jan. 14, 2013) (including $9 million in debt relief in measuring the total value of settlement for purposes of calculating class counsel's fee award under the percentage-of-recovery method).

perpetuating the public perception that 'class action plaintiffs' lawyers are overcompensated for the work that they do.'" *Fangman*, 2017 WL 86010, at *6 (quoting *Singleton*, 976 F. Supp. 2d at 687). This case provides a quintessential example of the public policy justifications behind class actions, as it obtains relief from participants in a lending scheme that would otherwise go undiscovered and against whom it would be difficult for any individual consumer to obtain relief without significant resources. Moreover, there should be no concerns that Class Counsel are seeking overpayment considering the overall value of the settlement.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court grant this Motion for Final Approval of the Class Action Settlement, as well as their request for reasonable service awards and attorneys' fees.

Respectfully submitted,

**PLAINTIFFS**

 */s/ Kristi C. Kelly*
Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Matthew G. Rosendahl, VSB #93738
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7570
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: matt@kellyguzzo.com
*Class Counsel*